# Exhibit 2



# TO PROTECT AND SERVE?

## A STATUS REPORT ON THE RELATIONSHIP BETWEEN THE COMMUNITY AND THE ALBANY POLICE DEPARTMENT

# THE CENTER FOR LAW AND JUSTICE, INC.
## JUNE 1998

PINE WEST PLAZA BUILDING 2 ❖ WASHINGTON AVENUE EXTENSION ❖ ALBANY, NEW YORK 12205 ❖ (518) 427-8361

Copyright © 1998, The Center for Law and Justice, Inc.
Reproduction in full or in part of text or charts in any printed, electronic media, or computer format, only by
prior permission of The Center for Law and Justice, Inc.

Additional copies of this report are available for $3.00 each. For further information, contact:
The Center for Law and Justice, Inc.
Pine West Plaza Building 2
Washington Avenue Extension
Albany, New York 12205
(518) 427-8361

# TABLE OF CONTENTS

Executive Summary.................................................................................................................................................1

Introduction............................................................................................................................................................3

The Historical Background of the Relationship Between Albany's Police Department and the Community................4

Citizen Complaints Made to The Center..............................................................................................................10

Police Department Response to Citizen Complaints..............................................................................................11

The Community-Police Relations Board...............................................................................................................13

Community Survey of Residents' Attitudes Toward Albany Police.......................................................................15

Center Meeting with the Mayor and the Police Chief...........................................................................................19

Conclusions..........................................................................................................................................................20

Recommendations.................................................................................................................................................21

Appendix...............................................................................................................................................................25

Notes....................................................................................................................................................................30

PAGE 4/17 * RCVD AT 7/14/2011 9:45:59 AM [Central Daylight Time] * SVR:ALFAX01/17 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-37

## PREFACE AND ACKNOWLEDGEMENTS      ◇

The Center for Law and Justice has worked vigorously over the past 13 years to call attention to the adverse impact of the criminal justice system on poor communities and communities of color. At no time has there been greater concern over that impact than at present. Prisons are needlessly claiming our urban young people at an alarming rate due primarily to drug and mandatory sentencing laws. Annual total commitments to New York State prisons have more than doubled since The Center was founded. Almost 23,000 new prisoners are admitted each year. Currently there are over 69,000 men and women incarcerated in New York State correctional facilities. [1]

We also recognize the direct connection between New York's sentencing laws and policing, the most likely point of entry into the criminal justice system for these young people. That connection has caused us over the years to monitor over closely policing and the relationships that exist between communities and their police departments.

This report was written by Alice P. Green, Ph.D., Executive Director of The Center for Law and Justice, and was developed with the assistance of a number of people. Appreciation is extended to: Robin A. Busch, Program Director at The Center; Scott Christianson, Ph.D.; Tony Gaddy, outreach worker at The Center; Roger Harris, intern at The Center; Susan Hoffman, criminal justice graduate student; Annie Rody-Wright, Esq., Legal Director at The Center; Maryann Strauss, social work and criminal justice graduate student; and Bonita Veysey, Ph.D., Senior Research Associate at Policy Research Associates, Inc. The Center also wishes to thank Commander William T. Bowen, formerly of the Office of Professional Standards of the Albany Police Department, and Angela Dixon of the Community-Police Relations Board for providing information and sharing resources.

**EXECUTIVE SUMMARY**

This report on the relationship between the Albany Police Department and city residents, particularly African Americans, was prompted in part by increased charges of police harassment and two recent high-profile police abuse claims made by Jason and Adrian Moore and Jermaine Henderson.

Data was collected, examined, and analyzed using client files of The Center for Law and Justice, public records from the Community-Police Relations Board, and other written reports, research articles, newspapers, and books. Information was also recorded from community meetings and a meeting with Mayor Gerald Jennings and Police Chief Kevin Tuffey. In January 1998, The Center, with assistance from Bonita Veysey, Ph.D., Senior Research Associate with Policy Research Associates, Inc. (PRA), conducted a survey to assess residents' opinions of the Albany Police.

One hundred four residents responded to the survey conducted in the Arbor Hill, South End, North Albany, Pine Hills, West Hill, and Center Square neighborhoods. Because the questionnaire included questions related to racial bias, a stratified design was used to obtain a sample in which 50% would be people of color. Therefore, this study does not make claims of scientific validity or reliability and generalizations cannot be drawn from its findings. Yet, the findings can shed some light on citizen attitudes towards police.

## Survey Findings

Some important survey findings included the following:

1) Although there was an even distribution of positive and negative opinions about the police, in general, African Americans and Latinos had less favorable opinions of the police than did whites.

2) People of color were more critical of the police regarding the use of excessive force.

3) Only 26 percent of respondents said that racial bias does not exist in the Albany Police Department.

4) Overall, 29 percent of respondents said they knew how to file a complaint against the police.

5) Only 33 percent of all respondents surveyed were aware of the Community-Police Relations Board.

6) Both Blacks and whites (97 percent and 96 percent, respectively) highly value specialized officer training regarding ethnic and cultural issues.

7) Eighty-nine percent (89 percent) of respondents thought that community oversight, i.e., independent citizen involvement in investigations of police misconduct, would improve relations.

♡

## Other Findings

Data from sources other than the survey support the following:

1) Police misconduct and brutality continue to be seen by African Americans as serious problems, primarily affecting them and the poor.

2) Police misconduct and abuse can result in significant physical and/or psychological harm to those who are mistreated. Yet, Albany fails to acknowledge or competently address this harm to its citizens.

3) Mistrust of the police continues to exist particularly among people of color who are more likely to believe that race influences the way they are treated by police.

4) There is expressed concern that too much secrecy surrounds the operations of the Police Department, particularly the manner in which citizen complaints are investigated and reported.

5) The Community-Police Relations Board is not carrying out its mandated functions.

## Recommendations

This report makes five recommendations that should be seriously considered in efforts to promote a healthier relationship between the citizens of Albany and the Police Department. These recommendations are that:

1) The city of Albany should adopt some form of citizen oversight of its police department, preferably that which holds management responsible for police abuse of authority.

2) The city should clearly and effectively explain to the public the rationale for the current level of secrecy surrounding the operation of investigations of citizen complaints against police. If investigations are not guided by a set of minimum standards, they should be adopted.

3) The city must begin seriously and effectively to address the issues of race and ethnicity that have plagued the Department over the years.

4) The Community-Police Relations Board, founded to improve the relationship between the police and the community, should be eliminated or restructured to function independently of the mayor's office.

5) There must be official recognition of the harm done to the victims of police misconduct and their families. Efforts need to be made to identify, develop, and publicly support competent services that can address the physical, psychological, and economic harms that result from police misconduct and abuse.

PAGE 7/17 * RCVD AT 7/14/2011 9:45:59 AM [Central Daylight Time] * SVR:ALFAX01/17 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-37

## INTRODUCTION

In the summer of 1984, Jesse Davis, a young Black man, was shot and killed by police in his Arbor Hill apartment. His killing served to galvanize the African American community in Albany to seek change in the way the Police Department treated Blacks. In many ways, the community has remained vigilant and sensitive to the treatment meted out to Blacks by the Police Department. After all, the Davis case has haunted the community for a long period of time. In June 1994, the city of Albany agreed to pay the slain man's family $500,000. Mayor Jennings offered the following apology: "I am extending my official regrets and condolence to Louise Thornton and other members of Davis' family for this tragic incident. Although this event occurred more than 10 years ago, as the current Mayor, I am agreeing to the settlement to end the family's suffering." [2]

As this report will indicate, during the intervening 10 years, the Davis affair served as both a barometer that measured African American discontent over police-community relations, and as a catalyst that spurred community action and new developments in that relationship.

One outgrowth of the community's outrage over the killing was the birth of The Center for Law and Justice in 1985. The Center helped to keep the case before the public over the 10-year period, gave moral support to the Davis family, assisted attorneys with a federal lawsuit against the city, and organized community demonstrations and fundraising events to cover legal expenses related to the family's suit. Although The Center's overall mission has been to promote the empowerment of people to change the oppressive nature of the total criminal justice system, the organization has focused much of its work on policing issues. There is recognition of the powerful influence policing has on the entire system: it functions as the most significant means of entry into the criminal justice system. Also, it has been found that the primary source of racial disproportionateness in the justice system is the differential created at the time of arrest. Blacks are disproportionately arrested and prosecuted for the crimes that typically result in prison sentences.

Deeply concerned over the disproportionate criminalization and imprisonment of African Americans -- close to eight times that of whites [3] -- the Center embarked on a five-month examination of the existing relationship between Albany residents and their police department. There was particular interest in uncovering any special or unique issues faced by communities of color. To accomplish its goal, Center staff and volunteers engaged in a number of data-gathering activities that included:

1) A review of 53 Center client files in which police contacts and claims of police mistreatment or abuse were reported;

2) A survey of community opinions about police, completed in January 1998;

3) A review and analysis of the Community-Police Relations Board's official minutes and reports;

PAGE 8/17 * RCVD AT 7/14/2011 9:45:59 AM [Central Daylight Time] * SVR:ALFAX01/17 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-37

4) An examination of available public information on the citizen complaint review process of the Albany Police Department's Office of Professional Standards;

5) Participation in a meeting with Mayor Jennings and Police Chief Tuffey;

6) A review of written reports, research articles, newspapers, studies, books, etc.;

7) Collection of information and testimony offered by community residents at informational and instructional meetings sponsored by The Center.

This report examines data gathered from the above research activities and makes several recommendations that will hopefully give useful information and direction to those seeking to improve the relationship between the Albany Police Department and the public. But first, the report recounts a number of historical events thought to be significant in shaping the relationship between the Albany Police Department and the public it is mandated to serve.

## THE HISTORICAL BACKGROUND OF THE RELATIONSHIP BETWEEN ALBANY'S POLICE DEPARTMENT AND THE COMMUNITY

When asked to reflect on Albany's past and the relationship between Black citizens and the police, some long-time residents characterized the 1940s and '50s as a "troubled time." One such resident reported that, "Blacks knew their place and the police made sure you did. Police beatings were routine and expected. No one complained about the situation; it was just the way it was." [4]

It was not until the early '60s and the Civil Rights Movement that serious citizen protests against police treatment of Blacks emerged. Most notable was a small group of white liberals and Blacks who organized to protest police misuse of force. Their protests, usually voiced during community meetings, appeared to raise the general level of community consciousness regarding the problem.

But, it was The Brothers, a group of Black male civil rights activists, who organized the Black community during the late '60s to protest police brutality and social, economic, and political conditions. Organized demonstrations and marches were carried out in a number of locations. These actions were seen as confrontational and threatening by the Mayor Edwin Corning administration. Mayor Corning responded with what has been called "political bullying" of The Brothers' members. Many were harassed by police on the street and arrested.

According to Corning biographer Paul Grondahl, the Mayor conducted a "J. Edgar Hooveresque surveillance" of Black activists, particularly The Brothers. He elaborates, "Corning directed his own police department and State Police investigators to prepare for him a kind of spy file on each member of The Brothers." [5]

In his biography of Mayor Corning, Grondahl quotes a former member of The Brothers, Leon Van Dyke:

> 'The cops used to sit across the street from our office, taking pictures of who came and went, keeping an eye on us and they also tapped our phones...The police harassed us constantly, threw us in jail on phony charges, kept us locked up on high bail and tried to break us up. Besides that, there was a real problem with police brutality against Blacks in general. If you wandered out of the ghetto up beyond Bleecker Stadium, you could get your head taken off.' [6]

The Brothers' agenda included organizing the community to demand changes in policies adversely affecting Black communities, especially police brutality. As a result, the tensions between residents of Arbor Hill and the South End, and the police increased considerably.

Conservative scholar James Q. Wilson documented Albany's style of policing when he included Albany's police department in his national study of seven police departments in the early '70s. He characterized the Albany Police Department at that



time as having a "watchman style" police force, which championed maintaining order as the rule of the day. Discourtesy by citizens was not tolerated. It was perceived as a challenge to police authority, and was often met with force, including verbal abuse and physical intimidation by the officer who felt threatened. When handling disorderly situations, a citizen was judged by "what they deserved," as determined by the officer in the moment. This resulted in uneven treatment, particularly in sections of the city that were populated by persons of color. Wilson also concluded that the "watchman style" of the Albany Police Department was characterized by corruption, brutality, and racism. [7]

Deeply concerned over the strained relations between the Black community and the police, The Brothers met with the Police Chief in 1967. Together they set up a monthly advisory committee to review police practices in the Black community. However, little change resulted from the group's forceful protests or attempts at diplomacy. Tensions remained high between the Black community and the Police Department, which included only a few Black officers among its ranks.

However, new efforts aimed at improving the relationship came with federal funding made available to the city under the Law Enforcement Assistance Administration (LEAA). The LEAA was formed after Martin Luther King, Jr.'s assassination and the urban riots that followed, to assist police departments in acquiring the latest in technology and enforcement methods. With the funding, the Police Department tried a new form of policing to address perceived citizen mistrust. A decentralized storefront neighborhood police unit was set up in both Arbor Hill and the South End in 1971. Officers selected for the special units received community sensitivity training and attempted to cultivate more of a "partnership" relationship with community residents. For more than 10 years, an uneasy truce existed between police and the Black community.

Without consulting community members, the neighborhood units were abruptly closed by Mayor Thomas Whalen, who succeeded Mayor Corning. Already greatly angered over the police killing of one of its members, the community expressed open outrage over the new mayor's action.

On July 8, 1984, Jesse Davis, a 35-year-old mentally handicapped African American man, was killed by police officers responding to a call of "a man gone berserk." Although there was no ostensible crime being committed by Davis, who was alone in his Clinton Avenue apartment, police broke down his door. They later claimed that Davis threatened them with a knife and fork. After several protests and marches, community leaders demanded a grand jury investigation. But, the officers involved were not indicted and the killing was deemed justifiable. Photographs taken by a police officer at the scene would surface 10 years later, showing Davis clutching a toy truck and set of keys instead of the reported knife and fork.

Davis' sister, Louise Thornton, filed a federal lawsuit charging the city with violating her brother's civil rights. After 10 years of heated debate, controversy, and increasingly strained relations between the police and the African American community, Thornton settled her claim out of court when the city offered her $500,000 and a formal apology from Mayor Jennings.

Soon after Davis' death, the Department put into effect new procedures for responding to calls involving those with mental handicaps and emotional problems. A mobile crisis unit was established to allow mental health experts to be available on the scene to advise police on the handling of disturbed people.

Then, in 1985, Mayor Whalen ordered an in-depth assessment and evaluation of the management, structure, and operations of the Albany Police Department. After much delay, *The Management Study of the Albany Police Department* was released in February 1987. [8] Among other things, the study cited a need to develop a comprehensive training and staff development program and to recruit and retain college-educated police officers. The study also recognized the problem of police stress and recommended the establishment of an employee assistance program.

Although it commended the Mayor for commissioning the study, the local chapter of the National Association for the Advancement of Colored People (NAACP) criticized the report as:

> [I]ncomplete, misleading, and dishonest...No mention is made of the context surrounding the establishment of the Study Committee or community concerns over existing police-community relations. Major issues such as affirmative action, racism, brutality, or police brutality are completely ignored. [9]

In 1989, Mayor Whalen surprised many by appointing veteran Albany Police Lieutenant John Dale as the Department's first African American police chief. In 1973, Dale had been called before the State Investigation Committee to answer questions about suspected police corruption, but he was not indicted. [10]

PAGE 11/17 * RCVD AT 7/14/2011 9:45:59 AM [Central Daylight Time] * SVR:ALFAX01/17 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06:37

Working together closely, Chief Dale and Mayor Whalen increased the number of people of color and women on the force. Black representation on the force went from 1.2 percent to approximately six percent within a six-year period. At the beginning of 1997, the Albany Police Department had 309 "sworn manpower" members, 25 of whom were Black, and two of whom were Latino. [11]

Following the Davis shooting, some community activists called for the establishment of an independent citizen review board, but that call fell on deaf ears. Instead, in late 1984, Mayor Whalen established the Albany Community-Police Relations Board. Working with representatives from groups such as the Urban League, the NAACP, the Alliance for the Mentally Ill, and the Capital District Gay and Lesbian Community Center, agreement was reached to establish the 15-member volunteer board that would function to receive citizen complaints against police and work to improve community-police relations. After a stormy history, a Board still exists, but its effectiveness continues to be seriously questioned.

These changes failed to significantly improve what some saw as a deteriorating relationship between the police and communities of color. Due to the declared "War on Drugs" of the '80s and the alleged use of drug courier profiles by the police, there were increased charges of police harassment, mistreatment, and abuse of Black and Latino citizens. These charges were independently corroborated in 1989 when defense attorney Terence Kindlon hired a private investigator to secretly monitor police activity at the Albany

Greyhound bus station over a period of several weeks. In their released report, the investigators noted that, "not a single white person was stopped, or questioned, and not one Black or Latino had gotten through the bus station without being stopped." [12] In addition, a number of those stopped were strip searched as well.

Several well-publicized lawsuits during the late '80s and early '90s added to citizen mistrust of their police. Albany paid out close to a million dollars, either in out-of-court settlements or by court order, for violating the civil rights of plaintiffs such as Greg Baity, Daniel Amlaw, Ronald Grier, James White, and James Lunday.

Following a string of these lawsuits and the increasing availability of federal and state funding, in 1991, the Department looked to change its style of policing and embraced parts of what was a new concept in police-community relations -- so-called "community policing." The idea was that the Police Department would become more service-oriented. Under community policing, the police would assist community groups in preventing crimes and solving problems. The Albany Police Department set up three storefront community outreach centers which, together, acted as a base of operation for nine community police officers assigned beats in the South End, Arbor Hill, and West Hill, three communities considered high crime neighborhoods by the city. Volunteer community residents helped to staff these offices to receive complaints and give reported information to police.

TO PROTECT AND SERVE? - p. 7 -

In the fall of 1992, the Albany Civic Forum, a community group largely composed of business and professional leaders, convened the Public Safety Panel of the Albany Civic Forum and gave it the task "to look into the existing community policing demonstration in the city of Albany and make recommendations on expanding its application city-wide." In its report, the panel encouraged the city to further develop the community policing model. One of its recommendations was that, "The [Albany Police Department] must strive to increase the public visibility of police officers (both uniformed and non-uniformed) in the community and encourage their interaction with the community." [13]

In 1993, the Department established a Walk-and-Watch program, with local residents taking turns walking through the Pine Hills neighborhood with walkie-talkies, as an aid to the police. Later in the year, volunteer teams of patrol officers were placed on the same shifts in the Center Square/Hudson Park/Washington Park area to become more acquainted with the community. [14] More officers became involved in government-funded police-sponsored community programs such as the Albany Police Athletic League (PAL) and Drug Abuse Resistance Education (DARE) to teach students about drugs. Then, the Department instituted a citizens' police academy to teach citizens about the Department and its functions. But, these changes were not enough to satisfy many in the city.

## Citizen Oversight

Civil rights and civil libertarian groups organized to push for the city's adoption of a civilian review board. In 1994, Capital District Citizen Action, a local affiliate of a statewide political action group, called for the creation of an independent civilian review board. In so doing, the group noted that:

> Trust between citizens and the police is an essential part of having a safe city. Incidents of misconduct in the Albany Police Department have eroded public confidence in the police. An effective, independent Civilian Review Board that has the trust of diverse civilian communities will restore and enhance public trust in the police. In addition, an independent Civilian Review Board could work in cooperation with the Police Department to bring about a broader respect for the difficult work of police officers. [15]

In the same year, the Capital District chapter of the New York Civil Liberties Union (NYCLU) issued a report, *The City of Albany: The Need for All-Civilian Review of Police Misconduct to Ensure Accountability and Fair Law Enforcement.* [16] In the report, the NYCLU called for an all-civilian review of police misconduct to replace the existing internal investigations unit of the Albany Police Department.

Alderman Keith St. John, an African American representative on the Albany Common Council, independently introduced legislation to establish a citizen review board that would have subpoena powers and police representation. [17] His measure went down to defeat by two votes.

Since the defeat of the St. John proposal, several widely publicized police encounters with African Americans have contributed to increased community-police tensions and prompted new calls for a citizen review board. In one such case, three young African American men, 19-year-old Adrian Moore, his younger brother Jason, 16, and Radcliff Angus, 19, were arrested by police during a street disorder outside the Albany Domino Club on Washington Avenue in August 1997. The men maintained that they were not involved in the disorder and that police hurled racial slurs, beat them, and unleashed a police dog on them outside the club. The men were charged with 10 felony counts, including inciting a riot and assault, but later pleaded guilty to disorderly conduct, a violation. After community members initiated several protest marches, the Police Department began an internal investigation into the actions taken during the incident. The outcome of that investigation has not been released to the public. Similarly, the Community-Police Relations Board held a special meeting, but it has not issued a public report. Soon after the incident, the Moore brothers filed a legal notice of claim with the intention of suing the city.

In October 1997, another highly charged incident outraged the Black community once again and, as many believe, prompted an administrative shake-up in the Albany Police Department. The incident involved a young African American college basketball star, Jermaine Henderson. He was arrested after an alleged altercation with two off-duty police officers in an Albany bar. Taken into custody after being arrested by the officers, Henderson, while handcuffed, was allegedly beaten by the two white officers in the police station garage of Division 2. Acting swiftly, Deputy Police Chief Robert Grebert took the unprecedented steps of suspending the officers for 30 days without pay and filing assault charges against them. Then Mayor Jennings ordered the release of what some call damaging evidence that suggested a cover-up attempt by fellow officers. In addition, Mayor Jennings ordered that video cameras be placed in the police station garage and booking rooms.

Rank-and-file police officers and the Albany Police Officers Union were strongly critical of these high-level actions. Several officers suggested that some of their fellow officers were protesting the arrests of Officers William Bonanni and Sean McKenna by making fewer arrests. An estimated 100 officers marched in front of City Hall in open protest to the



official handling of the matter. In further support, rank-and-file members launched a fund-raising party to collect monies for their charged colleagues. The latter action drew the public ire of the NAACP and other Black groups. These groups raised concerns about the continuing strength and influence of the Albany Police Officers Union, a group that many contend has historically dominated and unduly influences policies governing the relationship between the Police Department and the general community, particularly the African American community.

TO PROTECT AND SERVE? - p. 9 -

Claiming that staff changes were necessary to improve community-police relations, Police Chief Tuffey recently forced Deputy Police Chief Grebert, who is credited with the forceful handling of the Henderson case, into retirement. Also replaced was the head of the Office of Professional Standards, Commander William T. Bowen. Plans are currently underway to open a new police substation in Arbor Hill where 30 officers will work. The unit is "designed to increase the Police Department's community presence" and improve the relationship between the community and the Police Department. [18]

## CITIZEN COMPLAINTS MADE TO THE CENTER

The Center's review of its client files provided additional information on some citizen contacts with police. Since this information comes primarily from Center clients seeking redress of grievances against the Police Department, much of it is understandably critical. Nonetheless, it can and does provide additional insight and serves to document a continuing problem between the police and some citizens.

Requests for assistance and complaints are made to The Center by phone, in person, or through written correspondence. A review of client files identified 53 complaints received against Albany police during 1996 and 1997. Attempts were made to contact all of these complainants by phone. Of those successfully contacted, 27 complained that brutality was the basis of their complaint. These 27 complainants were asked whether they had also filed a complaint with the Police Department, and if so, what was their level of satisfaction with the Department's handling of that complaint.

Fifteen of those contacted said that they did not have enough confidence in the Department to formally file their complaint. But 12 of those contacted indicated that they had indeed filed their complaint with the Albany Police Department. Most of them also reported that they experienced some difficulty in filing. One claimed that she was told that she would need a lawyer in order to file



a complaint; several accused the Department of failing to notify them that their complaint had been received, or failing to keep them informed of the ongoing investigation; and others expressed uncertainty about whether their witnesses had been contacted during the investigative process.

Of the 12 complaints that were filed with police, six remained unresolved at the time of The Center's contact; one was reported to have been satisfactorily handled informally by a police supervisor; and five were determined to be "unfounded." One of the complainants from the latter group declared, "It is a crime to be young, Black, and living in a poor neighborhood. If we're not allowed to be heard, then how can justice occur?" [19]

Our examination of Center data on police complaints also revealed claims of lingering physical and psychological harm suffered by those who had reported police mistreatment and abuse. Several people disclosed injuries to various parts of their bodies including limbs, head, back, and jaw. Some of their injuries reportedly included broken noses, eardrums, and hands. One client recounted how he was beaten on the skull with a flashlight. He suffered head lacerations and was treated at Albany Medical Center Hospital. Five months later, he still complains of headaches and has been diagnosed with Bell's Palsy on the right side of his face.

Others claiming police abuse presented symptoms of post-traumatic stress and anxiety. Some complained of difficulty concentrating and sleeping. Others spoke of engaging in avoidance behaviors such as shunning social contacts or specifically avoiding contact with police officers. One young man stated his fear of being left alone forcing him to sleep in a room next to his parents. Another man describes his fear that police will attack him again or even kill him. He brought to The Center the bloody shirt that he reportedly wore the night he was beaten by police to show others in the event he "ends up missing or with a bullet in the back." [20]

One of the starkest reports on police behavior received by The Center came in the form of a letter from a former Albany police officer. He claims that certain arrestees are more likely to be beaten by police under certain circumstances and conditions that include: being African American or Latino; being involved in an interracial relationship; driving "a nicer car than the [attending] officer"; if the arresting officer is injured by someone; and disrespecting an officer or causing him/her to appear "silly." The former officer also charged:

> Police brutality is rampant in the Albany Police Department and any cop who says they don't see it or never witnessed it is lying. I have seen officers, sergeants, and lieutenants take a handcuffed individual into the back room of Division 2 where the cells are and beat the crap out of the individual and then throw him into a cell without any medical attention. When they beat them real bad and they had to have medical attention, they would just call the ambulance and tell them no lights or sirens, which I believe was done to alleviate attention to the station. These beatings also occurred before the prisoners even got out of the paddy wagon. Officers would climb into the back of the wagon while it was docked in its near soundproof room and the beatings would begin there. Sometimes officers would be the lookout men so that if a civilian entered the front desk area he could alert the other officers to quiet the prisoner's screams of pain and cries for help. Everyone in the station knows what's going on...Police brutality has been going on forever in the Albany Police Department. It starts with the rookies right out of the academy... [21]

## POLICE DEPARTMENT RESPONSE TO CITIZEN COMPLAINTS

Additional accounts of police behavior were gathered from complainants and the general public at community meetings sponsored by The Center and other organizations. The Center conducted one such open community forum in December 1997 entitled, "Cops, Citizens, and Complaints: How to Be Heard and Make Change" to educate residents about the Department's civilian complaint process and how to use it effectively. Commander

Bowen, then head of the Office of Professional Standards (OPS) of the Department (previously known as the Internal Affairs Unit), participated in the forum as a speaker. Although attendance was lower than expected, information on the process was presented and an engaging discussion ensued.

It is often difficult to ascertain the inner workings of the Police Department because it is a relatively closed organization, the work of which is done largely out of the public's view. In order to gain more insight into how citizen complaints are handled, Center staff conducted an interview with Commander Bowen.

As explained by Commander Bowen, OPS is a four-member unit responsible for, among other things, receiving and investigating citizen complaints against the Albany Police Department and its personnel. Citizen complaints are taken by phone, mail, or in person from anyone who has been directly affected by a police action. Most complainants use a one-page English/Spanish complaint form which is available at the OPS office and several other locations including City Hall and The Center for Law and Justice. (See Appendix A.) The written complaint is accepted and, according to Commander Bowen, a written notification of receipt is sent to the complainant within 10 days.

Complaints are classified according to seriousness. "Minor" complaints, such as charges of "rudeness," are handled informally and quickly by police supervisors, through the filing of a supervisor's inquiry report. In this case, the complainant is contacted within a few days and the supervisor talks with both him/her and the officer(s) involved to attempt to reconcile their differences. In those cases that warrant investigation, the supervisor discusses the issue with the accused officer(s) and future performance is monitored. If a pattern or problem is detected, the officer(s) will be subject to re-training or discipline.

"Serious" complaints are handled by OPS which, according to operating procedures, may interview the complainant and any known witnesses to the incident. Officers named in the complaint provide written accounts of the alleged incident after background information is gathered, including medical reports and all paperwork pertaining to the case. When the investigation is completed, a report is compiled and the findings are reported to the Police Chief. The report may include OPS recommendations for disposition of the matter. Finally, the complainant is notified of the Chief's determination and whether any disciplinary action is warranted. However, due to certain protections afforded police officers under their union contract and the civil service law, no other information is made public. Still, the number of complaints filed against each officer and any substantiated charges are included in the officer's record file.

After the complainant is notified, the case is determined to be closed and cannot be re-opened unless substantial new credible evidence is presented. Any requests for an appeal must be made to the Mayor and/or the Community-Police Relations

Board. The viability of this avowed appeal process is seriously questioned, given the fact that the Mayor is technically the head of the Police Department and the Community-Police Relations Board. In addition, the Board has no legal power or authority to carry out an investigation or to render a binding opinion.

Furthermore, the limited public information provided on how investigations of complaints are actually carried out has prompted charges of undue secrecy. Such indictments feed citizen distrust and result in claims that fair determinations cannot be made by the police who only "police themselves."

Several other aspects of the complaint process invite critical inspection. One is that it is difficult to determine the extent to which the Department's proclaimed process is followed. For instance, a number of complainants reported that they were never notified that OPS had received their complaints, nor were all of their listed witnesses interviewed by OPS. In addition, although the Department asserts that there is no time limit attached to filing a complaint, few know that there does exist a union-imposed one-year limit which requires that a complaint be filed, investigated, and any disciplinary action taken within one year of the incident. After more than a year, even if a claim of police misconduct is substantiated by facts, no sanction can be imposed.

Perhaps the most important consideration is the question of how effective, just, and fair the process is. This question is most often answered by relying upon determinations made by the Department. Our examination of OPS data for years 1991 through 1997 revealed that for the past four years, the number of complaints filed with the Department has increased considerably. In 1994-95, there was a combined total of 159 complaints. In 1996, the number increased to 179. In 1997, there were 232 complaints, or a 30 percent increase from 1996. [22] But, this surge in complaints does not even take into account a sizeable under-reporting of citizen complaints that should be considered, according to the NYCLU report. [23]

More interestingly, while of the 776 complaints filed for the seven-year period, 106 were brutality/excessive force cases, only two of these were considered "substantiated" by the Department. And, since 1992 none have been substantiated. Overall, the Department substantiated 63 of the 776 claims, or 7.5 percent, lower than the national average of 10 percent. [24] This low substantiation rate of citizen complaints has historically given rise to expressed criticism and mistrust of the complaint process and the Department.

## THE COMMUNITY-POLICE RELATIONS BOARD

The original Community-Police Relations Board, founded in 1984 in response to the Jesse Davis case, was formed for the purpose of improving the relationship between the police and the community. [25] It currently consists of three members from the City Human Rights Commission, two members from the Albany Police Department, and six members who represent the general community.

PAGE 2/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41

According to the Board's constitution and by-laws, its stated purpose is to develop and maintain an atmosphere of mutual trust and respect between the community and the Police Department. [26] It is also responsible for assuring that community members' rights are protected and is authorized to accept citizen complaints which must be forwarded to the Police Department. In addition, the Board is charged with monitoring the status of citizen complaints through periodic reports from the Department. Although it has no investigative authority, it can ask the mayor, in a written request, for a review of a particular OPS investigation if serious bodily injury or death results from a police officer's actions.

To ascertain the work of the Board, an interview was conducted with Board Executive Director Angela Dixon in December 1997. The Center also requested copies of the Board's annual reports and minutes, which are required in its by-laws. Minutes of public meetings were made available, but it was difficult to verify whether annual reports had been completed and published. From the material made available, only two such reports, which are required to be "submitted simultaneously to the mayor and the public in December of each year," were found. [27] The 1991 report was a small, informational brochure, and the 1992 report was a brief, three-page document that included a list of meeting dates and locations. A review of the minutes revealed Board preoccupation with police-sponsored activities and programs such as PAL and DARE. Board members reportedly visited precincts to discuss issues of concern to police officers, attended police academy graduations and police retirement celebrations, and formally commended police for exceptional work.

Meetings of the Community Police Relations Board are held on an inconsistent basis; scheduled days, times, and locations are scattered with little or no official prior notice to the public. Public attendance is almost non-existent. When there is an issue to discuss regarding specific citizen complaints against police, the Board meets in closed executive session in which no minutes are recorded and secrecy is maintained.

The manner in which the Board meets and attends to citizen concerns are brought to light in the written minutes. Meetings are held on an inconsistent basis: scheduled days, times, and locations are scattered with little or no official prior notice to the public. Public attendance is almost non-existent. When there is an issue to discuss regarding specific citizen complaints against police, the Board meets in closed executive session in which no minutes are recorded and secrecy is maintained.

During the 1993-94 meeting year, the Board concerned itself with an activity that appears to go beyond the scope of its official mandate. Responding to police concerns that defendants were being treated too leniently by the court system, and based on the Board chairman's recommendation, the Board decided to lobby Chief Justice Judith Kaye of the New York State Court of Appeals for stiffer sentencing penalties. [28]

## COMMUNITY SURVEY OF RESIDENTS' ATTITUDES TOWARD ALBANY POLICE

To our knowledge, no scientific examination of resident opinions about the Albany Police Department has ever been undertaken. As a result, in January 1998, The Center developed and conducted such an opinion survey, with the professional assistance of Bonita Veysey, who studies criminal justice issues at PRA, an internationally recognized research group. Veysey also specializes in matters pertaining to mental health services, violence, and children and families at risk.

### Methodology: Data Collection Instrument and Procedures

A brief survey questionnaire was developed to assess Albany residents' opinions about Albany police (see Appendix B). Questionnaire items included prior interactions with Albany police officers, a six-item attitude scale, knowledge of complaint procedures and suggestions for more citizen involvement in complaint resolution, respondent demographics, and location of primary residence.

Six volunteers surveyed respondents in public areas across much of the city. Primary data collection sites were high traffic areas that were selected to reduce systematic bias, including supermarkets, convenience stores, bus stops, and laundromats. These locations were selected because it was believed that they provided services to the general public and not for a specific sub-group of the Albany community. Volunteers approached prospective participants and solicited their involvement in the study. On average, the survey took three to five minutes to administer.

### Participants

According to the 1990 Census, the total population of the city of Albany is 101,082. Of that number, whites represent roughly 76 percent of the population, Blacks 21 percent, and Hispanics 3.1 percent. [29] Since our research questions dealt with issues of racial bias and we wanted to test significant differences between racial/ethnic groups, we used a stratified design to allow for close to 50 percent of our sample to be persons of color.

Potential participants were approached upon entry or exit from the public locations. Respondents were initially asked where they resided, and only Albany residents were interviewed. In addition, children under age 16 were excluded from the study. Data was collected from 104 respondents. Fifty-two percent of the sample were African American, 38 percent were white, and the remaining 10 percent were Latino or of other racial/ethnic heritage. Of the sample, 54 percent were male and 46 percent were female. Twelve percent were under the age of 20, 47 percent between 20 and 40 years old, and 41 percent were over the age of 40. Neighborhood representation varied widely. For computation purposes, some neighborhoods were collapsed together.

TO PROTECT AND SERVE? - p. 15 -

Approximately 36 percent of the sample were residents of Arbor Hill (including North Albany and West Hill), 31 percent were residents of Center City (Center Square, New Scotland, and Washington Park areas), 19 percent were residents of Pine Hills (including upper Western Avenue area), and 14 percent were residents of the South End.

## Results: Contact with Police

Of those interviewed, 35 percent had had an encounter with an Albany police officer within the past year. Any contact conducted in the course of routine police business, including citizen requests for assistance, are included. There were no significant differences between gender, race, age, or place of residence, hence the results are not included here in table form.

## Citizen Attitudes Toward Albany Police Officers

A six-item scale was constructed to measure various aspects of citizen-police encounters, including police professionalism, respectfulness, use of excessive force and improper language, racial bias, and expectations for fair treatment. The original items may be found in the survey questionnaire in Appendix B. Each item was rated on a four-point scale from "strongly agree" at the low end (1) to "strongly disagree" at the high end (4). For purposes of presentation and ease of interpretation, all items were recorded to reflect level of agreement to positively worded statements.

Table 1 displays the distribution of responses for the total sample for the six attitude items. Overall, the distribution of responses was similar for four items. Forty to 50 percent of citizens agree that police: 1) behave professionally, 2) always show respect for the citizens with whom they are dealing, 3) do not use excessive force, and 4) do not use improper language. However, only 26 percent believe no racial bias exists in the Albany Police Department. Despite this, 65 percent expect to be treated fairly in their dealings with officers.

**Table 1.  Citizen Attitudes Toward Albany Police Officers**

| Variable | Strongly Agree | Agree | Disagree | Strongly Disagree |
|---|---|---|---|---|
| Professional conduct | 8.9 | 30.7 | 38.6 | 21.8 |
| Always show respect | 8.2 | 37.1 | 40.2 | 14.4 |
| No excessive force | 9.4 | 30.2 | 43.8 | 16.7 |
| No improper language | 8.7 | 42.7 | 38.8 | 9.7 |
| No racial bias | 8.5 | 18.1 | 46.8 | 26.6 |
| Expect fair treatment | 24.5 | 41.2 | 21.6 | 12.7 |

TO PROTECT AND SERVE? - p. 16 -

Despite the apparently even distribution of positive and negative attitudes toward police in the total sample, there are significant differences by race and age -- no differences exist, however, by sex or neighborhood of residence. Average scores (on a scale of one to four, with higher scores indicating less favorable attitudes) for each item were calculated and compared across groups. Citizen attitudes toward Albany police divided by racial/ethnic membership are presented in Table 2. Persons of color in general have less favorable attitudes toward police than whites. Four of the six variables display significant differences, specifically: attitudes regarding professional conduct, use of excessive force, use of improper language, and the expectation of fair treatment.

**Table 2. Citizen Attitudes Toward Albany Police Officers by Race**
(on a scale of one to four, with higher scores indicating less favorable attitudes)

| Variable | White | Black | Latino/ Other | sig. |
|---|---|---|---|---|
| Professional conduct | 2.1 | 3.1 | 3.2 | .000 |
| Always show respect | 2.4 | 2.8 | 2.4 | n.s. |
| No excessive force | 2.3 | 3.0 | 3.0 | .001 |
| No improper language | 2.1 | 2.9 | 2.3 | .000 |
| No racial bias | 2.7 | 3.0 | 3.4 | n.s. |
| Expect fair treatment | 1.8 | 2.3 | 2.8 | .006 |

Table 3 presents citizen attitudes by age group. Five of the six attitude variables are statistically significant. More importantly, in every case, attitudes vary inversely with age. That is, as age increases, attitudes toward Albany police officers become more favorable. The only variable that was not significant was the statement regarding racial bias. However, even this variable followed the same pattern.

**Table 3. Citizen Attitudes Toward Albany Police Officers by Age Group**
(on a scale of one to four, with higher scores indicating less favorable attitudes)

| Variable | <20 | 20-40 | 40-60 | >60 | sig. |
|---|---|---|---|---|---|
| Professional conduct | 3.1 | 2.9 | 2.5 | 2.0 | .018 |
| Always show respect | 3.1 | 2.8 | 2.3 | 2.0 | .001 |
| No excessive force | 3.2 | 2.8 | 2.5 | 2.0 | .047 |
| No improper language | 3.0 | 2.7 | 2.2 | 2.0 | .002 |
| No racial bias | 3.3 | 2.9 | 2.8 | 2.5 | n.s. |
| Expect fair treatment | 2.8 | 2.4 | 2.0 | 1.3 | .009 |

TO PROTECT AND SERVE? · p. 17 -

Overall, 29 percent of the respondents said they knew how to file a complaint against an Albany police officer and 33 percent were aware of the existence of the Community Police Relations Board (Table 4). No statistically significant differences existed by sex, age, race/ethnicity, or place of residence in knowledge of how to file a complaint. There were no significant differences by sex, age, or race/ethnicity in awareness of the existence of the Community-Police Relations Board. This variable did differ significantly by neighborhood of residence. Specifically, 47 percent of the residents of the city center were knowledgeable of the existence of the Board, followed by 38 percent of the Pine Hills residents, 27 percent of the Arbor Hill residents, and only seven percent of the residents of the South End.

## Table 4. Awareness of Complaint Procedures and Community Resources

| Variable | Yes | No |
|---|---|---|
| Know how to file a complaint | 28.2 | 71.8 |
| Aware of the Community Police Relations Board | 33.0 | 67.0 |

## Suggestions for Improvement of Community-Police Relations

Table 5 presents respondents' suggestions for improvement of community-police relations. Fully 95 percent of the respondents believed that officer training in ethnic and cultural issues would enhance community-police relationships. Both white and African American respondents highly valued this suggestion (97 percent and 96 percent, respectively), while 88 percent of Latino respondents and 50 percent of persons of other ethnic groups agreed. Age, sex, and neighborhood were not significantly related.

Eighty-nine percent thought that community oversight of investigations of alleged police misconduct would improve relations. Responses to this question varied significantly by neighborhood. Ninety-seven percent of residents of the city center, 95 percent of Arbor Hill respondents, 86 percent of South End respondents, and only 71 percent of Pine Hills respondents agreed with this suggestion. Age, sex, and race/ethnicity were not significantly related.

Overall, 77 percent of the respondents believed that more police-sponsored educational and recreational programs in the community would improve relations. No demographic variable was significantly related.

Overall, 64 percent believed that more police officers on the street would help community-police relations. Significant differences existed by age and ethnicity on this variable. Specifically, 33 percent of persons under age 20, 55 percent of those aged 20 to 40, 80 percent of persons between ages 40 and 60, and 100 percent of those over age 60 thought more police officers on the street would help. Eighty-one percent of white respondents

PAGE 7/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41

thought more officers on the street would improve relations, while only 58 percent of African Americans, 50 percent of Latinos, and 0 percent persons of other ethnic groups agreed with this suggestion.   Sex and neighborhood were not significantly related.

**Table 5.  Suggestions for Improvement of Community-Police Relations**

| Variable | Yes | No |
|----------|-----|-----|
| More police officers on the street | 63.5 | 36.5 |
| More police-sponsored education and recreation programs | 76.9 | 23.1 |
| Officer training in ethnic/cultural issues | 95.2 | 4.8 |
| Community oversight of police misconduct investigations | 89.4 | 10.6 |

## CENTER MEETING WITH THE MAYOR AND POLICE CHIEF

In November 1997, in the midst of a community uproar over the Henderson case, Center staff met with Mayor Jennings, Assistant Mayor Philip Calderone, and Police Chief Tuffey to discuss the current state of and proposed improvements to the police complaint process, as well as community-police relations in general in the city.  The Center viewed the meeting also as an opportunity to request and clarify information about policing policies and procedures, comment on perceived community concerns, and make several recommendations for consideration in the city's efforts to improve the Police Department's relationship with various factions in the Albany community.

During the more than one-hour meeting, the Mayor's office made a number of commitments that included the following:

1) To study the feasibility of placing cameras in the elevator and interrogation room at Albany's Division 2;

2) To create a plan by which all video cameras in the police station will be monitored and the video tapes retained for future use;

3) To put supervisor's inquiries in writing and make sure that verbal complaints are put in writing, either by giving each complainant a form to fill out or by assisting the complainant to fill out the form;

4) To place a log at the front desk in the police station so that every complaint is documented;

5) To give each complainant a copy of his/her completed complaint form;

6) To send a letter of receipt to all persons who fill out a complaint form or lodge a supervisor's inquiry;

7) To send a response letter to all persons who fill out a complaint form or lodge a supervisor's inquiry, advising them of the result of the investigation of their complaint;

8) To explore the idea of forwarding complaint files of those facing criminal charges to the District Attorney's office;

TO PROTECT AND SERVE? · p. 19 ·

9)  To make certain changes to the police complaint form itself, such as:

   a)  Noting on the form that there is, in effect, a one-year statute of limitations on filing a police complaint, due to the police union contract which permits an Albany police officer to be disciplined as a result of a police complaint investigation only within one year from the date that the alleged misconduct occurred;

   b)  Stating on the form that the complainant may be accompanied by a person of his/her choosing when being interviewed by police investigating the complaint.

Mayor Jennings promised to provide The Center with a copy of OPS's Minimum Standards and Guidelines used for investigating complaints so that The Center could comply with his request for suggestions of changes that should be made to those standards and guidelines. In addition, Chief Tuffey agreed to review any existing appeal processes used by other jurisdictions to accommodate complainants dissatisfied with outcomes of police investigations of their complaints against police.

At the conclusion of the meeting, the Mayor vowed to meet again with The Center staff to discuss further changes in community-police relations. However, neither the Mayor's office nor the Police Chief has yet honored the commitments made at that meeting. There has not even been a response to The Center's letter memorializing the commitments made during that meeting. And, to date, The Center has not received a copy of OPS Minimum Standards and Guidelines, as promised.

## CONCLUSIONS

The data and information gleaned from the varied sources described above suggest that the following conclusions may be drawn regarding the relationship between the Albany community and its police department:

1)  A significant portion of Albany city residents, particularly people of color, continue to experience differential treatment at the hands of some police officers. That treatment is perceived by residents to be meted out in a discriminatory, biased, and harmful manner due primarily to their ethnicity, color, and culture.

2)  The Albany Police Department has historically denied and ignored the possibility that systemic racism exists within its ranks.

3)  Many residents believe that the Department conducts too much of its business in secrecy which prevents public scrutiny. Major criticism is directed at the degree of secrecy surrounding the handling of citizen complaints.

4) There does not exist in Albany any viable and accessible alternative mechanisms for addressing citizen concerns regarding police behavior. Most regrettably, the appeal process touted by the Department is seriously deficient.

5) Citizens who are victims of police misconduct often experience physical and/or psychological harm, resulting in the need for appropriate and competent aftercare.

6) The Community-Police Relations Board fails to take its mission seriously and has not properly and adequately fulfilled its mission or carried out its mandate.

7) The Albany Police Officers Union exerts undue influence and control over the manner in which the Department investigates and disciplines it officers and relates to the general public.

8) The Mayor and Police Chief have failed to discern accurately the level of public dissatisfaction with the Department. In addition, they have been unable or unwilling to invite or utilize public urging and recommendations for change in community-police relations.

9) Results of a survey on public attitudes toward police support several long-held public views: that mistrust of the police continues to exist, particularly among people of color who are more likely to believe that race influences the way they are treated by police; little more than one out of four respondents knows how to file a complaint against the police; and only one out of three are even aware of the existence of the Community-Police Relations Board. Even more significantly, respondents strongly indicated support for two historically controversial ideas. First, they believe that officers need to be better trained on ethnic and cultural issues. And, more surprisingly, 89 percent of respondents believe that citizen oversight of police investigations conld operate to improve community-police relations. In the central part of the city, 97 percent of respondents were of the same mind in support of this issue.

## RECOMMENDATIONS

The five recommendations offered here are presented to inform, generate community discussion and dialogue, and hopefully assist those in our community dedicated to improving the relationship between the Albany Police Department and the public. Positive change in this area will promote the public safety. These recommendations are largely based on the research data collected as described and The Center's many years of professional

experience in monitoring policing and criminal justice activities and providing information, education, and advocacy to residents of Albany and the Capital District community. They reflect a sincere interest on the part of The Center to witness and participate in a new and stronger commitment in Albany to actions that will bring about the fair and just treatment of all its citizens.

## 1) Citizen Review and Oversight: Full-time, Independent, and Expert

Increasingly across the country, communities are demanding some level of police accountability through the operation of citizen complaint review mechanisms. Over the past 15 years in Albany, community activists and organizations dissatisfied with the Police Department's internal review process have intermittently demanded a citizen review board. To date, external review has gained little acceptance by the Department, unlike the response in cities such as Syracuse, Rochester, New York, Baltimore, Minneapolis, and others. Most of these cities have incorporated an oversight body that specifically focuses upon investigating charges of police misconduct or abuse and seeing that appropriate disciplinary action is taken against guilty officers. Whether they are effective or not is deeply rooted in controversy. One certainty is that police misconduct continues to be a problem.

In a democracy, citizens should exercise control over their police departments, although the form that control should take needs to be explored carefully and decided upon by each community. We do question, however, whether limiting citizen oversight to instances of individual police misconduct and discipline is adequate to effectively address the problem which is often rooted in the operating environment, both political and social, of the department and community.

It is our recommendation that the city of Albany adopt some form of citizen oversight of its police department. In preparing to do so, it should take advantage of available expertise and resources that already exist in and beyond our community. To begin, the School of Criminal Justice of the University at Albany should be seen as such a resource. The school's Dean, David Bayley, Ph.D., offers a thoughtful approach to citizen oversight. Bayley is critical of most current oversight efforts which he characterizes as "bad apples" and reactive approaches. Under these approaches, there has been a failure to change the way police organizations are run. He argues that "[c]ommunities must create a system that forces police departments to become responsible for developing and implementing management policies that reduce the likelihood that misconduct will occur." [30] That is, police administrators must be the ones held accountable for management. To accomplish this goal, Bayley offers a number of straightforward principles that include the adoption of full-time, non-political, citizen oversight of the police.

TO PROTECT AND SERVE? - p. 22 -

Any review of citizen oversight models should also include a close examination of the Office of Citizen Complaints in Kansas City, Missouri in which civil service staff review citizen complaints, refer them to internal affairs, review investigations for thoroughness, and formulate suggested outcomes. [31] There are aspects of this model that can be easily incorporated into the full-time independent approach mentioned above. (See Appendix C for the example of a model developed by The Center for Law and Justice.)

## 2) Reduce Secrecy Surrounding the Work of the Police Department

Like most other police departments across the country, the Albany Police Department functions as a relatively closed institution, performing much of its work out of the public view and operating as a paramilitary operation set apart from the community. It is deeply immersed in a subculture that prescribes, to a great extent, the thinking, values, and actions of its members. Closeted in a world set apart from others, police officers are often accused of being reluctant to mingle with "the common folk." For years, the secrecy under which they have operated has been the basis for much of the criticism lodged against them. It may be time for some of the walls of secrecy to be torn down, particularly those covering the citizen complaint process. Towards that end, there is at least a need for the community to be informed and educated on a consistent basis about the workings of the Department. That process might very well include mandated regular reporting by the Police Chief to the public.

When a citizen files a formal complaint against police, the Department should have an affirmative obligation to inform him/her of his/her rights as a complainant and of the process that will be used to investigate his/her complaint. One way of carrying out this function would be to amend the present complaint form to include certain additional pertinent information or attach an existing document such as "10 Tips for Filing an Albany Police Complaint Form" to the form. (See Appendix D.) In conjunction, it would behoove city officials and legislators to consider the development and formal adoption of a set of minimum standards and guidelines, with community input, that would govern the investigation of citizen complaints against police and offer legal protection to citizens when those standards are violated. For example, the Department could be required to interview all witnesses to an incident whose names were provided by the complainant. Failure to follow this minimum standard would provide the complainant with legal grounds to challenge the Department's action.

## 3) Address Race and Ethnicity Issues Within the Police Department

For far too long, issues of race and racism have plagued the Department. These issues were raised anew during the Moore brothers' case, the Henderson case, and in the responses to our citizen opinion survey. As

TO PROTECT AND SERVE? - p. 25 -

a result, demands are being made for a Department which is more sensitive and responsive to the needs of communities of color. Many believe that significant change will come only when police are required to live in the city proper, when the force achieves better racial and gender balance at all levels, and when officers are better educated and trained to understand and respect other ethnic cultures.

## 4) Eliminate or Restructure the Community-Police Relations Board

As currently organized and functioning, the Community-Police Relations Board appears to serve no useful community purpose. As mentioned earlier, few citizens ever attend its meetings; it blatantly ignores its own mandate to issue written reports; the Board receives few complaints, and when it does, conducts its executive meetings in secret; and for all intents and purposes, it functions more as a public relations arm of City Hall and the Police Department than as a body charged with improving community-police relations. The Board should be restructured as an independently functioning body, or eliminated.

## 5) Identify, Develop, and Publicly Support Health and Social Services for Victims of Police Misconduct, Including Minority-focused Mental Health and Counseling Services

Increasingly, our society is recognizing and addressing the needs of those victimized by crime. Special services, programs, and public bodies have been set up to serve their interests. However, there is a failure to recognize the needs of those harmed by law enforcement abuse of power. Victims of such behavior often suffer great physical and emotional harm and economic loss.

Since African Americans and Latinos are both more likely to be victims of crime and police misconduct and abuse, victim services and programs must be made more accessible to them and designed to address their situations adequately. There is a particular need for culturally competent mental health care services that can address the unique needs of powerless people who have experienced mistreatment at the hands of law enforcement officers. Therefore, human service providers must take the lead in identifying, developing, and delivering services with public financial support.

STATE OF NEW YORK)
                 )          ALBANY POLICE DEPARTMENT
COUNTY OF ALBANY )               Public Safety Building
                 )           Morton Avenue & Broad Street
CITY OF ALBANY   )              Albany, New York 12202

                             CIVILIAN COMPLAINT

OFFICIAL USE ONLY
Date Received _____
By(Name) _____  _____
Location _____  _____
☐ Mail         ☐ In Person

Complete Items 1 through 7. (PLEASE PRINT)

1. Name _____ Phone_____

   Address _____

2. Date/Time of Incident _____ Location: _____

3. Names of Employee(s) (if known): _____

   Shield Number(s) (if known): _____

4. Description, if name not known: Race: _____   Sex:_____   Age:_____   Height:_____

   Weight:_____   Eyes:_____   Hair:_____   Vehicle Number(s):_____

   Clothing:_____

5. Witness or Witnesses:
   Name/Address/Phone: _____

   Name/Address/Phone_____

6. Person Assisting in Writing Complaint:
   Name/Address/Phone_____

7. Details of Complaint (Attach second page if needed): _____

   _____

   _____

   _____

   _____

   _____

I, _____ , do hereby swear that the foregoing information provided
by me is true and complete to the best of my knowledge and belief. I understand that any false, misleading or
untrue statements, accusations or allegations herein made by me in relation to this complaint, either orally or
in writing, to any person or persons investigating this complaint may subject me to civil and/or criminal
prosecution.
   I realize that it may be necessary in the investigation of this complaint for me to meet with a member or
members of the City of Albany to discuss this complaint. I accept the premise that if an Administrative
Hearing is a result of my complaint, my testimony at such hearing may be needed and hereby agree to make
myself available for such proceeding if requested to do so.

                              SIGNED:  _____

                              This_____Day of _____ , 19____

Page 1 of _____          (Printed 2/27/87 by Centro Civico Hispanoamericano, Inc. · see other side for Spanish translation.)

PAGE 14/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41

### *Survey Questions*

1. **WHAT DO YOU THINK ABOUT THE ALBANY POLICE DEPARTMENT?**

2. **HAVE YOU HAD ANY INTERACTION WITH ALBANY POLICE OFFICERS IN THE LAST 12 MONTHS?**

   No (0) ___ / Yes (1) ___

3. **IF YES, COULD YOU BRIEFLY DESCRIBE THE MOST RECENT INTERACTION?**

*I am going to read six statements. For each, please tell me to what extent you agree or disagree with the statement:*

4. **ALBANY POLICE OFFICERS ALWAYS CONDUCT THEMSELVES IN A PROFESSIONAL MANNER.**

   Strongly agree (1) ___ / Agree (2) ___ / Disagree (3) ___ / Strongly Disagree (4) ___ / (9) ___

5. **ALBANY POLICE OFFICERS RARELY SHOW RESPECT FOR PERSONS THEY ARE DEALING WITH ON THE STREET.**

   Strongly agree (1) ___ / Agree (2) ___ / Disagree (3) ___ / Strongly Disagree (4) ___ / (9) ___

6. **ALBANY POLICE OFFICERS USE EXCESSIVE FORCE WHEN CONTROLLING A SITUATION.**

   Strongly agree (1) ___ / Agree (2) ___ / Disagree (3) ___ / Strongly Disagree (4) ___ / (9) ___

7. **ALBANY POLICE OFFICERS USE IMPROPER LANGUAGE WHEN INTERACTING WITH CITIZENS.**

   Strongly agree (1) ___ / Agree (2) ___ / Disagree (3) ___ / Strongly Disagree (4) ___ / (9) ___

8. **RACIAL BIAS IS NOT A PROBLEM IN THE ALBANY POLICE DEPARTMENT.**

   Strongly agree (1) ___ / Agree (2) ___ / Disagree (3) ___ / Strongly Disagree (4) ___ / (9) ___

9. **I EXPECT TO BE TREATED FAIRLY BY ALBANY POLICE OFFICERS.**

   Strongly agree (1) ___ / Agree (2) ___ / Disagree (3) ___ / Strongly Disagree (4) ___ / (9) ___

TO PROTECT AND SERVE? - D. 26 -

PAGE 15/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41

10. **DO YOU KNOW HOW TO FILE A COMPLAINT AGAINST AN ALBANY POLICE OFFICER IF YOU EXPERIENCE A PROBLEM?**

No (0) ___ / Yes (1) ___

11. **ARE YOU AWARE OF THE EXISTENCE OF A COMMUNITY POLICE RELATIONS BOARD IN THE CITY OF ALBANY?**

No (0) ___ / Yes (1) ___

12. **WHICH OF THE FOLLOWING CHOICES, IF ANY DO YOU BELIEVE CAN CREATE A MORE POSITIVE RELATIONSHIP BETWEEN THE POLICE AND YOUR COMMUNITY? [check all that apply]**

More police officers on the street: No (0)___ / Yes (1)___
More police-sponsored educational and recreational programs in the community: No (0)___ / Yes (1)___
Officer training in ethnic/cultural issues: No (0)___ / Yes (1)___
Community oversight of investigations of alleged police misconduct No (0)___ / Yes (1)___
Other (5)_____

13. **SEX:**

Male (0)___ / Female (1)___

14. **ETHNICITY:**

African-American (1)__ / Asian (2)__ / Caucasian (3)__ / Hispanic (4)__ / Other (0)__

15. **WHAT IS YOUR AGE?**

Under 20  (1)___
20-39     (2)___
40-59     (3)___
60 + over  (4)___

16. **ZIP CODE:** _____

## PROPOSED MODEL: OFFICE OF POLICY REVIEW AND CITIZEN COMPLAINTS*

### FUNCTIONS:

❖ Monitor internal operations and policies of the police department such as training, staffing, public relations, etc.

❖ Make policy and procedural recommendations.

❖ Hold community meetings and hearings to receive input and explain departmental policy and practices.

❖ Receive complaints and analyze, screen, categorize, and refer to the police department for investigation.

❖ Review investigations for thoroughness, clarity, objectivity, and conformity to minimum standards and guidelines. Can require that additional witnesses be called, evidence gathered, or specific questions be asked.

❖ Formulate suggested outcomes after an investigation review.

❖ Refer investigation to chief of police.

❖ Allow all complainants and attorneys to review their investigative files.

### STAFF:

❖ Full-time professional civil service staff.


\* This citizen oversight model is based on the Office of Citizen Complaints which has been in operation for almost 25 years in Kansas City, Missouri. It was adapted from Douglas W. Perez's Common Sense About Police Review (Philadelphia: Temple University Press, 1994).

TO PROTECT AND SERVE? - p. 28 -

PAGE 17/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41

# 10 Tips on Filing an Albany Police Complaint Form

1. Although you do not need to, you may wish to consult an attorney before you file a complaint form, especially if there are criminal charges pending against you or if you plan to pursue further legal action. Be aware that other forms of legal action may need to be commenced within a relatively short period of time from the date of the incident in question.

2. You may file your complaint form in written format, or in-person at the police station with a detective from the Office of Professional Standards. If you choose to meet with a detective, or if you go to the station for an interview, you may be accompanied by another person such as a friend, family member, pastor, or representative from a community organization. You may not file a complaint on behalf of another person, unless you are the parent or guardian of a child under the age of 18, or unless the complainant is a relative (although the complainant him/herself must still sign the form.) Complaint forms are available in English and Spanish, and interpreters can be provided by the department if requested by the complainant.

3. When completing the form, be clear and concise. It may be helpful to you to make a list of your complaints, including descriptions of the officers involved and details of the encounters, before you write this information on the actual form. In fact, you may wish to write down details about the incident as soon after it happens as possible. It is best to identify the officers involved by name and/or badge number, but be sure to at least include good physical descriptions if you do not know this information.

4. Be sure to attach any documentation which will substantiate the allegations in your complaint, and make a notation on your complaint form regarding the attachments. This may include items such as hospital medical records, photographs of sustained injuries, statements of witnesses, lists of property damaged, or other evidence. While an investigation is pending, you may make amendments to your complaint by contacting the police department, or going to the police department and filing an additional written complaint marked "amendment." Be sure to take a copy of your original complaint with you to the station and give a copy of it to the intake officer to attach to your amended complaint. Make sure you keep copies of both your original and your amended complaints.

5. Keep a copy of the complaint for your own records. If you file your complaint at the department, ask for a copy, and be sure you read it over carefully and are comfortable with what has been written by the detective before signing the form. Make sure to get the name of the detective with whom you file. If you are not comfortable speaking with this person, do not hesitate to ask for his/her supervisor.

6. Complaint forms are legal documents. It is illegal to knowingly make false statements on these forms, and you can be criminally prosecuted or face civil charges for making false statements.

7. Technically, there is no statute of limitations for filing a complaint, however, since under union contract, police officers can only be disciplined within a year of the occurrence of the incident reported, it is best to file your complaint as soon as possible.

8. Once you file a complaint form, you should receive confirmation of it within two weeks in the form of a "letter of receipt." This letter informs you that your complaint is under investigation. If you do not receive this letter, you may wish to contact the Office of Professional Standards at 462-8017 to be sure they have received your complaint.

9. There is no standard period of time for completing an investigation into your complaint. When the investigation into your complaint is completed, and a determination is made, however, you should receive a "letter of response" informing you of the disposition of your complaint. During the investigation process, the officer(s) in question as well as any independent witnesses may be interviewed, and details and any leads may be explored. Be aware that there is no formal appeals process to challenge an Office of Professional Standards decision.

10. Several community and municipal agencies, including The Center for Law and Justice, the Community Police Relations Board, the Mayor's Office, the Urban League, Centro Civico, Trinity Institution, the Arbor Hill Community Center, the Albany Fire Department, and the city's Equal Employment Opportunity/Fair Housing Office, may have complaint forms available in their offices. The Center for Law and Justice can assist persons in completing and filing forms in its downtown office. Please call 427-8361 to make an appointment.

**The Center for Law and Justice, Inc.**
Pine West Plaza Building 2
Washington Avenue Extension
Albany, New York 12205
518/427-8361 phone

TO PROTECT AND SERVE? - p. 29 -

PAGE 18/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41

1. As of April 1, 1998, according to the New York State Department of Correctional Services, there were 69,290 inmates housed in state correctional facilities.

2. John Caher and Jay Jochnowitz, "Davis Family Settles for $500,000," Times Union 21 June 1994: A1.

3. Bruce Frederick, New York State Division of Criminal Justice Services, Discrimination and the Decision to Incarcerate (May 12, 1983) iii.

4. Informal discussions with Albany residents reported by Alice P. Green.

5. Paul Grondahl, Mayor Corning: Albany Icon, Albany Enigma (Albany: Washington Park Press, 1997) 14.

6. Paul Grondahl, Mayor Corning: Albany Icon, Albany Enigma (Albany: Washington Park Press, 1997) 15.

7. James Q. Wilson, Varieties of Police Behavior: The Management of Law and Order in Eight Communities (Cambridge, Massachusetts: Harvard University Press, 1978).

8. Albany Police Department, Management Study of the Albany Police Department (February 1987).

9. National Association for the Advancement of Colored People, Albany Chapter, Response to: The Management Study of the Albany Police Department (1987).

10. Joann Crupi, "Police Attorney Charges SIC 'Smear'," Times Union 26 September 1973: 15.

11. This information was obtained over the telephone from a spokesperson for the Albany Police Department.

12. John R. Probst Investigations, Inc., Report to Terrence Kindlon (1989) 3.

13. Albany Civic Forum Public Safety Panel, Community Policing in the City of Albany (1993).

14. Albany Civic Forum Public Safety Panel, Community Policing in the City of Albany (1993).

15. Mark Mishler, Capital District Citizen Action, Citizen Action of New York, Civilian Review Board Testimony (1994).

16. New York Civil Liberties Union, Capital District Chapter, The City of Albany: The Need for All-Civilian Review of Police Misconduct to Ensure Accountability and Fair Law Enforcement (1994).

17. Keith St. John, City of Albany Ordinance #14.42.94 18 April 1994.

18. James Denn, "Agency Takes Control of Arbor Hill Police Project," Times Union 21 March 1998: B1.

19. This quote is excerpted from comments made by a client during a telephone interview with Center staff on September 19, 1997.

20. This quote is excerpted from comments made by a client during a telephone interview with Center staff on October 9, 1997.

21. Darrell Nicholson, "Albany Police Brutality" (1997).

22. Albany Police Department Office of Professional Standards, Annual Reports, 1991-1997.

23. New York Civil Liberties Union, Capital District Chapter, The City of Albany: The Need for All-Civilian Review of Police Misconduct to Ensure Accountability and Fair Law Enforcement (1994).

24. Samuel Walker, Citizen Review Resource Manual, Police Executive Research Forum (Washington, D.C., 1995).

25. The original board, discouraged by a lack of power and Mayor Whalen's control over it, voted to dissolve itself in 1989. The Mayor responded by instituting the present board, which has basically the same mission.

26. Community-Police Relations Board, Constitution and By-laws, Article 1, Section 2.

27. Community-Police Relations Board, Constitution and By-laws.

28. Community-Police Relations Board, Minutes of Meetings 5/25/93, 7/27/93, 10/26/93, and 11/30/93.

29. United States Department of Commerce, Bureau of the Census (Washington, D.C.: GPO, 1990).

30. David Bayley, "Getting Serious About Police Brutality," Accountability for Criminal Justice: Selected Essays, ed. P.C. Stenning (Toronto: University of Toronto Press, 1995) 94.

31. Douglas W. Perez, Common Sense About Police Review (Philadelphia: Temple University Press, 1994).

TO PROTECT AND SERVE? - p. 30 -

PAGE 19/19 * RCVD AT 7/14/2011 9:52:46 AM [Central Daylight Time] * SVR:ALFAX01/12 * DNIS:3515336 * CSID:5184520600 * DURATION (mm-ss):06-41