UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANNE POPE, et al.,

                    Plaintiffs,

        v.

COUNTY OF ALBANY, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 11-CV-0736 (LEK) (DRH)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR PRELIMINARY INJUNCTION

GIBSON, DUNN & CRUTCHER LLP
Mitchell A. Karlan
mkarlan@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Fax: 212.351.4035
Bar Roll No. 511874

DEROHANNESIAN & DEROHANNESIAN
Paul DerOhannesian II
derolaw@verizon.net
677 Broadway, Suite 202
Albany, New York 12207-2985
Telephone: 518.465.6420
Fax: 518.427.0614
Bar Roll No. 104792

Attorneys for Plaintiffs

July 15, 2011

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................. 3

    I.     ALBANY COUNTY .............................................................................. 3

    II.    THE LEGISLATURE ........................................................................... 3

    III.   THE LEGISLATURE'S 1990 REDISTRICTING PLAN  AND 1991 CONSENT JUDGMENT AND DECREE ............................. 3

    IV.   THE LEGISLATURE'S 2000 REDISTRICTING PLAN  AND THE *ARBOR HILL* LITIGATION ............................................... 4

    V.    THE 2010 U.S. CENSUS DATA ......................................................... 5

    VI.   THE LEGISLATURE'S 2010 REDISTRICTING PLAN .................... 6

    VII.  THIS LAWSUIT ................................................................................... 7

    VIII. PLAINTIFFS' PROPOSED ALTERNATIVE REDISTRICTING PLAN .......... 8

ARGUMENT ......................................................................................................... 8

    I. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED  ON THE MERITS OF THEIR VOTING RIGHTS ACT CLAIM ....................................... 9

        A.     The *Gingles* Preconditions Exist In Albany County ............................... 11

            1.     The Minority Population Is Sufficiently Large In Number  And Geographically Compact To Comprise Five MMDs .................. 11

            2.     The Minority Population Is Politically Cohesive ......................... 13

            3.     The Minority Population's Preferred Candidates  Are Usually Defeated By White Bloc Voting ................................. 15

        B.     Under The Totality Of The Circumstances, The Legislative Districts Adopted By Albany County Violate The Voting Rights Act ................. 16

            1.     History Of Voting-Related Discrimination ................................... 17

            2.     Pattern Of Racially Polarized Voting .......................................... 18

            3.     Limited Past Election Of Minority Group Members ................... 19

# TABLE OF CONTENTS
## (Continued)

**Page**

4.   Dilution-Enhancing Voting Practices And Procedures............... 20

5.   Exclusion Of Minority Group From Candidacy ......................... 21

6.   Effects Of Past Discrimination ..................................................... 22

7.   Lack Of Responsiveness To Minority Needs ............................. 24

8.   Tenuous Policy Underlying Redistricting.................................... 26

II.   ABSENT AN INJUNCTION, PLAINTIFFS AND OTHER MINORITY VOTERS IN ALBANY COUNTY WILL SUFFER IRREPARABLE HARM . 27

III.   THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN PLAINTIFFS' FAVOR ................................................................................................... 28

IV.   THE PUBLIC INTEREST WEIGHS STRONGLY IN FAVOR  OF GRANTING A PRELIMINARY INJUNCTION.................................................... 28

CONCLUSION............................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

### Cases

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
 2003 U.S. Dist. LEXIS 11386 (N.D.N.Y. July 7, 2003) .................................................. *passim*

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
 281 F. Supp. 2d 436 (N.D.N.Y. 2003) ............................................................................. *passim*

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
 289 F. Supp. 2d 269 (N.D.N.Y. 2003) ........................................................................... 5, 23

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
 357 F.3d 260 (2d Cir. 2004) .......................................................................................... 6, 23

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
 No. 03-CV-502 (N.D.N.Y.) ............................................................................................ *passim*

*Banks v. City of Albany*,
 953 F. Supp. 28 (N.D.N.Y. 1997) ................................................................................... 26

*Bartlett v. Strickland*,
 129 S.Ct. 1231 (2009) .................................................................................................... 13

*Bridgeport Coalition for Fair Representation v. City of Bridgeport*,
 26 F.3d 271 (2d Cir. 1994), *rev'd on other grounds*, 512 U.S. 1283 (1994) ............................ 9

*Coleman v. Bd. of Educ. of the City of Mount Vernon*,
 990 F. Supp. 221 (S.D.N.Y. 1997) ................................................................................. 31

*Goosby v. Town Bd.*,
 180 F.3d 476 (2d Cir. 1999) .......................................................................................... 11

*Johnson v. Miller*,
 929 F. Supp. 1529 (S.D. Ga. 1996) ............................................................................... 33

*Montana v. United States*, 440 U.S. 147 (1979). ......................................................................... 13

*Mullins v. City of New York*,
 626 F.3d 47 (2d Cir. 2010) ............................................................................................ 9

*NAACP v. City of Niagara Falls*,
 65 F.3d 1002 (2d Cir. 1995) ......................................................................................... 12, 18

*NAACP v. County of Albany*,
 91-CV-1288 (Nov. 13, 1991) ......................................................................................... 23

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Quick Bear Quiver v. Nelson*,
 387 F. Supp. 2d 1027 (D.S.D. 2005) ................................................................ 33

*Thornburg v. Gingles*,
 478 U.S. 30 (1986) ............................................................................... *passim*

*U.S. v. Berks County*,
 *250 F. Supp. 2d 525 (E.D. Pa. 2003)* ............................................................ 31

*U.S. v. Charleston County*,
 *318 F. Supp. 2d 302 (D.S.C. 2002)* .............................................................. 33

*U.S. v. Osceola County*,
 *475 F. Supp. 2d 1220 (M.D. Fla. 2006)* ........................................................ 31

*U.S. v. Village of Port Chester*,
 *704 F. Supp. 2d 411 (S.D.N.Y. 2010)* ............................................................ 9

### Statutes

42 U.S.C. § 1973 .................................................................................... 8

Albany County Charter Art. 2, § 207 ............................................................ 2

### Other Authorities

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) .............................................. 9

### Rules

Fed. R. Civ. P. 65 .................................................................................. 1

Plaintiffs Anne Pope, Janis Gonzalez, and Wanda Willingham respectfully submit this memorandum of law in support of their motion for preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## INTRODUCTION

This Court has seen this movie before.  For the third consecutive decennial census, the United States has confirmed that the number of blacks and Hispanics living in Albany County continues to grow significantly, both in absolute terms and as a percentage of the total population.  As has been true now for at least three decades, the latest census confirms that this minority population resides in a compact area of the County—overwhelmingly within the City of Albany and largely in certain areas of the City.  For the third time in a row, however, the County's government has thumbed its nose at the minority community and federal voting rights law by adopting a redistricting plan that is transparently intended to reduce and dilute the voting strength of the minority community.  And so, for the third time in a row, minority voters are forced to file suit in this Court seeking relief under federal law to protect their right to vote and to be fairly represented in local government.  On two prior occasions, this Court has entered judgment requiring redistricting to increase the number of districts in which minority voters would constitute a majority within the district.  On the last occasion, it was necessary to enjoin the scheduled election and reschedule it at a later time to provide full justice.  Given the stinging language this Court employed to condemn the County's conduct during the last litigation, all citizens might be forgiven for hoping that the County Legislature would, this time, "get it."  But that has not been the case.

The evidence presented below is overwhelming and compelling.  Minority residents of the County now comprise 24% of the total population.  Within the City of Albany, the figure is 46%.  Since the last census, the minority population of the County has grown by over 36%,

including an increase in the Hispanic population of more than 64%. Yet of the 39 districts in the Legislature, minority voters constitute a majority in only four of them under the County's newest plan. Because white voters in the County continue to vote as a bloc, minority candidates do not win elections unless minority voters constitute a majority in the district. Thus, under the County's plan, minorities cannot hope to elect more than 10% of the members of the Legislature, while constituting 24% of the population.

There is no question that it is possible—indeed, absurdly simple—to draw a plan for the Legislature in which minorities will constitute a majority of the voters in five, rather than four, districts. Moreover, the plan Plaintiffs propose is also superior in other respects because it does not fracture natural and municipal boundaries.

After more than 20 years of litigation, it is clear that resistance to the growing numerical presence of black and Hispanic voters in this County is strong, palpable, and unyielding. Plaintiffs again ask this Court for relief. For all the reasons set forth herein, this Court should issue the preliminary injunction that Plaintiffs request.

## FACTUAL BACKGROUND

### I.     ALBANY COUNTY

Defendant County of Albany (the "County") is comprised of 19 cities, towns, and villages, the largest of which is the City of Albany (the "City"). *See* Declaration of Aaron Mair, dated July 15, 2011 ("Mair Decl."), ¶ 4. The County's minority population has grown in recent decades and is located principally in the City. *See* Declaration of William Cooper, dated July 14, 2011 ("Cooper Decl."), ¶ 6; Mair Decl. ¶ 5.

### II.    THE LEGISLATURE

The legislative power of the County government resides in the County Legislature (the "Legislature"). *See* Albany County Government Organization, *available at* http://www.albanycounty.com/aboutus.asp?id=392 (last visited July 15, 2011). Pursuant to the County Charter, the Legislature consists of single members elected from each of the County's 39 districts. *See id.*; Cooper Decl. ¶ 22. The County's 39 districts are required to be comprised of approximately equal numbers of residents based on data from the United States Census Bureau. The County redistricts itself following each decennial national census. Albany County Charter Art. 2, § 207.

Elections to the Legislature are held every four years. The next primary election for the Legislature is scheduled for September 13, 2011. New York State Board of Elections, *Political Calendar 2011* (April 5, 2011). The next general election is scheduled for November 8, 2011. *Id*.

### III.   THE LEGISLATURE'S 1990 REDISTRICTING PLAN
###        AND 1991 CONSENT JUDGMENT AND DECREE

After receiving the 1990 U.S. Census data, the Legislature passed a local reapportionment law that redrew the 39 legislative districts created in 1980. Though the 1990

3

U.S. Census data indicated that there was a sufficient geographically condensed minority population in the City to create three majority-minority districts ("MMDs"), the reapportionment law passed by the Legislature contained only a single MMD.  Minority voters in the County brought suit, alleging that the 1990 legislative districts and the 1980 legislative districts violated Section 2 of the Voting Rights Act.  *See* Mair Decl. ¶ 7; Declaration of Carlos Gonzalez ("C. Gonzalez Decl.") ¶ 6.

On November 13, 1991, the County entered into a consent judgment and decree.  C. Gonzalez Decl., Ex. 1.  In approving the consent decree, District Judge Con Cholakis ordered that "[t]o remedy the existing claimed non-compliance with the Voting Rights Act," the County must adopt a "redistricting plan [that] include[s] three districts in the area of the City of Albany equal to or greater in black and Hispanic combined population of at least 63%."  *Id.*, Ex. 1, ¶ 2 of Order.

Pursuant to this judgment, three MMDs were created, and three minority legislators ultimately were elected from those districts.  Mair Decl. ¶ 8.

## IV.    THE LEGISLATURE'S 2000 REDISTRICTING PLAN AND THE *ARBOR HILL* LITIGATION

After receiving the 2000 U.S. Census data, the Legislature adopted Local Law J to redistrict the County.  Although the 2000 U.S. Census data indicated that there was a sufficient geographically condensed minority population in the City to create four MMDs, Local Law J provided for only three MMDs.  Minority voters in the County brought suit, alleging that the Local Law J legislative districts violated Section 2 of the Voting Rights Act.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, No. 03-CV-502 (N.D.N.Y.).

On July 7, 2003, Magistrate Judge David R. Homer issued a Report and Recommendation that the minority voters' motion for a preliminary injunction be granted.  *Arbor*

*Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, ("*Arbor Hill I*"), No. 03-CV-502 (NAM/DRH), 2003 U.S. Dist. LEXIS 11386 (N.D.N.Y. July 7, 2003).  After a "*de novo* review of the record," District Judge Norman A. Mordue adopted Magistrate Judge Homer's Report and Recommendation "in its entirety" and enjoined "the scheduled 2003 election of Albany County legislators pending adoption by the legislature of a new redistricting plan which creates a fourth majority/minority district determined to be compliant with the Voting Rights Act." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany ("Arbor Hill II")*, 281 F. Supp. 2d 436, 442, 457 (N.D.N.Y. 2003).  In a Memorandum-Decision and Order dated October 20, 2003, Judge Mordue noted that "[t]he County created the present circumstances by adopting a redistricting plan which flagrantly violated the rights of minority voters." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany ("Arbor Hill III")*, 289 F. Supp. 2d 269, 276 (N.D.N.Y. 2003).

After further litigation, including an appeal to the Second Circuit, *see Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany* ("*Arbor Hill IV*"), 357 F.3d 260 (2d Cir. 2004), the County entered into a consent decree and judgment on August 19, 2004.  *See* Mair Decl. ¶ 12.  Pursuant to the consent decree and judgment, four MMDs were created, from which minority legislators generally have been elected.  *Id*.

## V.      THE 2010 U.S. CENSUS DATA

The 2010 U.S. Census revealed further growth in the minority population of the County. According to the 2010 U.S. Census, the minority population of the County is 73,052, comprising 24% of the County's total population.  *See* Cooper Decl. ¶ 5, Ex. 1.  The minority population in the County increased by 36.2% from the 2000 U.S. Census to the 2010 U.S. Census, including a 15.5% increase in the black population and a 64.3% increase in the Hispanic population.  *Id.* ¶

5

12.  During the same period, the non-Hispanic white population of the County decreased by 4.1%.  *Id.*

The growth in the County's minority population occurred in significant part in a compact geographical area within the eastern part of the City.  According to the 2010 U.S. Census, the minority population of the City is 44,999, comprising 46% of the City's total population.  *See* Cooper Decl. ¶ 11.  The minority population in the City increased by 21.0% from the 2000 U.S. Census to the 2010 U.S. Census, including a 9.4% increase in the black population and a 57% increase in the Hispanic population.  *Id.* ¶¶ 9-11.  During the same period, the non-Hispanic white population of the City decreased by 9.6%.  *Id.* ¶ 8.

## VI.     THE LEGISLATURE'S 2010 REDISTRICTING PLAN

After receiving the 2010 U.S. Census data, the Legislature appointed a Redistricting Commission to evaluate the existing legislative districts and propose a redistricting plan.  Mair Decl. ¶ 14; *see also* Albany County Charter Art. 2, § 207.  None of the Commission's public hearings, however, were held in a minority community or any of the existing MMDs. Declaration of Anne Pope, dated July 14, 2011 ("Pope Decl."), ¶ 10; Declaration of Lucille McKnight, dated July 14, 2011 (McKnight Decl."), ¶ 8; Declaration of Wanda Willingham ("Willingham Decl.") at ¶ 11.  Although the hearings were purportedly public, they were not widely advertised.  For example, the meetings were not advertised in the *Times Union*, the Albany area's local daily newspaper.  Mair Decl. ¶ 16.  Moreover, whereas changes ultimately were made to the proposed redistricting plan in response to complaints from the majority community, no changes were made to the proposed redistricting plan in response to concerns from the minority community.  McKnight Decl. ¶¶ 9-10; Willingham Decl. ¶¶ 15-16; Declaration of Janis Gonzalez, dated July 14, 2011 ("J. Gonzalez Decl."), ¶ 8.  Among concerns

that members of the minority community raised were the need for a fifth MMD.  *See, e.g.*, Pope

Decl. ¶ 6.  Members of the minority community presented to the Commission and the Legislature

a redistricting plan that includes a fifth MMD.  Mair. Decl. ¶ 30.

Ultimately, the Legislature adopted a local reapportionment law, Local Law C, on May

23, 2011, and the County Executive signed it on June 6, 2011.  *See* McKnight Decl. ¶ ¶ 14-15;

Albany County, N.Y., Local Law C (June 6, 2011), Declaration of Paul DerOhannesian II, dated

July 15, 2011 ("DerOhannesian Decl."), Ex. 3.  Although the 2010 U.S. Census data reflects

significant growth in the minority population of the County and a sufficient geographically

condensed minority population in the City to create five MMDs, Local Law C maintains the

number of MMDs at four.  *See* Cooper Decl. ¶ 29; Albany County, N.Y., Local Law C (June 6,

2011).  Under Local Law C, Districts 1, 2, 3, and 4 remain MMDs.  *Id.*  District 6 under Local

Law C, however, has a substantial minority population coupled with portions of areas that are

predominantly white.  *See id.*  Under Local Law C, District 6 has a minority voting-age

population ("VAP") of 43.10%.  *Id.*

## VII.   <u>THIS LAWSUIT</u>

On June 29, 2011, this lawsuit was filed.  Plaintiffs Anne Pope, Janis Gonzalez, and

Wanda Willingham are each minorities and registered voters in the County.  Plaintiffs allege that

the County's failure to establish five MMDs in the wake of 2010 U.S. Census data dilutes

minority voting power, in violation of Section 2 of the Voting Rights Act.

Plaintiffs seek, *inter alia*, a declaration that Local Law C is void and an order enjoining

Defendants from holding any elections for Legislature seats or related processes under local

apportionment laws or redistricting plans that contain fewer than five MMDs, pending adoption

and implementation of a new redistricting plan that creates a fifth MMD and is otherwise determined to comply with the Voting Rights Act.

## VIII.   <u>PLAINTIFFS' PROPOSED ALTERNATIVE REDISTRICTING PLAN</u>

Local Law C creates districts that divide neighborhoods and artificially associate areas that have few ties to one another.  *See* Mair Decl. ¶¶ 33-34.  For example, at least two districts under Local Law C cross the City's boundaries into surrounding municipalities in the County, in three different locations.  *Id.* ¶ 34.

As an alternative to Local Law C, Plaintiffs present a redistricting plan developed by the Arbor Hill Environmental Justice Corporation (the "AHEJ Plan").  *Id.* Ex. 14.  The AHEJ Plan contains five compact MMDs within the City and was developed using the same methodology and principles applied to develop the proposed alternative plan in connection with the *Arbor Hill* litigation.  *Id.* ¶ 35; *see also* Cooper Decl. ¶ 24 ("The technical work of the plan produced by Arbor Hill Environmental Justice . . . is on par with, or better than, the typical government agency or redistricting consultant.").  The AHEJ Plan is comprised of districts that respect natural community, neighborhood, and municipal boundaries.  Mair Decl. ¶ 31.

## <u>ARGUMENT</u>

The "traditional standards" for a preliminary injunction govern in a Voting Rights Act case.  *See Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 274 (2d Cir. 1994), *rev'd on other grounds*, 512 U.S. 1283 (1994).  Thus, a preliminary injunction may issue when the party moving for an injunction shows a likelihood of success on the merits and irreparable harm absent injunctive relief.  *Id.  See also Mullins v. City of New York*, 626 F.3d 47, 52-56 (2d Cir. 2010) (affirming order granting preliminary injunction); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 416 (S.D.N.Y. 2010) (noting grant of preliminary injunction

in VRA case); *Arbor Hill II*, 281 F. Supp. 2d at 442 (granting preliminary injunction in VRA case).

As discussed below, the evidence here demonstrates that (i) Plaintiffs are substantially likely to prevail on the merits of their VRA claim; (ii) Plaintiffs and other minority voters in Albany County will suffer irreparable harm absent an injunction; (iii) the balance of hardships tips decidedly in Plaintiffs' favor; and (iv) the public interest weighs strongly in favor of granting a preliminary injunction.

**I.      PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR VOTING RIGHTS ACT CLAIM**

Plaintiffs allege a violation of Section 2 of the VRA.  Section 2 states in part as follows:

(a)      No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or implied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . .

(b)      A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading up to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice . . .

42 U.S.C. § 1973 (2006).  The essence of a Section 2 claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

In *Gingles*, the Supreme Court's seminal case interpreting Section 2, the Court identified three "preconditions" that must exist for a vote dilution claim under Section 2:

1.      The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.

2.      The minority group must be able to show that it is politically cohesive.

3.      The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

478 U.S. at 50-51.  "[I]nquiry into the *cause* of white bloc voting is not relevant to a consideration of the *Gingles* preconditions."  *Goosby v. Town Bd.,* 180 F.3d 476, 493 (2d Cir. 1999) (emphasis in original).

Once a district court determines that the *Gingles* preconditions exist, it must analyze the "totality of the circumstances" with reference to the following factors, which were listed in the Senate Report for the 1982 amendments to the Voting Rights Act:

1.      Whether there is a history of official discrimination in the political unit;

2.      Whether voting is racially polarized;

3.      Whether current electoral mechanisms enhance vote dilution;

4.      If there is a candidate slating process, whether access to such a process is denied to minorities;

5.      The extent to which members of the minority group in question bear the effects of discrimination in education, employment, and health, that hinder their ability to participate in the political process;

6.      Whether racial appeals have formed part of political campaigns; and

7.      Whether minorities have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 44-45 (citing S. Rep. No. 417, 97th Cong., 2d Sess. (1982)).  The Supreme Court also noted two other factors in the Senate Report that plaintiffs may elect to show in some cases:  whether elected officials have failed to respond to minority needs, and whether the policy underlying the contested practice or structure is tenuous.  *Id*. at 45.

A Section 2 plaintiff need not prove any particular number of factors or that a majority of the factors point "one way or the other."  *Id.* (quoting S. Rep. No. 97-417, at 29). "The list of factors 'is neither comprehensive nor exclusive.'  Rather, in deciding whether § 2 has been

violated, courts are to engage in a 'searching practical evaluation of the past and present reality.'" *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1008 (2d Cir. 1995) (quoting *Gingles*, 478 U.S. at 45). However, "it will be only the very unusual case in which the plaintiff can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances. *Id.* at 1019 n.21 (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ,*, 4 F.3d 1103, 1135 (3d. Cir. 1993)).

### A.      The *Gingles* Preconditions Exist In Albany County

In their 2003 rulings in *Arbor Hill*, Magistrate Judge Homer and District Judge Mordue found that there was ample evidence that each of the *Gingles* preconditions existed in Albany County. *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *16-34; *Arbor Hill II*, 281 F. Supp. 2d at 444-50. As discussed below, each of the *Gingles* preconditions exists today as well.[1]

### 1.      The Minority Population Is Sufficiently Large In Number And Geographically Compact To Comprise Five MMDs

The 2010 U.S. Census revealed significant growth in the minority population of the County, particularly in the City, where there has been a 21% increase in the minority population. *See* Cooper Decl. ¶ 11. Based on the 2010 U.S. Census data, the minority population in the County is "sufficiently large" to easily constitute a majority in five single member districts. *Gingles*, 478 U.S. at 50.

---

[1]   It is worth noting that the previous litigation concerning redistricting of the Albany County Legislature establishes against the Defendants a variety of key facts in the *Gingles* inquiry pursuant to the doctrine of collateral estoppel. A significant number of precise legal and factual issues presented on the motion were actually litigated and decided against the Defendants in the *Arbor Hill* litigation, including the existence of irreparable harm, the political cohesion among blacks and Hispanics in Albany County, the history of voting-related discrimination, and the effects of past discrimination. *See generally Montana v. United States*, 440 U.S. 147 (1979).

"A minority group is sufficiently large if it comprises more than 51% of the population of a voting district." *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *16; *see also Bartlett v. Strickland*, 129 S.Ct. 1231, 1246 (2009) ("It remains the rule . . . that a party asserting § 2 liability must show . . . that the minority population in the potential election district is greater than 50 percent."). Moreover, "blacks and Hispanics may be considered as a single minority group under the Voting Rights Act if the coalition meets the three *Gingles* preconditions." *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386 at *18; *see also Arbor Hill II*, 281 F. Supp. 2d at 445 (noting that "minority groups can be combined to meet VRA litigation requirements" and that "it was entirely appropriate for the Magistrate Judge to combine black and Hispanic populations in his analysis").

As explained in the accompanying declaration of expert witness William Cooper, the increased minority population supports at least five MMDs. *Id.* ¶ 26, Ex. 11. Indeed, the increased population of blacks and Hispanics supports five MMDs with VAP of between 60.46% and 62.69%. *Id.* ¶ 26 table, Ex. 11. Lest there be any doubt, the increased population of blacks *alone* supports 5 MMDs with non-Hispanic black VAPs of between 50.44% and 52.67%. *Id.* ¶ 26, n.2, Ex. 11.

To maintain the number of MMDs at four, the County has gone out of its way to create districts that artificially associate areas that have few ties to one another. *See* Mair Decl. ¶ 33. For example, at least two districts under Local Law C cross the City's boundaries into surrounding municipalities in the County, in three different locations. *Id.* ¶ 34. Moreover, as illustrated in the AHEJ Plan, the addition of a fifth MMD is feasible because the black and Hispanic populations are largely concentrated in a geographically compact area, within the eastern part of the City. *Id.* ¶¶ 23-24, Exs. 8-9. According to the 2010 Census, 71.9% of the

County's non-Hispanic African-Americans and Latinos live in the City.  Cooper Decl. ¶ 25, Ex. 5.  Because of the significant concentration of blacks and Hispanics in the City, simple and straightforward revisions to the districts drawn in Local Law C would create a fifth MMD that respects natural community, neighborhood, and municipal boundaries.  Mair Decl. ¶ 31.

Because the black and Hispanic populations in the County are now sufficiently large and geographically compact to constitute a majority in five single-member districts, the first *Gingles* precondition is satisfied.  *See Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *22-25 (finding existence of first *Gingles* precondition in Albany County); *Arbor Hill II*, 281 F. Supp. 2d at 444-447 (same).

### 2.    <u>The Minority Population Is Politically Cohesive</u>

"Black and Hispanic groups are politically cohesive when most members of the two groups vote for the same candidates in most elections."  *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *26.  In *Arbor Hill*, Judge Mordue noted that (i) "no one has raised a question . . . concerning the political cohesiveness of the black community in Albany County"; (ii) the County had implicitly acknowledged the cohesiveness between blacks and Hispanics in the consent judgment and decree that it entered into in 1991; and (iii) the political cohesion between blacks and Hispanics was "amply supported by the record."  *Arbor Hill II*, 281 F. Supp. 2d at 448-49.

The evidence continues to demonstrate that the black community is politically cohesive and that blacks and Hispanics are politically cohesive.  "A showing that a significant number of minority group members usually vote for the same candidate is one way of proving political cohesiveness necessary to a vote dilution claim."  *Gingles*, 478 U.S. at 56.  As explained in the accompanying expert report of Dr. Baodong Liu, Associate Professor at the University of Utah, the black community has routinely voted as a bloc.  *See* Expert Report of Dr. Baodong Liu ("Liu

13

Rep.") at 2 (attached to the Declaration of Baodong Liu, dated July 12, 2011).  For example, in City-wide elections analyzed, the black candidate received between 73.92% and 77.7% of the black votes.  *Id*. at 4.  In County Legislature primaries Dr. Liu analyzed, black voters preferred black candidates with 94.95% and 82.44% of their votes.  *Id*.

The political cohesion of blacks and Hispanics is also plainly apparent.  Indeed, "a fair reading of the Consent Decree reflects that in November 1991, defendants stipulated that the black and Hispanic groups in the County were cohesive and should be considered as one group for purposes of the Voting Rights Act."  *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386 at *27. Moreover, as attested to by leader in the minority community, blacks and Hispanics in the County have joined together in numerous ways to further each other's political and social interests.  Declaration of Joseph Gomez, dated July 15, 2001 ("Gomez Decl."), ¶ 8; J. Gonzalez Decl. at ¶¶ 10-13.  Community organizations that primarily serve Hispanics, such as Centro Civico Hispanoamericano, Somos El Futuro, and the Pew Hispanic Center, frequently collaborate with community organizations serving primarily blacks.  J. Gonzalez Decl. at ¶ 13. New York Leadership, an organization committed to political and governmental issues most important to the minority community, brings together and serves both blacks and Hispanics.  *Id*. at ¶ 12.  And, Albany's Ward Three, which includes the predominantly black neighborhood of Arbor Hill, was the first to elect a Hispanic committeeperson to the Albany County Democratic Committee.  C. Gonzalez Decl. ¶ 10.

Because the black community is politically cohesive, as are blacks and Hispanics, the second *Gingles* precondition is satisfied.  *See Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *25-29 (finding existence of second *Gingles* precondition in Albany County); *Arbor Hill II*, 281 F. Supp. 2d at 448-49 (same).

**3.**     **The Minority Population's Preferred Candidates**
**Are Usually Defeated By White Bloc Voting**

"A white bloc vote that normally will defeat the combined strength of minority support plus white 'cross-over' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56.  "[T]he cause for the white bloc voting is irrelevant in analyzing the third precondition." *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *31.

In *Arbor Hill*, the court found that the historical evidence "strongly supports the conclusion that the white majority in [Albany] County and in the area of [the disputed district] 'votes sufficiently as a bloc to enable it to . . . usually to defeat the minority's preferred candidate.'" *Id.*, at *34 (quoting *Gingles*, 478 U.S. at 51).

The empirical data shows that Albany County elections involving a choice between or among black and white candidates have been racially polarized in the last three decades.  Liu Rep. at 2.  Moreover, there has been no significant change in majority voting patterns since the Arbor Hill litigation.  Indeed, the continued absence of minority elected officials in the County speaks for itself:  only two minority candidates have since been elected to County-wide office, and only one minority candidate has ever been nominated by a major political party to run for such office.  Mair. Decl. ¶¶ 40-41.  The same racial polarization pattern that Plaintiffs' expert showed in the County from 1991 to 2002 persists in the data from 2003 to 2010.  *Id.*  From the most recent data, Plaintiffs' expert analyzed two recent County-wide elections, four recent City-wide elections, and five County Legislature elections.  Liu Exs. 1-6.  His analysis revealed that "voting in Albany County, New York from 2004 to 2010 involving a choice between or among black and white candidates has been racially polarized."  Liu Rep. at 2 (internal quotation marks omitted).  For example, in two recent mayoral elections involving a minority candidate, minority candidates who received 74% and 75% of black votes in the primaries were ultimately defeated

by non-minority candidates.  *Id.* at 4.  Thus, white bloc voting still persists so that it is unlikely

that a "minority candidate can even get on the ballot."  *Arbor Hill II*, 281 F. Supp. 2d at 450.

As the foregoing demonstrates, white bloc voting persists in Albany County.  *See* Liu

Rep. 1-13.  Thus, the third *Gingles* precondition is satisfied.  *See Arbor Hill I*, 2003 U.S. Dist.

LEXIS 11386, at *30-34 (finding existence of third *Gingles* precondition in Albany County);

*Arbor Hill II*, 281 F. Supp. 2d at 449-50 (same).

\* \* \*

Having met the three *Gingles* preconditions, Plaintiffs are presumptively entitled to relief:

"[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the

three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the

circumstances."  *NAACP*, 65 F.3d at 1019 n.21 (quoting *Jenkins*, 4 F.3d at 1135).

### B.       Under The Totality Of The Circumstances, The Legislative Districts Adopted By Albany County Violate The Voting Rights Act

In *Gingles*, the Supreme Court explained that the two most important Senate factors in

assessing the totality of the circumstances are (i) the "extent to which minority group members

have been elected to public office in the jurisdiction"; and (ii) the "extent to which voting in the

elections of the state or political subdivision is racially polarized."  478 U.S. at 48 n.15.  If those

factors are present, the other Senate factors "are supportive of, but *not essential to*, a minority

voter's claim."  *Id.* (emphasis in original).  In their 2003 rulings in the *Arbor Hill* litigation,

Magistrate Judge Homer and District Judge Mordue reviewed the Senate factors and determined

that they weighed heavily in the plaintiffs' favor.  *See Arbor Hill I*, 2003 U.S. Dist. LEXIS

11386, at *34-48; *Arbor Hill II*, 281 F. Supp. 2d at 450-56.  As discussed below, the evidence

confirms that the two key Senate factors and multiple other corroborative Senate factors remain

present in Albany County.  Accordingly, this Court should find that, under the totality of the

circumstances, Plaintiffs here are substantially likely to prevail on their claim that the legislative districts adopted by Albany County violate the Voting Rights Act.

### 1.        History Of Voting-Related Discrimination

Albany County has an established history—recognized by this court—of voting-related discrimination.  This Court found in the *Arbor Hill* litigation that "specific undisputed historical facts" established this discriminatory history.  *Arbor Hill II*, 281 F. Supp. 2d at 451-52 (footnote omitted).  Among other facts, this Court noted that (i) "no minority has ever been elected to County-wide office"; (ii) "[n]o minority has ever been nominated by a major political party to run for a County-wide office"; and (iii) only once "has a major political party endorsed a minority candidate in a majority-white legislative district."  *Id.* at 451 (quoting *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *35).

Little has changed.  Since the 2003 *Arbor Hill* litigation, only two minority candidates have since been elected to County-wide office, and only one minority candidate has since been nominated by a major party to run for such office.  Mair Decl. ¶¶ 40-41.  The record continues to show that outside of MMDs, "minorities have been effectively excluded from meaningful participation in County elections and governance."  *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *35-36.

There has unfortunately been other, additional voting-related discrimination in the wake of the *Arbor Hill* litigation.  For example, absentee ballot abuses in MMDs marred the March 2004 special election ordered by this Court to remedy the 2003 violation, requiring a new special election in Plaintiff Wanda Willingham's district, where she was the minority candidate.  Willingham Decl. ¶ 4.  As a result of those absentee ballot abuses in MMDs, the County faced a Section 11 VRA lawsuit, which it resolved through a consent decree agreeing to reforms with

regard to the unlawful absentee ballot activities. *Id.* ¶ 5, Ex. 1; *see also* Mair Decl. ¶ 13, Ex. 3; Willingham Decl. ¶ 5, Ex. 1.

There are more examples. In 2011, Samuel Coleman, an African-American resident of the City's Arbor Hill neighborhood, declared his candidacy for the Legislature and received the Democratic Party's endorsement. Declaration of Samuel Coleman, dated July 15, 2011, ("Coleman Decl.") ¶ 2. During the endorsement process, however, representatives from minority-community wards voted for Coleman, while representatives from majority wards voted against him. *Id.* ¶ 9.

When Plaintiff Willingham was on the verge of becoming chair of the Albany City Democratic Committee, the chairman of the Legislature declined to call the meeting necessary to keep the committee in existence, in what Willingham understood to be an effort to block the minority community from organizing. Willingham Decl. ¶ 6. A fellow legislator posted a racist, hateful comment regarding Willingham's efforts to change the committee's direction, advising Willingham, "back of the bus, sister. . . ." *Id.* ¶ 23.

## 2. Pattern Of Racially Polarized Voting

In the Arbor Hill litigation, Judge Mordue found that "voting in Albany County is polarized along racial lines." *Arbor Hill II*, 281 F. Supp. 2d at 452. As discussed in Section I.A.3. above, there continues to be ample evidence of racially polarized voting in both Albany County and the City. *See also Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *36 ("Substantially for the reasons set forth above in [the discussion of the third *Gingles* precondition], voting in the County and in the area of existing District No. 4 has been characterized by racially polarized voting.").

"[T]here is strong empirical evidence showing the elections involving a choice between or among black and white candidates in Albany County, New York have been racially polarized in the last three decades."  Liu Rep. at 2.  And in the wake of the 2003 *Arbor Hill* litigation, elections in Albany County and City continue to be characterized by racially polarized voting. See section I.A.3. *supra*.  From 2004 to 2010, in elections involving a choice among or between black and white candidates, black voters voted for black candidates in 11 of 14 races examined. Liu Rep. at 2.  Moreover, in three Democratic county legislature primaries between 2004 and 2010, black voters preferred the minority candidates with 53.36%, 94.95%, and 82.44% of their votes, while the non-black support for these minority candidates was only 20.50%, 34.75%, and 16.51%, respectively.  *Id*. at 4.

The racially polarized voting is even pervasive within political parties.  During this year's candidate selection process, for example, Democratic votes divided along racial lines. When the Democratic Committee members voted on their endorsement for the legislative candidate for District 3 this year, committee representatives generally casted their votes along racial lines. Coleman Decl. ¶ 9.   Ward representatives who are minorities generally voted for Samuel Coleman, a black man, but ward representatives who are white generally voted for the white incumbent candidate.  *Id.* ¶¶ 3, 8, 9.

### 3.  Limited Past Election Of Minority Group Members

In the *Arbor Hill* litigation, this Court found that "[o]utside the majority/minority districts, the record demonstrates that the election of minority group members in [Albany] County has been non-existent."  *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *39; *see also Arbor Hill II*, 281 F. Supp. 2d at 453 (same).  Indeed, Judge Mordue noted that "in most cases, no minority candidate can even get on the ballot."  *Arbor Hill II*, 281 F. Supp. 2d at 445.

The record continues to show that minority candidates have had little success outside of the MMDs.  Since the County's incorporation in 1788, only twice in 223 years has a minority candidate been elected to countywide office in Albany County; each of those two individuals— the County Coroner and the District Attorney—were first elected in 2004.  *See* Mair Decl. ¶ 41; *see also Arbor Hill II*, 281 F. Supp. 2d at 451.  Only once has a minority candidate ever been nominated by a major political party to run for countywide office.  *See* Mair Decl. ¶ 40.  Only one County department has ever been headed by a minority, McKnight Decl. ¶ 19, only a slight change from what the court recognized in *Arbor Hill II*, 281 F. Supp. 2d at 449.  There is not a single Hispanic on the City Council, the County Legislature, or the Democratic Committee Leadership.  J. Gonzalez Decl. ¶ 14.

The lack of minority representation is not for lack of trying; minority candidates have run for office in the County.  Declaration of Alice Green ("Green Decl.") ¶ 5 ; *see also* Liu Rep. at 3-5.  Hispanics have fared even worse.

### 4.   Dilution-Enhancing Voting Practices And Procedures

Albany County plainly has a history of redistricting in order to dilute minority votes, as evidenced by the 1991 Consent Decree, 2003 *Arbor Hill* litigation, 2004 Consent Decree, 2007 Consent Decree, and findings of multiple Voting Rights Act violations.  Consent Decree & Judgment, *NAACP v. Cnty. of Albany*, 91-CV-1288 (Nov. 13, 1991); *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386; *Arbor Hill II*, 281 F. Supp. 2d; Consent Decree & Judgment, *Arbor Hill v. Cnty. of Albany*, 03-CV-0502 (Aug. 19, 2004); *Arbor Hill III*, 289 F. Supp. 2d 269; *Arbor Hill IV*, 357 F.3d 260; Consent Decree & Judgment, *Willingham v. Cnty. of Albany*, No.04-CV-369 (Jan. 22, 2007), Willingham Decl. Ex. 1.  The numerous suits filed by minority voters against the County for voter dilution in violation of the VRA and the numerous judgments against the

County underscore the County's persistent and systematic efforts to dilute and marginalize minority votes.

### 5.      Exclusion Of Minority Group From Candidacy

In *the Arbor Hill* litigation, this Court found that "the oft repeated history of voting in Albany County . . . demonstrates that minorities have not been selected as candidates for county-wide office or for office in non-majority/minority districts." *Arbor Hill II*, 281 F. Supp. 2d at 452. Indeed, as the *Arbor Hill* court noted in 2003, "[n]o minority individual has ever been nominated by a major political party to run for a County-wide office in Albany County. On only one occasion has a major political party endorsed a minority candidate in a majority-white legislative district." *See id*. at 451.

The exclusion of minority community members from candidacy has continued since the *Arbor Hill* litigation in 2003. *See generally*, McKnight Decl.; Willingham Decl.; J. Gonzalez Decl.; C. Gonzalez Decl.; S. Coleman Decl. In a County legislative race, the Democratic Party declined to endorse then-and-current legislator Lucille McKnight, an African-American and Democrat, forcing McKnight to run on the Working Families Party ballot line. McKnight Decl. ¶ 4. Plaintiff Janis Gonzalez, who is black and Hispanic and is a current legislative candidate, found the Albany County Democratic Committee unresponsive to her requests to be considered for an endorsement. J. Gonzalez Decl. ¶ 4. And current Legislature candidate Sam Coleman, an African-American and Democrat, has found that members of the County Democratic Party have limited their contact with him since he declared his candidacy. Coleman Decl. ¶ 6.

The exclusion of minority candidates from the nominating and slating process hinders the ability of minorities and minority-preferred candidates to run for office and win elections.

6.    **Effects Of Past Discrimination**

In the *Arbor Hill* litigation, this Court found that "minorities continue to lag behind the white majority in the County in virtually all socio-economic categories, including education, employment, housing, income and mobility." *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *38; *see also Arbor Hill II*, 281 F. Supp. 2d at 452 (same). Judge Mordue concluded that the record demonstrated that past discrimination continued to affect the County's minority community. *Arbor Hill II*, 281 F. Supp. 2d 436 at 452. The socio-economic gap between minorities and whites in Albany County remains. Minorities in the County bear the effects of past discrimination—in hiring and employment, education, health, and income—which have greatly diminished their ability to participate effectively in the political process.

The effects of discrimination are especially pronounced in minority hiring and employment. For example, while the County has 23 unelected departments, only one minority individual has ever headed any one of the County departments. *See* Mair Decl. ¶ 42. Although the County's hiring contracts contain language about hiring minorities, it appears no real effort to hire minorities has been undertaken. McKnight Decl. at ¶ 17.

The experience of minorities aspiring to join the City's fire department provides the clearest example. In 1995, a black applicant to the City's fire department sued the City for discrimination when he was not hired, even though he achieved the same score on the civil service exam as the white applicants who were ultimately hired. *Banks v. City of Albany*, 953 F. Supp. 28 (N.D.N.Y. 1997); Mair Decl. ¶ 43. At the time, only 3% of the city's firefighters were black. *Banks,* 953 F. Supp. at 35. The City entered a consent decree to resolve that suit. Declaration of Corey Ellis dated July 14, 2011 ("Ellis Decl.") ¶ 4, Ex. A. The lawsuit, however, did little to resolve the issue. As of 2009, only 5% of the city's firefighters were black.

Declaration of Kathy Sheehan ("Sheehan Decl.") Ex. 1; Albany County 2009 Demographic Report.  As a member of the Albany City Council, Corey Ellis worked to resolve this disparity and other disparities, including by the County, but his efforts met little success.  Ellis Decl. ¶¶ 4-6.  Similarly, as of January 2010, only 15.8% of all City employees were black, although blacks make up 28.7% of City residents.  DerOhannesian Decl., Ex. 1; Jordan Carleo-Evangelist, *City Says Fill Diversity Post*, TimesUnion.com, Aug. 26, 2010; Sheehan Decl. ¶ 5.

The effects of past discrimination continue to plague Albany's minority residents in housing, health, and education as well.  Minority residents continue to fall behind the white population on common measures of socioeconomic status, educational attainment, and access to the resources necessary to participate effectively in the political process.  *See* Cooper Decl. ¶ 16. In the County today, 18.7% of blacks did not complete high school, compared to 7.6% of white residents.  *See* Cooper Decl., Ex. 2.  The current high school graduation rate in the Albany City School District is 72% for whites, but only 42% for blacks. Declaration of Noelene Smith, dated July 14, 2011 ("Smith Decl.") at ¶ 3.  In the Albany City School District, 21% of black students are placed in special education.  *Id*. at ¶ 4.  In terms of higher education, only 19.5% of Albany's black residents and only 25% of Latino residents have a bachelor's degree, compared to 38.3% of whites.  Cooper Decl., Ex. 2.

Blacks face significantly higher mortality rates than whites in asthma, diabetes, heart disease, AIDS, lower respiratory disease, and homicide.  Declaration of Ingrid M. Allard, M.D. ("Allard Decl.") ¶¶ 5-8.  Blacks face significantly higher hospital admission rates in these areas as well.  *Id.* ¶¶ 14-24.

Albany's blacks also face a steep income disparity.  Nearly 24% of black families in Albany County have incomes below the poverty level, compared to only 4% of white families.

Cooper Decl., Ex. 2.  The median family income for African-Americans in Albany is $35,000,

compared to more than $82,000 for white households.  *Id*.  On a per capita basis, African-

American citizens of Albany make, on average, half as much money as average white citizens of

Albany do—$17,243 versus $33,887.  *Id*.

In short, minority citizens in Albany lag behind whites in nearly every socio-economic

measure.  *See* Cooper Decl. ¶ 16, Exs. 2 and 3.

### 7.    Lack Of Responsiveness To Minority Needs

The County has ignored and even refused to acknowledge the needs of members of the

minority community, both with regard to public services generally, and during the recent County

legislative redistricting process when members of the minority community publicly expressed

their needs and concerns.

The Arbor Hill neighborhood of the City, the heart of Albany's minority community,

receives next to nothing in terms of government services:  lighting in parks is out; the community

center's hours have been cut; there is a dearth of afterschool programs; the Little League fields

are unsafe and unusable; and the Boys' Club building itself was sold.  Coleman Decl. ¶ 10.

Community leaders' complaints to remedy these deficiencies fall on deaf ears.  *Id*.  Similarly, the

Albany Police Department ignored its obligations to the minority community under the former

police chief by focusing on petty street crimes while closing stations in minority neighborhoods

without any input from the minority community.  Green Decl. ¶ 11.  Moreover, the command

staff of the Albany Police Department, which includes its chief, deputy chief, assistant chief, and

commanders, has no minorities among its ranks.  Green Decl. ¶ 7.  On a grander scale, a

committee established in 2006 to evaluate the future of the City of Albany—a serious endeavor

concerning all members of the community, including minorities—did not include a single member of the minority community.  Ellis Decl. ¶ 8.

The County's dismissiveness toward the minority community manifested itself again during the process leading to the enactment of Local Law C.  Of the 10 public hearings held regarding the redistricting plan, none was held in minority communities.  Mair Decl. ¶¶ 16-18; *see also* McKnight Decl. ¶ 8; Willingham Decl. ¶ 11.   The meetings that the County did hold—outside of minority communities—were poorly advertised, with some absent even from the County's web site.  Willingham Decl. ¶ 9.  Moreover, the Commission failed to provide information regarding its proposed districting plan upon request from members of the minority community.  Pope Decl. ¶¶ 4-5.  During the process, the Commission and Legislature listened to and considered concerns from members of the majority white community, prompting revisions to the plan.  The concerns of the minority community were ignored or dismissed.  *See* Mair Decl. ¶¶ 27-29; McKnight Decl. ¶¶ 9-10; Willingham Decl. ¶¶ 14-16.  During the process, plaintiff Willingham learned from the Chairman of the Commission, upon seeking an explanation why changes were made for some concerns but not others, that Legislator Shawn Morse, the Commission's chairman, would not "chang[e] the black lines."  Willingham Decl. ¶ 16.   The Chairman of the Legislature, Daniel McCoy, indicated there was not sufficient time to consider five MMDs because the plan needed to be implemented rapidly.  Willingham Decl. ¶ 17; *see also* McKnight Decl. ¶ 13.

The Legislature refused to consider the AHEJ alternative districting plan that included five MMDs and complies with the VRA.  Mair Decl. ¶ 31.  The Legislature's Chairman and others rejected the AHEJ plan out of hand, without considering it.  *See* Willingham Decl. ¶ 18; Pope Decl. ¶ 7.  The Commission's Chairman and other legislators were uninterested during the

presentation of the AHEJ plan by community activist Aaron Mair.  *See* Pope Decl. ¶ 7.  When

Plaintiff Pope raised concerns about the Local Law C plan at one meeting, the Commission's

chairman spoke over her and carried on a separate conversation during her presentation.  Pope

Decl. ¶ 8. The evidence demonstrates that Albany County turns its back on the concerns of the

minority community not only in the day-to-day operation of government, but also in the

districting process giving rise to the instant litigation, demonstrating contempt toward the

minority community.

### 8.   <u>Tenuous Policy Underlying Redistricting</u>

In the Arbor Hill litigation, this Court identified the policy at issue as "the County's

determination in its Plan not to create a fourth majority/minority district."  *Arbor Hill I*, 2003

U.S. Dist. LEXIS 11386, at *41.   Judge Mordue rejected the County's contentions that the

County was not responsible for the districting plan because it had relied on a consultant to draw

the plan, noting, "[i]t strains the bounds of credulity for defendants to argue that the County is

not responsible for the redistricting plan at issue in this case. . . ."  *Arbor Hill II*, 281 F. Supp. 2d

at 453.  This Court found that the County's policy underlying its plan was tenuous for a number

of reasons, including the significant increase in the number of minorities in the MMDs beyond

63% of the population, which the County agreed in the 1991 consent decree was sufficient to

constitute a MMD.  *Arbor Hill II*, 281 F. Supp. 2d at 454 (citing *Arbor Hill I*, 2003 U.S. Dist.

LEXIS 11386, at *42-44).

Here, as in 2003, the County's policy underlying its redistricting scheme is to avoid

creating an additional MMD, despite population changes that require it under Section 2.  Rather

than adopting a fifth MMD that follows natural community, neighborhood, and municipal

boundaries, as it easily could have, *see* Mair Decl. ¶ 31, the County redrew existing MMDs so

the minority population in the MMDs was significantly higher than necessary to constitute

MMDs.  The County plan increases the number of minorities in three MMDs so they constitute

even greater percentages than did the three districts the County packed in 2003.  Under Local

Law C, black and Hispanics comprise more than 65% of the VAP in each of three districts.

Cooper Decl. ¶ 29.  District 1 has 70.62% black and Hispanic VAP; District 3 has 70.56%; and

District 4 has 65.93%.[2]  In 2003, the County offered three districts with minority VAPs of

65.8%, 66.5%, and 67.7%.  *Arbor Hill II*, 281 F. Supp. 2d at 454.  Furthermore, instead of

creating the fifth MMD that demographics warrant and the minority community supported, the

County carved minorities out of districts—for example, Local Law C District 6 has 33.69%

black and Hispanic VAP.  Cooper Decl. ¶ 29.  Instead, the County went out of its way, creating

districts that chop up neighborhoods and cross municipal boundaries, merely to avoid creating a

fifth MMD.  *See* Mair Decl. ¶¶ 33-34.

## II.    ABSENT AN INJUNCTION, PLAINTIFFS AND OTHER MINORITY VOTERS IN ALBANY COUNTY WILL SUFFER IRREPARABLE HARM

Plaintiffs and other minority voters in Albany County will suffer irreparable harm absent

an injunction.  *Arbor Hill* is directly on point.  Like the plaintiffs here, the plaintiffs in *Arbor Hill*

sought a preliminary injunction enjoining the County of Albany and the Albany County Board of

Elections from conducting elections for the Legislature pending adoption of a new redistricting

plan that created an additional MMD and complied with the VRA.  This Court found that the

irreparable harm requirement was plainly satisfied because "[t]he abridgement or dilution of the

---

[2]   Under Local Law C, the fourth MMD, District 2, has 61.17% black and Hispanic VAP. Cooper Decl. ¶ 24.

right to vote is an irreparable harm."  *Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386, at *9; *see also*

*Coleman v. Bd. of Educ.*, 990 F. Supp. 221, 226 (S.D.N.Y. 1997).

To permit elections for the Legislature to proceed "in a manner that will violate the

Voting Rights Act constitutes irreparable harm to voters."  *United States v. Berks Cnty.*, 250 F.

Supp. 2d 525, 540 (E.D. Pa. 2003).  Furthermore, denial of equal electoral access discourages

future participation by minority voters.  *See United States v. Osceola Cnty.*, 475 F. Supp. 2d

1220, 1233 n.30 (M.D. Fla. 2006) ("[T]here is a sense of futility that often leads [a minority

group] to not participate in contests where there does not appear to be a reasonable opportunity

for their preferred candidate to win.").

## III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN PLAINTIFFS' FAVOR

The irreparable harm that Plaintiffs and other minority voters in Albany County will

suffer in the absence of an injunction plainly outweighs any conceivable harm to Defendants

from the grant of an injunction.  Indeed, as this Court found in *Arbor Hill*, "[t]he interests of

plaintiffs in obtaining equal voting rights in [Albany] County outweighs the interests of

defendants in avoiding disruption of the ongoing electoral process."  *Arbor Hill I*, 2003 U.S.

Dist. LEXIS 11386, at *53; *see also id*. at *52-54 (finding that "the equities weigh strongly in

favor of granting the preliminary injunction" because "disrupting and delaying ongoing

Legislature election processes is not unprecedented in the County"); *Arbor Hill IV*, 357 F.3d at

262-63 (holding that the equitable powers of district courts permit the restructuring and rewriting

of the election calendar to redress a VRA violation).

## IV.    THE PUBLIC INTEREST WEIGHS STRONGLY IN FAVOR
##          OF GRANTING A PRELIMINARY INJUNCTION

The public interest also weighs strongly in favor of granting a preliminary injunction.

Courts repeatedly have held that it is in the public interest to prevent electoral processes that may

dilute the votes of minority voters. *See Arbor Hill II*, 281 F. Supp. 2d at 456 (finding that "the public interest weighs strongly in favor of granting plaintiffs' request for a preliminary injunction" and entering preliminary injunction enjoining Albany County and Albany County Board of Election from conducting scheduled election of Albany County legislators pending adopting of new redistricting plan which creates an additional MMD compliant with the VRA); *see also Johnson v. Miller*, 929 F. Supp. 1529, 1560-61 (S.D. Ga. 1996) ("The public has a strong interest in having elections conducted according to constitutionally drawn districts, instead of pursuant to racially gerrymandered lines that violate the constitutional rights of all citizens within those districts."); *Quick Bear Quiver v. Nelson*, 387 F. Supp. 2d 1027, 1034 (D.S.D. 2005) ("The public has an interest in ensuring compliance with federal laws, namely the VRA."); *United States v. Charleston Cnty.*, 318 F. Supp. 2d 302, 327 (D.S.C. 2002) (finding that "the public interest aligns with the Congressional enactment of the Voting Rights Act prohibiting the use of an election system that unlawfully dilutes black voting strength").

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court grant its motion for preliminary injunction and enter an order enjoining Defendants from holding any elections for Legislature seats or related processes under local apportionment laws or redistricting plans that contain less than five MMDs, pending adoption and implementation of a new redistricting plan, such as the AHEJ Plan, that creates a fifth MMD and otherwise complies with the Voting Rights Act.

Dated:  July 15, 2011

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Mitchell A. Karlan
     Mitchell A. Karlan

mkarlan@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Fax: 212.351.4035
Bar Roll No. 511874677

DEROHANNESIAN & DEROHANNESIAN
Paul DerOhannesian II
derolaw@verizon.net
677 Broadway, Suite 202
Albany, New York 12207-2985
Telephone: 518.465.6420
Fax: 518.427.0614
Bar Roll No. 104792

Attorneys for Plaintiffs