UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ANNE POPE, JANIS GONZALEZ, and WANDA WILLINGHAM,

                        Plaintiffs,

        vs.

COUNTY OF ALBANY and the ALBANY COUNTY BOARD OF ELECTIONS,

                        Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

Civil Action #11-CV-736

LEK/DRH

---

        Defendants submit this response to Plaintiffs' Application for a Temporary Restraining Order (Dkt. Nos. 56, 57). For the reasons stated below, in Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction, and the hearing on Plaintiff's Motion for a Preliminary Injunction, this request should be denied.

        Plaintiffs could have brought this request for a TRO when they commenced this litigation on June 29, 2011. They did not. Instead, Plaintiffs allowed the election process to proceed apace to the detriment of voters, political parties, and candidates. Matthew J. Clyne, Albany County Democratic Election Commissioner, testified that during the past six weeks candidates, voters, campaign workers, and election officials have devoted substantial time, money, and effort in gathering and processing nominating and opportunity to ballot petitions (including expensive election law litigation) that are based upon election districts established with the adoption of Local Law C. As a result, Plaintiffs' claim of immediate irreparable harm is belied by their own lack of urgency.

        Moreover, Plaintiffs contend that the enjoining of the elections is *de minimis* when compared with their claim alleging dilution of the minority vote. Plaintiffs obdurately refuse

1

to recognize, as conceded by their own expert, that the existing district lines that were created in 2004 are now mal-apportioned and violate the one-man, one-vote requirement of the 14th Amendment.  As such,  every voters' (including minority voters' rights) constitutional right would be violated by stopping the election.   In utter contrast, Local Law C meets the Equal Protection Clause requirement, provides for the same number of majority- minority districts (MMDs), and allows the voters to select their own representatives.  As such, the choice between an admittedly unconstitutional option and Local Law C is clear.

Plaintiffs obviously understand the defects in their motion.  One might suspect that the motion was not really brought to secure a TRO but rather to make a legal pivotal because they failed to establish the three necessary preconditions stated in *Thornburg v. Gingles*, 478 U.S. 30 (1986).   Plaintiffs have failed to meet any of the three *Gingles* necessary preconditions.

 In particular, plaintiffs must show that they can create a fifth MMD that is "sufficiently large" enough to enable Black voters to elect the candidate of their choice. Implicit in their motion is the admission that plaintiffs have failed to prove political cohesion between Blacks and Hispanics.  Thus, plaintiffs find themselves in the unenviable position that their fifth MMD, which has a voting age population of fractionally over 50%, is an effective MMD.  There are three problems with this position: (1) the single case upon which plaintiffs rely does not support the proposition for which they cite it; (2) plaintiffs' expert here as well as their prior objection to the County's remedial plan 10 years indicated that at least 55% of Black voting age population is required to make a sufficiency large effective district.  See Marcelle Dec. Exh. B at 23-24, Exhibit 17 and Exhibit 17A and (3) even to achieve the incredible low number of 50.27%, plaintiffs had to systemically under populate

all 5 of their MMDs (providing for disproportional representation based on race within Albany County) in order to attempt to maximize the number of MMDs that they consider to be (but which are not) effective MMDs.

First, Plaintiffs now argue, for the first time in their OTSC, that *Bartlett v. Strickland*, 129 S.Ct. 1231 (2009) only requires a simple majority for a MMD.  Plaintiffs overstate *Bartlett*.  *Bartlett* addressed only "crossover districts" that do not meet the *Gingles* precondition of a "sufficiently large" and compact district.  A majority of the Court did not hold that only a mere bare majority of a minority voting age population is sufficient to create an effective MMD.

Second, like the prior litigation, Plaintiff's own expert, Dr. Paul Liu, testified that a 55% minority population is required for an effective MMD.  In the prior litigation, Plaintiffs stated that "to be effective, the majority-minority districts must contain significantly more than a simple bare majority."  See Marcelle Dec. Exh. B at 23-24.   In the end, however, Plaintiffs' only demonstrate a fifth district  of DOJ Non-Hispanic Black populations of  50.4 % (barely a simple majority). See Cooper Dec. Aff. 26 & Exh. 6 (Dkt. No. 25-6).

As plaintiffs argued in 2003 relying on Hastert *v. State Board of Elections,* 777 F. Supp. 634 (N.D. Il1. 1991), a 50% VOP of Blacks is insufficient to create MMD.  Defendants agree with Plaintiffs that Hastert presents the correct principle of law.  In *Hastert*, the court approved a redistricting plan that created a MMD that had a voting age population that was 59.29% African-American and  stated that "[m]inority concentrations of 65% total population and 60% voting age population within a single District are regarded as necessary to provide a minority population with a reasonable opportunity to 'exercise political control over that district.' *Id.* at 647 n. 20.  Local Law C achieves the standard the plaintiffs urged

the Court to adopt in 2003.  Local Law C contains four districts with DOJ Non-Hispanic Black populations between 55.09 % and 61.75%, all above the percentage required by Plaintiff's own expert.  See Cooper Dec. Aff. 29 & Exh. 8 (Dkt. No. 25-8).

In essence acknowledging that they are unable to meet their burden of a "sufficiently large" population by Black voters alone, Plaintiffs sought, but failed, to demonstrate a "political cohesion" with Hispanic voters.  Plaintiffs' "expert", Mr. William Cooper, admitted that he was not, in fact, an expert on "political cohesion" or socio-economic cohesion and was uncomfortable with the use of the word "cohesive" in his declaration in describing the socio-economic relationship between Blacks and Hispanics.  Dr. Liu testified that there is no statistical evidence to prove the political influence of Hispanic voters.

Plaintiffs' reliance upon a Consent Decree in 1999 is similarly misplaced.   In *Arizona v. California*, 530 U.S. 382, 414 (2000), the Supreme Court held:

> But settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect. "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus consent judgments ordinarily support claim preclusion but not issue preclusion." 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4443, pp. 384-385 (1981). This differentiation is grounded in basic res judicata doctrine. It is the general rule that issue preclusion attaches only "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." Restatement (Second) of Judgments § 27, p. 250 (1982).  "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section [describing issue preclusion's domain] does not apply with respect to any issue in a subsequent action." *Id.,* comment *e,* at 257.

 Here, of course, the Consent Judgment was reached without litigation and, in any event, does not mention political cohesion between Blacks and Hispanics.  But even if it did,

it does not state that it is binding on the Albany County Legislature on all future redistricting plans, including Plan C adopted decades later.  Moreover, as stated at the hearing, the political influence of Hispanic population has expanded due to the tripling of the population over the past twenty years.  Any statement in the ancient Consent Judgment would be dispositive only of the claim presented, but would have no preclusive effect on the issue of whether the Hispanic and Black populations are politically cohesive.  *See Arizona*, 530 U.S. at 414.

Third, each and every one of plaintiffs five MMDs are under-populated.  Not good. The only explanation for such systemic under-populating is that it is an effort to "separate voters into different districts on the basis of race."  *Shaw v. Reno*, 507 U.S. 630, 649 (1993). Such districts are "the product of [presumptively] unconstitutional gerrymandering … ." *Bush v. Vero*, 527 U.S. 952, 976 (1996).  At a minimum, this issue raises serious concerns about the constitutionality of plaintiffs plan and serious questions of whether the County is required to adopt a plan is constitutionally suspect.  Given these questions alone, the Court has sufficient reasons to deny the TRO and the injunction that seeks to stop people from choosing their representatives.

Finally, the County is not required to create the maximum possible number of compact MMDs — "reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast."  *Bartlett v. Strickland*, 129 S.Ct. 1231, 1244 (U.S. 2009) (internal citations and quotations omitted); *see also Gingles*, 478 U.S. at 94-95

The Supreme Court in *DeGrandy* made clear that when a districting plan provides the minority group with substantial proportionality, the fact that certain districts may be "packed" or "fragmented" is not, without more, evidence of dilution. *515 U.S.* at 1015-16. In *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998), the Seventh Circuit held that the minority group's "citizen voting age population" was the proper measure of electoral strength. *Id*. at 704. Importantly, the Seventh Circuit in *Barnett* affirmed judgment in favor of the City of Chicago because Latino's comprised just 11% of the City of Chicago's citizen voting age population but enjoyed super-majorities in 14% of the wards. The Seventh Circuit held that "[a] group that has electoral power . . . equal to its fraction of the electorate *will be hard-pressed to demonstrate, and has not demonstrated in this case, that its members nevertheless have less opportunity than other members . . . to elect representatives of their choice.*" *Barnett*, 141 F.3d at 705 [emphasis added; internal quotations omitted].

Plaintiffs' expert says Black VAP makes up 11.2 % of the County. There are 39 seats that comprise the Albany County Legislature. Accordingly, a proportional representation of Blacks in the County Legislature would be entitled to 4.36 seats (.112 x 39 = 4.36). Moreover, the more relevant geographical area, the City of Albany, provides Blacks even when combined with Hispanics provides this combines group with proportional representation. Blacks make-up 25.2% of the VAP of the City and have received 4 out of 13 City seats or 30.8% which is higher than Black VAP. Black +Hispanic VAP (not even the required CVAP) is 32.4% which is approximately proportional to 30.8% representation provided under Local Law C.

"Cases in which the Supreme Court has found a problem under § 2 <u>all involve transparent gerrymandering that boosts one group's chances at the expense of another's</u>. …

6

Nothing remotely similar happened in [Albany County in 2011]. A glance at the [Local Law C's] map reveals that the districts are compact and regular, with the few rough edges needed to ensure that they have equal population". *Gonzalez v. City of Aurora*, 535 F.3d 594, 598-599 (7th Cir. 2008) (internal citations and quotations omitted) (emphasis added).  Here, plaintiffs' own expert testified that the districts at worst what might be considered "slightly packed" and "slightly cracked."   Since, Blacks (and even Blacks and Hispanics) are represented under Local Law C in proportion to their VAP with only at best a slight case of packing; surely, Plaintiffs have not met their extraordinary high burden to enjoin an election.

For these reasons, Plaintiffs' application for a temporary restraining order should be denied in its entirety.

Dated: August 5, 2011				LAW OFFICES OF THOMAS MARCELLE, ESQ.
						          /s/ Thomas Marcelle
					By _____
						Thomas Marcelle, Esq.
						Bar Roll No. 117102
						Attorney for Defendant Albany
						County Board of Elections
						2 E-Comm Square, 3rd Floor
						Albany, New York, 12207
						Telephone:  518-424-9275
						Telefax: 518-427-1764
						E-mail: tjmarcelle@yahoo.com

						MURPHY, BURNS, BARBER & MURPHY, LLP
						          /s/ Peter G. Barber
					By  _____
						Peter G. Barber, Esq.
						Bar Roll No.  301523
						Attorneys for Defendant County
						of Albany
						226 Great Oaks Boulevard
						Albany, New York, 12203
						Telephone: 518-690-0096
						Telefax: 518-690-0053
						E-mail: pgb@mbbmlaw.com