UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                      :

ANNE POPE et al.,                 :
                                        :

                Plaintiffs,      :
                                        :

       -against-           :  No. 11-cv-0736 (LEK) (CFH)
                                        :

ALBANY COUNTY, et al.,     :
                                        :

                Defendants.    :
--------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GIBSON, DUNN & CRUTCHER LLP
Mitchell A. Karlan
mkarlan@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Fax: 212.351.4035
Bar Roll No. 511874

DEROHANNESIAN &
DEROHANNESIAN
Paul DerOhannesian II
derolaw@verizon.net
677 Broadway, Suite 202
Albany, New York 12207-2985
Telephone: 518.465.6420
Fax: 518.427.0614
Bar Roll No. 104792

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ...................................................................1

**STATEMENT OF FACTS** .......................................................................3

**ARGUMENT** ...........................................................................................8

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT WITH RESPECT TO ALL OF THE ISSUES THEY RAISE** ........................8

I.    Plaintiffs Have Adduced Evidence That the County Can Support Five MMDs Comprised of More Than 50% Black or Black/Hispanic Voting Age Population ...........................................................................................8

    A.    Any Resident Who Self-Identifies as Black or Hispanic Should Be Counted As a Minority for Purposes of Analyzing the County's Minority Population ...................................................................8

        1.    Even Without Combining Minority Groups, Plaintiffs Have Satisfied the First *Gingles* Factor by Demonstrating That Minorities Constitute More Than 50% of the Voting-Age Population in Five MMDs ...........................................................9

    B.    Voting-Age Population Is the Correct Measure of Minority Presence in a Voting Rights Act Case ....................................................10

II.   All Plaintiffs Have Standing as Albany County Minority Voters .....................12

    A.    A. Plaintiffs Pope, Willingham, Bell, Coleman, Pickney, and Proposed Plaintiffs Frazier, Gomez, Lebron, Davis, and Alfonso Have Standing Because Plaintiffs Have Asserted a Packing Claim..............................12

    B.    Proposed Plaintiffs Frazier, Alfonso, and Davis Have Standing as Minority Voters in Albany County Because They Reside Outside of the MMDs Under Local Law C, But They Could Easily Reside in an MMD Under the Adopted Remedial Plan. ....................................................14

III.  The Act Requires Five MMDs in Albany County ...........................................15

    A.    Minority Voters May Combine into Coalitions for Purposes of the Act..............15

    B.    Plaintiffs Have Adduced Evidence to Raise a Genuine Issue of Material Fact Whether Blacks and Hispanics in Albany Are Politically Cohesive ............19

# TABLE OF CONTENTS
## (Continued)

Page

C.  Plaintiffs Have Adduced Evidence to Raise a Genuine Issue of Material Fact Whether the White Majority Votes as a Bloc to Usually Defeat the Minority's Preferred Candidate ..................................................................................24

1.  There is no bright line rule with which to judge "sufficient" white bloc voting ...............................................................................................25

2.  The limited success of a few minority candidates does not preclude a Section 2 claim......................................................................................28

3.  Special circumstances found in Albany are probative of racially polarized voting ..................................................................................30

IV.  Because Local Law C Was the Product of Intentional Discrimination, Plaintiffs Need Not Prove That the Relevant Minority Population Was Greater Than 50 Percent in Any Event ...........................................................................................32

**CONCLUSION** .........................................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abrams v. Johnson*, 521 U.S. 74 (1997) ................................................................. 30

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) ................................................ 18

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp.
2d 436 (N.D.N.Y. 2003) ........................................................................... 3, 16, 18

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 289 F. Supp.
2d 269 (N.D.N.Y. 2003) .................................................................................. 4, 33

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, No. 03-CV-
0502, 2003 WL 21524820 (N.D.N.Y. July 7, 2003) ........................................ 4, 10

*Barnett v. City of Chicago,* 141 F.3d 699 (7th Cir. 1998) ......................................... 11

*Barnett v. City of Chicago*, 92 C 1683, 1996 WL 34432 (N.D. Ill. Jan. 29, 1996) ......... 12, 13, 14

*Barnett v. City of Chicago*, 969. F. Supp. 1359 (N.D. Ill. 1997) ................................... 20

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................. 17, 18, 33, 34

*Benavidez v. Irving Ind. Sch. Dist., Tex.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010) ................. 11, 15

*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) ......................... 19, 29, 32

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) ........................................................ 19

*Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d
Cir.) ............................................................................................................... 16, 19

*Broward Citizens for Fair Dists. v. Broward Cnty.*, 12-60317-CIV, 2012
WL 1110053 (S.D. Fla. Apr. 3, 2012) .................................................. 1, 12, 13, 14

*Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988) ............................... 17

*City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547 (11th Cir. 1987) ............. 25

*Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000) ............................................. 10

*Chisom v. Roemer*, 501 U.S. 380 (1991) ................................................................ 18

*Clarke v. City of Cincinnati*, 40 F.3d 807 (6th Cir. 1994) ..................................... 26, 27

*Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524
(11th Cir. 1990) ................................................................................................ 17

# TABLE OF AUTHORITIES
## (Continued)

<u>Page</u>

*Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996) ................................................................. 10

*France v. Pataki,* 71 F. Supp. 2d 317 (S.D.N.Y. 1999) ................................................. 16

*Garza v. Cnty. of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) ...................................... 11

*Georgia v. Ashcroft*, 539 U.S. 461 (2003) .................................................................... 18

*Growe v. Emison*, 507 U.S. 25 (1993) ........................................................................... 17

*Hall v. Virginia*, 276 F. Supp. 2d 528 (E.D. Va. 2003) ............................................... 14

*Holder v. Hall*, 512 U.S. 874 (1994) ............................................................................ 18

*Jenkins v. Red Clay Consolidated Sch. Dist. Bd. of Ed.*, 4 F.3d 1103 (3rd Cir. 1993) .......... 27, 28

*Johnson v. DeGrandy,* 512 U.S. 997 (1994) ............................................................ 29, 32

*Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189 (1973) ................................ 19

*Lepak v. City of Irving,* 569 U.S. __ (2013) ................................................................. 11

*Lewis v. Alamance Cnty.,* 99 F.3d 600 (4th Cir. 1996) ................................................. 31

*Lopez v. Merced Cnty.*, 473 F. Supp. 2d 1072 (E.D. Cal. 2007) .................................. 14

*Meek v. Metrop. Dade Cnty., Fla.*, 985 F.2d 1471 (11th Cir. 1993) ............................. 31

*Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1 (2d Cir. 1999) ..................... 10

*Negron v. City of Miami Beach*, 113 F.3d 1569 (11th Cir. 1997) ................................. 11

*Nixon v. Kent Cnty.*, 76 F.3d 1381 (6th Cir. 1996) ....................................................... 17

*Old Person v. Cooney*, 230 F.3d 1113 (9th Cir. 2000) ....................................... 26, 28, 30

*Perez v. Texas*, CIV.A. 11-CA-360-OLG, 2011 WL 9160142 (W.D. Tex. Sept. 2, 2011) ................................................................................................................... 12

*Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348 (E.D. Va. 2009) ........................... 14

*Pope v. Cnty. of Albany*, 687 F.3d 565 (2d Cir. 2012) .......................................... *passim*

*Reed v. Town of Babylon*, 914 F. Supp. 843 (E.D.N.Y. 1996) ..................................... 31

*Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D.N.Y. 2004) ........................................ 16

## TABLE OF AUTHORITIES
### (Continued)

Page

*Rogers v. Lodge*, 458 U.S. 613 (1982)........................................................................ 33

*Sanchez v. Bond*, 875 F.2d 1488 (10th Cir. 1989) ..................................................... 20

*Sanchez v. Colorado*, 97 F.3d 1303 (10th Cir. 1996) ................................................ 20

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................................... *passim*

*United States v. Hays*, 515 U.S. 737 (1995) ......................................................... 12, 13

*United Steelworkers v. Weber*, 443 U.S. 193 (1979) ................................................. 19

*Uno v. City of Holyoke*, 72 F.3d 973, 989 (1st Cir. 1995) ......................................... 26

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ........................................................... 12, 14

**Statutes**

42 U.S.C. § 1973(a) .................................................................................................... 17

42 U.S.C. § 1973(b) ......................................................................................... 16, 17, 19

42 U.S.C. § 1973b(f)(2) .............................................................................................. 17

**Other Authorities**

*Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed.
    Reg. 7470, 7472–73 (Feb. 9, 2011) ................................................................ 9

Nathaniel Persily, The Law of the Census: How to Count, What to Count, Whom to
    Count, and Where to Count Them, 32 Cardozo L. Rev. 755 (2011) ..................... 11

S. Rep. No. 97–417, *reprinted in* 1982 U.S.C.C.A.N. 177 ........................................ 28

U.S. Census Bureau, A Compass for Understanding and Using American Community
    Survey Data: What General Data Users Need to Know 4 (Oct. 2008), *available at*
    http://www.census.gov/acs/www/Downloads/handbooks/ACSstateLocal.pdf ..... 11

U.S. Census Bureau, Three Tips for Using American Community Survey (ACS)
    Data, http://www.census.gov/acs/www/guidance_for_data_users/guidance_main/
    (last visited Apr. 5, 2013) ................................................................................ 11

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants'

motion for summary judgment filed March 16, 2013 (Dkt. No. 214).

## PRELIMINARY STATEMENT

Both sides have now moved for summary judgment in this case. Plaintiffs' summary

judgment motion (Dkt. No. 209) focuses on the three *Gingles* factors, seeking summary

judgment on the first and second: that is, that Albany County's minority population, even taking

the Black population alone without including Hispanics, is sufficiently large, compact, and

politically cohesive to constitute an effective voting majority in five majority-minority districts

("MMDs").

Defendants' motion first questions Plaintiffs' standing. In Defendants' view, Albany

County (the "County") could pack all minority voters into one district, thereby denying standing

to—and disenfranchising—all minority voters. This is plainly not the law. And, in any event,

several additional plaintiffs seek to join the lawsuit to eliminate any doubt concerning this

question.

The rest of Defendants' motion boils down to three arguments: that the Voting Rights Act

(the "Act") does not permit coalitions of minority voters for purposes of enforcing the Act; that

Blacks and Hispanics in the County are not cohesive and therefore cannot form such coalitions;

and that racial bloc voting that defeats minority-preferred candidates is not present in County

elections.

Defendants' motion fails on every point. First, the law is clear that a plaintiff has

standing under the Act to bring a claim based on racial gerrymandering in the district where he

or she resides. *See Broward Citizens for Fair Dists. v. Broward Cnty.*, No. 12-60317-CIV, 2012

WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012). Plaintiffs here have standing as Black and Hispanic

1

voters who have been unlawfully packed into MMDs with the effect of diluting the minority vote.[1]

Defendants' arguments on coalitions also fail.  Defendants confuse cross-over districts (in which minority voters make up less than a majority of the population and must rely on white cross-over electoral support to elect representatives of their choice) with coalition districts (in which two minority groups who share community and political interests are treated as one minority community).  Courts in this Circuit and across the country have recognized that coalition districts are permissible under the Act.  Moreover, Plaintiffs have offered extensive evidence that Black and Hispanic voters in the County are politically cohesive, as they face the same socio-economic problems and work together to alleviate those same problems.  Further, Plaintiffs have adduced evidence that Black and Hispanic voters in the County support the same political candidates, volunteer on the same campaigns, and vote together to try and elect candidates that best serve Albany's minority community.

Finally, Plaintiffs have offered sufficient evidence to establish that the white majority votes as a bloc to usually defeat the minority community's preferred candidate.  Defendants have proffered no evidence to the contrary; instead, they argue that the limited success of a few minority candidates (six, in fact) eliminates any genuine issue of fact on this question.  There is substantial evidence in the record that white bloc voting is present in the County and usually defeats the minority community's preferred candidates.  Substantial evidence demonstrates that minority candidates in the County cannot win without the assistance of special circumstances such as appointments, incumbency, and most importantly, MMDs.

---

[1]   Plaintiffs have moved to amend the Complaint to add additional plaintiffs (who are minority voters living outside of the County's majority-minority districts) to replace Plaintiff Gonzalez, whom Defendants admit had standing in this case.  *See* Def. Br. at 11–13 Dkt. No. 214-24 ("Def. Br"); Dkt. No. 226.

As Plaintiffs have presented comprehensive evidence that Albany's minority community is sufficiently large and geographically compact, is politically cohesive, and can form effective coalitions of Black and Hispanic voters, and that white bloc voting in Albany usually defeats the minority community's preferred candidate, Defendants' motion for summary judgment cannot succeed. The Court should deny Defendants' motion for summary judgment.

## STATEMENT OF FACTS

The County has a long and sorry history of racial discrimination, which during the past 23 years has manifested in repeated violations of Section 2 of the Act. Minority voters successfully sued the County in 1990, alleging that the redistricting plan for the districts of the County Legislature (the "Legislature") improperly diluted the minority vote by packing minorities into a single MMD.[2]

In 2003, the County's redistricting plan packed minorities into only three MMDs, even though the minority population required four. Black and Hispanic voters sued the County,[3] and successfully established that the County's Black and Hispanic population required four MMDs.[4] The Court found that the Black and Hispanic communities were politically cohesive, and the County, in the adopted remedial plan, combined the Black and Hispanic populations to create four MMDs.[5]

---

[2]  *See* Consent Judgment and Decree, *NAACP v. Albany Cnty.*, No. 91-CV-1288 (N.D.N.Y. Nov. 13, 1991), Dkt. 1-2 ("1991 Consent Decree"), submitted as Exhibit 1 to the Declaration of Mitchell A. Karlan dated April 30, 2013 ("Karlan Decl.").

[3]  *See* Complaint, ¶¶ 11, 14, 15, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, No. 03-CV-502 (N.D.N.Y. Apr. 22, 2003) ("2003 Complaint"), Karlan Decl., Ex. 2 (identifying plaintiffs as Hispanic and Black).

[4]  *See* 2003 Complaint, ¶¶ 57, 94 ("The minority population (Hispanic/black and black alone) vote as a bloc."); Declaration of William S. Cooper, dated April 30, 2003, attached Exhibit B to 2003 Complaint (providing expert opinion on both the non-Hispanic black and Hispanic/Latino populations simultaneously), Karlan Decl., Ex. 3.

[5]  *See Arbor Hill Concerned Citizens Neighborhood Association v. Cnty. of Albany, 281 F. Supp. 2d 436, 448-49 (N.D.N.Y. 2003) ("Arbor Hill II"); Arbor Hill Concerned Citizens*

A. Local Law C:

The County once again undertook redistricting in 2011 following the 2010 U.S. census. At the first public hearing of the 2011 Albany County Redistricting Commission (the "Commission"), "members agreed that the most important ingredient to a successful redistricting is input from the community."[6] Over the next several months, however, the Commission failed to hold public hearings in MMDs, advertised the public hearings minimally, and held them at inconvenient times and locations.[7] At these hearings, the minority community educated the

---

*Neighborhood Ass'n v. Cnty. of Albany*, 289 F. Supp. 2d 269, 272 (N.D.N.Y. 2003) ("*Arbor Hill III*"). Indeed, even in the 1990 litigation, the plaintiffs combined the black and Hispanic populations. *See* NAACP 1992 Remedial Plan Proposal (displaying stats for "Blk. & Hisp." only), Karlan Decl., Ex. 4; *see also* 1991 Consent Decree ¶¶ 15, 22, 24; *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, No. 03-CV-502, 2003 WL 21524820, at *9 (N.D.N.Y. July 7, 2003) ("*Arbor Hill I*") (noting parties stipulated to cohesion). During the remedial stage of the litigation, the plaintiffs attempted to argue that the size of the minority population be based on the Black population only, which the Court rejected. Mem. Decision & Order, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, No. 03-CV-502, at 9 n.2 (N.D.N.Y. Oct. 20, 2003), Karlan Decl., Ex. 5.

[6] Secretary Thomas Scarff's notes regarding select 2011 Redistricting Committee public hearings ("Scarff Notes") at 1, Karlan Decl., Ex. 6.

[7] Declaration of Anne Pope, dated July 14, 2011 ("Pope Decl.") ¶¶ 10–11, Karlan Decl., Ex. 7; Declaration of Lucille McKnight, dated July 14, 2011 ("McKnight Decl.") ¶ 8, Karlan Decl., Ex. 8; Declaration of Wanda Willingham, dated July 15, 2011 ("Willingham Decl.") ¶¶ 9–11, Karlan Decl., Ex. 9; Transcript of Albany County Executive Hearing, May 31, 2011 ("Exec. Hr'g Tr."), at 64:8–16 (Pope testifying that no hearings were held in a minority community), Karlan Decl., Ex. 10; *id.* at 5:15–6:21, 7:11–8:17; Deposition of Thomas Scarff, taken Apr. 12, 2012 ("Scarff Apr. 12 Dep. Tr.") at 74:22–79:10 (indicating the Commission had limited means to advertise, and did little to reach out to the public), Karlan Decl., Ex. 11; Deposition of Geraldine Bell, taken Feb. 1, 2012 ("Bell Dep. Tr.") at 41:3–6 (stating she never received any information about the hearings), Karlan Decl., Ex. 12; Deposition of Janis Gonzalez, taken May 17, 2012 ("Gonzalez Dep. Tr.") at 91:9–93:20 (testifying that information about the public hearings was hard to track down, even for those "Internet-savvy," and that the times and locations were inconvenient, especially for the poor), Karlan Decl., Ex. 13; Deposition of Anne Pope, taken May 3, 2012 ("Pope Dep. Tr.") at 49:1–5, Karlan Decl., Ex. 14; Declaration of Aaron Mair, dated July 15, 2011 ("Mair PI Decl.") ¶ 15–17, Karlan Decl., Ex. 15; Albany Citizen One, "Chasing Down Albany County Redistricting," May 15, 2011, Karlan Decl., Ex. 16 (noting the need for "chasing down" the Commission hearing locations). While there was one hearing at the Albany County Office Building at 112 State Street, the facility is an office building outside that district's residential areas and unfamiliar

4

Commission about the large increase in the minority population, and why a fifth MMD was required.[8]

At its May 6, 2011, public hearing the Commission released a redistricting map, which kept the number of MMDs at four.  At this hearing, Thomas Marcelle, then-Counsel to the Minority in the Legislature, publicly stated that the MMDs in the proposed map were based on combining the Black and Hispanic populations.[9]  Although the public had not seen a draft redistricting map until that day, the Commission voted to forward the map as Local Law C to the Legislature.[10]

The public continued to express disagreement with the map, and stated that Local Law C would dilute the minority vote in violation of the Act.[11]  At the Legislature's May 9 public comment period, Aaron Mair presented the Arbor Hill Environmental Justice Corporation's alternative redistricting plan (the "AHEJ Plan"), which showed how the County's increased minority population justified at least five MMDs.[12]  The Commission, however, disregarded Mr. Mair's plan.

---

to the minority community.  Pope Dep. Tr. at 46:16–47:5.  A second hearing may or may not have been held at 400 Central Avenue, which is in an MMD, but it was not publicized and members of the minority community were not informed of the hearing.  *See id.* at 47:6–48:19.

[8]  *See, e.g.*, Scarff Notes at 12; Pope Decl. ¶ 4. Commissioner Nardacci believed these concerns needed addressing, but Chairman Morse felt doing so was not justified.  Email from Tom Nardacci to John Merrill, May 5, 2011 (Bates Emails000150–53), Karlan Decl., Ex. 17.

[9]  Transcript of Public Hearing Regarding Albany County Legislative Redistricting, Plaintiffs' Exhibit G, Dkt. 86-4, Karlan Decl., Ex. 18.

[10]  Deposition of Lucille McKnight, taken Mar. 22, 2012 ("McKnight Dep. Tr.") at 37:11–38:21, Karlan Decl., Ex. 19.

[11]  Transcript of Public Hearing on Local Law C, May 17, 2011 ("May 17, 2011 Hr'g") at 6:4–19, 11:18–20, 18:15–19, Karlan Decl., Ex. 20; Pope Dep. Tr. at 36:1–18; *see also* Pope Decl. ¶ 6.

[12]  Mair PI Decl. ¶ 26.

After the Commission sent Local Law C to the Legislature, it became apparent that the Commission's mapmaking consultant, John Merrill, was told he should not follow the rulings that this Court made in then 2003 litigation, should not combine the Black[13] and Hispanic populations when creating MMDs, and should explicitly not create a fifth MMD.[14]   The Legislature voted to approve Local Law C by a 22 to14 vote on May 23, 2011.   After similarly divisive County Executive hearings, the County Executive signed it into law on June 6, 2011.[15]

B. Prior Proceedings In This Action:

Plaintiffs filed this lawsuit on June 29, 2011.   On August 3 and 4, 2011, this Court held a hearing on Plaintiffs' motion for a preliminary injunction, which this Court later denied.   Dkt. No. 76.   Plaintiffs appealed this decision to the Court of Appeals, which found legal error in the "district court's demand for plaintiffs to show more than a simple majority," and held that Plaintiffs "satisfy the first *Gingles* factor for DOJ Non-Hispanic Blacks."   *Pope v. Cnty. of Albany*, 687 F.3d 565, 574, 577 n.11 (2d Cir. 2012).   Fact and expert discovery has since progressed, and Plaintiffs have gathered substantial additional evidence regarding the *Gingles* preconditions and Senate Factors.

During expert discovery after the preliminary injunction proceedings, Plaintiffs' experts provided significant further opinions and analyses.   The supplemental expert report of Plaintiffs' expert William Cooper analyzed the demographics and socio-economic figures of the County's

---

[13]   "Black" includes all individuals who self-identify as black—sometimes described as "Any Part Black."   *See infra* note 23.

[14]   Deposition of John Merrill, taken Apr. 25, 2012 ("Merrill Dep. Tr.") at 185:20–186:10, 177:11–178:2, Karlan Decl., Ex. 20; McKnight Dep. Tr. at 45:23–46:22 (during a legislative caucus session, Merrill stated that he "fixed it to make sure it stayed" at four MMDs and that "he didn't count some of the mixed race people . . . he did as he was told"); McKnight Decl. ¶ 12; *see also* Deposition of Carolyn McLaughlin, taken Mar. 23, 2012 ("McLaughlin Dep. Tr.") at 114:2–13, Karlan Decl., Ex. 22.

[15]   *See* Exec. Hr'g Tr. at 34:19–39:19, 43:17–45:1, 48:12–53:6, 61:11–65:15.

minority population, finding significant growth of the minority community based on the 2010

U.S. Census figures, and that Blacks and Hispanics "lag behind whites across most socio-

economic measures."[16]   Cooper also provided additional population figures for Local Law C, the

AHEJ Plan, and his Illustrative Plans.[17]

Plaintiffs' expert Dr. Baodong Liu submitted supplemental expert reports and

declarations that analyzed additional elections.  Dr. Liu's opinion that racially polarized voting

exists in the County is now based on analysis of 46 races—12 multi-member-district elections

and 34 single-member-district elections.  Supplemental Expert Report of Dr. Baodong (Paul)

Liu, dated Dec. 20, 2011 at 1–2, 6 ("Liu Supp. Rep."), Karlan Decl., Ex. 25 .  Thirty of the 46

races were marked by racially polarized voting, and Black candidates were defeated in 27 of the

races.  *Id*. at 10.  Among the 15 single-member races that did not exhibit racially polarized

voting, Dr. Liu found that 14 were non-competitive elections.  *Id*. at 7.  Ten of these 15 races

involved incumbents, and several minority candidates were first appointed to their positions

before being reelected as incumbents in the positions.  *Id*. at 9–10.  Statistically reliable

conclusions regarding the voting patterns of the Hispanic population are not possible because

there is a lack of sufficient statistical data.  *See* Deposition of Dr. Baodong Liu, taken Apr. 20,

2012 ("Liu Apr. 20, 2012 Dep. Tr.") at 117:19–118:16, Karlan Decl., Ex. 26.

Defendants' expert Professor Ronald Keith Gaddie opined that the minority population

was not sufficiently large under the first *Gingles* precondition using a single-race Black

---

[16]   Supplemental Declaration of William S. Cooper, dated Dec. 20, 2011 ("Cooper Supp. Decl.")
¶ 9, Karlan Decl., Ex. 23.

[17]   *See* Declaration of William S. Cooper, dated Apr. 29, 2013 ("Cooper SJ Decl.") ¶ 7 with
Table 1, Karlan Decl., Ex. 24.

definition, the most restrictive definition possible.[18]   However, Gaddie admitted that, had he used

the widely and generally accepted DOJ Black definition, *see infra* note 23, he might have found

the minority population to be sufficient to satisfy *Gingles* 1.[19]   He used a different definition of

the minority population, non-Hispanic DOJ Black, when analyzing the second and third *Gingles*

preconditions.[20]   In offering these opinions, Gaddie analyzed only 14 races hand-picked by the

Defendants.[21]   Further, he did not examine any special circumstances, despite admitting that they

are relevant in Section 2 litigation.[22]

## ARGUMENT

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT WITH RESPECT TO ALL OF THE ISSUES THEY RAISE

I.   **Plaintiffs Have Adduced Evidence That the County Can Support Five MMDs Comprised of More Than 50% Black or Black/Hispanic Voting Age Population**

   A.   **Any Resident Who Self-Identifies as Black or Hispanic Should Be Counted As a Minority for Purposes of Analyzing the County's Minority Population**

The purpose of the Act is not to impose a litmus test on who is "black enough" for the

Act.  Rather, the goal of the statute is to allow minority citizens in America's communities to

effectively elect representatives of their choosing.  Moreover, DOJ redistricting guidance

provides that individuals who identify as Hispanic (or Latino) and "one or more minority races

(for example, Latinos who list their race as Black/African-American)" will be counted as

Hispanic/Latino *and* with the minority race.  Guidance Concerning Redistricting Under Section 5

---

[18]   Deposition of Ronald Keith Gaddie, taken Mar. 4, 2013 ("Gaddie Mar. 4, 2013 Dep. Tr.") at 300:4–14, 321:12–17, Karlan Decl., Ex. 27.

[19]   *Id.* at 310:10–311:13, 312:3–8, 313:20–314:7.

[20]   *Id.* at 317:17–318:7, 323:14–324:3.

[21]   Deposition of Ronald Keith Gaddie, taken Apr. 20, 2013 ("Gaddie Apr. 20, 2013 Dep. Tr.") at 132:20–25, Karlan Decl., Ex. 28.

[22]   *Id.* at 153:21–25, 157:18–158:10, 232:2–16. In fact, Gaddie testified that he was not even aware that Albany County had been sued before for Act violations.  *Id.* at 165:11–14.

of the Act, 76 Fed. Reg. 7470, 7472–73 (Feb. 9, 2011).  It is therefore appropriate to include all individuals who self-identify as Black—sometimes described as "Any Part Black"—in the definition of "Black" in this litigation.[23]  Plaintiffs utilize this definition of "Black" throughout this brief.

> 1.    **Even Without Combining Minority Groups, Plaintiffs Have Satisfied the First *Gingles* Factor by Demonstrating That Minorities Constitute More Than 50% of the Voting-Age Population in Five MMDs**

Blacks and Hispanics should both be considered for calculating MMDs, but even if Blacks and Hispanics are not considered together, Plaintiffs have demonstrated that five MMDs can be created with a Black voting-age population ("VAP") of more than 50%.  Rebuttal Report of William S. Cooper in Response to the Report of Ronald Keith Gaddie, dated Apr. 16, 2012 ("Cooper Rebuttal Rep.") at 6, Table 1, Karlan Decl., Ex. 29.  Defendants maintain that the DOJ Black population in proposed AHEJ Plan District 4 is insufficient because it constitutes a "bare majorit[y]."  *See* Def. Br. at 20 n.9.[24]  This issue has already been resolved by the Second Circuit in this litigation.  The Court of Appeals held that the first *Gingles* factor is satisfied where a plaintiff demonstrates that "an identified minority group forms a simple majority of the relevant population of a proposed district."  *Pope*, 687 F.3d at 577.  By demonstrating that, even without

---

[23]  Defendants exclude Hispanics from the definition of "DOJ Black," conflating it with *non-Hispanic* DOJ Black.  *See* Def. Br. at 7.  DOJ Black, without the "non-Hispanic" modifier, however, includes Hispanics (or Latinos).  *See Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7470, 7472–73.  Feb. 9, 2011 ("the total numbers for 'Black/African American,' . . . reflect the total of the single-race responses and the multiple responses in which an individual selected a minority race and white race. . . . responses which report Latino and one or more minority races (for example, Latinos who list their race as Black/African-American), those responses will be allocated alternatively to the Latino category and the minority race category.").

[24]  Plaintiffs' Illustrative Plans are just that—illustrative.  The boundaries and exact minority population percentages of any Illustrative Plan is not important, as the plans would have to be re-drawn following this litigation. Rather the purpose of the Illustrative Plans is to demonstrate that five MMDs can be drawn in the County.  *See* Cooper SJ Decl. ¶¶ 4 –5.

Hispanics, Blacks would form a majority of the voting-age population in five proposed MMDs, Plaintiffs have satisfied the first *Gingles* factor.

**B.     Voting-Age Population Is the Correct Measure of Minority Presence in a Voting Rights Act Case**

Defendants erroneously assert, without any evidentiary foundation, that the proper metric for determining minority presence in a Section 2 case is *citizen* voting-age population ("CVAP"), not voting-age population ("VAP").  Def. Br. at 8–9; 19–20 nn.8–9.

This issue cannot be relitigated by the County in this lawsuit.  The doctrine of judicial estoppel bars a party from pursuing a position inconsistent with its prior stance if that party's earlier position was accepted by a tribunal before which it was advanced.  *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6–7 (2d Cir. 1999).  In this case, Defendants have repeatedly proffered VAP figures to advance their arguments.[25]  Defendants' witness John Merrill utilized 2010 Census data—which presents only VAP data—to create the redistricting map at issue.  Merrill Aff., dated July 29, 2011, Dkt. No. 42, Karlan Decl., Ex. 30, ¶¶ 3–4; *see also, e.g.*, Local Law C Maps and Statistics, Ex. E, attached to Merrill Affidavit ("Merrill Aff. Ex. E."), Karlan Decl., Ex. 31.  The Second Circuit adopted the parties' usage of VAP statistics. *See Pope*, 687 F.3d at 573 n.6 ("Because the parties argue by reference to VAP, we do not here consider the alternative possibility of employing *citizen* voting-age population . . .") (emphasis added).  Defendants cannot change their tune at this juncture.

In any event, the majority of Courts of Appeals that have decided this issue have not required the use of CVAP data.  *See Chen v. City of Houston*, 206 F.3d 502, 523 (5th Cir. 2000); *Daly v. Hunt*, 93 F.3d 1212, 1224–26 (4th Cir. 1996); *Garza v. Cnty. of Los Angeles*, 918 F.2d

---

[25]  Even in the 2003 round of litigation, the County argued the court must use VAP figures.  *See Arbor Hill I*, 2003 WL 21524820, at *14

10

763, 774–75 (9th Cir. 1990); *see also Lepak v. City of Irving*, *cert. denied,* 569 U.S. __ (2013)

(denying certiorari on whether CVAP is the correct population measure in VRA suits).

Moreover, the cases upon which Defendants rely acknowledge that the use of CVAP data

is not appropriate where the data is unreliable or if there is no evidence of a noteworthy

difference in citizenship rates. *See Negron v. City of Miami Beach*, 113 F.3d 1569 (11th Cir.

1997) (CVAP data appropriate only "where there is reliable information indicating a significant

difference in citizenship rates between the majority and minority populations"); *Barnett v. City of

Chicago,* 141 F.3d 699, 705 (7th Cir. 1998) (noting that courts may use VAP rather than CVAP

if it appears "noncitizens were not a significant part of the relevant population[]").

Here, Defendants' own expert conceded that there is no reliable CVAP data for the 2010

Census because the long-form census questionnaire (which collected information on citizenship)

was abandoned for the 2010 Census. *See* Gaddie Apr. 20, 2012 Dep. Tr. at 47:22–25 ("the long

form that we used to use in the census isn't available, so we don't have CVAP data"); *see also*

Cooper SJ Decl. ¶ 8; *see also Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 464,

459–60 (N.D. Tex. 2010) (holding the use of CVAP data inappropriate in a section 2 case).[26]

---

[26] Because the long-form census questionnaire which collected information on citizenship was
not used for the 2010 Census, the only means of approximating CVAP is through
information obtained through the Census Bureau's American Community Survey
(ACS). *See* Cooper SJ Decl. ¶ 9; Nathaniel Persily, *The Law of the Census: How to Count,
What to Count, Whom to Count, and Where to Count Them*, 32 CARDOZO L. REV. 755 (2011)
(hereinafter "Persily"). The U.S. Census Bureau itself cautions that "[a]ll ACS data are
survey *estimates*," and that the ACS is not intended for use in redistricting. U.S. Census
Bureau, *Three Tips for Using American Community Survey (ACS) Data*,
http://www.census.gov/acs/www/guidance_for_data_users/guidance_main/ (last visited Apr.
5, 2013); U.S. Census Bureau, *A Compass for Understanding and Using American
Community Survey Data: What General Data Users Need to Know* 4 (Oct. 2008), *available
at* http://www.census.gov/acs/www/Downloads/handbooks/ACSstateLocal.pdf. The Bureau
further advises that the ACS is not intended for use in redistricting purposes. *See also
Benavidez*, 690 F. Supp. 2d at 464 (holding the use of CVAP data inappropriate in a section 2
case).

II.     **All Plaintiffs Have Standing as Albany County Minority Voters**

A.      **A. Plaintiffs Pope, Willingham, Bell, Coleman, Pickney, and Proposed Plaintiffs Frazier, Gomez, Lebron, Davis, and Alfonso Have Standing Because Plaintiffs Have Asserted a Packing Claim.**

Defendants contend that certain Plaintiffs lack standing to challenge the discriminatory impact of Local Law C.  However, "[c]ase law is clear that a plaintiff has standing to bring a claim based on racial gerrymandering in the district where he resides."  *Broward Citizens*, 2012 WL 1110053, at *3 (collecting cases); *accord, e.g.*, *United States v. Hays*, 515 U.S. 737, 744-45 (1995) ("[w]here a plaintiff resides in a racially gerrymandered district," he "has standing to challenge the legislature's action"); *Perez v. Texas*, No. 11-CA-360-OLG, 2011 WL 9160142, at *9 (W.D. Tex. Sept. 2, 2011) (same).

Defendants' contrary contention fatally depends on misconstructions of both the case law and Plaintiffs' claim.  The Plaintiffs whom Defendants challenge here allege a "packing" claim: that Local Law C dilutes minority voting power in Albany County by "concentrati[ng]" its expanding minority population in four super-majority MMDs rather than the five (or more) to which the population's numbers entitle it.  *Voinovich v. Quilter*, 507 U.S. 146, 153–54 (1993); *see* First Amended Complaint, Dkt. No. 100, ¶¶ 59–60, 82–83.  The case law uniformly holds that such packing claims may be asserted by residents of the packed districts—as the challenged Plaintiffs are here.  *See, e.g.*, *Broward Citizens*, 2012 WL 1110053, at *3; *Barnett v. City of Chicago*, No. 92 C 1683, 1996 WL 34432, at *5–6 (N.D. Ill. Jan. 29, 1996).

The "dilut[ive]" injury in a packing claim occurs because the minority group is not "assured" of as many representatives as its numbers warrant due to "concentration of minority voters . . . 'into districts where they constitute an excessive majority.'"  *Voinovich*, 507 U.S. at 153-54 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)).  As the Supreme Court has

stated, "[h]ow such concentration or 'packing' may dilute minority voting strength is not difficult

to conceptualize":

> A minority group, for example, might have sufficient numbers to constitute a
> majority in three districts.  So apportioned, the group inevitably will elect three
> candidates of its choice, assuming the group is sufficiently cohesive.  But if the
> group is packed into two districts in which it constitutes a super-majority, it will
> be assured only two candidates.

*Id*.  A packing claim is thus distinct from a "fragmentation" or "'dispersal'" claim, in which the

"'[d]ilution of racial minority group voting strength'" is "'caused'" instead "'by the dispersal of

blacks into districts in which they constitute an ineffective minority of voters.'"  *Id*. (quoting

*Gingles*, 478 U.S. 46 n.11); *see also id.* (stating that claims are distinct).  In a packing claim,

each minority resident of a packed district has suffered a "dilut[ion]" of "minority voting

strength" because his minority group has been deprived of the opportunity to elect a number of

candidates commensurate with its "numbers."  *Id*.

It is undisputed that each challenged Plaintiff is a registered voter and a member of the

minority group whose voting strength was diluted.  *See* Def. Br. at 11–13.  And it is undisputed

that each resides in one of the packed districts.  *See* Def. Br. at 12.  The case law requires nothing

more: Plaintiffs who "live in packed wards which could be redrawn into non-excessive majority

[minority] wards" have standing.  *Barnett*, 1996 WL 34432, at *5–*6; *accord, e.g., Broward

Citizens*, 2012 WL 1110053, at *3.

The argument that Plaintiffs "must reside in a majority white district" to have standing is

simply wrong.  Def. Br. at 11.  Even the authorities that Defendants rely on recognize that the

relevant standing question in redistricting cases is whether the plaintiffs "live in the district that

is the primary focus of their racial gerrymandering claim."  *Hays*, 515 U.S. at 738 (cited at Def.

Br. at 11).  Where a Section 2 claim "focus[es]" (*id.*) on the diminution of voting power suffered

by a "voter in a *minority-represented* [district]," *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d

13

348, 364 (E.D. Va. 2009) (emphasis added) (cited at Def. Br. at 13), that voter has standing even though he does not "reside in a majority white district," Def. Br. at 11.  *See Perry-Bey*, 678 F. Supp. 2d at 364.[27]  Such is the case here, where Plaintiffs' claim "focuses not on the fragmentation of a minority group among various districts but on the concentration of minority voters within a district."  *Voinovich*, 507 U.S. at 153.[28]  Indeed, it could hardly be otherwise.  By Defendants' logic, the County could pack all of Albany County's minority voters into super-majority MMDs and thereby deprive *every minority voter* of standing.  *See, e.g.*, *Broward Citizens*, 2012 WL 1110053, at *3; *Barnett* 1996 WL 34432, at *5–6.

> **B.    Proposed Plaintiffs Frazier, Alfonso, and Davis Have Standing as Minority Voters in Albany County Because They Reside Outside of the MMDs Under Local Law C, But They Could Easily Reside in an MMD Under the Adopted Remedial Plan.**

Defendants "concede" that those Plaintiffs who "would reside in an MMD" "[u]nder plaintiffs' plan" have standing.  Def. Br. at 13.  Thus, there is no standing challenge to proposed Plaintiffs Frazier, Alfonso, and Davis.[29]  These three voters wish to be plaintiffs and would be added by the proposed amended complaint.

---

[27]  *Perry-Bey* is otherwise inapposite.  The court in *Perry-Bey* dismissed plaintiff's challenge to mayoral at-large elections on standing grounds not because plaintiff resided in an MMD, but because of pleading deficiencies in the plaintiff's amended complaint—*i.e.*, she did not allege that she was a minority, a registered voter, nor a resident of a minority-represented ward.  *See* 678 F. Supp. 2d at 363–64.  And Defendants do not—and *cannot*—argue that such pleading deficiencies are present here.  *See* Proposed Second Am. Compl., Dkt. No. 226-3 ¶¶ 7–11.

[28]  *Lopez v. Merced County*, 473 F. Supp. 2d 1072 (E.D. Cal. 2007), and *Hall v. Virginia*, 276 F. Supp. 2d 528 (E.D. Va. 2003), concern claims with wholly different "primary foc[i]," *Hays*, 515 U.S. at 738 and are therefore inapposite.  *See Lopez*, 473 F. Supp. 2d at 1079–80 (residents of one municipality within a county covered by Section 5 of the Act challenged municipal elections in separate municipalities in which they did not reside); *Hall*, 276 F. Supp. 2d at 530 (challenging a redistricting scheme that reduced the Black population from approximately 39% to 34% in a single non-MMD).  Indeed, *Lopez* is not even a Section 2 case.

[29]  To the extent that an individual Plaintiff's residence under the AHEJ Plan and Illustrative Plans is relevant to the question of standing, Plaintiffs emphasize that such plans are merely

Notably, under Local Law C, proposed new Plaintiff Frazier lives in District 9, adjacent to District 1, an MMD; proposed new Plaintiff Alfonso lives in District 7, adjacent to Districts 4 and 5, which are also MMDs; and proposed new Plaintiff Davis lives in District 9, adjacent to District 1.  *See* Cooper SJ Decl. ¶ 6, Ex. 2 (Illustrative Plan 5).  Thus, under a plausible remedial plan, these Plaintiffs could easily be placed in a newly-drawn MMD.  *See*, *e.g.*, Cooper SJ Decl. ¶ 6 (attaching remedial plan in which proposed new Plaintiff Frazier moves from a white majority district (District 9) under Local Law C to an MMD (proposed District 6) under Illustrative Plan 5 and proposed new Plaintiff Davis moves from District 9 to District 6); *cf. Benavidez*, 690 F. Supp. 2d at 457 n.11 (finding standing where plaintiff's expert redrew an illustrative map for the purpose of including plaintiff in the proposed MMD).

## III.    The Act Requires Five MMDs in Albany County

### A.    Minority Voters May Combine into Coalitions for Purposes of the Act

Defendants contend that the Act does not require them to recognize the County's cohesive Black/Hispanic population as a protected minority class.  Complaining that imposing such a requirement would unfairly "[g]rant[] minorities a right to . . . preferential treatment" not "afforded" to "whites," Def. Br. at 24, Defendants argue that the Act permits them instead to statistically segregate minority groups for redistricting purposes according to a strictly formalist taxonomy of racial and linguistic classifications.  That argument finds no support in the Act or the law of this Circuit.  Indeed, the text and history of the Act, confirmed by the overwhelming weight of authority, validate Plaintiffs' claim: that Albany County's politically cohesive Black

---

illustrative.  *See* Cooper SJ Decl. ¶¶ 4–6.  In order to create a final remedial plan to replace Local Law C, an entirely new plan would have to be created, utilizing the new election district boundaries from the Albany County Board of Elections.  *Id.* ¶ 5.  As such, Plaintiffs' injury for standing purposes should not be measured solely against Plaintiffs' illustrative remedial plans.

and Hispanic population may assert their rights as a "class" of protected voters under Section 2.
*See* 42 U.S.C. § 1973(b).

Plaintiffs' "coalition" claim is that Blacks and Hispanics in Albany County constitute one cohesive minority group for purposes of Section 2.  The claim is not—as Defendants mistakenly contend—that Blacks and Hispanics are "different groups" joined only by "political alliance." Def. Br. at 24–25; *see also id.* at 20.  "Coalition" is a bit of a misnomer.  Blacks and Hispanics are a single "class" of cohesive minority voters.  *See*  42 U.S.C. § 1973(b).  Defendants do not— and plausibly cannot—claim that the Act's text or history prohibit such a claim.  Indeed, they concede that the Act permits claims by "a[ny] protected class compris[ing] a cohesive voting majority" and "ha[ving] 'less opportunity' 'to elect representatives of [its] choice.'"  Def. Br. at 25 (quoting 42 U.S.C. § 1973(b)) (emphasis omitted).

Courts in this Circuit (including this Court) have consistently held that "blacks and Hispanics can be combined in a section 2 claim if evidence is presented to show they are politically cohesive."  *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 405 (S.D.N.Y. 2004); *accord Arbor Hill II*, 281 F. Supp. 2d at 445 ("[E]xisting law in . . . the Second Circuit . . . assumes diverse minority groups can be combined to meet VRA [Voting Rights Act] litigation requirements….") (citing *Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir.), *vacated and remanded on other grounds*, 512 U.S. 1283 (1994)); *France v. Pataki,* 71 F. Supp. 2d 317, 321–22 (S.D.N.Y. 1999) (recognizing a class consisting of Black and Hispanic voters for a Section 2 claim).

The majority of Courts of Appeal who have reviewed this question agree with Plaintiffs. *See Pope*, 687 F.3d at 572 n.5; *compare, Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 525 (11th Cir. 1990) (recognizing a class consisting of "all black

and Hispanic residents of Hardee County" and considering the class's claim for relief under a Section 2 dilution claim); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1242–44 (5th Cir. 1988) ("There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics. Section 1973(a) protects the right to vote of both racial and language minorities. *See* 42 U.S.C. §§ 1973(a), 1973b(f)(2).") *with Nixon v. Kent Cnty.*, 76 F.3d 1381, 1386–87 (6th Cir. 1996). The Supreme Court likewise assumed that such claims are valid. *See Growe v. Emison*, 507 U.S. 25, 41 (1993) (addressing whether there was "evidence of minority political cohesion (*whether of one or several minority groups*)" (internal quotation marks omitted) (emphasis added).)

Misapprehending Plaintiffs' claim as one seeking the Act's recognition of a "coalition" comprising "different groups" joined only by "political alliance," Defendants attempt to avoid this clear weight of authority by embarking on a quixotic search for plural references to "classes" and "groups" in the legislative text and history. Def. Br. at 15, 24. Their extended discussion of *Bartlett v. Strickland*, 556 U.S. 1 (2009) (Def. Br. at 18–22) misses the point for the same reason: Like the supposed absence of plural nouns in Section 2, the case is simply irrelevant. *Bartlett* addressed "crossover" districts, in which white voters—who by definition cannot be part of a "class" of minority voters, 42 U.S.C. 1973(b)—vote for minority candidates. *See Bartlett*, 556 U.S. at 13 (plurality opinion).[30] The Court explicitly "d[id] not address" the type of claim asserted by Plaintiffs here. *Id*. at 13–14. Strangely, Defendants acknowledge this fatal flaw, Def. Br. at 14, 20 n.10, and then rely on *Bartlett* anyway.

---

[30] In contrast to a crossover district, a coalition district is one where two or more minority groups, who often share similar interests and socioeconomic conditions, work together to elect their preferred candidate. *Bartlett*, 556 U.S. at 13. Unlike a crossover district, a majority of the population of a coalition district is comprised of members of minority groups and affords the protected minority voters the ability to elect without the need for cross-over participation by the majority (white) group.

Defendants compound their errors by mistakenly assuming that the Act requires minorities to be classified separately according to their "racial" or "language" identities, and thus disallows a class with both types.  Def. Br. at 23.  For this proposition, they cite no authority.  Nor could they.  It strains credulity to suggest that the Act's broad protection of minority voting rights would refuse to recognize a class of cohesive minority voters because it does not correspond to statistical demographic categories defined by the very local government the Act aims to protect them from.  *See Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (rejecting use of DOJ definition of "black" and instead requiring counting of "*all* individuals who identify as black").

As the Supreme Court has recognized, Congress "inten[ded] to give the Act the broadest possible scope."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 566–67 (1969); *accord, e.g.*, *Holder v. Hall*, 512 U.S. 874, 895 (1994) (Thomas, J., concurring) (requiring reading the Act with "the broadest possible scope"); *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (declining to impose "a judicially created limitation on the coverage of a broadly worded statute").  Even Defendants concede that "[t]he VRA's legislative history shows intent to end barriers to minority voting."  Def. Br. at 24.  The statute should be applied to achieve—not inhibit—those purposes.

It should hardly be surprising that Blacks and Hispanics might co-identify as members of a politically cohesive minority "class."  42 U.S.C. § 1973(b).  The Supreme Court has repeatedly recognized the similar experiences of Blacks and Hispanics as minorities who have been subject to discrimination.  *See, e.g., United Steelworkers v. Weber*, 443 U.S. 193, 201–02 (1979) (upholding an employer's affirmative action plan because, although the Civil Rights Act of 1964's explicit language prohibited race-preferential treatment, its purpose was to protect traditionally disempowered minorities); *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S.

189, 196–97 (1973) (holding that the district court erred in separating Blacks and Hispanics for purposes of defining a "segregated" school).

    **B.**    **Plaintiffs Have Adduced Evidence to Raise a Genuine Issue of Material Fact Whether Blacks and Hispanics in Albany Are Politically Cohesive**

At a minimum, there is a genuine issue of fact whether the Black and Hispanic communities in the County are politically cohesive. *Cf. Arbor Hill II*, 281 F. Supp. 2d at 448 (finding cohesion was "amply supported by the record" despite no statistical evidence).

Due to insufficient data, experts cannot offer reliable statistical analysis regarding Hispanic voting patterns and racial polarization in County elections involving Hispanic candidates. *See* Liu Apr. 20, 2012 Dep. Tr. at 117:19–25, 118:2–16; *see also* Expert Report of Dr. Baodong Liu, dated July 12, 2011 ("Liu PI Rep.") at 3, Karlan Decl., Ex. 32. In the absence of such data, "'courts *must* rely on other factors' to determine whether [a] Section 2 claim has been proved." *Pope*, 687 F.3d at 573, n.5 (quoting *Gingles*, 478 U.S. at 57 n.25) (emphasis added); *see also Bridgeport*, 26 F.3d at 276 (relying on anecdotal evidence when finding political cohesion); *Brewer v. Ham*, 876 F.2d 448, 454 (5th Cir. 1989) ("[S]tatistical evidence is not a *sine qua non* to establish cohesion. . . ."); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1004 (D.S.D. 2004) (collecting cases, and holding that the "experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive") (internal citations and quotation marks omitted); *Barnett v. City of Chicago*, 969 F. Supp. 1359, 1414 (N.D. Ill. 1997) (noting that, in the absence of available statistical evidence, it "is not to say that the opinions of those significantly involved in the political process might not also be of relevance"); *cf. Sanchez v. Bond*, 875 F.2d 1488, 1493 (10th Cir. 1989) ("We find nothing in *Gingles*, however, to suggest that a trial court is *prohibited* from considering lay testimony in deciding whether a minority group is politically cohesive.").

19

The "additional evidence required to meet the threshold [for proving cohesion] . . . is not very substantial, and the burden may be satisfied with a variety of evidence, including lay testimony. . . .*"; *Sanchez v. Colorado*, 97 F.3d 1303, 1320–21 (10th Cir. 1996).  Plaintiffs have met this burden.

The Black and Hispanic communities face the same economic and social conditions, and evince similar interests; and as a result they are closely aligned on political issues, support the same candidates, and vote the same way in elections.  *See* Declaration of William S. Cooper, dated July 14, 2011 ("Cooper PI Decl.") ¶¶ 14–18, Karlan Decl., Ex. 33; Cooper Supp. Decl. ¶¶ 6–12.  There is significant political interaction between the Black and Hispanic communities, which is often a result of how close Blacks and Hispanics are as a social community.  Gonzalez Dep. Tr. at 81:4–5 ("Everything goes hand in hand, blacks and Hispanics."); Deposition of Wanda Willingham, taken Jan. 30, 2012 ("Willingham Dep. Tr.") at 49–50 (describing how communities have continued to merge over the past ten years, and that they have "become one"), Karlan Decl., Ex. 34; *id.* at 61; Deposition of Vicente Alfonso, taken Mar. 23, 2012 ("Alfonso Dep. Tr.") at 69–70, 84:17–19, Karlan Decl., Ex. 35; Pope Dep. Tr. at 27, 60:10–17 ("[W]hat [Blacks] get politically will impact the Hispanics . . . if it's something that the Hispanics are advocating for, then African-Americans will benefit from it.  If it's something that the Hispanics are advocating for, then African-Americans benefit.  So we benefit from the work that we do, politically or otherwise."); Declaration of Joseph Gomez, dated Apr. 29, 2013 ("Gomez SJ Decl."), ¶¶ 4–12, Karlan Decl., Ex. 36; Declaration of Nathan Lebron, dated Apr. 29, 2013 ("Lebron SJ Decl."), ¶¶ 2–6, Karlan Decl., Ex. 37.  Thus, the communities support the same issues.  Deposition of Joseph Gomez, taken Mar. 23, 2012 ("Gomez Dep. Tr.") at 27–28, 33, 54–56 (describing how the Greater Capital Region Minority Business Association, comprised of

both Black and Hispanic members, pickets companies to garner support for minority

contractors), Karlan Decl., Ex. 38; Pope Dep. Tr. at 27 (noting that Hispanics and Blacks work

together with the organization African-American Heritage Census Complete Count Committee),

*id*. at 30 (noting how the County's Blacks and Hispanics are both involved in the NAACP); Bell

Dep. Tr. at 71-73 (describing how Blacks and Hispanics meet to discuss community issues such

as schools, health care, and employment); Deposition of Samuel Coleman, taken Feb. 1, 2012

("Coleman Dep. Tr.") at 65, 70, Karlan Decl., Ex. 39; Gomez SJ Decl. ¶ 2; Lebron SJ Decl. ¶ 3;

Declaration of Elaine Frazier, dated Apr. 25, 2013 ("Frazier SJ Decl.") ¶ 3, Karlan Decl., Ex. 40;

Declaration of Ladan Alomar, dated Apr. 30, 2013 ("Alomar SJ Decl.") ¶¶ 20–21 (describing

common concerns such as education and access to health care, and a minority community event

discussing public education), Karlan Decl., Ex. 41.  Candidates reach out to the Black and

Hispanic communities simultaneously due to their close level of social interaction.  *See, e.g.*,

Alfonso Dep. Tr. at 77–81 (describing how Nathan LeBron campaigned at an informal gathering

of the Black and Hispanic communities); Alomar SJ Decl. ¶ 17 (describing a political fundraiser

organized by Black and Hispanic women for former N.Y. Gov. Eliot Spitzer); Declaration of

Corey Ellis, dated Apr. 30, 2013 ("Ellis SJ Decl.") ¶¶ 11–18 (describing campaign events

attended by Blacks and Hispanics), Karlan Decl., Ex. 42.  Wanda Willingham recognized this

fact, and she distributed Spanish-language campaign literature during her 2011 reelection

campaign to foster and benefit from the political cohesion between Black and Hispanic voters in

her district.  Karlan Decl., Ex. 43; *see also* Willingham Dep. Tr. at 66–67, 91–95 (also noting

that she requested that election materials be provided in Spanish by the County); McLaughlin

Dep. Tr. at 110 (describing Willingham's use of Spanish language materials and translators).

The Black and Hispanic communities also worked together to advocate for a fifth MMD during the 2011 redistricting.  Alfonso discussed the issue with Aaron Mair and Bill Clay, a Black County Legislator.  Alfonso Dep. Tr. at 68–70, 65; *see also* Scarff Notes at 11; May 17, 2011 Hr'g at 5–40 (demonstrating that Pope, Mair, Carlos Gonzalez, *inter alia*, advocated at the public hearings).  Similar advocacy occurred again during the public hearings for the City's redistricting as a result of the 2010 Census.  Frazier SJ Decl. ¶ 6.

Further, the Black and Hispanic communities generally support the same candidates.  *See generally* Alfonso Dep. Tr. at 101 (testifying that the Hispanic community supported Black candidate Michael Brown's campaign for City office); Gonzalez Dep. Tr. at 83:17–85:5 (noting the two communities come together for many candidates); Pope Dep. Tr. at 27–29 (noting both communities supported Janis Gonzalez and Al Cruz); McLaughlin Dep. Tr. 88–89; Declaration of Vicente Alfonso, dated Apr. 29, 2013 ("Alfonso SJ Decl.") ¶¶ 7–12, Karlan Decl., Ex. 44; Alomar SJ Decl. ¶ 10; Declaration of Mónica M. Arias Miranda, dated Apr. 29, 2013 ("Miranda SJ Decl.") ¶¶ 13–14, Karlan Decl., Ex. 45; Gomez SJ Decl. ¶¶ 2–5; Lebron SJ Decl. ¶¶ 2–5; Frazier SJ Decl. ¶ 8; Ellis SJ Decl. ¶ 8.  Minority candidates can count on the support of the Black and Hispanic community when collecting petition signatures.  Gonzalez Dep. Tr. at 37; Deposition of Aaron Mair, taken Apr. 13, 2012 ("Mair Dep. Tr.") at 120 (describing how Gustavo Santos carried petitions for and generally campaigned on behalf of Mert Simpson), Karlan Decl., Ex. 46  *id.* at 168:7–8 (noting Santos received the support of the Black and Hispanic community for Delegate); Coleman Dep. Tr. at 37–39.

Individual experiences confirm the political cohesion among Blacks and Hispanics.  Vicente Alfonso has campaigned on behalf of statewide officials, among the County's Black and Hispanic community.  Alfonso Dep. Tr. at 17–20.  Janis Gonzalez has helped with get-out-the-

vote efforts, canvassing, visiting polls, and working with local organizations for minority candidates including Corey Ellis, and David Soares.  Gonzalez Dep. Tr. at 32–35, 83, 109–110; *see also* Miranda SJ Decl. ¶¶ 5–11 (describing her experiences as a political activist for the minority community in the Capital Region).  Corey Ellis supported and worked for David Soares alongside Black and Hispanic activists, and Blacks and Hispanics supported Ellis's own campaigns.  Ellis SJ Decl. ¶¶ 11–18.  Joseph Gomez also supported Ellis and McLaughlin. Gomez SJ Decl. ¶ 5; *see also* Alfonso SJ Decl. ¶¶ 7–13.  Further, Mónica M. Arias Miranda assisted Nathan Lebron with his 2009 campaign for mayor of Albany and Barack Obama during his 2008 presidential campaign.  Miranda SJ Decl. ¶ 13–14 (noting that other Blacks and Hispanics assisted on both campaigns as well).

The County's minority organizations further demonstrate the minority community's political cohesion.  For example, One Hundred Black Men, which is comprised of both Blacks and Hispanics, helps the minority population get involved in politics by organizing voter registration drives, and has supported specific minority candidates.  Gomez SJ Decl. ¶¶ 6–8.  The NAACP has similarly organized voter registration drives, and has held public forums for political candidates.  Gomez SJ Decl. ¶ 9; Lebron SJ Decl. ¶ 6.  In 2011, the Hispanic Coalition NY, Inc. partnered with the NAACP to assist with its voter registration drive on African American Family Day—a yearly festival in the City of Albany.  Miranda SJ Decl. ¶¶ 6, 9.  The organization People of Color Who Vote supports candidates in local races, discusses issues of concern, and undertake get-out-the-vote efforts.  Alfonso Dep. Tr. at 45–48, 50.  The Capital Area Urban League is seeking to recruit and nurture effective minority candidates for political office in the County and surrounding region.  Frazier SJ Decl. ¶ 12.

23

The City of Albany recently found the Black and Hispanic populations in the City to be politically cohesive for purposes of redistricting the City's Common Council wards.  Alfonso SJ Decl. ¶ 5.

Defendants have not provided a shred of evidence to the contrary.  Based on Plaintiffs' unrebutted evidence, a genuine issue of material fact exists such that Defendants should not be granted summary judgment on whether the Black and Hispanic communities are politically cohesive.

### C. Plaintiffs Have Adduced Evidence to Raise a Genuine Issue of Material Fact Whether the White Majority Votes as a Bloc to Usually Defeat the Minority's Preferred Candidate

Plaintiffs have presented sufficient evidence to establish a genuine issue of material fact as to whether white voters in Albany vote sufficiently as a bloc to usually defeat minority voters' chosen candidate.  Plaintiffs' expert, Dr. Liu, analyzed 46 bi-racial elections in Albany County since 1991.  Dr. Liu found that voting in the County from 1991 to 2011 has been "racially polarized," as "African American voters have expressed an overwhelming preference for African American candidates, and this preference was not shared by white voters."  Liu Supp. Rep. at 4. This evidence is sufficient to raise a genuine issue of material fact as to whether white bloc voting in Albany usually defeats the minority community's preferred candidate.

Defendants' expert does not dispute Dr. Liu's findings.  Defendants cherry-picked which bi-racial elections to analyze, ultimately analyzing only 14 of the 46 bi-racial elections in the County over the past 20 years.  *See* Gaddie Apr. 20, 2013 Dep. Tr. at 132:20–25.  Defendants' expert did not analyze the other 30 bi-racial elections analyzed by Plaintiffs, summarily dismissing them.[31]

---

[31] For example, Defendants dismissed elections for being too old, or involving Republicans or third parties.  However, historical elections, especially those following in the wake of Act

### 1.    There is no bright line rule with which to judge "sufficient" white bloc voting

There is no bright-line numerical threshold for how often white bloc voting must "usually" defeat the minority's preferred candidate.  *Gingles* requires only that "the minority . . . be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate."  478 U.S. at 51.  Defendants nevertheless suggest such a bright-line test exists, but as the *Gingles* Court observed, "there is no simple doctrinal test for the existence of legally significant racial bloc voting," as "the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances."  478 U.S. at 57–58*; see also City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1557 (11th Cir. 1987) ("[T]he Court noted that because the degree of racial bloc voting that is cognizable as an element of a § 2 voting dilution claim would vary from case to case, the Court declined to announce any single doctrinal test to determine the degree of legally significant racial bloc voting.").  Instead, courts apply the plain meaning of "usually"—*i.e.,* "more than half of the time."  *Old Person v. Cooney*, 230 F.3d 1113, 1122 (9th Cir. 2000).

Moreover, the cases cited by Defendants do not reflect the situation in the County.  In *Uno v. City of Holyoke*, the court found racially polarized voting in only "three or four (out of

---

litigation, can be probative, as "a pattern of racial bloc voting that extends over a period of time is more probative … than are the results of a single election." *Gingles*, 478 U.S. at 57. Defendants' expert similarly dismissed elections involving third parties, discounting that third parties, particularly the Working Families Party, have been very active and influential in local politics in New York State. *See* Baodong (Paul) Liu, Rebuttal Expert Report in Response to the Expert Report of Dr. Ronald Keith Gaddie, dated Apr. 16, 2012 ("Liu Rebuttal Rep.") at 5–6, Karlan Decl., Ex. 47. For example, the Working Families Party is widely credited with the success of minority candidate David Soares in the 2004 Albany County District Attorney election. *Id.* at 6.  Further, Defendants rely on historic elections in their own statement of facts and in the declaration of Matthew Clyne. *See* Defendants' Statement of Material Facts, Dkt. 214-1, ¶ 45; Declaration of Matthew J. Clyne, dated Mar. 26, 2013, Dkt. 214-2, ¶ 4.

eleven)" elections.  72 F.3d 973, 989 (1st Cir. 1995).  "[T]hree or four (out of eleven)" is no

one's definition of "usually."  Further, *Uno* noted that "determining whether racial bloc voting

exists is not merely an arithmetic exercise that consists of totaling up columns of numbers, and

nothing more.  To the contrary, the district court should not confine itself to raw numbers, but

must make a practical, common sense assay of all the evidence."  *Id*.

Defendants, however, are apparently determined to reduce the analysis to just such an

arithmetic exercise, relying on *Clarke v. City of Cincinnati*, 40 F.3d 807, 812–13 (6th Cir. 1994),

to suggest that a minority candidates' election rate of less than 50% can support a finding that

minority-preferred candidates are not "usually" defeated.

Defendants' reliance on *Clarke* is misplaced in three ways.  First, Defendants rely on

*Clarke*, an outlier Sixth Circuit case, to support their argument for a bright line test when no such

test exists in the Second Circuit.  *Clarke* does not control here and is contrary to the plain

meaning of "usually."

Second, Defendants' shortsighted focus on minority success rates is inapposite to this

case.  In fact, *all* of the cases cited in Defendants' "minority success rate" argument, including

*Clarke*, involve at-large, multi-member districts, which present different issues than the County

Legislative elections here.  Defendants misstate the language of *Jenkins v. Red Clay*

*Consolidated School District Board of Education*, which in fact discusses plurality rules in at-

large elections.[32]  4 F.3d 1103 (3d Cir. 1993).  The proportionality of minority candidates'

---

[32]  The language quoted by Defendants (which is accompanied by a citation to a quote from
*Gingles*) actually reads: "If minority-preferred candidates are consistently able to prevail in
representative numbers ***because of the existence of a plurality rule***, then it cannot be said
that white voters vote sufficiently as a bloc… ."  4 F.3d at 1122 (emphasis added).  The
operative section of the *Gingles* decision to which the court cites is not even the section on
racially polarized voting, but it instead comes directly from the section on vote dilution
through the use of pluralities in multi-member districts.  *See Gingles*, 478 U.S. at 46–51.

success to the size of the minority population may be relevant in at-large, multi-member district scenarios, but Defendants offer no authority suggesting that it is a valid measure in examining white bloc voting in single-member district elections.  This metric simply does not bear on the analysis outside multi-member district elections.

Third, *Clarke* suggests that the proper analysis is to consider only the success rate of minority candidates in the at-large political offices whose election districts were the subject of the challenge.  That is, *Clarke* considers only the elections for the Cincinnati City Council—the legislative body whose multi-member district (at large) electoral structure was as issue in the case.  40 F.3d at 812–13.  Defendants, however, attempt to apply such math to Plaintiffs' expansive data set that captures 46 bi-racial elections including not only Albany County Legislature elections but also County-wide elections, City Common Council, City-wide elections, and New York State elections.  While all the elections in Plaintiffs' comprehensive data set are probative, Defendants' reliance on an apples-to-oranges comparison of *Clarke*'s endogenous elections to all elections in Plaintiffs' data set is misleading and disingenuous.  An appropriate comparison to *Clarke* requires considering only the County's bi-racial Legislature elections.  In Albany, not one single minority candidate who has not first been appointed to the position has ever prevailed in a competitive non-MMD Legislature election—which, under *Clarke*, gives minority legislative candidates in Albany a success rate of exactly zero.[33]  Even under the *Clarke* analysis (which this Court should reject), therefore, it is unequivocally clear that white bloc voting defeats the minority-preferred candidate—not just *usually*, but *always*.

---

[33]  It is appropriate to exclude the MMD elections from this analysis because  considering minority success in existing MMDs when examining persistent white bloc voting would inoculate past Section 2 violators against future Section 2 claims, even when violations continue or return, because MMDs have the effect of scrubbing white bloc voting of some success in defeating minority candidates.  *See Old Person*, 230 F.3d at 1122, 1127.

Defendants' theory that racially polarized voting cannot be present where minority candidates have enjoyed discrete successes is in fact belied by the very cases they cite. *Jenkins* explains that *Gingles* does not require racially polarized voting to be present in all elections.

> *Gingles* does not require a showing that white voters vote as an unbending monolithic block against whoever happens to be the minority's preferred candidate.  To the contrary, the *Gingles* standard presupposes the existence of crossover voting. . . .  Moreover, the standard in *Gingles* necessarily presupposes variations in the levels of crossover voting from election to election.

*Jenkins,* 4 F.3d at 1123 (internal citation omitted).

### 2.	The limited success of a few minority candidates does not preclude a Section 2 claim

As *Gingles* makes clear, the fact that a few black candidates in Albany have been successful in a handful of elections does not preclude a Section 2 claim.  "[T]he language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim." *Gingles*, 478 U.S. at 75; *see also* S. Rep. No. 97–417, at 29 n.115, *reprinted in* 1982 U.S.C.C.A.N. 177, 207 n. 115 (The Senate Report accompanying the 1982 amendment to the Act explicitly stated that "the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote.'") (internal quotation marks omitted).  Even repeated success does not forestall a Section 2 claim.  *Gingles*, 478 U.S. at 77 ("In some situations, it may be possible for § 2 plaintiffs to demonstrate that such sustained success does not accurately reflect the minority group's ability to elect its preferred representatives. . . .").

In County elections, a host of special circumstances have contributed to the relative success of a select number of minority-preferred candidates.  As the Senate Report emphasized, "the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality."  *Gingles*, 478 U.S. at 75 (internal quotation marks

omitted).  For example, the lower court "could properly consider to what extent the pendency of this very litigation might have worked a one-time advantage for black candidates."  *Id.* at 76 (internal quotation marks and brackets omitted).  In this case, the County has faced litigation under the Act no less than three times—and each instance has had notable and substantial effects on the success of minority-preferred candidates in County elections.  Of the 15 elections that Defendants cite in which a minority candidate prevailed, two closely followed the 1991 Section 2 litigation against the County.  Liu Supp. Rep. Table 3.  Of those same 15 elections, an additional seven occurred following the 2003 Section 2 litigation against the County.   Liu Supp. Rep. Table 3.  These nine discrete victories by minority-preferred candidates are a direct result of the past litigation against the County.  Discounting these nine successful minority elections that were a direct result of past Act litigation, minority-preferred candidates were only successful in six out of 34 bi-racial elections, or 17.6%.

Moreover, two of the minority victories cited by Defendants took place in majority-minority districts.  Courts have consistently held that, in evaluating VRA violations, "courts must focus on election results from the majority-white district[s]."  *Bone Shirt*, 461 F.3d at 1027; *see also Johnson v. DeGrandy,* 512 U.S. 997, 1003–04 (1993) (ratifying the District Court's conclusion that the  third *Gingles* precondition was satisfied by "a tendency of non-Hispanic whites to vote as a bloc to bar minority groups from electing their chosen candidates *except in a district where a given minority makes up a voting majority*") (emphasis added).  The presence of electoral successes in majority-minority districts "does not lessen the significance of white bloc voting in neighboring majority-white districts," as "[t]o do otherwise would permit white block voting in a majority-white district to be washed clean by electoral success in [MMDs]."  *Old Person*, 230 F.3d at 1122, 1127.

Defendants' efforts to discount the presence of racially polarized voting in the County by pointing to a handful of discrete electoral successes by minority-preferred candidates is blatantly wrong, as it ignores elections directly in the wake of the 1991 and 2003 Act lawsuits and elections within MMDs—the very districts created to result in minority victories. Dr. Liu's analysis of more than 20 years of bi-racial elections in Albany County found a consistent pattern of racially polarized voting. A handful of minority electoral successes, the majority of which occurred in special circumstances, does little to undermine that conclusion. "[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences significant polarization than are the results of a single election." *Gingles*, 478 U.S. at 57.

### 3.    Special circumstances found in Albany are probative of racially polarized voting

Defendants' assertion that special circumstances are not relevant here is belied by the case law. The *Gingles* Court explicitly listed incumbency as a special circumstance. *See id*. ("Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as . . . incumbency . . . may explain minority electoral success in a polarized contest."); *accord. Abrams v. Johnson*, 521 U.S. 74, 93 (1997) (holding incumbency to be a special circumstance). Incumbency, moreover, is regularly considered by federal courts in this Circuit and in Circuits across the country as a "special circumstance." *See, e.g., Reed v. Town of Babylon*, 914 F. Supp. 843, 879 (E.D.N.Y. 1996) (finding that Section 2 of the Act was violated and that an election "involved special circumstances" that "could be attributed" to a politician's "incumbency status"); *Meek v. Metrop. Dade Cnty., Fla*., 985 F.2d 1471, 1483 (11th Cir. 1993) (finding a black county commissioner's incumbency to be a special circumstance).

Dr. Liu's report makes clear that in among the limited successes achieved that by Black candidates have achieved in the County, many were due to such "special circumstances."  Of the 15 (out of 46) elections where Dr. Liu found that the voting was not racially polarized, 14 were non-competitive, and 10 involved the special circumstances of incumbency and appointment. Liu Supp. Rep. at 7–8; *see Gingles*, 478 U.S. at 57 (discussion of special circumstances); *see also Meek,* 985 F.2d at 1481 (concluding that the election of incumbents who were first appointed constituted a "special circumstance" "which explains the evidence of some successful black candidates"); *Lewis v. Alamance Cnty.,* 99 F.3d 600, 632 (4th Cir. 1996) (holding that "incumbency, coupled with [black candidate's] appointment and the unique nature of his 1974 election, constitute special circumstances requiring that we discount this election victory").  *See also* Gaddie Apr. 20, 2012 Dep. Tr. at 155:5-15 (noting that relying on performance of minority incumbents will result in "stronger than expected white support for the black incumbent").

In fact, only six minority individuals have prevailed in Albany elections outside of an MMD.  *See* Liu Supp. Rep. at 13–19.  Twelve of the 13 elections where a minority candidate has prevailed outside an MMD involved the same five candidates: Soares, Heath-Roland, Barnette, McLaughlin and McCall.  *See id.*  David Soares, an incumbent who campaigned for office right after the 2003 Act lawsuit against the County, won three times.  Liu Supp. Rep. at 8.  Helena Heath-Roland, who was appointed to office before being re-elected, accounted for two more of the 13 wins.  *Id.*  Betty Barnette was appointed to her office following the 1991 Act litigation and was later re-elected.  *Id.* at 9.  And Carl McCall was first appointed and then elected in a *state-wide* race for New York State Comptroller and does not, therefore, fairly represent the ability of minorities to win elections in the County.

While Defendants argue that incumbency should matter for both black and white candidates in Albany, in reality the elections involving Black and white incumbents reflect very different circumstances.  Of the 12 contests involving white incumbents, nine were racially polarized, and the white incumbent did not win a majority of Black support.  *See* Liu Supp. Rep. Table 3.  In contrast, two out of the three[34] elections where a black incumbent prevailed outside of an MMD were not racially polarized and required significant support by white voters for the black candidate.  *Id.*   That is, Black incumbents were only able to succeed because of discrete instances of white crossover voting.  Thus incumbency supports the point that most bi-racial elections in Albany are racially polarized, and minority candidates can only succeed where there is significant white crossover—which rarely occurs in Albany.  Plaintiffs have offered sufficient evidence to raise a genuine issue of material fact that elections in Albany are often characterized by racially polarized voting that, without the aid of special circumstances, usually results in a loss by the minority candidate.

IV.   **Because Local Law C Was the Product of Intentional Discrimination, Plaintiffs Need Not Prove That the Relevant Minority Population Was Greater Than 50 Percent in Any Event**

In *Bartlett,* the United States Supreme Court acknowledged that the "greater than 50 percent" rule may be relaxed "in cases in which there is intentional discrimination against a racial minority."  556 U.S. at 19–20.  This is because "evidence of discriminatory intent 'tends to suggest that the jurisdiction is not providing an equal opportunity to minority voters to elect the representative of their choice, and it is therefore unnecessary to consider the majority-minority

---

[34]  The fourth and fifth elections Defendants cite where a black incumbent prevailed took place in MMDs.  As noted *supra*, courts must focus on election results from majority-white districts, not districts specifically drawn to elect minority representatives.  *Bone Shirt*, 461 F.3d at 1027; *De Grandy*, 512 U.S. 997 at 1003–04.

requirement before proceeding to the ultimate totality-of-the-circumstances analysis.'" *Id.* at 20 (quoting Brief for United States as *Amicus Curiae* 14).

Plaintiffs allege that Local Law C was not just the result of inadvertency, but of intentional discrimination against minorities in Albany County. *See* First Am. Complaint, Dkt. No. 100, ¶ 70 (recalling the "long history of discrimination against minorities in Albany County"). The history of discrimination in Albany County spans decades, as evidenced by (a) affirmative action resolutions that were passed by the Albany County Legislature in 1993 and 1996 (Dkt. Nos. 100-9, 100-10), (b) this Court's 1991 order that the County repair the existing non-compliance with the Act (Dkt. No. 100-2), and (c) this Court's conclusion that the County had again violated the Act in 2003. *See Arbor Hill III*, 289 F. Supp. 2d at 273.

Albany County has once more enacted a plan that disadvantages minorities. This raises an inference of purposeful discrimination. *See Rogers v. Lodge*, 458 U.S. 613, 625 (1982) ("Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo.").

Many of the same actors participated in the prior unlawful redistricting plans and the unlawful plan that is the subject of this litigation. *See* Memorandum in Support of Motion to Compel Deposition of Thomas Marcelle, Dkt. No. 139. Because there is evidence that the County intentionally "'is not providing an equal opportunity to minority voters to elect the representative of their choice . . . it is [] unnecessary to consider the majority-minority

requirement before proceeding to the ultimate totality-of-the-circumstances analysis.'" *Bartlett,*

556 U.S. at 20 (quoting Brief for United States as *Amicus Curiae* 14).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary

judgment.

Dated:   New York, New York                     Respectfully submitted,
         April 30, 2013

                                                GIBSON, DUNN & CRUTCHER LLP

                                                 /s/ Mitchell A. Karlan
                                                Mitchell A. Karlan

                                                mkarlan@gibsondunn.com
                                                200 Park Avenue
                                                New York, New York 10166-0193
                                                Telephone: 212.351.4000
                                                Fax: 212.351.4035
                                                Bar Roll No. 511874

                                                DEROHANNESIAN & DEROHANNESIAN
                                                Paul DerOhannesian II
                                                derolaw@verizon.net
                                                677 Broadway, Suite 202
                                                Albany, New York 12207-2985
                                                Telephone: 518.465.6420
                                                Fax: 518.427.0614
                                                Bar Roll No. 104792

                                                *Attorneys for Plaintiffs*