UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                 :

ANNE POPE, et al.,                 :

              Plaintiffs,     :

     -against-           :   No. 11-cv-0736 (LEK) (CFH)

COUNTY OF ALBANY, et al.,    :

             Defendants.   :

--------------------------------------------------------x

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' LOCAL RULE 7.1(A)(3) STATEMENT OF MATERIAL FACTS

**Past Redistricting Efforts in Albany County:**

1.     The Albany County Legislature (the "Legislature") is made up of 39 single-member districts pursuant to the Albany County Charter. *See* Albany County Charter, Dkt. 20-1 ("Charter"), art. 2, §§ 202, 206. The Legislature holds elections every four years. *Id.*

     **Defendants' Response No. 1**: *Defendants admit this statement.*

2.     After each decennial federal census, Albany County (the "County") forms a Redistricting Commission. The Redistricting Commission is tasked with recommending a proposed map of the County's legislative districts. *See* Charter, § art. 2, § 207. The Legislature then votes on whether to adopt the proposed plan, and if approved, the Legislature sends the plan to the Albany County Executive for consideration and signature into law.

     **Defendants' Response No. 2:** *Defendants admit this statement.*

3.     In 1991, the Legislature approved a redistricting plan after receiving the 1990 U.S. Census data. This plan contained only a single majority-minority legislative district ("MMD"). Declaration of Carlos Gonzalez, dated July 14, 2011, Dkt. 23 ("C. Gonzalez Decl."), ¶ 4.

     **Defendants' Response No. 3:** *Defendants admit this statement.*

4.     Minority voters in the County brought suit alleging that the legislative districts violated Section 2 of the Voting Rights Act. In a consent judgment and decree, the County was ordered to adopt a redistricting plan including three MMDs. *See* Consent Judgment and Decree, *NAACP v. Albany Cnty.*, No. 91-cv-1288 (N.D.N.Y. Nov. 13, 1991), Dkt. 1-2,

¶ 15; *see also* Declaration of Aaron Mair, dated July 15, 2011, Dkt. 28 ("Mair PI Decl."), ¶ 7; C. Gonzalez Decl. ¶ 6.

**Defendants' Response No. 4:** *Defendants admit this statement.*

5.    District Judge Con Cholakis ordered that the MMDs be within the City of Albany and that the Black and Hispanic populations be counted together to form a majority.  C. Gonzalez Decl. ¶ 8.

**Defendants' Response No. 5**: Defendants deny this statement. Plaintiffs fail to note that the Consent Judgment and Decree states that "[t]he redistricting plan will include three districts *in the area of the City of Albany*…" See Consent Judgment and Decree, NAACP v. Albany County, No. 91-cv-1288 (N.D.N.Y. Nov. 13, 1991), Dkt. 1-2, ¶ 2 under "IT IS HEREBY ORDERED" (emphasis added). By substituting their own phrase, "within the City of Albany," in place of the Court's phrase "in the area of the City of Albany," plaintiffs misconstrue the Order of the Court.

6.    In that 1991 case, this Court found that "[t]he black population of Albany County is characterized by *sufficient numerosity, political cohesion, and geographic concentration within particular areas of the county* such that if members of the County Legislature were elected entirely from fairly drawn single member district, black voters would likely be able to elect candidates of their choice for at least three of the positions on the Albany County Legislature."  Consent Judgment and Decree, *NAACP v. Albany Cnty.*, No. 91-cv-1288 (N.D.N.Y. Nov. 13, 1991), Dkt. 1-2, ¶ 17 (emphasis added).

**Defendants' Response No. 6:** *Defendants admit this statement.*

7.    Following the creation of the three new MMDs in 1991, each new MMD elected a minority legislator to the Albany County Legislature.  *See* Mair PI Decl. ¶ 8.

**Defendants' Response No. 7**: Defendants admits this statement only to the extent of elections conducted under the plan adopted as a result of the Consent Judgment and Decree, NAACP v. Albany County, No. 91-cv-1288 (N.D.N.Y. Nov. 13, 1991).

8.    After receiving the 2000 U.S. Census data, the Legislature again attempted to redistrict the County and adopted a redistricting map as part of Local Law J.  *See* Mair PI Decl. ¶ 9. This map maintained the status quo of three MMDs.  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 2003 U.S. Dist. LEXIS 11386 (N.D.N.Y. July 7, 2003) ("*Arbor Hill I*").

**Defendants' Response No. 8:** *Defendants admit this statement.*

9.    Minority voters brought suit and alleged that Local Law J violated Section 2 of the Voting Rights Act.  Mair PI Decl. ¶ 10; *see also Arbor Hill I*, 2003 U.S. Dist. LEXIS 11386.

**Defendants' Response No. 9:** *Defendants admit this statement.*

10.   U.S. Magistrate Judge David R. Homer issued a Report and Recommendation that supported granting a preliminary injunction. *Arbor Hill I,* 2003 U.S. Dist. LEXIS 11386.

**Defendants' Response No. 10:** *Defendants admit this statement.*

11.   The District Court adopted Judge Homer's Report and Recommendation and enjoined the scheduled election pending the adoption of a redistricting plan with four MMDs. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 457 (N.D.N.Y. 2003) ("*Arbor Hill II*").

**Defendants' Response No. 11:** *Defendants admit this statement.*

12.   The Court found that "[t]he County created the present circumstances by adopting a redistricting plan which flagrantly violated the rights of minority voters." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 289 F. Supp. 2d 269, 276 (N.D.N.Y. 2003) ("*Arbor Hill III*").

**Defendants' Response No. 12:** *Defendants admit this statement.*

13.   Albany County then entered into a settlement with the minority voters. Following the settlement, the County's 2003 revised redistricting plan "included in its calculations of the minority populations in the majority/minority districts not only blacks but Hispanics and those of mixed race who included either black or Hispanic as one of their races." *Arbor Hill III,* 289 F. Supp. 2d at 272.

**Defendants' Response No. 13**: Defendants deny this statement. Plaintiffs offer no support for their assertion that Albany County entered into a settlement with minority voters in 2003. This Court, in Arbor Hill III, indicates just the opposite: "the 1991 case was negotiated by the parties and settled by way of the Consent Decree which has not occurred here … Second, it is not clear that even if there was a settlement in this case and an agreement by the parties to conduct a special election that the Court would have the power to order it to occur." Arbor Hill III, 289 F. Supp. 2d at 276.

Plaintiffs also misconstrue this Court's statement in Arbor Hill III, F.Supp.2d at 272. Although plaintiffs attempt to give the impression that defendants have multiple past redistricting "plans" that included blacks and Hispanics in the constitution of MMDs, this conclusion is unsupported by plaintiffs' reference to Arbor Hill III. Rather, the Court there was making reference to "Local Law E" only, not several or even multiple "plans" as plaintiff would like the Court to believe. Arbor Hill III, 289 F. Supp. 2d at 271-72.

**Plaintiffs' Reply**: On August 19, 2004, the County entered into a Consent Decree and Judgment, which required implementation of a revised plan (to replace Local Law E). *See* Consent Decree and Judgment, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 03-CV-0502 (N.D.N.Y. Aug. 19, 2004) ("2004 Consent Decree"), submitted as Exhibit 6 to the Declaration of Brittany Garmyn, dated May 20, 2013 ("Garmyn Decl."). This plan, known as "Revision 4b2," included both Blacks and Hispanics in the constitution of its MMDs. *See* Population Comparison Table, dated July 12, 2004 (comparing the non-Hispanic DOJ Black population plus Hispanic population

sizes in the County's revised redistricting plan version 4b2 with the Arbor Hill Concerned Citizens Neighborhood Association's proposed plan), Garmyn Decl., Ex. 7; *see also* Merrill Dep. Tr. at 187:4–191:11, 197:3–197:11, Garmyn Decl., Ex. 8.

The County not only included both Blacks and Hispanics in its calculations of the minority populations when creating MMDs after the 2000 U.S. Census, but in 1991, the County also "agree[d] to adopt a legislative redistricting plan that shall include three majority *Black and Hispanic* legislative districts."  Consent Judgment and Decree, *NAACP v. Albany Cnty.*, No. 91-CV-1288 (N.D.N.Y. Nov. 13, 1991) ("1991 Consent Decree") ¶ 24, Dkt. No. 231-1 (emphasis added).

14.  The final revised plan was implemented in a consent decree and judgment (Consent Decree and Judgment, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany* (N.D.N.Y. Aug. 19, 2004), Dkt. 1-5), and adopted by the Legislature.  *See* Local Law No. 2 for 2004, Albany County, N.Y. (Sept. 13, 2004), Dkt. 1-6.

**Defendants' Response No. 14:** *Defendants admit this statement.*

## 2010 Census:

Albany County 2010 Demographics:

15.  According to the 2010 U.S. Census, Albany County has a population of 304,204, with a non-Hispanic single-race Black population of 36,396 (11.96% of the County's population).  Amended Declaration of William S. Cooper, dated Aug. 2, 2011, Dkt. 54 ("Cooper PI Decl."), ¶ 12 with table.  The Hispanic population comprised 4.9%.  *Id.*

**Defendants' Response No. 15:** *Defendants admit this statement.*

16.  According to the 2010 U.S. Census, the non-Hispanic DOJ Black population of Albany County was 39,087, or 12.85% of the County's total population.  *See* U.S. Census, Hispanic Or Latino and Not Hispanic Or Latino By Race (P2), 2010 Census Redistricting Data (Public Law 94-171) Summary File, Albany County, N.Y., *available at* http://factfinder2.census.gov/bkmk/table/1.0/en/DEC/10_PL/P2/0500000US36001|0600000US3600101000 (last visited Mar. 25, 2013), attached as Exhibit 1 to the Declaration of Mitchell A. Karlan, dated Mar. 26, 2013 ("Karlan Decl.") ("2010 Hispanic Census Table") (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows to calculate the size of the population, and dividing this figure by the County's total population to calculate the percentage that is non-Hispanic DOJ Black).

**Defendants' Response No. 16:** *Defendants admit this statement.*

17.  According to the 2010 U.S. Census, Albany County has an "Any Part Black" population (including all persons who self-identify as at least part Black and may also be part Hispanic) of 43,076 or 14.2% of the County's total population.  U.S. Census, Profile of General Population and Housing Characteristics: 2010 (DP-1), 2010 Demographic Profile Data, Albany County, N.Y., *available at* http://factfinder2.census.gov/bkmk/table/1.0/

en/DEC/10_DP/DPDP1/0500000US36001|0600000US3600101000?slice=GEO~050000
0US36001 (last visited Mar. 25, 2013), Karlan Decl., Ex. 3 ("2010 General County
Census Table") (identified in "Races alone or in combination with one or more other
races: Black or African American" row to calculate the size of the population, and
dividing this figure by the County's total population to calculate the percentage that is
Any Part Black).

**Defendants' Response No. 17:** *Defendants admit this statement.*

18.     According to the 2010 U.S. Census, the County has a total voting age population of
        243,573.  Cooper PI Decl. ¶ 13.

**Defendants' Response No. 18:** *Defendants admit this statement.*

Albany City 2010 Demographics:

19.     According to the 2010 U.S. Census, there are 28,479 non-Hispanic single-race Blacks in
        the City of Albany.  Cooper PI Decl. ¶ 6; *see also* 2010 Hispanic Census Table (Ex.1)
        (identified in "Black or African American alone" row).

**Defendants' Response No. 19:** *Defendants admit this statement.*

20.     According to the 2010 U.S. Census, there are 29,769 non-Hispanic DOJ Blacks in the
        City of Albany.  2010 Hispanic Census Table (Ex. 1) (identified by finding the sum of
        percentages in "Black or African American alone" and "Two or More Races: White;
        Black or African American" rows).

**Defendants' Response No. 20:** *Defendants admit this statement.*

21.     According to the 2010 U.S. Census, there are 32,569 Any Part Blacks in the City of
        Albany.  U.S. Census, Profile of General Population and Housing Characteristics: 2010
        (DP-1), 2010 Demographic Profile Data, Albany, N.Y., *available at*
        http://factfinder2.census.gov/bkmk/table/1.0/en/DEC/10_DP/DPDP1/0500000US36001|0
        600000US3600101000?slice=GEO~0500000US36001 (last visited Mar. 25, 2013),
        Karlan Decl., Ex. 12 ("2010 General City Census Table") (identified in "Races alone or
        in combination with one or more other races: Black or African American" row).

**Defendants' Response No. 21:** *Defendants admit this statement.*

22.     According to the 2010 U.S. Census, non-Hispanic single-race Blacks represent 29.1% of
        the City's population.  Cooper PI Decl. ¶ 7; *see also* 2010 Hispanic Census Table (Ex. 1)
        (identified in "Black or African American alone" row, and dividing this figure by the
        total population of the City).

**Defendants' Response No. 22:** *Defendants admit this statement.*

23.     According to the 2010 U.S. Census, non-Hispanic DOJ Blacks represent 30.4% of the
        City's population.  2010 Hispanic Census Table (Ex. 1) (identified by finding the sum of

percentages in "Black or African American alone" and "Two or More Races: White; Black or African American" rows, and dividing this figure by the total population of the City).

**Defendants' Response No. 23:** *Defendants admit this statement.*

24.    According to the 2010 U.S. Census, Any Part Blacks represent 33.28% of the City's population.  2010 General City Census Table (Ex. 12) (identified in "Races alone or in combination with one or more other races: Black or African American" row, and dividing this figure by the total population of the City).

**Defendants' Response No. 24:** *Defendants admit this statement.*

25.    According to the 2000 U.S. Census and 2010 U.S. Census, the non-Hispanic White population of the City decreased by 5,602 or 9.6% from the 2000 Census to the 2010 Census.  Cooper PI Decl. ¶ 8.

**Defendants' Response No. 25**: Defendants deny this statement. Plaintiffs reference Mr. Cooper's preliminary injunction declaration as their sole support for this statement. Although Mr. Cooper notes in his declaration that this data regarding an alleged decrease of the non-Hispanic white population in the City of Albany is based upon the 2000 and 2010 Censuses, he fails to provide a specific citation to the census documents. See Cooper PI Decl. ¶8. Moreover, although "Exhibit 1" of Mr. Cooper's declaration purports to be "a true compilation of 2000 and 2010 U.S. Census data for Albany County and the City of Albany," see Cooper PI Decl. ¶5, this supposed "true compilation" does not even indicate the creator of the document or the source of the information. See Cooper PI Decl. Exh. 1.

**Plaintiffs' Reply**: As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census.  *See* Cooper PI Decl. ¶ 8 & Ex. 1.  According to the 2010 U.S. Census, the non-Hispanic white population of the City of Albany is 52,857. U.S. Census, Hispanic Or Latino and Not Hispanic Or Latino By Race (P2), 2010 Census Redistricting Data (Public Law 94-171) Summary File, Albany County, N.Y., *available at* http://factfinder2.census.gov/bkmk/table/1.0/en/DEC/10_PL/P2/0500000US36001| 0600000US3600101000 (last visited May 17, 2013), Dkt. No. 212-1 ("2010 Hispanic Census Table") (identified in Not Hispanic or Latino: Population of one race: White alone row). According to the 2000 U.S. Census, the non-Hispanic white population of the City of Albany was 58,459.  U.S. Census, Hispanic Or Latino and Not Hispanic Or Latino By Race (PL002), Census 2000 Redistricting Data (Public Law 94-171) Summary File, Albany County, N.Y., *available at* http://factfinder2.census.gov/bkmk/table/1.0/en/ DEC/00_PL/PL002/0500000US36001|0600000US3600101000 (last visited May 17, 2013), Dkt. No. 212-2 ("2000 Hispanic Census Table") (identified in Not Hispanic or Latino: Population of one race: White alone row).  Accordingly, the non-Hispanic white population of the City of Albany decreased by 5,602 from the 2000 Census to the 2010 Census.  *Compare* 2010 Hispanic Census Table, *with* 2000 Hispanic Census Table.

<u>Number of Blacks in the County Versus Number of Blacks in the City:</u>

26.    According to the 2010 U.S. Census, 78.25% of the County's non-Hispanic single-race Black population lives within the City of Albany.  *Compare* 2010 Hispanic Census Table (Ex. 1) (reflecting the size of the non-Hispanic single-race Black population in the City, identified in "Black or African American alone" row), *with* figure in 2010 Hispanic Census Table (Ex. 1) (reflecting the size of the non-Hispanic single-race Black population in the County, identified in "Black or African American alone" row), dividing the City figure by the County figure to calculate the percentage of the population living in the City.

       **Defendants' Response No. 26:** *Defendants admit this statement.*

27.    According to the 2010 U.S. Census, 76.16% of the County's non-Hispanic DOJ Black population lives within the City of Albany.  *Compare* 2010 Hispanic Census Table (Ex. 1) (reflecting the size of the non-Hispanic DOJ Black population in the City, identified by finding the sum of percentages in "Black or African American alone" and "Two or More Races: White; Black or African American" rows), *with* 2010 Hispanic Census Table (Ex. 1) (reflecting the size of the non-Hispanic DOJ Black population in the County, identified by finding the sum of percentages in "Black or African American alone" and "Two or More Races: White; Black or African American" rows), dividing the City figure by the County figure to calculate the percentage of the population living in the City.

       **Defendants' Response No. 27:** *Defendants admit this statement.*

28.    According to the 2010 U.S. Census, 75.61% of the County's Any Part Black population lives within the City of Albany.  *Compare* 2010 General City Census Table (Ex. 12) (reflecting the size of the Any Part Black population in the City, identified in "Races alone or in combination with one or more other races: Black or African American" row), *with* 2010 General County Census Table (Ex. 3) (reflecting the size of the Any Part Black population in the County, identified in "Races alone or in combination with one or more other races: Black or African American" row), dividing the City figure by the County figure to calculate the percentage of the population living in the City.

       **Defendants' Response No. 28:** *Defendants admit this statement.*

<u>Increase in the Minority Population From 2000 to 2010:</u>

29.    According to the 2000 U.S. Census, the non-Hispanic DOJ Black population of the City was 26,713.  *See* U.S. Census, Hispanic Or Latino and Not Hispanic Or Latino By Race (PL002), Census 2000 Redistricting Data (Public Law 94-171) Summary File, Albany County, N.Y., *available at* http://factfinder2.census.gov/bkmk/table/1.0/en/DEC/ 00_PL/PL002/0500000US36001|0600000US3600101000 (last visited Mar. 25, 2013), Karlan Decl., Ex. 2 ("2000 Hispanic Census Table") (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows).

       **Defendants' Response No. 29:** *Defendants admit this statement.*

7

30.     According to the 2000 U.S. Census, the Any Part Black population of the City was 28,638.  Census website.   U.S. Census, Profile of General Demographics Characteristics: 2000 (DP-1), Census 2000 Summary File 1 (SF 1) 100-Percent Data, Albany County, N.Y., *available at* http://factfinder2.census.gov/bkmk/table/1.0/en/DEC/00_SF1/DP1/ 0500000US36001|0600000US3600101000 (last visited Mar. 25, 2013), Karlan Decl., Ex. 4 ("2000 General Census Table") (identified in "Races alone or in combination with one or more other races: Black or African American" row).

      **Defendants' Response No. 30:** *Defendants admit this statement.*

31.     According to the 2000 U.S. Census, the non-Hispanic DOJ Black population of the County was 32,633.  2000 Hispanic Census Table (Ex. 2) (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows).

      **Defendants' Response No. 31:** *Defendants admit this statement.*

32.     According to the 2000 U.S. Census, the Any Part Black population of the County was 35,098.  2000 General Census Table (Ex. 4) (identified in "Races alone or in combination with one or more other races: Black or African American" row).

      **Defendants' Response No. 32:** *Defendants admit this statement.*

33.     According to the 2000 U.S. Census and 2010 U.S. Census, the non-Hispanic single-race Black population of the City increased by 2,437, or 9.4%, from the 2000 U.S. Census to the 2010 U.S. Census.  Cooper PI Decl. ¶ 9.

      **Defendants' Response No. 33**: Defendants deny this statement. Plaintiffs reference Mr. Cooper's preliminary injunction declaration as their sole support for this statement. Although Mr. Cooper notes in his declaration that this data regarding an alleged increase in the non-Hispanic single-race black population for the City of Albany is based upon the 2000 and 2010 Censuses, he fails to provide a specific citation to the census documents. See Cooper PI Decl. ¶9. Moreover, although "Exhibit 1" of Mr. Cooper's declaration purports to be "a true compilation of 2000 and 2010 U.S. Census data for Albany County and the City of Albany," see Cooper PI Decl. ¶5, this supposed "true compilation" does not even indicate the creator of the document or the source of the information. See Cooper PI Decl. Exh. 1).

      **Plaintiffs' Reply**:  As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census.  *See* Cooper PI Decl. ¶ 9 & Ex. 1.  According to the 2010 U.S. Census, the non-Hispanic single-race Black population of the City is 28,479. 2010 Hispanic Census Table (identified in Not Hispanic or Latino: Population of one race: Black or African American alone row).  According to the 2000 U.S. Census, the non-Hispanic single-race Black population of the City was 26,042.  2000 Hispanic Census Table (identified in Not Hispanic or Latino: Population of one race: Black or African American alone row).  Accordingly, the non-Hispanic single-race Black population of the City of Albany increased by 2,437 from the 2000 Census to the 2010 Census.  *Compare* 2010 Hispanic Census Table, *with* 2000 Hispanic Census Table.

34.    According to the 2000 U.S. Census and 2010 U.S. Census, the non-Hispanic DOJ Black population of the City increased by 3,056, or 11.44% from the 2000 U.S. Census to the 2010 U.S. Census.  *Compare* 2000 Hispanic Census Table (Ex. 2) (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows), *with* 2010 Hispanic Census Table (Ex. 1) (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows), and finding the difference of the 2000 and 2010 figures to calculate total growth, and dividing this figure by the 2000 figure to calculate percentage growth.

   **Defendants' Response No. 34:** *Defendants admit this statement.*

35.    According to the 2000 U.S. Census and 2010 U.S. Census, the Any Part Black population of the City increased by 3,931, or 13.73% from the 2000 U.S. Census to the 2010 U.S. Census.  *Compare* 2000 General Census Table (Ex. 4) (identified in "Races alone or in combination with one or more other races: Black or African American" row), *with* 2010 General City Census Table (Ex. 12) (identified in "Races alone or in combination with one or more other races: Black or African American" row), and finding the difference of the 2000 and 2010 figures to calculate total growth, and dividing this figure by the 2000 figure to calculate percentage growth.

   **Defendants' Response No. 35:** *Defendants admit this statement.*

36.    According to the 2010 U.S. Census, from 2000 to 2010, there was a 15.5% increase in the non-Hispanic single-race Black population in the County.  Cooper PI Decl. ¶ 12. During the same period, the non-Hispanic White population in the County decreased by 4.1%.

   **Defendants' Response No. 36**: Defendants deny this statement. Plaintiffs reference Mr. Cooper's preliminary injunction declaration as their sole support for this statement. Although Mr. Cooper notes in his declaration that this data regarding an alleged increase in the non-Hispanic single-race black population for the County of Albany is based upon the 2000 and 2010 Censuses, he fails to provide a specific citation to the census documents. See Cooper PI Decl. ¶12. Moreover, although "Exhibit 1" of Mr. Cooper's declaration purports to be "a true compilation of 2000 and 2010 U.S. Census data for Albany County and the City of Albany," see Cooper PI Decl. ¶5, this supposed "true compilation" does not even indicate the creator of the document or the source of the information. See Cooper PI Decl. Exh. 1.

   The chart located under ¶12 of Cooper's PI Decl., the paragraph cited by plaintiffs' as support for their statement, includes population figures for 2010; however the data allegedly relied upon by Mr. Cooper in producing this population chart only provides data from the years 1980-2000—this is easily discovered by simply inserting the website link Mr. Cooper provides directly below the chart. See Cooper PI Decl. ¶12 w/ chart.

   **Plaintiffs' Reply**:  As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census.  *See generally* Cooper PI Decl.  According to the 2010 U.S. Census, the non-Hispanic single-race Black population of the County is

36,396.  2010 Hispanic Census Table (identified in Not Hispanic or Latino: Population of one race: Black or African American alone row).  According to the 2000 U.S. Census, the non-Hispanic single-race Black population of the County was 31,514.  2000 Hispanic Census Table (identified in Not Hispanic or Latino: Population of one race: Black or African American alone row).  Accordingly, the non-Hispanic single-race Black population of the County increased by 15.5% from the 2000 Census to the 2010 Census.  *Compare* 2010 Hispanic Census Table, *with* 2000 Hispanic Census Table (calculated by dividing the County's non-Hispanic single-race Black population for 2010 (36,396) by the County's non-Hispanic single-race Black population for 2000 (31,514)).

According to the 2010 U.S. Census, the non-Hispanic single-race White population of the County is 231,152.  2010 Hispanic Census Table (identified in Not Hispanic or Latino: Population of one race: White alone row).  According to the 2000 U.S. Census, the non-Hispanic single-race White population of the County was 240,913.  2000 Hispanic Census Table (identified in Not Hispanic or Latino: Population of one race: White alone row).  Accordingly, the non-Hispanic single-race White population of the County decreased by 4.1% from the 2000 Census to the 2010 Census.  *Compare* 2010 Hispanic Census Table, *with* 2000 Hispanic Census Table (calculated by dividing the County's non-Hispanic single-race White population for 2010 (231,152) by the County's non-Hispanic single-race Black population for 2000 (240,913)).

37.     According to the 2000 U.S. Census and 2010 U.S. Census, the non-Hispanic DOJ Black population of the County increased by 6,454, or 19.78%, from the 2000 U.S. Census to the 2010 U.S. Census.  *Compare* 2000 Hispanic Census Table (Ex. 2) (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows), *with* 2010 Hispanic Census Table (Ex. 1) (identified by finding the sum of "Black or African American alone" and "Two or More Races: White; Black or African American" rows), finding the difference of the 2000 and 2010 figures to calculate total growth, and dividing this figure by the 2000 figure to calculate percentage growth.

**Defendants' Response No. 37:** *Defendants admit this statement.*

38.     According to the 2000 U.S. Census and 2010 U.S. Census, the Any Part Black population of the County increased by 7,978, or 22.73% from the 2000 U.S. Census to the 2010 U.S. Census.  *Compare* 2000 General Census Table (Ex. 4) (reflecting the size of the Any Part Black population, identified in "Races alone or in combination with one or more other races: Black or African American" row), *with* 2010 General County Census Table (Ex. 3) (reflecting the size of the Any Part Black population, identified in "Races alone or in combination with one or more other races: Black or African American" row), finding the difference of the 2000 and 2010 figures to calculate total growth, and dividing this figure by the 2000 figure to calculate percentage growth.

**Defendants' Response No. 38:** *Defendants admit this statement.*

<u>Concentration of Blacks in the City:</u>

39.     As Blacks make up 12% of the County, Cooper PI Decl. ¶ 5, but 29% of the City, Cooper PI Decl. ¶ 7, it follows that the County's Black population is concentrated in the City.

**Defendants' Response No. 39**: Defendants deny this statement. Plaintiffs seemingly draw a dichotomy between the City of Albany and the County of Albany in measuring the black population for each; plaintiffs therefore give no indication as to whether their calculation of the black population in the County includes the black population that is contained in the City. If the 12% black population figure for the County excludes the City of Albany, then the percentage black population for the County will of course be dwarfed by the percentage black population contained in the City. Because it is unclear whether the 12% figure accounts for the City black population, defendants are unable to admit that the "Black population is concentrated in the City."

Further, plaintiffs' sole support for this statement is Mr. Cooper's preliminary injunction declaration. <u>See</u> Cooper PI Decl. ¶¶5, 7. Although Mr. Cooper notes in his declaration that the non-Hispanic black population constitutes 12% of the County total population, he cites to an "Exhibit 1" that, as stated, gives no indication of the creator or the source of the document, "Exhibit 1." Also, Mr. Cooper's declaration does state that the non-Hispanic black population constitutes 29% of the City's population; however, Mr. Cooper does not reference any source whatsoever in offering this opinion in his declaration.

**Plaintiffs' Reply**: As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census. *See* Cooper PI Decl. ¶ 5 & Ex. 1. According to the 2010 U.S. Census, Blacks make up 12% of the County. *See* 2010 Hispanic Census Table (calculated by dividing the County's non-Hispanic single-race Black population figure (36,396) by the County's total population (304,204)). According to the 2010 U.S. Census, Blacks make up 29% of the City. *See id.* (calculated by dividing the City's non-Hispanic single-race Black population figure (28,479) by the City's total population (97,856)). Accordingly, the 12% Black population figure accounts for the City population as these numbers are merely derived from the Census data.

40.     The Black population of Albany is concentrated in the eastern portion of the City of Albany. Cooper PI Decl. ¶ 6; *see also* Declaration of Ingrid M. Allard, dated July 14, 2011 ("Allard PI Decl."), Dkt. 16, ¶ 10 ("The North Albany and Menands area, the West End area, and the West Hill and South End area have a high concentration of minorities relative to other areas of Albany County."); *see also* Declaration of Samuel J. Coleman, dated July 15, 2011 ("Coleman PI Decl."), Dkt. 22, ¶ 5; Mair PI Decl., Exhibit 8, Dkt. 28-8.

**Defendants' Response No. 40**: Defendants deny this statement. Plaintiffs offer no statistical data for this assertion, but rather the three references cited to by plaintiffs offer unsupported conclusory opinions only.

**Plaintiffs' Reply**: The Black population of Albany is concentrated in the eastern portion of the City. *See* Matthew Bloch et al., Mapping the 2010 U.S. Census, N.Y. Times, *available at* http://projects.nytimes.com/census/2010/map?nl=todaysheadlines&emc= thab1 (last visited May 17, 2013), Garmyn Decl., Ex. 9.

Definition of Black:

41.    Both the United States government and the state of New York use the non-Hispanic DOJ Black definition for purposes of monitoring civil rights and voting rights issues. *See infra* ¶¶ 44–46.

**Defendants' Response No. 41:** *Defendants admit this statement.*

42.    Non-Hispanic DOJ Black includes all persons who self-identify as single-race non-Hispanic Black and all persons of two races who self-identify as non-Hispanic Black and White.  Rebuttal Report of William S. Cooper in Response to the Report of Ronald Keith Gaddie, dated April 16, 2012, ¶ 4, Karlan Decl., Ex. 8 ("Cooper Rebuttal Report"); *see also* Gaddie Apr. 20, 2012 Dep. Tr. at 24:15–24, Karlan Decl., Ex. 7 ("Gaddie Apr. 20, 2012 Dep. Tr.").  This definition is in accordance with Department of Justice policy pursuant to Part II of OMB Bulletin 00-02.  Dept. of Justice, 66 Fed. Reg. 5412 (Jan. 18, 2001).

**Defendants' Response No. 42:** *Defendants admit this statement.*

43.    The U.S. Office of Management and Budget uses non-Hispanic DOJ Black in civil rights monitoring.  *See* Office of Mgmt. & Budget, Exec Office of the President, OMB Bull. No. 00-02, Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement (2000), *available at* http://www.whitehouse.gov/omb/bulletins_b00-02; *see also* Gaddie Apr. 20, 2012 Dep. Tr. at 18:7–23.

**Defendants' Response No. 43:** *Defendants admit this statement.*

44.    The U.S. Department of Justice uses non-Hispanic DOJ Black for enforcement of Section 5 of the Voting Rights Act.  Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, Notice 76 Fed. Reg. 7,470–73 (Feb. 9, 2011); *see also* Gaddie Apr. 20, 2012 Dep. Tr. at 19:14–23.

**Defendants' Response No. 44:** *Defendants admit this statement.*

45.    The State of New York used non-Hispanic DOJ Black for the recent court-drawn redistricting plan for New York State's congressional districts.  Aff. of Prof. Nathaniel Persily, J.D., Ph.D., *Favors v. Cuomo*, No. 11-CV-5632 (E.D.N.Y. Mar. 12, 2012), ¶ 31, *available at* https://ecf.nyed.uscourts.gov/dropbox/324457/1.11.cv.5632.6746199.1.pdf, *adopted by Favors v. Cuomo*, No. 11-CV-5632, 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012).

**Defendants' Response No. 45:** *Defendants admit this statement.*

46.     Albany County's past redistricting plans "included in its calculations of the minority populations in the majority/minority districts not only blacks but Hispanics and those of mixed race who included either black or Hispanic as one of their races." *Arbor Hill III*, 289 F. Supp. 2d at 272.

**Defendants' Response No. 46**: Defendants deny this statement. Plaintiffs misconstrue this Court's statement in <u>Arbor Hill III</u>, F.Supp.2d at 272. Although plaintiffs attempt to give the impression that defendants have multiple past redistricting "plans" that included blacks and Hispanics in the constitution of MMDs, this conclusion is unsupported by plaintiffs' reference to <u>Arbor Hill III</u>. Rather, the Court there was making reference to "Local Law E" only, not several or even multiple "plans" as plaintiff would like the Court to believe. <u>Arbor Hill III</u>, 289 F. Supp. 2d at 271-72.

**Plaintiffs' Reply**: The County not only included both Blacks and Hispanics in its calculations of the minority populations when creating MMDs after the 2000 U.S. Census, *see* Population Comparison Table, dated July 12, 2004, but in 1991, the County also "agree[d] to adopt a legislative redistricting plan that shall include three majority Black and Hispanic legislative districts." 1991 Consent Decree ¶ 24.

47.     Non-Hispanic DOJ Black is an appropriate definition to use when calculating the Black population in Albany County. *See* Merrill Dep. Tr. at 170:21–171:7, Karlan Decl., Ex. 11; Gaddie Apr. 20, 2012 Dep. Tr. at 13:8; Gaddie Apr. 20, 2012 Errata Sheet at 13:8 ("I was asked to use DOJ black"), Karlan Decl., Ex. 13; Gaddie Mar. 4, 2013 Dep. Tr. at 289:15–290:9, Karlan Decl., Ex. 9 ("Gaddie Mar. 4, 2013 Dep. Tr.").

**Defendants' Response No. 47:** *Defendants admit this statement.*

48.     Defendants' expert Gaddie does not include "all citizens of Albany County who identified themselves as black" in his analysis. Gaddie Apr. 20, 2012 Dep. Tr. at 25:19–24.

**Defendants' Response No. 48:** Defendants deny this statement. Dr. Gaddie testified that he applied the DOJ black standard in his analysis of <u>Gingles</u>' second and third preconditions. <u>See</u> Gaddie Mar. 4, 2013 Dep. Tr. at 294:4–22. Therefore, plaintiffs' blanket statement intimating that Dr. Gaddie's whole analysis is flawed for allegedly wrongly leaving out a segment of the black population is simply false. Moreover, the very standard plaintiffs advocate for, the DOJ Black standard, which was also used by Dr. Gaddie, by its very definition does not account for individuals who identified as both black and Hispanic, thereby leaving out a segment of the population "who identified themselves as black." <u>See</u> DOJ's *Guidance Concerning Redistricting and Retrogression Under Section 5*, 66 Fed. Reg. 5412.

**Plaintiffs' Reply**: While Gaddie apparently did use non-Hispanic DOJ Black for his analysis of *Gingles* 2 and 3, that measure of the population nevertheless fails to capture <u>all</u> individuals who identify as Black because it excludes any individual who identifies as <u>both</u> Black and Hispanic. Regardless of whether Gaddie used non-Hispanic DOJ Black

or single-race black, Gaddie admitted that he did not include "all citizens of Albany County who identified themselves as black" in his analysis:

> Q. In your report of Albany County, is there a reason you chose not to include all citizens of Albany County who identified themselves as black?
>
> A. There was no conscious reason for that choice.
>
> Q. Is there any reason that you have made the decision to not include all citizens of Albany County who identify themselves as black in analyzing the redistricting plan for the county legislature?
>
> A. No.

Gaddie Apr. 20, 2012 Dep. Tr. at 25:19–26:6, Garmyn Decl., Ex. 10.

Gaddie did not include "all citizens of Albany County who identified themselves as black" in his analysis of the first *Gingles* precondition, which is the precondition that analyzes population numbers.

> Q. Did you use the D -- DOJ black definition in your analysis of the Gingles 1 condition?
>
> A. No, I only used it in this ecological regression analysis and ecological inference analysis.

Gaddie Mar. 4, 2013 Dep. Tr. at 294:17–22, Garmyn Decl., Ex. 11.  Gaddie testified that he did not recall what definition he utilized to analyze the population under *Gingles* 1, but that it is "entirely possible" that he used black only (a definition which does not include mixed race individuals who self-identify as Black).

> Q. What do you recall, if anything, about the definition of minority utilized to create the numbers set forth in Table 1 of Exhibit 1?
>
> A. Counselor, it's entirely possible that I used black only in defining this table.

*Id*. at 296:22–297:3.

> Q. In your analysis of the Plaintiff's redistricting plan under Gingles Precondition 1, what is the basis for your population figures in Table 1 of your report and on Page 8 of your report?
>
> A. Counsel, just to be clear: You're asking me to indicate what the basis is of the measure?
>
> Q. Yes.
>
> A. This would appear to be single black VAP defined.

*Id*. at 300:4–14.

**The Alternative Redistricting Plans:**

49.    The Arbor Hill Environmental Justice Corporation ("AHEJ") created an alternative redistricting plan (the "AHEJ Plan") using the 2010 U.S. Census data.  Mair PI Decl. ¶¶ 30–31, 35; *see also* Mair PI Decl., Ex. 14, Dkt. 28-14.

    **Defendants' Response No. 49**: Defendants deny this statement. Plaintiffs offer Mr. Mair's preliminary injunction declaration as the sole support for their statement. See Mair PL Decl. ¶¶ 30-31, 35; see also Mair PL Decl., Ex. 14, Dkt. 28-14. Mr. Mair's testimony is inadequate because, although plaintiffs aver in their statement that the AHEJ plan was created "using the 2010 U.S. Census data," the specific paragraphs cited to by plaintiffs in Mr. Mair's declaration include no exhibits or verifiable references of U.S. census data or reports. See id. The fact that Mr. Mair claims that he "looked at the 2010 Census population" in crafting his proposed redistricting plan is not convincing.

    **Plaintiffs' Reply**: Plaintiffs' Expert William Cooper ran a detailed analysis of Mr. Mair's AHEJ Plan.  *See* Cooper PI Decl. ¶¶ 24–30, Ex. 6.  As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census—e.g., the 2010 Hispanic Census Table and the 2000 Hispanic Census Table.  *See generally* Cooper PI Decl.

50.    The AHEJ Plan includes five legislative districts with the non-Hispanic DOJ Black voting age population comprising 52.17% in District 1, 52.66% in District 2, 52.67% in District 3, 50.44% in District 4, and 51.56% in District 6.  Cooper PI Decl., ¶ 26 with table; Mair PI Decl., Exhibit 11, Dkt. 28-11.  In addition, the AHEJ Plan includes Hispanic voting age populations of 10.51% in District 1; 7.8% in District 2; 8.9% in District 3; 11.53% in District 4; and 9.56% in District 6.  Mair PI Decl., Exhibit 11, Dkt. 28-11.

    **Defendants' Response No. 50**: Defendants deny this statement in part and admit in part. Defendants admit that the AHEJ plan purports to have MMDs with percentage DOJ Black population percentages. However, neither Mr. Cooper nor Mr. Mair offers any foundation for how they arrived at these DOJ Black voting age population percentages. See Cooper PI Decl., ¶ 26 with table; see also Mair PI Decl., Exhibit 11, Dkt. 28-11. Defendants therefore deny the accuracy of these percentages for this reason. See id. As established in defendants' motion for summary judgment, the proper criteria is CVAP not VAP.

    **Plaintiffs' Reply**: Plaintiffs' Expert William Cooper ran a detailed analysis of Mr. Mair's AHEJ Plan.  *See* Cooper PI Decl. ¶¶ 24–30, Ex. 6.  As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census—e.g., the 2010 Hispanic Census Table and the 2000 Hispanic Census Table.  *See generally* Cooper PI Decl.  Moreover, Plaintiffs deny that CVAP is the proper criteria to measure the population for Voting Rights Act purposes.

51.   Plaintiffs' expert William S. Cooper created Illustrative Plans to demonstrate additional alternative redistricting plans for the County, using the 2010 U.S. Census data.  Cooper PI Decl. ¶¶ 31–39.

**Defendants' Response No. 51**: Defendants deny this statement. Defendants admit that the Cooper plans purports to have MMDs with percentage DOJ Black population percentages. However, Mr. Cooper offers no foundation for how he arrived at these DOJ Black voting age population percentages. See Cooper PI Decl., ¶ 26 with table. Defendants therefore deny the accuracy of these percentages for this reason. See id. As established in defendants' motion for summary judgment, the proper criteria is CVAP not VAP.

**Plaintiffs' Reply**: As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census—e.g., the 2010 Hispanic Census Table and the 2000 Hispanic Census Table.  *See generally* Cooper PI Decl.  Moreover, Plaintiffs deny that CVAP is the proper criteria to measure the population for Voting Rights Act purposes.

52.   Illustrative Plan 3 includes five legislative districts with  the non-Hispanic DOJ Black voting age population comprising 51.16% in District 1, 52.75% in District 2, 62.54% in District 3, 51.21% in District 4, and 51.62% in District 6.  Cooper PI Decl., ¶ 38 with table.

**Defendants' Response No. 52**: Defendants deny this statement. Plaintiffs offer Mr. Cooper's preliminary injunction declaration as the sole support for their statement. See Cooper PI Decl., ¶ 38 with table. Even though plaintiffs accurately extract from Mr. Cooper's declaration the non-Hispanic DOJ Black VAP percentages offered by Mr. Cooper, Mr. Cooper provides no basis for his calculations in arriving at the claimed percentages. See id.

**Plaintiffs' Reply**: As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census—e.g., the 2010 Hispanic Census Table and the 2000 Hispanic Census Table.  *See generally* Cooper PI Decl.

53.   Illustrative Plan 4 includes five legislative districts with the non-Hispanic DOJ Black voting age population comprising 54.37% in District 1, 54.35% in District 2, 54.32% in District 3, 54.36% in District 4, and 54.20% in District 6.  Cooper Rebuttal Report, ¶¶ 18–19 with attachments.

**Defendants' Response No. 53**: Defendants deny this statement. Plaintiffs reference Mr. Cooper's Rebuttal Report as support for the stated non-Hispanic DOJ black VAP percentages as contained in "Illustrative Plan 4." See Cooper Rebuttal Report, ¶¶ 18-19 with attachments. However, Mr. Cooper's Rebuttal Declaration at the stated paragraphs cite to no census reports or data or any official document whatever as a basis for arriving at the non-Hispanic DOJ Black VAP percentages. See id.

**Plaintiffs' Reply**: As stated in his Declaration, Mr. Cooper relied on data from the 2000 U.S. Census and 2010 U.S. Census—e.g., the 2010 Hispanic Census Table and the 2000 Hispanic Census Table.  *See generally* Cooper PI Decl.

54.   One can easily walk from one end to the other of any of the MMDs in Plaintiffs'
      alternative redistricting plans.  *See* Transcript of Preliminary Injunction Hearing at
      203:4–8, Karlan Decl., Ex. 10.

**Defendants' Response No. 54**: Defendants deny this statement. First of all, this
statement is completely irrelevant and has no bearing on the <u>Gingles</u> analysis whatsoever.
Even if it was relevant, plaintiffs however offer little support, in addition to misleading
the Court. For example, plaintiffs cite to testimony given by John Merrill, defendants'
map maker. Mr. Merrill, at the preliminary injunction hearing, however was not speaking
in terms of plaintiffs' "redistricting plans," but rather his answer regarding the difficulty
of walking from one end of an MMD to another was only in reference to plaintiffs' AHEJ
plan (plan in the singular). *See* Transcript of Preliminary Injunction Hearing at 201-203.
Plaintiffs therefore mislead the Court.

Plaintiffs' reference to "Karlan Decl., Ex. 10" contains testimony from plaintiffs' expert,
Mr. Cooper in which he offers his opinion regarding the compactness of the AHEJ
MMDs. Yet, compactness of a district does not necessarily equate to feasibility of
walking from one end of the MMD to the other on foot, as plaintiffs seem to intimate.
Therefore, Mr. Cooper's testimony, as cited by plaintiffs, lends no credence to plaintiffs'
statement.

**Plaintiffs' Reply:**  The size of the district, including the fact that it is confined within a
distinct neighborhood, or is easily walkable, is relevant to the analysis of whether a
district complies with traditional districting principles.  Mr. Merrill's testimony
concerned the districts proposed in the AHEJ Plan.  Plaintiffs believe Mr. Merrill's
testimony on this issue is clear enough from the transcript:

Q. These are -- am I right, sir, that this – the the five majority/minority districts in
the Arbor Hill plan are all located in densely-populated downtown urban city
Albany City. Correct?

A. Yes.

Q. These are aren't out in the middle of Montana where they are running for miles
and miles and miles.  Correct?

A. Right.

Q. And do you know that the legal definition of "compact" is under the Voting
Rights Act?

A. I -- I can't say that I do.

Q. Do you think it would be difficult for any person living in any of those
proposed districts to walk from one end of the district even if the polling place
was in the entire other end of the district?

A. It -- it would not be difficult.

Transcript of Preliminary Injunction Hearing, Aug. 3–4, 2011 ("PI Hr'g Tr.") at 202:17–203:8, Garmyn Decl., Ex. 2.

**Expert Analysis by Defendants' Expert Dr. Ronald Keith Gaddie:**

55. Defendants' expert witness Dr. Ronald Keith Gaddie's conclusion that the AHEJ Plan's MMDs were not sufficiently large under the first *Gingles* precondition used the non-Hispanic single-race Black definition to identify and count the minority population.  *See* Gaddie Mar. 4, 2013 Dep. Tr. at 303:10–14.

    **Defendants' Response No. 55:** *Defendants admit this statement.*

56. Gaddie has not disclosed the underlying data for his analysis on the first *Gingles* precondition.  Gaddie Mar. 4, 2013 Dep. Tr. at 291:6–19, 297:4–12, 301:12–17, 307:10–20.

    **Defendants' Response No. 56**: Defendants deny this statement. Plaintiffs are well aware that Dr. Gaddie relied on the 2010 Census data in performing his analysis of Gingles' first precondition. See Dr. Gaddie Amended Expert Report at p. 4, dated April 2, 2012. This is the same data that plaintiffs expert, Dr. Liu, claims to have used as well. See Dr. Liu Supplemental Expert Report at p. 4, dated December 20, 2011.

    **Plaintiffs' Reply**: Gaddie testified unambiguously that he did not provide any supporting data for Table 1 of his report, which summarized his alleged findings on the first *Gingles* precondition.  Gaddie Mar. 4, 2013 Dep. Tr. at 301:12–17, 307:10–20.  Gaddie himself testified that even he has no way of knowing what his *Gingles* 1 analysis is based upon:

    > Q. Do you know -- have any way of telling us anything about what the basis is for the numbers shown on Table 1 of Exhibit 1?
    >
    > A. No.
    >
    > Q. Do you have any notes or charts or tables or documents that would help refresh your recollection as to how you did the math to get to the percentages shown on Table 1?
    >
    > A. No.

    *Id*. at 297:4–12.

57. Using the traditional non-Hispanic DOJ Black definition would increase the number of minorities in the County for purposes of analyzing the first *Gingles* precondition.  Gaddie Mar. 4, 2013 Dep. Tr. at 310:25–311:4.

    **Defendants' Response No. 57**: Defendants deny this statement. The answer Dr. Gaddie provided at his March 4, 2013 deposition was in regard to "voting age black people," not "minorities" in general, which, as this litigation has demonstrated, has the potential of carrying with it a number of definitions. See Gaddie Mar. 4, 2013 Dep. Tr. at 311:3.

"[V]oting age black people," on the other hand, has a more restrictive meaning.

Moreover, plaintiffs' statement omits any kind of context. If plaintiffs are representing to the Court that the DOJ Black definition would serve to "increase the number of minorities" in the County, this can only possibly be true in relation to another standard for calculating black population—in other words, the supposition is relative, not absolute. However, plaintiffs' statement does not offer a standard in which to compare DOJ Black to, and therefore is nonsensical.

**Plaintiffs' Reply:** Gaddie admitted that using the non-Hispanic DOJ Black definition would increase the number of "voting age black people," in the County for purposes of analyzing the first Gingles precondition.

> Q. Do you agree that using the DOJ black definition would increase the number of voting age black people in Albany county?
>
> A. Yes.

Gaddie Mar. 4, 2013 Dep. Tr. at 310:25–311:4. Plaintiffs believe it is generally understood that "voting age black people," would be included in the general term "minorities" as it is commonly understood. Plaintiffs' assertion concerns absolute numbers, not percentage of the minority population. Basic math dictates that if "voting age black people" are included in the overall number of "minorities," and there are more "voting age black people" than Gaddie originally calculated, then an increase in the total population numbers for "voting age black people" necessarily increases the total population number of "minorities."

58. Using the non-Hispanic DOJ Black definition, rather than the restrictive single-race Black definition, Plaintiffs' proposed alternative redistricting plans could contain sufficient minority population to support a fifth MMD. Gaddie Mar. 4, 2013 Dep. Tr. at 310:10–311:4, 312:3–8, 313:20–314:7, 314:8–18.

**Defendants' Response No. 58**: Defendants deny this statement. None of plaintiffs' references here support the assertion they wish to make. Dr. Gaddie, in plaintiffs' first transcript reference, merely responded "yes" to whether the "DOJ black definition would increase the number of voting age black people in Albany county." See Gaddie Mar. 4, 2013 Dep. Tr. at 310:10–311:4. Dr. Gaddie made no comment in this transcript reference regarding any of plaintiffs' proposed plans, and certainly gave no opinion as to whether any of plaintiffs' proposed plans contain sufficient minority population to support a fifth MMD. Id.

In their second transcript reference, plaintiffs' again attempt to stretch Dr. Gaddie's testimony to create the illusion that Dr. Gaddie's testimony agrees with their statement. However, Dr. Gaddie merely responds "[i]t is possible, yes" as to whether using "a less inclusive definition of minority," under Gingles first precondition, would affect his evaluation of the AHEJ plan. See Gaddie Mar. 4, 2013 Dep. Tr. at 312:3–8.

Plaintiffs' third transcript reference again fails to lend any credence to plaintiffs' statement. Dr. Gaddie here responded "[i]t is possible" with regard to whether applying the DOJ black standard would change his analysis of plaintiffs' redistricting plan. For the same reason this does not support plaintiffs' assertion. <u>See</u> Gaddie Mar. 4, 2013 Dep. Tr. at 313:20–314:7.

As for plaintiffs' fourth and final transcript reference, Dr. Gaddie affirms that "I have not made that determination" regarding whether it is possible to create a fifth MMD operating under the DOJ black standard. <u>See</u> Gaddie Mar. 4, 2013 Dep. Tr. at 314:8–18. Again, far from espousing plaintiffs' assertion that their proposed MMDs could contain sufficient minority population under the DOJ black standard, Dr. Gaddie in no uncertain terms attests: "I have not made that determination." <u>See</u> Gaddie Mar. 4, 2013 Dep. Tr. at 314:8–18.

**Plaintiffs' Reply**: Plaintiffs' assertion merely deals in raw population numbers. The Court may take judicial notice of the reported 2010 U.S. Census population numbers themselves. Any dispute regarding these numbers in this litigation stems from Defendants using a more restrictive definition of "Black" than Plaintiffs—and the U.S. Department of Justice—believe is appropriate. Gaddie's testimony makes clear that using a more standard definition of Black *could* change his analysis of Plaintiffs' proposed districts. Again, Gaddie's testimony makes this point:

> Q. If you used the same definition of minority for DO -- under Gingles 1 as you did in Gingles 2 and 3, namely DOJ -- excuse me -- non-Hispanic DOJ black, would that have resulted in a different numbers for your analysis under Gingles 1?

> A. Perhaps, yes.

> …

> Q. Have you ever sought to compute, at any time, the voting age population of blacks in Albany county using the DOJ black definition?

> A. No.

> Q. Do you agree that using the DOJ black definition would increase the number of voting age black people in Albany county?

> A. Yes.

> …

> Q. In your opinion, would it affect the outcome of your analysis under Gingles 1 if you used a less inclusive definition of minority vo- -- voter in evaluating the AHEJC plan when it was proposed?

> A. It is possible, yes.

…

Q. Could using the definition of non-Hispanic DOJ black as the definition of minority voter to evaluate the Plaintiff's proposed redistricting plan, including people who are of mixed race such as black and white and self-identify as black as opposed to your definition of single-race black, change your analysis of the Plaintiff's redistricting plan as you have done in Exhibit 1?

[MR. BARBER: Objection to the form. You can answer again.]

A. It is possible.

Q. Is there any possibility that using the DOJ black definition to evaluate the Plaintiff's redistricting plan and, again, including people who are of mixed race such as black and white who self-identify as black as opposed to single-race black, would show that a fifth majority/minority district is possible in Albany county?

[MR. BARBER: Object to the form.]

A. Again, it's might. I have not made that determination.

Gaddie Mar. 4, 2013 Dep. Tr. at 310:10–314:18.  In his testimony, Gaddie makes clear that "it is possible" that using a more standard definition of Black "might" change his analysis of *Gingles* 1, thus possibly finding that a the minority population is sufficiently large to support a fifth MMD.

59.  Gaddie used different definitions of the County's minority population for his analysis of the first *Gingles* precondition and for his analyses of the second and third *Gingles* preconditions.  Gaddie Mar. 4, 2013 Dep. Tr. at 307:21–25, 308:17–22.

**Defendants' Response No. 59**: Defendants deny this statement. Dr. Gaddie corrected his testimony and confirmed that his opinion that elections in Albany County were not racially polarized was based upon analyses using DOJ Black. See Gaddie errata sheet.

**Plaintiffs' Reply**: Gaddie's errata sheet corrected his testimony to assert that he did apparently use non-Hispanic DOJ Black to analyze *Gingles* 2 and 3. His testimony had previously stated that he used "single race black" for his entire analysis (*Gingles* 1, 2, and 3).  However, while Gaddie testified that he used non-Hispanic DOJ Black for his analysis of *Gingles* 2 and 3, Gaddie did use a different definition ("single race Black") for his analysis of *Gingles* 1.  Defendants correctly state that Gaddie apparently used non-Hispanic DOJ Black for his analysis on racially polarized elections.  However, the testimony cited by Plaintiffs deals with Gaddie's analysis of *Gingles* 1—that is, the size of the minority population.  Again, Gaddie's testimony speaks for itself:

Q. Did you use a different definition of black for your analysis under Gingles 1 as you did for your analysis under Gingles 2 and 3?

A. Yes.

…

Q. Did you ever identify in any document submitted in this lawsuit that you were using a different definition of minority under your analysis for Gingles 1 compared with your analysis under Gingles 2 and 3?

A. No.

...

Q. In doing your work in the field of analysis of racially polarized elections and redistricting, is it your practice to use a different definition of minority in your analysis of Gingles 1 as opposed to your analysis under Gingles 2 and 3?

A. No.

Q. In your opinion as an expert in the field of studying elections for redistricting purposes, is it generally accepted to utilize a different definition of minority under Gingles 1 as opposed to Gingles 2 and 3?

A. No.

Q. Is there a reason that you did not indicate in your report that you were using a different definition of minority for your analysis under Gingles 1 compared with your analysis under Gingles 2 and 3?

A. No.

Gaddie Mar. 4, 2013 Dep. Tr. at 307:21–25, 308:17–22, 309:15–310:3.

**Cohesion:**

60.     This Court previously determined that the Black population in the County is politically cohesive.  *See* Consent Judgment and Decree, *NAACP v. Albany Cnty.*, No. 91-cv-1288 (N.D.N.Y. Nov. 13, 1991), Dkt. 1-2, ¶ 17 ("The black population of Albany County is characterized by . . . political cohesion . . . ."); Memorandum-Decision and Order, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 03-CV-502 (N.D.N.Y. Aug 22, 2003), Dkt. 1-3, at 17 ("[N]o one has raised a question in this case concerning the political cohesiveness of the black community in Albany County.").

**Defendants' Response No. 60**: Defendants' deny this statement. Plaintiffs' reference to the 1991 Consent Judgment and Decree omits critical language. Although plaintiffs assert that the black population "in the County," unqualifiedly, is politically cohesive, this is not what the 1991 Consent Decree declares. Rather, the Consent Decree binds the political cohesiveness of the black population within Albany County specifically to "particular areas of the county," which is not to say that the black population is cohesive within the

entire County, as plaintiffs intimate. See Consent Judgment and Decree, NAACP v. Albany County, No. 91-cv-1288 (N.D.N.Y. Nov. 13, 1991), Dkt. 1-2, ¶ 17.

**Plaintiffs' Reply**: Plaintiffs will again let the document speak for itself. The 1991 Consent Judgment and Decree states:

> The black population of Albany County is characterized by sufficient numerosity, political cohesion, and geographic concentration within particular areas of the county such that if members of the County Legislature were elected entirely from fairly drawn single member districts, black voters would likely be able to elect candidates of their choice for at least three of the positions on the Albany County Legislature.

1991 Consent Decree ¶ 17.

Plaintiffs maintain, in the current suit, that the Black population of Albany County is characterized by sufficient numerosity, political cohesion, and geographic concentration within particular areas of the county such that if members of the County Legislature were elected entirely from fairly drawn single member districts, black voters would likely be able to elect candidates of their choice for at least five of the positions on the Albany County Legislature.

61. The Black population in the County is politically cohesive. *See* Defendants' Amended Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Dkt. 40, at 19 ("The Second factor requires that Plaintiffs show that Blacks are politically cohesive. Defendants concede this point for the purposes of this hearing.").

**Defendants' Response No. 61**: Defendants deny this statement. Plaintiffs' reference fails to support their statement. Plaintiffs' statement is refuted by the very face of the quote plaintiffs rely upon. The quote extracted by plaintiffs from Defendants' Amended Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction merely concedes political cohesion of the black community for the purpose of the preliminary injunction and no more, as the language cited by plaintiffs clearly evinces. Defendants' concession regarding political cohesion at the preliminary injunction stage does not therefore require defendants to make the same concession nearly two years later in the making of dispositive motions—defendants make no such concession.

In seeking to establish that the minority's preferred candidate is "usually defeated" by majority bloc voting under Gingles' third precondition, plaintiffs relied upon an analysis of 34 bi-racial contests, including the black population's preferred candidate in 2005 Legislative District No. 7 Republican Party Primary and 2005 Legislative District No. 8 Republican Party Primary. See DSMF at ¶41, Marcelle Dec. Exh. "S" at p. 8, Table 3. Plaintiffs also analyzed the preferred candidate of the black community in the 2011 Legislative District No. 3 General Election in which a black candidate (Clifton Dixon) ran as the Conservative and Working Families candidate; the 2010 County Surrogate Court General Election in which a black candidate (Helena Heath-Roland) ran as the Working Families candidate; the 2005 Albany Mayor General Election in which a black

candidate (Alice Green) ran as the Green Party candidate; and the 2004 Legislative District No. 2 General Election in which a black candidate (Lucille McKnight) ran as the Working Families candidate. Having sought to rely upon this evidence to prove the preferred candidate of the black community under <u>Gingles</u>' third precondition, plaintiffs must suffer the consequences, as noted by the Second Circuit, when the same evidence undermines its effort to prove that the same community is politically cohesive under <u>Gingles</u>' second precondition. Plaintiffs have offered no proof that the black supporters of Democratic, Republican, Conservative, Working Families, and Green Party candidates are politically cohesive.

**Plaintiffs' Reply**: Defendants' concession at the preliminary injunction stage speaks for itself, and  Defendants' concessions in the prior consent decrees—e.g., the 1991 Consent Decree—further prevent them from arguing that the Black community is not cohesive.

Moreover, Plaintiffs' expert has opined that the County's Black population is politically cohesive: "[i]n all 34 single-member district elections, the white support for the leading black candidate in an interracial race was on average 42.43%, while the black support for the same black candidate was on average 71.62%.  In other words, the racial gap between the two racial groups is more than 29%.  Clearly, black voters preferred black candidates, and this preference was not shared by the white voters in Albany County, New York between 1991 and 2011."  Supplemental Expert Report of Dr. Baodong (Paul) Liu, dated Dec. 20, 2011, at 6 ("Liu Supp. Rep."), Dkt. No. 231-25; *see also* id. at 6–7 ("African American voters [in Albany County] are 'politically cohesive.'"); Supplemental Declaration of Dr. Baodong (Paul) Liu, dated May 1, 2012, ¶ 10, Dkt. No. 232-27.

Plaintiffs also object to Defendants' contention that political cohesion requires party cohesion.  A minority group is politically cohesive when its members support the same candidates, regardless of their political affiliation.  *See, e.g.*,  Declaration of Nathan Lebron, dated April 29, 2013, ¶ 8, Dkt. No. 232-7 (describing how he voted for and supported Alice Green as a mayoral candidate, despite the fact that she ran on the Green Party platform and he is a Republican); Declaration of Corey Ellis, dated April 29, 2013, ¶¶ 4–6, Dkt. No. 232-12 (describing his candidacy for the Democratic Party nomination for mayor of the City of Albany, in 2009 and 2013, and his candidacy in the 2009 general election for mayor of the City of Albany as the Working Families Party candidate); Declaration of Lucille McKnight, dated July 14, 2011, ¶ 4, Dkt. 231-9 (noting that she has been a candidate on the Democratic Party line and the Working Families Party line).

Dated:   New York, New York
    May 20, 2013

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

 _/s/ Mitchell A. Karlan_     
Mitchell A. Karlan

mkarlan@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Fax: 212.351.4035
Bar Roll No. 511874

DEROHANNESIAN & DEROHANNESIAN
Paul DerOhannesian II
derolaw@verizon.net
677 Broadway, Suite 202
Albany, New York 12207-2985
Telephone: 518.465.6420
Fax: 518.427.0614
Bar Roll No. 104792

*Attorneys for Plaintiffs*