# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ANNE POPE, WANDA WILLINGHAM, GERALDINE BELL,
SAMUEL COLEMAN, and LEE PINCKNEY,

                                                              Plaintiffs,

                                    vs.

COUNTY OF ALBANY and the ALBANY COUNTY BOARD
OF ELECTIONS,

                                                              Defendants.
                        _____

Civil Action #11-CV-736
(LEK/CFH)

## DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MURPHY, BURNS, BARBER & MURPHY, LLP
Attorneys for Defendant County of Albany
226 Great Oaks Boulevard, Albany, New York, 12203
Telephone: 518-690-0096; Telefax: 518-690-0053
Email: pgb@mbbmlaw.com

THOMAS MARCELLE, ESQ.
Albany County Attorney
Attorney for Defendant Albany County Board of Elections
112 State Street, Suite 1010, Department of Law
Albany, New York, 12207

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT ...........................................………1

ARGUMENT ...................................................................................2

POINT I

NO REMAINING PLAINTIFF POSSESSES STANDING ...................................2

POINT II

THE VRA DOES NOT REQUIRE ALBANY COUNTY TO COMBINE HISPANIC AND BLACK VOTERS AS IF THEY WERE A SINGLE RACE FOR THE PURPOSE OF MAXIMIZING THE NUMBER OF MAJORITY MINORITY DISTRICTS BASED UPON A HISPANIC/BLACK POLITICAL COALITION ....................................................................7

A.    The Text Of The VRA Does Not Mandate That The County Create Coalition Districts to Maximize the Number Of MMDs....................8

B.    Since §2 Treads On A Traditional Local Government Area (Redistricting), The Cannons Of Statutory Construction Prevent A Court From Creating A Cause Of Action That Congress Chose Not To Explicitly Create……………………………………………………………10

C.    Creating A District Based On A Coalition Of Two Different Minority Groups (A Coalition District) Is Logically No Different Than Creating A District Based On A Coalition Of Whites And A Minority (A Cross-Over District), Which The Supreme Court Has Held Is Not Mandated By Section 2…………………………………………………………… 11

1.    Resolution Of the Definition of the Relevant Populations under Section 2 of the Voting Rights Act……..……………………11

a.    There is no black only claim involved in this case……. 12

b.    DOJ Black and Hispanic are the relevant population categories……………………………………………….. 12

i

c.      CVAP is the correct population to consider in determining
numerosity in a district……………………………………...13

2.      Creating A District Based On A Coalition Of Two Different
Minority Groups (A Coalition District) Is Logically No Different
Than Creating A District Based On A Coalition Of Whites And A
Minority (A Cross-Over District), Which The Supreme Court Has
Held Is Not Mandated By Section 2 …………………….....  14

POINT III

THERE IS NO MATERIAL ISSUE OF FACT ON PLAINTIFFS'
FAILURE TO ESTABLISH POLITICAL COHESION………………………….…16

POINT IV

THERE IS NO MATERIAL ISSUE OF FACT ON PLAINTIFFS'
FAILURE TO PROVE GINGLES' THIRD PRECONDITION THAT
THE WHITE MAJORITY VOTES AS A BLOC TO USUALLY
DEFEAT MINORITY'S PREFERRED CANDIDATE…………………………..20

A.      Plaintiffs Failed to Establish The Coalition's "Preferred" Candidate….  21

B.      The Minority "Preferred" Candidate Is Not "Usually" Defeated…………  22

C.      No Special Circumstances Explain The Success Of Minority's Preferred
Candidate………………………………………………………………...   26

CONCLUSION………………………………………………………………………29

# TABLE OF AUTHORITIES

Page

Arbor Hill v. County of Albany, 281 F.Supp.2d 436 (N.D.N.Y. 2003) ........................................18

Baker v. Carr, 369 U.S. 186 (1962)………………………………………………….…5

Barnett v. City of Chicago, 1996 WL 34432 (N.D. Ill.)……………………………………..6

Barnett v. City of Chicago, 141 F.3d 699 (7th Cir. 1998) ......................................................13, 23

Bartlett v. Strickland, 556 U.S. 1 (2009)………………………………………..… .7, 14, 15

Bone Shirt v. Hazeltine, 336 F.Supp.2d 976 (D.S.D. 2004) ......................................................18

Broward Citizens for Fair Dists. v. Broward County, 2012 WL 1110053 (S.D. Fl.)…………..6

Clarke v. City of Cincinnati, 40 F.3d 807 (6th Cir. 1994), cert. denied, 514 U.S. 1109 (1995)......................................................................................................................................24,26

Democratic Party of Arkansas, 890 F.2d 1423 (8th Cir.1989)…………………………… 18

Fairley v. Patterson, 493 F.2d 598 (5th Cir. 1974) ......................................................................5

France v. Pataki, 71 F.Supp.2d 317 (S.D.N.Y. 1997)................................................................19

Goosby v. Bd. of the Town of Hempstead, 956 F.Supp. 326 (E.D. 1997)………………………28

Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991)………………………………………… 10

Growe v, Emison, 507 U.S. 25 (1993)..........................................................................................18

Hall v. Virginia, 276 F.Supp.2d 528 (E.D.Va. 2003) ..................................................................5

Hickey v. State University of New York at Stony Brook, 2012 WL 3064170 (E.D.N.Y. 2012)............................................................................................................................3

Holder v. Hall, 512 U.S. 874, 914 (1994)………………………………………………9

Jenkins v. Red Clay Cons. School Dist. Bd. of Educ., 4 F.3d 1103 (3rd Cir. 1993) ...............22, 24

League of United Latin American Citizens v. Clements, 999 F.2d 831, 894 (5th Cir. 1993)…….9

League of Women Voters of Nassau County v. Nassau County Board of Supervisors, 737 F.2d 155 (2nd Cir. 1984)..........................................................................................4, 5, 6, 7

Lewis v. Alamance Coumty, 99 F.3d 600, 607 (4th Cir. 1996)……………………………………22

Lopez v. Merced County, Cal., 473 F.Supp.2d 1072 (E.D.Cal. 2007) ...........................................5

Lujan v. Defendaers of Wildlife, 504 U.S. 555 (1992).........................................................4, 6, 7

National Ass'n for Advancement of Colored People, Inc. v. City of Niagara, 913 F.Supp. 722 (W.D.N.Y. 1994) ...........................................................................................22

Nixon v. Kent County, 76 F.3d 1381 (6th Cir.1996)……………………………………………9

Page v. Bartels, 248 F.3d 175 (2nd Cir. 2001)...............................................................................18

Pope v. County of Albany, 2011 WL 3651114 (N.D.N.Y.) ...................................................16, 18

Pope v. County of Albany, 687 F.3d 565 (2nd Cir. 2012) .......................................7, 13, 16, 19, 20

Reyes v. City of Farmers Branch, 586 F.3d 1019 (5th Cir. 2009)………………………………..13

Rodriguez v. Pataki, 308 F.Supp.2d 346 (S.D.N.Y. 2004) ...........................................................18

Roxbury Taxpayers Alliance v. Delaware County Board of Supervisors, 886 F.Supp. 242 (N.D.N.Y. 1995) .............................................................................................5, 6, 7

Ruiz v. City of Santa Maria, 160 F.3d 543 (9th Cir. 1998)……………………………………..27, 28

Sanchez v. Bond, 875 F.2d 1488 (10th Cir. 1989) .......................................................................17

Shaw v. Reno, 509 U.S. 630 (1993)……………………………………………………………15, 16

Summers v. Earth Island Inst., 129 S.Ct. 1142 (2009) ...................................................................4

Thornburg v. Gingles, 478 U.S. 30 (1986) ........................................................................... passim

United States v. Charleston County, 365 F.3d 341 (4th Cir. 2004)................................................25

United States v. Village of Port Chester, 704 F.Supp.2d 411 (S.D.N.Y. 2010)………………   28

University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)………………………………   13

Uno v. City of Holyoke, 72 F.3d 973 (l[st] Cir. 1995)......................................................................24

Voinovich v. Quilter, 507 U.S. 146 (1993)....................................................................4, 10, 23

Whitfield v. Democratic Party of Ark., 890 F.2d 1423 (8th Cir. 1989) ..........................................7

<u>Wright v. Dougherty County, Georgia</u>, 358 F.3d 1352 (11th Cir. 2004) ……………………….. 5

Statutes, etc.

Local Law C……………………………………………………………………………………… passim

Federal Rules …………………………………………………………………………………… passim

Voting Rights Act ……………………………………………………………………………… passim

## PRELIMINARY STATEMENT

Litigation is a series of choices with resulting consequences.   In bringing this action, plaintiffs made a number of choices, including naming specific plaintiffs, seeking relief upon behalf of a coalition of Hispanic and black voters, and claiming that the voting strength of this coalition vote was diluted by improper splitting of the coalition.    Defendants responded to those choices by raising the affirmative defense that no party had standing, and by developing and conducting discovery and litigation strategy, including retaining experts, that were tailored to refute the coalition claim.    This Court imposed deadlines for adding parties, amending pleadings, conducting discovery, and filing dispositive motions.

The legal consequences of plaintiffs' choices were apparent at the outset.   Nearly two years ago, this Court denied plaintiffs' motion for injunctive relief based, in part, upon plaintiffs' failure to prove that the coalition was politically cohesive.   The legal consequences of plaintiffs' choice were evident again when the Second Circuit, in affirming this Court's decision, warned plaintiffs that their choice of minority had to be consistent and could not be altered to meet the Gingles' preconditions.    Despite these warnings, plaintiffs doubled down by remaining with a coalition claim based upon fragmenting the coalition vote in its First Amended Complaint.

With further opportunities to amend long expired, discovery completed, and experts retained and deposed, plaintiff sought partial summary judgment on their choice to pursue a coalition claim.   Defendants immediately responded with a summary judgment motion based upon the consequences of plaintiffs' choices and the extensive record developed, by showing that a coalition claim is not legally viable; that no plaintiff possessed standing; that the coalition is not politically cohesive; and that plaintiffs failed to even determine who were the coalition's preferred

1

candidates, let alone provide any proof that the minority's preferred candidate is not usually defeated.

Now, faced with the consequences of their choices, plaintiffs' response to defendants' motion seeks to replace these choices with new ones.    Unable to refute the lack of standing to bring a fragmenting claim, plaintiffs now erroneously contend that they meant the opposite and have alleged a "packing" of minority voters or a cross-over claim.   Unable to present expert testimony that the coalition is politically cohesive, plaintiffs seek to excuse this failure by wrongly claiming that the lack of Hispanic candidates made it impossible for their expert to analyze the political cohesion of the coalition.   With this excuse wrongfully presumed, plaintiffs in turn rely only upon mere anecdotal evidence to prove cohesion.   Unable to determine the preferred candidate of the coalition, plaintiffs rely upon their experts' analysis of the preferred candidate of the black voters alone.   And when that same expert finds irrefutable evidence that the preferred candidate of black voters is not usually defeated, plaintiffs improperly turn to a series of self-created rules in an attempt to exclude most (if not all) of the contests analyzed by their own expert to reach a few contests whose results meet their purpose.   Simply put, having made their choices years ago, and pursued them throughout this litigation, it is too late to change now and plaintiffs must suffer the consequences of being unable to defeat defendants' motion for summary judgment.

## ARGUMENT

## POINT I

## NO REMAINING PLAINTIFF POSSESSES STANDING

In this VRA action alleging the fragmenting of the minority vote, plaintiffs had the choice of what minority to assert and what claim to bring.   Plaintiffs made those choices by alleging in

their Complaint and First Amended Complaint that the action was on behalf of a minority consisting of a coalition of Hispanic and black voters and by alleging that Local Law C had diluted the minority vote by "splitting up" the coalition.   See Dkt. No. 1 at ¶58; Dkt. No. 100 at ¶61.   In response to these choices, defendants asserted, as an affirmative defense, that no plaintiff possesses standing.   See Dkt. No. 37 at ¶64; Dkt. No. 102 at ¶58.   Defendants also conducted discovery and retained experts to refute this coalition claim alleging a fragmented vote.

With discovery closed, plaintiffs moved first for partial summary judgment under two Gingles' preconditions: (1) sufficient number and compactness of the coalition and (2) political cohesion of the coalition (Dkt No. 209).   In a motion for summary judgment, defendants proved that plaintiffs' choices were not viable because a coalition claim is not allowed as a matter of law and that no plaintiff possesses standing to bring a claim based upon fragmentation (Dkt No. 214). Unable to address these fundamental failures, plaintiffs now pivot again and allege in their response brief that their claim was actually based upon "packed wards" and "concentration of minority voters."   See Dkt. No. 228 at pp. 19, 20.   Plaintiffs' new choices are far too late.

It is axiomatic that while "pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."   Hickey v. State University of New York at Stony Brook, 2012 WL 3064170 (E.D.N.Y., 2012).   This is exactly what plaintiffs improperly seek to do here by choosing a different claim and different relevant minority.   No word, phrase, or paragraph in the original Complaint (Dkt. No. 1), the First Amended Complaint (Dkt. No. 100), or even the Second Amended Complaint (Dkt No. 226-4) suggests, let alone alleges, that the plaintiffs were bringing a "packing" claim.   Words like "packing", "concentrating", "excessive majority" and the like are absent in each of these pleadings.

Rather, the opposite is true:   plaintiffs allege that their claim of vote dilution is based upon "fragmentation", not "packing", of minority voters.   Paragraph 61 of the First Amended Complaint alleges:

> Local Law C violates established districting criteria by **splitting up** historic districts of minority voters with shared community interests, **and diluting** the voting strength and thwarting the natural growth of such communities of interest.

See Dkt No. 100 at ¶61.

In their response brief, plaintiffs concede that "[a] packing claim is [] distinct from a 'fragmentation' or 'dispersal' claim." See Dkt. No. 228 at p.19.   Indeed, the Supreme Court has emphasized the crucial differences underlying the disparate claims and the distinct elements of proof for each distinct claim.   In Voinovich v. Quilter, 507 U.S. 146, 153-154 (1993), the Court held that a "fragmentation" or "dispersal" claim occurs when the "[d]ilution of racial minority group voting strength" is "caused" by the dispersal of blacks into districts in which they constitute an ineffective minority of voters."   In stark contrast, a "packing" claim occurs where there is a "concentration of black into districts where they constitute an excessive majority."   Id. (quoting Gingles, 478 U.S. 46 n.11).

Having made the choice to bring a "fragmentation" claim, it was incumbent upon plaintiffs to prove that each suffered an "injury in fact" that is "concrete and particularized" to have standing to sue.   Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992). It is also well-established that plaintiffs bear the burden of proving the standing requirements.   Summers v, Earth Island Inst., 129 S.Ct. 1142, 1149 (2009).

Both the Second Circuit and this Court have held that to prove an "injury in fact" in a vote dilution claim based on the "fragmenting" or "splitting" of the minority vote, a plaintiff must reside in the underrepresented district.   In League of Women Voters of Nassau County v. Nassau

4

County Board of Supervisors, 737 F.2d 155, 161-162 (2nd Cir. 1984), the Second Circuit dismissed, on standing grounds, the claims of plaintiffs who, like here, sought to compel more minority representation in their County legislature based upon the fact that such plaintiffs already resided in an overrepresented district.   The Court relied heavily upon the Supreme Court's decision in Baker v. Carr, 369 U.S. 186, 206 (1962), which held that only "voters who allege facts showing disadvantage to themselves have standing to sue."

In Roxbury Taxpayers Alliance v. Delaware County Board of Supervisors, 886 F.Supp. 242 (N.D.N.Y 1995), aff'd, 80 F.3d 42 (2nd Cir. 1996), this Court dismissed the claims of plaintiffs who resided in overrepresented voting districts.   Citing League of Women Voters, 737 F.2d at 161, this Court held "that plaintiffs who could not show injury by demonstrating that they were domiciled in an underrepresented voting district "lacked standing to contest a reapportionment law." Id. at 245.

Both the Fifth and Eleventh Circuit have similarly held that a plaintiff who already resides in an overrepresented district lacks standing to bring a dilution claim on behalf of voters residing in an underrepresented district.   Wright v. Dougherty County, Georgia, 358 F.3d 1352, 1355-1356 (11th Cir. 2004); Fairley v. Patterson, 493 F.2d 598, 603 (5th Cir. 1974) (holding the required "injury results only to those persons domiciled in the underrepresented voting districts").   This legal requirement has repeatedly caused courts to dismiss similar claims for lack of standing. Hall v. Virginia, 276 F.Supp.2d 528, 530-531 (E.D.Va., 2003) (plaintiffs who resided outside the fragmented district lacked standing to sue because they only alleged a "generalized grievance"); Lopez v. Merced County, Cal., 473 F.Supp.2d 1072, 1080 (E.D.Cal., 2007) ("plaintiffs must be injured by a challenged policy or election to have standing, and injury is established by domicile in the underrepresented district").

Indeed, the cases cited by plaintiffs actually support defendants' argument.   In <u>Barnett v. City of Chicago</u>, 1996 WL 34432 (N.D. Ill.), the court held that plaintiffs had standing to assert a fracturing claim because they resided in a white majority district.   The opposite is true here:   no plaintiff resides in a white majority district.   Similarly, in <u>Broward Citizens fro Fair Dists. v. Broward County</u>, 2012 WL 1110053 (S.D. Fl.) , the court held that plaintiffs who resided in an MMD lacked standing to bring a fracturing claim.

Here, there is no dispute that no remaining plaintiff resides in a fractured or underrepresented district.   Rather, each lives in an MMD, under Local Law C as well as plaintiffs' AHEJ plan.   <u>See</u> Dkt. No. 100 at ¶¶7, 9-12.   Therefore, no plaintiff has suffered harm that is "concrete and particularized" to have standing. <u>See</u> <u>Lujan</u>, 504 U.S. at 560-561; <u>League of Women Voters of Nassau County</u>, 737 F.2d at 162; <u>Roxbury Taxpayers Alliance</u>, 886 F.Supp. at 245.

Recognizing their inability to refute these facts, plaintiffs argue that defendants could "pack all of Albany County's minority voters into super-majority MMDs and thereby deprive *every minority voter* of standing." Dkt. No. 228 at p.20 (emphasis in original).   Of course, plaintiffs ignore the fact that they chose to bring a "fragmenting" claim, not a "packing" claim. And if plaintiffs had timely made that new choice, then defendants would have responded in kind by conducting discovery and retaining experts to refute this new claim.   Having sought summary judgment based on that choice, it is too late for plaintiffs to start over.

Finally, plaintiffs effectively concede the lack of standing for their remaining plaintiffs by seeking to add five new plaintiffs.   Plaintiffs fail to state that their proposed Second Amended Complaint simply speculates that three of the five new plaintiffs "could" reside in an MMD under some unidentified plan.   Unlike the remaining plaintiffs who all reside in the City of Albany, two of the five new plaintiffs reside in the Town of Colonie.   As a result, no proposed new plaintiff

6

would benefit under the AHEJ plan or Cooper plan and none has a "concrete and particularized" injury required for standing. See Lujan, 504 U.S. at 560-561;  League of Women Voters of Nassau County, 737 F.2d at 162; Roxbury Taxpayers Alliance, 886 F.Supp. at 245.

## POINT II

**THE VRA DOES NOT REQUIRE ALBANY COUNTY TO COMBINE HISPANIC AND BLACK VOTERS AS IF THEY WERE A SINGLE RACE FOR THE PURPOSE OF MAXIMIZING THE NUMBER OF MAJORITY MINORITY DISTRICTS BASED UPON A HISPANIC/BLACK POLITICAL COALITION.**

Plaintiffs have made one claim, a coalition claim. See Dkt. No. 1 at ¶s 63, 77-78; see also Dkt. No. 100 at ¶s 68, 83-84.   Plaintiffs argue that this multi-minority political alliance (which they have alleged) should be treated as a single minority class.

The problem is that Hispanics and blacks are not a single class. Congress deemed blacks to be a racial minority under Section 2 and Hispanics as a language minority under Section 2 – two entirely different classes, protected in the same manner but for different reasons.   There is no definitiveness in the case law on the subject and the Second Circuit and the Supreme Court have explicitly reserved on the question.   Bartlett v. Strickland, 556 U.S. 1, 38-39, n. 3 (2009); Pope v. County of Albany, 687 F.3d 565, 574 (2nd Cir. 2012).   However, in Bartlett, the Supreme Court ruled that Section 2 does not require cross-over districts — that is, districts where the force of the Supreme Court's logic in Bartlett is blacks and Hispanics are a single class of cohesive minority. The premise is flawed and supported by neither statute nor case law.

Plaintiffs make no strenuous effort to dismantle defendants' arguments on coalition districts.   Plaintiffs' lawyers are highly sophisticated advocates.   To submit a brief that skims so shallow on an issue that involves a circuit split is no mistake. Therefore, defendants will say what plaintiffs cannot:   The trial on the issue should be subsequent to the resolution of the legitimacy of the coalition claim.   That is, there is no good reason to try a case on a legal theory that is as highly

7

speculative as the permissibility of bringing a coalition claim.   Granting defendants' motion would allow the coalition issue to be ruled on by the appellate courts thereby either definitively killing or reviving the claim.   Defendants believe that even if the Court accepts the coalition claim as valid, defendants should be granted judgment on the grounds raised herein.   But should the Court be of a different mind, granting judgment in favor of defendants on the coalition claim would be the course even plaintiffs tacitly acknowledge as the wisest course of action.   The statutory language, history, comity, and case law all suggest that a plaintiff cannot force a government to create bi-minority coalition districts in order to maximize the coalitions' voting power.

### A.    The Text Of The VRA Does Not Mandate That The County Create Coalition Districts to Maximize the Number Of MMDs.

Plaintiffs make a conclusion — that different minority groups that are politically cohesive (meaning that they currently have the same political agenda) may combine to form a singular minority class. Their syllogistic argument is that (1) the VRA protects a single class; (2) a political coalition of different minorities is a single class; (3) therefore, such coalitions are permitted under the VRA.

The VRA provides in pertinent part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color **or** [membership in a language minority group], as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of ***a*** class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C.A. § 1973(b).

Plaintiffs arrive at their conclusion without a textual analysis of the statute and without reference to legislative history. "In determining the scope of § 2(a), as when interpreting any statute, we should begin with the statutory language."   Holder v. Hall, 512 U.S. 874, 914 (1994).

Plaintiffs seize on the word "cohesive" which does not appear in the statute but appears as part of the pre-conditions to bringing a VRA claim.   "Second, the minority group must be able to show that it is politically cohesive."   Thornburg v. Gingles, 478 U.S. 30, 51 (1986).

Thus, the Supreme Court required that a protected class must be cohesive prior to attempting to make a claim — that is, the minority group must vote in the same manner.   It does not mean, as plaintiff desires it to mean, that multi-minority groups (e.g. language minorities and racial minorities) are suddenly to be considered a single group instead of what they actually are: combined multi-minorities seeking a similar political objective.   If the Supreme Court intended the pre-conditions in Gingles to require municipalities to create coalition districts, the question would have been closed over a quarter of a century ago. The alchemy of mixing and infusing language of the VRA with the Supreme Court's pre-conditions to maintaining a suit to create a hybrid that fits their claim is not useful.

A statutory analysis condemns plaintiffs' claim.   "According to customary legal analysis, there should be no need to discuss the minority coalition theory of vote dilution because the text of the Voting Rights Act does not support it."   League of United Latin American Citizens v. Clements, 999 F.2d 831, 894 (5th Cir. 1993) (Jones, J., concurring). "Nothing in the clear, unambiguous language of §2 allows or even recognizes the application of the Voting Rights Act to coalitions …" Nixon v. Kent County, 76 F.3d 1381, 1386 (6th Cir.1996).   The VRA literally protects a singular group of minority voters, not bi-racial coalitions.   The persons protected from

a §2 violation are limited by definition "to members of *a class* of citizens protected by subsection (a)." <u>See</u> 42 U.S.C. §1973(b) (emphasis added).    No matter how plaintiffs slice it, Hispanics and blacks are different groups bound by a claimed political alliance, as plaintiffs have pled.

> **B.     Since §2 Treads On A Traditional Local Government Area (Redistricting), The Cannons Of Statutory Construction Prevent A Court From Creating A Cause Of Action That Congress Chose Not To Explicitly Create.**

Plaintiffs next argue: "There is nothing in the [VRA] that prevents plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics [… because the VRA] protects the right to vote of both racial and language minorities." <u>See</u> Dkt. No. 228 at p.23 (internal quotations and citations omitted).    Plaintiffs argue that Congressional silence can be equated with Congressional permission.   In other words, since the VRA does not expressly prohibit coalition claims, they should be permitted.   However, the regulation of the functions of the State (like reapportionment) by the federal government requires that Congress explicitly create coalition claims.   <u>See</u> <u>Gregory v. Ashcroft</u>, 501 U.S. 452, 460-61 (1991), (holding that "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (internal quotations and citations omitted).

Plaintiffs make no attempt to distinguish this doctrine.   They do not dispute that legislative reapportionment is unquestionably a traditional state function.   <u>See Voinovich v. Quilter</u>, 507 U.S. 146, 156 (1993) (internal citations and quotations omitted).   Therefore, since Congress did not explicitly mandate that local governments use coalition districts, a federal court should not be, by employing some kind of expansive non-textual interpretation, the genesis of such a mandate.   Consequently, defendants are entitled to summary judgment because plaintiffs lack power to force the County to use coalitions when apportioning.

**C.    Creating A District Based On A Coalition Of Two Different Minority Groups (A Coalition District) Is Logically No Different Than Creating A District Based On A Coalition Of Whites And A Minority (A Cross-Over District), Which The Supreme Court Has Held Is Not Mandated By Section 2.**

**1.    Resolution Of the Definition of the Relevant Populations under section 2 of the Voting Rights Act**

Before proceeding to the main argument, it is important to eliminate three constant sources of confusion: (1) there is no black only claim involved in this case; (2) DOJ Black and Hispanic are the relevant population categories; and (3) CVAP is the correct population measure to consider in determining numerosity in a district.

**a.    There is no black only claim involved in this case.**

Plaintiffs have made <u>only</u> a coalition claim.   <u>See</u> Dkt. No. 1 at ¶s 63, 77-78; <u>see</u> <u>also</u> Dkt. No. 100 at ¶s 68, 83-84.   With the third version of their complaint now before the Court, plaintiffs still assert a coalition claim as their sole cause of action.   <u>See</u> <u>Dkt</u>. No. 226-4 at ¶s 87-88. Plaintiffs have not pled that the County's reapportionment law violated the rights of black voters only, but rather black and Hispanic voters together.   Plaintiffs chose not to plead in the alternative or to plead multiple theories.   Thus, it is befuddling that plaintiffs keep referring and basing arguments on a black only claim they do not make.   Defendants will focus on the sole actual claim and ask the Court to ignore the phantom claim not made.

**b.    DOJ Black and Hispanic are the relevant population categories.**

Defendants seek to clarify the correct populations relevant to a coalition claim. Plaintiffs make a claim that combine black and Hispanic populations.   Defendants believe the relevant populations for such a claim is Hispanic and Non-Hispanic black (which defendants have referred to as DOJ Black). <u>See</u> DSMF ¶ 10.

Defendants have previously argued that in a §2 case, they have the discretion to choose the relevant minority populations.   See Dkt. No. 230 at pp. 11-12 n.2.   But even under the more restrictive §5 standard, when both Black and Hispanic populations are relevant to an apportionment case, the proper populations are DOJ Black and Hispanic.   Using the United States' numbers may have more relevance if the case involves a comparison of different minority groups. See Georgia v. Ashcroft, 539 U.S. at 473, n. 1 (noting that excluding from black population those individuals who identify themselves as both black and another minority is the relevant standard for cases that involve multiple races).

The reason for this rule in §5 cases is simple — if an individual declares himself as a mix of Black and Hispanic, he or she should only be counted once as either black or Hispanic and not counted twice, once under the black category and once under the Hispanic category.   Plaintiffs' definition of black includes individuals who identify as both black and Hispanic.   These individuals are included under the Hispanic population as well as the black population—they are therefore double counted.   Thus, to avoid the problem of double counting, DOJ Black represents the correct standard.

### c.   CVAP is the correct population to consider in determining numerosity in a district

Plaintiffs say the doctrine of *res judicata* bars the Court from determining whether CVAP or VAP is the relevant population in a voting rights case.   Res judicata, which is really two doctrines — claim preclusion and issue preclusion — is a doctrine that stops a party from making claims or raising issues that were resolved in another case.   Such, since this is the same case, the doctrine is inapplicable.

More to the point:

12

> [T]he purpose of a preliminary injunction is merely to preserve the relative
> positions of the parties until a trial on the merits can be held. Given this limited
> purpose, and given the haste that is often necessary if those positions are to be
> preserved, a preliminary injunction is customarily granted on the basis of
> procedures that are less formal and evidence that is less complete than in a trial on
> the merits. A party thus is not required to prove his case in full at a
> preliminary-injunction hearing and the findings of fact and conclusions of law
> made by a court granting a preliminary injunction are not binding at trial on the
> merits."

University of Texas v. Camenisch, 451 U.S. 390, 395 (1981).

Additionally, the issue of CVAP or VAP, upon which plaintiffs seek preclusion was not even raised before the Second Circuit.   In fact, the Second Circuit left the question open.   See Pope, 687 F.3d at 574, n.6 (noting that "[b]ecause the parties argue by reference to VAP, we do not here consider the alternative possibility of employing *citizen* voting-age population ("CVAP") in evaluating a Section 2 claim") (emphasis in original).   Plaintiffs never quite explain how defendants can be barred from raising an issue that was left open on an appeal from a preliminary injunction.

To the issue, plaintiffs, by demanding use of VAP over CVAP, are asking the Court and defendants to consider more than just the citizens—the only population that is in fact eligible to vote—in the Section 2 analysis.   Of course, the very reason why the **voting** age population is the benchmark in voting right cases as opposed to general population is because the VRA is concerned with the rights of the voting population.    See e.g., Reyes v. City of Farmers Branch, 586 F.3d 1019 (5th Cir. 2009); Barnett v. City of Chicago, 141 F.3d 699, 704 (7th Cir. 1998); Negron v. City of Miami Beach, 113 F.3d 1563, 1569 (11th Cir.1997).   Plaintiffs' insistence on including non-citizens in the calculation of the relevant population therefore serves to undermine the very Act (VRA) itself—which seeks to protect **voting rights**.

Lastly plaintiffs argue that CVAP only applies when CVAP may be significant to determining whether a district is composed of more than 50% minorities. Here, CVAP is very significant and plaintiffs had the burden to prove it.   In order to create the maximum number of conceivable MMDs, plaintiff shaved the DOJ Black VAP to bare majorities.   For example, the lowest district in the AHEJ plan, District 4, has a DOJ Black VAP of 50.41%.   If just ½ of 1% of the black population are non-citizens (or non-eligible voters), black voters no longer comprise a majority in District 4.    While one can safely assume that a large majority of DOJ Black VAP individuals are citizens, it is most certainly not 100 percent.   This was plaintiffs' burden to prove. Plaintiffs have failed to meet their burden to prove that District 4 has sufficient population. Plaintiffs chose not to offer an expert to opine that the CVAP is above 99.5 % of the VAP in AHEJ plan District 4.   Plaintiffs have not shown that District 4 has a CVAP greater than 50%.

In sum, this case involves a coalition claim.   As a coalition claim, the relevant populations are CVAP for NH DOJ Black and Hispanic.

> **2.      Creating A District Based On A Coalition Of Two Different Minority Groups (A Coalition District) Is Logically No Different Than Creating A District Based On A Coalition Of Whites And A Minority (A Cross-Over District), Which The Supreme Court Has Held Is Not Mandated By Section 2.**

Section 2 provides that a minority group will not, on account of race or language minority status, "have less opportunity than other members of the electorate to … elect representatives of their choice." 42 U.S.C. § 1973(b).   Here, plaintiffs claim that Local Law C dilutes votes not "on account of race" but on account of membership in a political coalition.   "There is a difference [, a fatal one,] between a racial minority group's own choice and the choice made by a coalition." Bartlett, 556 U.S. at 15.

Plaintiffs say that Bartlett sheds no light on this issue because Bartlett dealt with cross-over districts and not coalition districts.   True— and a point which defendants have repeatedly recognized.   However, Bartlett's logic is lethal to coalition districts.

At the core of Bartlett is the notion that political coalition building is admirable and desirable but not required by §2.   Coalition districts are, by definition, the result of two different minority groups that "join[] forces with … to elect their preferred candidate. The Voting Rights Act was passed to foster this cooperation." Bartlett, 556 U.S. at 25. While such a district may aid or even ensure the election of the candidate preferred by a coalition of voters, "[n]othing in §2 grants special protection to a minority group's right to form political coalitions.   [M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground."   Id. (internal citations and quotations omitted).   Justice Kennedy concluded that "§2 [does not] require cross-over districts."   Id. at 15.

In Bartlett, blacks were a near majority in a district but they combined with a small but electorally significant bloc of whites to elect preferred minority candidates.   Plaintiffs say that the political coalition based upon shared political goals between Black voters and a minority of white voters is fundamentally different from a political coalition between a language minority and a racial minority.

As discussed already, the difference cannot be found in either Supreme Court case law or the text of VRA.   That leaves legislative history as the lone potential source for multi-minority coalitions.   As defendants showed in the main brief, see Dkt No. 214-24, the legislative history of the VRA provides no comfort for plaintiffs on this front.

Finally, a significant problem that Plaintiffs snicker at is the 14th Amendment and the Supreme Court decision in Shaw v. Reno, 509 U.S. 630 (1993).   Plaintiffs want to permit certain

coalitions based upon racial classifications.   Mandating coalition districts so that certain minority voters can elect the candidate of their choice goes beyond ensuring equal access to the political process; it effectively requires districts that will always guarantee the election of the minority-preferred candidate by the sheer numbers of a multi-racial coalition wherever such a coalition exists. Granting minorities a right to rearrange districts so that their political coalition will usually win has nothing to do with equal opportunity, but is preferential treatment afforded to no others.   This raises serious Equal Protection issues.   <u>Shaw v. Reno</u>, 509 U.S. 630 (1993).

**POINT III**

**THERE IS NO MATERIAL ISSUE OF FACT ON
PLAINTIFFS' FAILURE TO ESTABLISH POLITICAL COHESION**

As with their choice of who to name as plaintiffs, plaintiffs also had the choice of the "relevant minority" group for whom to seek relief for alleged vote dilution.   Here, the plaintiffs chose in their Complaint, <u>see</u> Dkt. No. 1 at ¶s 63, 77-78, and in their First Amended Complaint, <u>see</u> Dkt. No. 100 at ¶s 68, 83-84, to rely upon a coalition of Hispanic and black voters as their "relevant minority."   The Second Circuit warned that this choice of relevant minority might help with producing sufficient numbers under <u>Gingles</u>' first preconditions, but that same choice could haunt plaintiffs when trying to meet their burden of proof on <u>Gingles</u>' second and third preconditions. <u>See</u> <u>Pope v. County of Albany</u>, 687 F.3d 565, 577 n.11 (2nd Cir. 2012).

Simply put, plaintiffs' inability to prove the political cohesion of the coalition of Hispanic and black voters has been a reoccurring flaw.   Nearly two years ago, this Court, in denying plaintiffs' motion for a preliminary injunction, held that, in the absence of any other evidence of voting patterns showing political cohesion between these two minority groups, anecdotal evidence **alone** was insufficient.   <u>See</u> <u>Pope v. County of Albany</u>, 2011 WL 3651114 at 5 (N.D.N.Y.). Now, after sixteen months of discovery, including the production of hundreds of pages of election

16

results in the County, and the retention of multiple experts, plaintiffs remain unable to offer any expert or statistical proof of the political cohesion of Hispanic and black voters.

To avoid this fatal lack of required proof, plaintiffs seek to excuse this failure by claiming that "[d]ue to insufficient data, experts cannot offer reliable statistical analysis regarding Hispanic voting patterns and racial polarization in County elections involving **Hispanic candidates**." (emphasis added).   See Dkt. No. 24 at p.5 (Liu Dec.)(emphasis added).   As detailed below in Point IV, plaintiffs' expert made the same mistake when he repeatedly stated that lack of Hispanic candidates made it impossible for him to determine the preferred candidate of Hispanic or coalition voters.   With this manufactured excuse, plaintiffs contend that they can rely upon anecdotal evidence alone to support their contention that Hispanic and black voters are politically cohesive.   Plaintiffs are wrong on both grounds.

Plaintiffs' reliance upon a lack of Hispanic candidates as their sole reason for not offering expert proof of political cohesion is flat out wrong.   In Gingles, 478 U.S. at 68, the Court held that "[c]learly, only the race of the voter, **not the race of the candidate**, is relevant to vote dilution analysis."   (emphasis added).   Indeed, in Sanchez v. Bond, 875 F.2d 1488, 1494 (10th Cir.1989) the Court held that the "preferred" candidate of a minority group need not be a minority.   In that case, several white candidates were shown to be the preferred candidates of the Hispanic voters. Having failed to offer statistical or expert analysis of political cohesion, plaintiffs cannot meet their burden of proof and this action must be dismissed.

With no excuse for not analyzing the preferences of Hispanic voters, plaintiffs' claim that this Court "must" find a factual issue on political cohesion based upon the statements of a few political activists rings hollow.   Each of the cases cited by plaintiffs allowed consideration of anecdotal evidence of a coalition's political cohesion *in addition to* statistical evidence of voting

patterns.   Bone Shirt v. Hazeltine, 336 F.Supp.2d 976, 1004 (D.S.D. 2004) citing Whitfield v. Democratic Party of Arkansas, 890 F.2d 1423, 1428 (8th Cir.1989). Here, plaintiffs rely upon anecdotal evidence *instead of* statistical evidence, and inexplicably fail to account for the possibility that Hispanics as a group may prefer a non-minority candidate.

Plaintiffs next mistakenly argue that their burden to show political cohesion is   not substantial (Dkt. No. 228 at p. 20).   The opposite is true:   the Supreme Court has emphasized that, when a VRA claim is based on a coalition of distinct ethnic and language minority groups, the "proof of minority political cohesion is all the more essential" and must be held to a "**higher-than-usual**" standard. Growe v. Emison, 507 U.S. 25, 41(1993) (emphasis added); see also Page v. Bartels, 248 F.3d 175, 197 (2nd Cir. 2001). "[A]s emphasized in Growe, the plaintiffs bear the burden of proving that Hispanics and Blacks are politically cohesive."   Rodriguez v. Pataki, 308 F.Supp.2d 346, 387 (S.D.N.Y. 2004).

Plaintiffs rely only upon the decision in Arbor Hill v. County of Albany, 281 F.Supp.2d 436 (N.D.N.Y. 2003), for their contention that statistical or other substantial evidence of coalition voting patterns is unnecessary.   Plaintiffs made the same argument in support of their motion for injunctive relief.     In rejecting this proof, this Court held:

> Nor can the Court conclude that blacks and Hispanics in Albany County are politically cohesive because a court concluded they were politically cohesive more than eight years ago . . . [That court] relied heavily on the County's admission in the consent decree of 1991 . . . As nearly twenty years have elapsed since the adoption of the Consent Decree, it carries little probative value in the determination of whether the black and Hispanic communities in Albany County are politically cohesive at present. . . . The Court finds no other cases applying the VRA in this Circuit or in other circuits where anecdotal evidence alone has been deemed sufficient to establish political cohesion.

Pope, 2011 WL 3651114 at 5.   On appeal, the Second Circuit expressed "no view" on this Court's determination that the coalition claim lacked factual support, since that determination was not necessary for affirmance of this Court's decision.   Pope, 687 F.3d

at 572 n.5.

Despite extensive discovery since the preliminary injunction hearing, plaintiffs cannot meet their burden to prove political cohesion between blacks and Hispanics.   In addition to their experts' failure to prove political cohesion, plaintiffs have also failed to document political cohesion.   In a flawed attempt to meet this standard of proof, plaintiffs cite isolated instances of Hispanics and blacks working "together" to elect Democratic party candidates, including the District Attorney and President.   Of course, as established above, plaintiffs' experts offered no statistical evidence of Hispanic voting patterns.   See Pope, 687 F.3d 578, fn 13.   Moreover, this proof may still be undercut by the explanation that "African–Americans' and Latinos' cohesiveness in general elections is due to the fact that they both vote along Democratic Party lines."   France v. Pataki, 71 F.Supp.2d 317, 327 (S.D.N.Y.1997).

In fact, despite dozens of contests over the past two decades and allegations that Spanish language campaign literature was distributed, plaintiffs have produced only **one** campaign brochure written in Spanish (Dkt. No. 232-13).   This lack of Spanish language political literature belies the claimed closeness of blacks and Hispanics for voting purposes.   Instead, this lack of evidence indicates the distinct language and ethnicity of the two minority groups.

Unable to provide expert testimony, statistical proof or even documentary evidence of political cohesion, plaintiffs are left only with rehashing evidence from the preliminary injunction hearing (Dkt No. 231-7, 8, 9, 10, 16, 33, 34, 50) and declarations which are nearly identical to that testimony (Dkt. No. 231-34, 35, 36, 37, 38, 43, 45) or made by persons who were never identified in plaintiffs' list of material witnesses (Dkt. No. 231-40, 42, 46).   Regardless of the source, this "evidence" now as then, is nothing more than

**19**

sweeping generalizations of economic and social issues, which are not limited to members of the coalition, such as access to health care, education, and employment opportunities. This purported proof of social cohesion has no bearing on whether there is a coalition for voting or political purposes.

In sum, plaintiffs have **no** expert testimony, data, statistics or other empirical evidence to show that the voting patterns of blacks and Hispanics prove political cohesion.   Having chosen not to provide such evidence by mistakenly assuming that it was not available, plaintiffs' reliance upon mere anecdotal evidence is not sufficient because it does not establish that blacks and Hispanics vote together.   The Second Circuit foresaw this evidentiary hurdle for plaintiffs by observing that "[w]hile choice of more expansive minority group may assist plaintiffs in satisfying first Gingles factor, it may also add to their burden in demonstrating political cohesion required for the second factor."   Pope, 687 F.3d at 577, n.11. Based upon this failure of proof, plaintiffs' coalition claim cannot surmount the second prong of the Gingles analysis.   For this additional reason, defendants' motion for summary judgment should be granted.

## POINT IV

### THERE IS NO MATERIAL ISSUE OF FACT ON PLAINTIFFS' FAILURE TO PROVE GINGLES' THIRD PRECONDITION THAT THE WHITE MAJORITY VOTES AS A BLOC TO USUALLY DEFEAT MINORITY'S PREFERRED CANDIDATE

In their motion for summary judgment, defendants established that plaintiffs cannot prove that "the white majority votes as a bloc to enable it …in the absence of special circumstances …usually to defeat the minority's preferred candidate." See Gingles, 478 U.S. at 50-51.    This legal conclusion was based upon two undisputed facts: (1) plaintiffs' expert admitted that he did not determine the "preferred candidate" of the purported coalition; and (2) plaintiffs' expert also admitted that even if the relevant minority was now DOJ Black, then the "preferred candidate" of that new minority was successful in 15 of 34 contests or 44%.   See DSMF ¶s 41-42; see also

Clyne Dec (Dkt. No. 214-2).   Unable to address the consequences of these factual findings which show that the minority's preferred candidate is not usually defeated, plaintiffs resort to a series of unusual and flawed arguments.

**A.     Plaintiffs Failed to Establish The Coalition's "Preferred" Candidate.**

Plaintiffs' quixotic effort starts with the flawed assumption that the claimed lack of Hispanic **candidates** made it impossible for their expert to determine the coalition's "preferred candidate."   This basic error is similar to plaintiffs' inability to provide expert proof of political cohesion as proven in Point III.   Plaintiffs' failure to even identify the coalition's "preferred candidate" renders it impossible for plaintiffs to show that this unknown candidate is usually defeated.

This flawed argument is based upon plaintiffs' mistaken belief that the race of the **candidate, not the voter,** was paramount in determining the preferred candidate of the coalition. Dr. Baodong Liu, plaintiffs' expert, could not have been clearer about this mistake.   Dr. Liu declared that he did not analyze the "preferred candidate" of Hispanic voters because there were no Hispanic **candidates**.   See DSMF ¶40 (Liu Dep. at p. 235); DSMF ¶36 (Liu Dep. at p. 193-194); see also Dkt. No. 24 at p.5 (Liu Dec.).   As a result, Dr. Liu admitted that he used only **Non-Hispanic** black voters as the relevant minority in his analysis of racially polarized voting. Dr. Liu conceded that he used the same approach in the 2003 litigation by testifying:   "I didn't analyze Hispanic votes, because I realized back then that the data was very limited on the Hispanic racial data in precincts.   So I developed my opinion even back then that for **Albany it's impossible to produce reliable estimates concerning Hispanic."**   See DMSF¶37 (Liu Dep. at p.116)(emphasis added).   In their response brief, plaintiffs cite this same reason – the lack of Hispanic candidates – for their inability to determine the coalition's preferred candidate.   See Dkt No. 228.

Simply stated, Dr. Liu's approach and plaintiffs' resulting claimed inability to meet their burden of proving the preferred candidate of the coalition cannot withstand scrutiny.   In Gingles, 478 U.S. at 68, the Court held that "[c]learly, only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis."   In National Ass'n for Advancement of Colored People, Inc. v. City of Niagara, 913 F.Supp. 722, 753 (W.D.N.Y. 1994), the court held that "[u]nder §2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important."   Indeed, a candidate is not a minority-preferred candidate simply because the candidate is a member of that minority.   See NAACP v. City of Niagara Falls, 65 F.3d 1002, 1016 (2nd Cir. 1995)(To hold otherwise would provide judicial approval to "electoral apartheid."); see Lewis v. Alamance Coumty, 99 F.3d 600, 607 (4th Cir. 1996); Jenkins v. Red Clay Consolidated School District, 4 F.3d 1103, 1125 (3rd Cir. 1993).   Simply put, the admitted failure to analyze the "preferred" candidate of Hispanics or the coalition is fatal to plaintiffs' claim.   Having failed to demonstrate the "preferred" candidate of Hispanic voters or the coalition, plaintiffs cannot prove that the unknown preferred candidate is usually defeated by white bloc voting as required under Gingles' third precondition.

**B.       The Minority "Preferred" Candidate Is Not "Usually" Defeated**

Plaintiffs compound this error by jettisoning their own expert's reliance upon 34 contests which he used as a basis for his opinion regarding racially polarized voting, and arbitrarily whittling down the number of relevant contests in which the black candidate prevailed to a mere 6 contests and then contending that the minority's preferred candidate's success rates was not the 44% determined by their own expert, but only 17.6%.   As demonstrated below, these arguments are meritless.

Even assuming plaintiffs can pivot and now argue at this late date that DOJ Black is the relevant minority, plaintiffs cannot demonstrate that its preferred candidate is "usually" defeated.

Unable to dispute the remarkable success rate of the minority's preferred candidate, plaintiffs resort to arguing that there is no "bright line rule" to gauge the success of this minority's preferred candidate.   Plaintiffs conveniently ignore the fact that this success was recorded by their own expert and that courts have granted summary judgment dismissing VRA actions with much lower success rates.

In Gingles, 478 U.S. at 99-100, the Court held that plaintiffs should show that the success rate of relevant minority's preferred candidate is less than its proportional representation. Similarly, in Barnett v. City of Chicago, 141 F.3d 699, 705 (7th Cir. 1998), the Seventh Circuit held that "[a] group that has electoral power … equal to its fraction of the electorate will be hard-pressed to demonstrate, and has not demonstrated in this case, that its members nevertheless have less opportunity than other members … to elect representatives of their choice."    With a County DOJ Black VAP of 11%, even the success rate of 17.6% in the contests arbitrarily self-selected by plaintiffs meet this measure.

To avoid the consequences of the success rate of 44% as recognized by their own expert (see DSMF ¶s 41-42), plaintiffs turn to a series of blatantly flawed assumptions in a vain attempt to reduce the success rate to 17%.   See Dkt No. 228 at p.35.   However, plaintiffs' gyrations required to reach this manufactured percentage are arbitrary to an almost comical extent.   First, plaintiffs start by asking this Court to disregard relevant case law.   Plaintiffs start, by dismissing as an "outlier," the Sixth Circuit's holding in Clarke v. City of Cincinnati, 40 F.3d 807, 812-13 (6th Cir. 1994)., cert. denied, 514 U.S. 1109 (1995) by simply contending that, with no Second Circuit case on point, the holding is not controlling.   To the contrary, the reasoning court in Clarke was based upon Voinovich v. Quilter, 507 U.S. 146 (1993) Supreme Court precedent which seeks to find whether white bloc voting is "targeted" against the minority's preferred candidate.   Id. at 812.   Not surprisingly, like here, the court held that a 47% success rate for minority candidates

23

was "no reason to find that blacks' preferred black candidates have 'usually' been defeated." Id. at 812-813.

Plaintiffs next attack the Third Circuit's holding in Jenkins v. Red Clay Cons. School Dist. Bd. of Educ., 4 F.3d 1103, 1122 (3rd Cir. 1993) by contending it is somehow inapposite because it involved at-large elections and not single member contests.   Indeed, the court in Jenkins rejected this distinction and stated that the Court in Gingles adopted a "practical, results oriented approach."   Contrary to plaintiffs' argument, the issue is whether the minority candidate was elected whether by plurality in an at-large contest or by majority in a single-member district.   The court held such election results relevant because it measured the "**effect** of bloc voting on the ability of minority voters fully to participate in the political process and to elect their representatives of choice." Id. at 1122.   The court concluded that "[i]f minority-preferred candidates are consistently able to prevail in **representative numbers** . . ., then it cannot be said that white voters vote sufficiently as a bloc usually to prevent the election of the minority preferred candidates." Id. (emphasis added).

Plaintiffs similarly discount the First Circuit's holding in Uno v. City of Holyoke, 72 F.3d 973, 985 (1st Cir. 1995) by noting that this Court should make a practical, common sense approach of all evidence.   That is exactly what the court did in Uno by holding that "usually to defeat" under Gingles' third condition "must be such that, over a period of years, whites vote sufficiently as a bloc to defeat minority candidates most of the time."

Second, plaintiffs' attack defendants' reliance upon the findings of their own expert. Indicative of their misplaced effort to discount the success of minority-preferred candidates based upon Dr. Liu's own conclusions for 34 bi-racial contests, plaintiffs argue that, while Dr. Liu's "comprehensive data set is probative," that defendants' reliance upon that data set to show success rates was misleading and disingenuous.   Instead, plaintiffs first contend that, unlike their own

expert's reliance upon State and County elections, that only County-legislative contests should be considered.   From that reduced number, plaintiffs then exclude contests that involved an appointed or incumbent candidate.     As a final cut, plaintiffs eliminate any contest in an MMD. With those arbitrary rules applied, plaintiffs do not identify which contests remain but they are still somehow able to declare that **no minority candidate** was successful.   In fact, with no contests remaining, it would appear that no minority candidate was defeated, and, more importantly, plaintiffs have created a data set (zero) which makes it impossible for them to meet their burden of proof.   For this additional reason, defendants' motion for summary judgment should be granted.

Finally, plaintiffs cannot dismiss case law and create their own rules to create a desired result.   It is beyond cavil that the focus is on the preferred candidate of minority **voters** (not the race of the candidate).   Dr. Liu considered 34 bi-racial single-member elections and reported that the minority "preferred" candidate prevailed in 15 contests or 44% of the contests.   See DSMF ¶42.   Of the 27 contests held since 2004, Dr. Liu reported that the minority's "preferred" candidate prevailed in 12 contests or 44% of the contests.   See id.; see United States v. Charleston County, 365 F.3d 341, 350 (4th Cir. 2004) (recent elections are the most probative in determining a vote dilution claim).

### C.    No Special Circumstances Explain The Success Of Minority's Preferred  Candidates.

In their response brief, plaintiffs try to discount the success rate of the minority's preferred candidate through next turning to a series of claimed "special circumstances."   In their zeal to explain away this success by relying upon special circumstances, plaintiffs curiously discount and ignore the hard campaigning, espoused positions, party support, and other reasons for a candidates' success.   The courts have repeatedly set aside efforts to overly apply the special circumstances exception.

First, there is no dispute that the only special circumstance discussed in <u>Gingles</u>, 478 U.S. at 51, is a contest where the minority's preferred candidate is unopposed.   Here, all elections were contested.

Second, plaintiffs mistakenly speculate that the success of the minority's preferred candidates could be the result of incumbency.   In <u>Clarke</u>, 40 F.3d at 813-814, the Sixth Circuit rejected efforts to make incumbency a blanket "special circumstance."   The court held:

> Plaintiffs assert that the special circumstance of incumbency explains away the success enjoyed by black candidates for City Commission because five of the eight blacks elected to the city council ... were first appointed to that body.... But unlike other 'special circumstances,' incumbency plays a significant role in the vast majority of American elections. To qualify as a 'special' circumstance, then, **incumbency must play an unusually important role in the election at issue**; a contrary rule would confuse the ordinary with the special, and thus 'make practically every American election a special circumstance'.

<u>Id.</u> at 813 (emphasis added).   Simply put, plaintiffs offered no expert testimony or proof of any kind to show that incumbency played an "unusually important role" in any contest.

But even if incumbency is wrongly presumed to be an "unusually important role" and thereby elevated to a "special circumstance," then, as suggested by Dr. Liu, <u>see</u> Dkt No. 214-216 at pp.9-12, **all** contests involving victorious incumbents (whether white or black) should be excluded.   Even under this strained approach, the success rate of the minority's preferred candidates in the remaining contests is overwhelming.   Of the 34 bi-racial contests analyzed by Dr. Liu, <u>see</u> DSMF ¶s41-42 (Table 3), the incumbent was victorious in17 bi-racial contests.   In the remaining 17 contests in which there was no elected incumbent or the incumbent was defeated, the black candidate won ten contests, the white candidate won seven contests, and the black incumbent was defeated in one contest and the white incumbent was defeated in three contests. <u>See</u> DSMF ¶44, <u>see also</u> Clyne Dec. Exh. A.   In sum, even excluding contests with an incumbent victory, the black candidate prevailed in 10 out of 17 such contests or **a success rate of 59%**.

Simply stated, incumbency is not a special circumstance needed to explain the success of black candidates.

Next, plaintiffs ignore their own expert's reliance upon these 34 bi-racial contests by arbitrarily imposing a number of exclusionary "special circumstances" to whittle the contests down to a number that suits their purposes.   Plaintiffs incredibly contend that contests which occurred after the 1991 and 2002 Voting Rights Act litigations should be excluded because the outcomes might have been impacted by publicity, even though such contests were analyzed by their expert, and, indeed, the purpose of this litigation was to increase the likelihood that the minority's preferred candidate would be elected.

In <u>Ruiz v. City of Santa Maria</u>, 160 F.3d 543 (9th Cir. 1998), the court rejected this approach and held that "special circumstances" involve whether specific election's outcome might be dependent upon unusual circumstances.   The court held:

> To invoke the special circumstances doctrine regarding an election that occurred after a Section 2 lawsuit is filed, **plaintiffs must show that a particular election was surrounded by unusual circumstances**. Those unusual circumstances must demonstrate that the election was not representative of the typical way in which the electoral process functions. The focus is voter behavior, not voter motivation.

<u>Id.</u> at 557 (emphasis added).   The court observed the following "unusual circumstances":

> Plaintiffs submitted evidence that several aspects of the 1994 city council election were unprecedented: the percentages of non-Hispanic crossover voting for two Hispanic candidates; the endorsements of several white politicians and predominantly-white organizations for those candidates; the amount of financial support contributed by non-Hispanic businesses and individuals to those campaigns; and the amount that Maldonado spent on his campaign. It was well-known throughout Santa Maria that the district court was awaiting the results of that election. Days before the election, Maldonado told a local newspaper that his victory would prove "Santa Maria is not racist."

<u>Id.</u> at 558.

Here, again, plaintiffs fall far short of the required burden of proof.   Instead, plaintiffs rely solely upon the fact that the 1991 and 2003 litigations occurred without

offering any evidence that it motivated voter behavior in any of the dozens of elections that took place near those events..

Similarly, in United States v. Village of Port Chester, 704 F.Supp.2d 411 (S.D.N.Y. 2010), the court rejected the proposition that concurrent-litigation elections should be accorded less weight.   The court held:

> Though the Second Circuit has not specifically defined the contours of the "special circumstances" doctrine, the Court thinks the Ninth Circuit's reasoning on this point is instructive. That court found that "to invoke the special circumstances doctrine regarding an election that occurred after a Section 2 lawsuit is filed, plaintiffs must show that a particular election was surrounded by unusual circumstances. Those unusual circumstances must demonstrate that the election was not representative of the typical way in which the electoral process functions. The focus is voter behavior, not voter motivation.

Id. at 442 n.28 citing Ruiz, 160 F.3d at 557.   Relying upon Goosby v. Bd. of the Town of Hempstead, 956 F.Supp. 326 (E.D. 1997), the court held:

> The original Complaint in *Goosby I* was filed in 1988, and a bench trial was held in July 1996. By Defendant's logic, the *Goosby I* court should not have considered any Town of Hempstead elections that took place after spring 1991, yet the record is replete with evidence from two elections held in 1993.   The argument that post–2001 elections should not be considered here is without merit.

Id. at 442 (emphasis in original).

Indicative of plaintiffs' over application of special circumstances, plaintiffs try to explain the success of David Soares as District Attorney in 2008 by noting a marked increased enrollment in the Working Families Party in that year.   Plaintiffs overlook the fact that Mr. Soares prevailed against the white incumbent in the Democratic Party primary.   Plaintiffs seemingly misunderstood that New York State Election Law does not allow members of one party (Working Families) to vote in another party's primary (Democratic).

In sum, as established in defendants' motion for summary judgment, plaintiffs failed to establish the preferred candidate of the coalition.   And even if the coalition is abandoned and substituted with blacks as the minority, the undisputed election results show that even under plaintiffs' hyper-exclusionary rules, the minority's preferred candidate is not usually defeated.

## **CONCLUSION**

For these reasons, defendants respectfully request that plaintiffs' motion for partial summary judgment be denied in its entirety and that defendants' motion for summary judgment be granted in its entirety.

Dated:    May 20, 2013               MURPHY, BURNS, BARBER & MURPHY, LLP
                                     By_____/s/ Peter G Barber_____
                                     Peter G. Barber, Esq.
                                     Bar Roll No. 301523
                                     Attorneys for County of Albany
Of counsel:                          226 Great Oaks Boulevard
                                     Albany, New York, 12203
Catherine A. Barber, Esq.            Telephone:    518-690-0096
                                     Telefax:    518-690-0053


                                     _____/s/ Thomas Marcelle_____
                                     Thomas Marcelle, Esq.
                                     Bar Roll No. 117102
                                     Albany County Attorney
Of counsel:                          Attorney for Albany County Board of Elections
                                     Department of Law
Adam Giangreco, Esq.                 112 State Street, Suite 1010
                                     Albany, New York, 12207

29