UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANNE POPE; WANDA WILLINGHAM;
GERALDINE BELL; SAMUEL
COLEMAN; and LEE PINCKNEY,

                              Plaintiffs,

        -against-                                       1:11-cv-0736 (LEK/CFH)

COUNTY OF ALBANY; and ALBANY
COUNTY BOARD OF ELECTIONS,

                              Defendants.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

Before the Court are Plaintiffs Anne Pope, Wanda Willingham, Geraldine Bell, Samuel

Coleman, and Lee Pinckney's ("Plaintiffs") Motion for partial summary judgment ("Plaintiffs' SJ

Motion") and Defendants County of Albany ("County") and Albany County Board of Elections'

(collectively, "Defendants") Motion for summary judgment ("Defendants' SJ Motion") in this

action challenging the redistricting of the Albany County Legislature ("Legislature") under Section

2 of the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. 1973 ("Section 2").  Dkt. Nos. 209; 214.

The Court also considers Plaintiffs' second Motion for leave to amend their Complaint and attached

Memorandum of law, which Defendants have opposed.  Dkt. Nos. 226 ("Motion to Amend"); 226-1

("Motion to Amend Memorandum").  For the reasons that follow, the Court grants Plaintiffs' SJ

Motion in part and denies it in part, and denies Defendants' SJ Motion.

## II.    BACKGROUND

### A. Procedural Posture

Plaintiffs filed a Complaint in June 2011 alleging that the VRA requires the creation of an additional majority-minority district ("MMD") in the Legislature following population shifts reflected in the 2010 Census. Shortly thereafter, Plaintiffs filed a Motion for preliminary injunction to prevent the County from holding elections under the Legislature's operative redistricting plan. Dkt. No. 12 ("PI Motion"). They argued that: (1) it is possible to create 5 MMDs within the City of Albany ("City") using a narrow definition of black voters, Dkt. No. 30 ("PI Memorandum") at 12; (2) the "black community [has] routinely voted as a bloc" and, thus, "the black community is politically cohesive, as are blacks and Hispanics," id. at 13; and (3) that the minority-preferred candidate is usually defeated and the totality of the circumstances supports a finding of vote dilution, id. at 15-26. Defendants filed a response, Dkt. No. 40 ("PI Response"), arguing that Plaintiffs could not prove that minority voters were sufficiently numerous to create five majority-minority districts "when counting Blacks alone," Dkt. No. 40 ("PI Response") at 11-12, as well as that the Plaintiffs had not proved the rest of the Gingles factors. Id. at 13-23. The Court denied the PI Motion, holding that Plaintiffs failed to prove that they were likely to succeed on the merits. Dkt. No. 76.

Plaintiffs filed an interlocutory appeal ("Appeal"). Dkt. No. 78. The Second Circuit found error in the Court's requirement of something more than a simple majority at the first step of Section 2 analysis, but ultimately affirmed the Court's decision. Dkt Nos. 153, 153-1; Pope v. Cnty. of Albany, 687 F.3d 565 (2d Cir. 2012). Meanwhile, Plaintiffs filed an Amended Complaint, Dkt.

2

No. 100 ("Amended Complaint"), which is the operative pleading for purposes of this decision.[1]

Plaintiffs' Motion seeks judgment that the black population in Albany County is: (1) sufficiently numerous and geographically compact to justify five MMDs; and (2) politically cohesive. Dkt. No. 210 ("Plaintiffs' SJ Memorandum"). Defendants filed a Response, and Plaintiffs a Reply. Dkt Nos. 230 ("Defendants' SJ Response"); 241 ("Plaintiffs' SJ Reply").[2]

Defendants' Motion seeks judgment on Plaintiffs' claim to the extent it relies upon a coalition of black and Hispanic voters. In particular, Defendants argue that: (1) Plaintiffs lack standing to bring a claim under Section 2; (2) the VRA does not allow a black and Hispanic voting coalition; (3) Plaintiffs cannot show political cohesion; (4) Plaintiffs cannot show that racially polarized voting yields white bloc votes sufficient to usually defeat minority-preferred candidates. Dkt. No. 214-24 at 1-2 ("Defendants' SJ Memorandum"). Plaintiffs submitted a Response, and Defendants a Reply. See Dkt. Nos. 228 ("Plaintiffs' SJ Response"); 242 ("Defendants' SJ Reply").

Both parties submitted Statements of material facts with their Motions. Dkt. Nos. 211 ("Plaintiffs' SMF"); 214-1 ("Defendants' SMF"). Defendants responded to Plaintiffs' SMF and Plaintiffs replied. Dkt. Nos. 230-1 ("Defendants' SMF Response"), 241-1, ("Plaintiffs' SMF Reply"). Plaintiffs responded to Defendants' SMF, including a counter-statement of facts. Dkt. No.

---

[1] Although Plaintiffs have filed the second Motion to Amend, they make no amendments to the factual allegations in the Amended Complaint. See generally Mot. Am. Therefore, the Court will consider the Amended Complaint to be the operative pleading for purposes of deciding the summary judgment Motions, and then resolve the Motion to Amend.

[2] Defendants argue that the Court should not consider a black-only "claim," because it was not fairly raised in their pleadings. See Defs.' Resp. As discussed below, Plaintiffs' complaint explicitly states only one cause of action, but fairly supports two theories to prove that cause of action. Furthermore, Defendants' arguments in their preliminary injunction briefing indicates that they understood the Plaintiffs would attempt to prove their claim using a black-only theory.

229 ("Plaintiffs' SMF Response" and "Plaintiffs' Counter-SMF").

During summary judgment briefing, the parties stipulated that Plaintiff Janis Gonzalez ("Gonzalez"), the only Hispanic Plaintiff, would withdraw her claim. Dkt No. 222. Two weeks later, Plaintiffs filed their second Motion to Amend to add additional plaintiffs, some of whom are Hispanic, and who live both inside and outside the City the Albany. See Mot. Am. Mem. Defendants' Opposition challenges the Motion to Amend on several bases: (1) that the Motion to Amend would cause undue delay; (2) that Plaintiffs brought the Motion in bad faith; (3) that the Motion to Amend would prejudice Defendants; and (4) the Motion to Amend is futile. See generally Opp. Mot. Am.

### B. Facts

County voters in single-member districts elect 39 representatives to sit on the Legislature every four years. Defs.' SMF ¶ 1. After each decennial United States Census ("Census"), the County redraws its districts to account for population shifts. Pls.' SMF ¶ 2.

After both the 1990 and 2000 Census, minority voters in the County—and, specifically, in the City—filed Section 2 claims against Defendants ("1990 Litigation" and "2003 Litigation"). Pls.' Counter-SMF ¶ 7. Each time, the County modified its redistricting plans. Id. The 1990 Litigation increased the number of MMDs from one to three. Id. ¶ 7; Dkt. No. 1-2 ("1991 Consent Decree"). The County maintained the three MMDs when it redrew districts subsequent to the 2000 Census. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 281 F. Supp. 2d 436, 440 (N.D.N.Y. 2003). Minority voters sued for and obtained an injunction. Id. at 457. The parties entered a consent decree, which created a fourth MMD. Pls.' Counter-SMF ¶ 7.

The Department of Justice ("DOJ") releases racial-demographic data. The relevant

4

demographics are Hispanic population, non-Hispanic DOJ black population,[3] and non-Hispanic white population.[4]  The County's total population as of the 2010 Census was 304,204, of which the voting-age population ("VAP") was 243,573.  U.S. Census, 2010 Redistricting Data (Public Law 94-171) Summary File, Albany County, N.Y.[5]  The Hispanic population was 14,917, with a VAP of 10,024, the DOJ black population was 39,087, with a VAP of at least 26,196 but no more than 29,435,[6] and the white population was 231,152, with a VAP of 197,006.[7]  Id.

The Albany County Redistricting Commission ("Commission") is charged with examining

_____

[3] The parties use "Non-Hispanic DOJ Black" to mean the simple sum of the Census responders identifying as "Black of African American alone" and "Two Races: White; Black or African American."  Pls.' SMF ¶ 42.  The Court recognizes that this definition does not include Hispanic individuals that may identify as black, nor multiracial individuals identifying as a combination of races other than "White" and "Black or African American," and thus may not be fully inclusive of the population that identifies as black.  However, this definition ensures that the operative black and Hispanic populations do not overlap for purposes of VRA litigation.

[4] The Plaintiffs contend that an additional definition, "any part black," is the proper definition of black for the purposes of a black only claim.  Pls.' Mem. at 3 n.8.

[5] The Court may take judicial notice of government statistics.  See Fed. R. Evid. 201; United States v. Esquivel, 88 F.3d 722, 726-27 (9th Cir. 1996).

[6] The Census data does not delineate a "Two or More Races: White; Black or African American" category for the voting-age population.  Rather, the above range employs the non-Hispanic "Black or African American" population as the minimum, and the sum of the non-Hispanic "Black or African American" population and the non-Hispanic "Two or More Races" population as the maximum.  The actual population is somewhere in the middle, because the "Two or More Races" VAP includes the "White; Black or African American" VAP that would be used to calculate the DOJ black VAP.

[7] There are currently 4 MMDs out of 39 total districts, which equates to 10.26 percent.  The black VAP consists of between 10.75% and 12.08% of the total VAP using a non-Hispanic DOJ black definition.  Using an "any part black" definition, which includes black Hispanic individuals and additional multiracial individuals, would result in a higher number.  The combined black and Hispanic VAP consists of between 14.87% and 16.20% of the total voting population.  Plaintiffs' proposed changes would cause MMDs to comprise 12.82% of the total districts.

new Census data and creating a map of proposed new districts.  Pls.' SMF ¶ 2.  The Commission

held hearings to allow the public to comment before releasing proposed districts.  Pls.' Counter-

SMF ¶ 8.  However, Plaintiffs allege that members of the minority communities were generally not

aware of these meetings because they were held in unfamiliar locations or were minimally

advertised.  Id.  Minority voters that did attend the meetings advised the Commission that the

minority population had grown since 2000, and that a fifth MMD was therefore warranted.  Id. ¶ 9.

Aaron Mair presented an alternative redistricting plan, the Arbor Hill Environmental Justice plan

("AHEJ Plan") to illustrate the possibility of creating five MMDs in the City.  Id. ¶ 14.  The

Commission maintained the number of MMDs at four, id. ¶ 11, reasoning that there were "not

enough numbers to justify" a fifth MMD, Dkt. No. 231-17 at 3.  However, Mr. Merrill, who drew

the districts for Defendants, relied on a definition of "minority" as "single race black."  Dkt. No.

231-17, at 177:2-178:2.  The Legislature passed the Commission's plan as Local Law C, which the

County Executive signed into law.  Pls.' Counter-SMF ¶¶ 18-19.

### C. Expert Findings on Racial Polarization

Plaintiffs and Defendants employed experts to analyze racially polarized voting and other

data relevant to Section 2 litigation.  Plaintiffs' first expert, Dr. Baodong Liu, analyzed 46 elections

between his original and supplemental reports to test for racial bloc voting and minority candidate

success.  Id. ¶ 24-25.  Dr. Liu's supplemental Declaration and Report focused on 34 single-member

elections where a black candidate ran against a white candidate, and 12 multi-member elections.[8]

---

[8]  Dr. Liu analyzed single-member elections using "Ecological Inference," which purportedly improves upon the bivariate ecological regression technique employed in Thornburg v. Gingles, 478 U.S. 30 (1986), because it does not assume homogeneity or produce impossible estimates.  See Liu Report at 4-5; 478 U.S. at 52-53.  For multi-member districts, Dr. Liu used "homogeneous precinct analysis" because "[Ecological Inference] methodology is not useful" where voters elect more than

Dkt. No. 231-25 ("Liu Report") at 4-5. Dr. Liu analyzed only the voting patterns of black and white voters because of "the lack of sufficient statistical data on Hispanic voters," and defined black voters for the purposes of his analysis as "non-Hispanic Black." Pls.' Counter-SMF ¶ 27; Defs.' SMF ¶ 33. Dr. Liu concluded that racially polarized voting occurred in 19 single-member elections. Liu Report at 6. Of the 15 elections that were not polarized, ten involved incumbent candidates and 14 were "non-competitive." Id. at 7-9. In 11 of the 12 multi-member elections analyzed by Dr. Liu, white voters' most preferred candidate was white, and black voters' most preferred candidate was black. Id. at 5-6. Dr. Liu found that black voters, as defined above, were "'politically cohesive' in that they have overwhelmingly preferred African American candidates as their choices in biracial or multiracial elections involving black and white candidates." Id. at 6-7.

Defendants also retained an expert, Dr. Ronald Gaddie, to analyze political cohesion and racial bloc voting. See Dkt. No. 122. However, to the Court's knowledge, Dr. Gaddie's expert report has never been entered into the record, and Defendants do not rely on it in their papers.

Plaintiffs' second expert, William Cooper, analyzed demographic and socio-economic Census data for the County, as well as Local Law C and the AHEJ Plan. Dkt. No. 231-23 ("Cooper Supplemental Declararation") ¶ 6. Mr. Cooper concluded that "African-Americans and Latinos in Albany County lag behind whites across most socioeconomic measures."[9] Id. ¶ 9. Mr. Cooper

---

one candidate at a time. Id. at 5. "Homogeneous precinct analysis" is another term for the "extreme case analysis" employed in Gingles. See Gingles, 478 U.S. at 53; Montano v. Suffolk Cnty. Legislature, 268 F. Supp. 2d 243, 254 (E.D.N.Y. 2003).

[9] Because Mr. Cooper drew his estimates from the American Community Survey (the accuracy of which the Court addresses in footnote 15, *infra*), the demographics presented in Mr. Cooper's overlap somewhat—the "African-American" category contains black Hispanics, as does the "Latino" category. Cooper Supplemental Decl. ¶ 8.

further concluded that "there is little appreciable difference in the overall socio-economic status of African-Americans and Latinos." Id. ¶ 12. Mr. Cooper also analyzed potential districts using computer software, and found that the AHEJ plan "complies with one-person, one-vote requirements . . . [and] other key traditional redistricting criteria such as compactness, contiguity, and the non-dilution of minority voting strength." Dkt. No. 54 ("Cooper Am. Declaration") ¶¶ 19-21, 27-28. Meanwhile, Mr. Cooper contends that Local Law C "packs minorities into four districts." Id. ¶ 29.

Mr. Cooper also created several additional "Illustrative Plans." The first Illustrative Plan merges the AHEJ MMD allocation with the existing framework of Local Law C, and would require the redrawing of ten out of 39 districts. Id. ¶ 31-33. Mr. Cooper compares this design with an "Illustrative Plan 2" that creates 6 MMDs.[10] Id. ¶ 36-37. Mr. Cooper has also created a third Illustrative Plan, which aims to make as few changes to district lines as possible to create 5 MMDs. Id. ¶ 38. While this approach creates larger majorities of minority voters than the AHEJ Plan, each MMD contains below-average total population. Id. ¶ 38; Defs.' SMF ¶ 21.

## III.     LEGAL STANDARD

### A. Summary Judgment

Summary judgment is proper where "there is no genuine issue as to any material fact," and thus "the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Niagara Mohawk Power Corp. v. Hudson River-Black

---

[10]   The Court notes that the sixth MMD only achieves a majority of minority voters when combining all minority groups—not just blacks and Hispanics—and only reaches 50.18% minority voters.

River Regulating Dist., 673 F.3d 84, 94 (2d Cir. 2012). The moving party must first meet a burden of production, which differs depending on whether the moving party will have the burden of proving the claim or element at trial. Celotex, 477 U.S. at 330-32 (Brennan, J., dissenting). Because Plaintiffs will bear the burden of proving the Gingles factors at trial, they "must support [their] motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle [them] to a directed verdict if not controverted at trial." Id. at 331. Defendants will not bear the burden at trial; they may, in support of their Motion: (1) "submit affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) "demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Id. If a moving party has carried its burden, the nonmoving party must raise some genuine issue of material fact; "metaphysical doubt as to material facts" is not enough. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, the burden of persuasion remains at all times with the moving party, who must affirmatively demonstrate entitlement to judgment as a matter of law. Celotex, 477 U.S. at 332.

## B. VRA Section 2 Claims

Courts assess the merit of Section 2 vote dilution claims under the three-step framework specified in Thornburg v. Gingles. A plaintiff must prove that: (1) the alleged minority group is sufficiently numerous and geographically compact to compose a majority of a single-member district; (2) members of the minority group are politically cohesive; and (3) that white bloc voting is usually sufficient to defeat the minority-preferred candidate. See generally Gingles, 478 U.S. 30. Although it would be "a *very* unusual case" where a plaintiff establishes the Gingles factors and fails to establish a Section 2 violation, courts must still consider the totality of the

circumstances—additional indicia that tend to show a pattern and history of discrimination and a need for redress. <u>Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.</u>, 4 F.3d 1103, 1135 (3d Cir. 1993) (emphasis in original).

## IV. DISCUSSION

### A. Defendants' Motion for Summary Judgment

Defendants advance several arguments. Defendants first contend that Plaintiffs reside within existing MMDs under the current scheme and therefore do not have standing to bring this action. Defs.' Mem. at 11. Second, Defendants contend that black and Hispanic voters may not form a coalition for the purposes of Section 2. <u>Id.</u> at 13. Third, Defendants contend that Plaintiffs have not proved political cohesion among the black and Hispanic voting populations taken as a whole. <u>Id.</u> at 26. Fourth, Defendants contend that Plaintiffs cannot prove that white bloc voting is usually sufficient to defeat the minority-preferred candidate. <u>Id.</u> at 28. The Court rejects each of these arguments, and thus denies summary judgment.

#### 1. Standing[11]

Defendants posit that Plaintiffs, as residents of existing majority-minority districts, lack standing to bring a claim for vote dilution. <u>Id.</u> at 11. Defendants argue that only residents of majority-white districts suffer injury as a result of Local Law C, and thus only those residents are properly situated to bring a claim. <u>Id.</u>

In general, a plaintiff has standing if she satisfies three elements: (1) she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) she can show a

---

[11] This section addresses only the standing of Plaintiffs under the Amended Complaint. The standing of the proposed Plaintiffs in the Motion to amend is discussed *infra*.

connection between the defendant's conduct and the complained injury; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). In a Section 2 claim, the putative injury is that the minority lacks "substantial proportionality" of political opportunity—per capita voting power on par with the majority[12]—under the existing voting system. See Johnson v. DeGrandy, 512 U.S. 997, 1013-15 (1994). The first Gingles factor provides further guidance on whether a Plaintiff has standing to assert a Section 2 claim. That threshold analysis "requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." Id. at 1008. Thus, supported allegations that Plaintiffs reside in a reasonably compact area that could support additional MMDs sufficiently proves standing for a Section 2 claim for vote dilution.[13] Here, Plaintiffs have identified a personalized injury: that the apportionment of 4 MMDs to the sufficiently numerous and geographically compact minority population, as opposed to the 5 MMDs that Plaintiffs contend are required by the VRA, dilutes Plaintiffs' individual voting power—including those in existing MMDs. Therefore, all Plaintiffs have standing to litigate these claims.

Defendants rely on United States v. Hays, 515 U.S. 737 (1995) to support their assertion that

---

[12] This concept is related to, but distinct from, proportional representation, to which Section 2 does not provide an unfettered guarantee. Johnson v. DeGrandy, 512 U.S. 997, 1014 n.11 (1994).

[13] No circuit has developed a framework specifically for a Section 2 standing inquiry. Plaintiffs cite two unpublished district court decisions, Broward Citizens for Fair Dists. v. Broward Cnty., No. 12-60317-CIV, 2012 WL 111053 (S.D. Fla. Apr. 3, 2012), and Barnett v. City of Chicago, No. 92 C 1683, 1996 WL 34432 (N.D. Ill. Jan. 29, 1996), in support of standing in similar factual circumstances. Other circuits have declined to review standing where Gingles factors were not met. See, e.g., African Am. Voting Rights Legal Def. Fund, Inc. v. Villa, 54 F.3d 1345 (8th Cir. 1995).

only those residents of majority-white districts may properly sue for relief under the VRA. Hays was not a Section 2 case, but a challenge to a redistricting plan on Equal Protection grounds. Id. at 738-39. The voters lacked standing not because they resided in an MMD (they did not), see Hays, 515 U.S. at 742, but because they did not challenge the constitutionality of their own district or area. Id. at 746-47; id. at 750 (Breyer, J., concurring) (emphasizing that Plaintiffs are "voters . . . who do not reside within the district they challenge").[14] Plaintiffs here, in addition to making their claim under Section 2 as opposed to the Fourteenth Amendment, challenge the drawing of district lines in a compact area within the City of Albany, where they reside. See Pls.' SJ Mem. at 8. The Parties' discussion of "packing" and "fragmentation" claims, Pls.' SJ Resp. at 12-13; Defs.' SJ Reply at 3-4, obscures the actual issue in the standing inquiry— whether or not black and Hispanic voters allege that they do not enjoy proportional political opportunity. See DeGrandy, 512 U.S. at 1015-16.

### 2. Minority Coalitions

Defendants argue that black and Hispanic populations together do not comprise a "minority group" under Section 2, entitling Defendants to summary judgment on Plaintiffs' combination of black and Hispanic populations. Defs.' SJ Mem. at 14.[15]

---

[14] Although Defendants correctly assert that Hall v. Virginia, 276 F. Supp. 2d 528 (E.D.Va. 2003) extended Hays to a Section 2 claim, that court did so on rather unusual facts. In that case, the class of plaintiffs included individuals that had resided in the former influence district in the past, but did not reside there currently, and did not allege that they should be part of the influence district, or that their situation should change at all. Id. at 531. Because they established no link to the actual redistricting process, they had no standing to assert a claim. Id. at 531-32. The plaintiffs in that case also sought to restore an influence district by returning the black population to 40%. Id. at 529-30. Indeed, the opinion goes to lengths to distinguish the Hall facts from a situation where voters seek to establish a former influence district as an additional MMD. See, e.g., id. at 530 n.4.

[15] Defendants draw an analogy between coalitions of minorities voters and crossover districts, where a minority group combines with a subset of the majority to elect candidates of its choosing. Defs.' Mem. at 20-22. Defendants rely on the plurality opinion in Bartlett v. Strickland,

Courts are divided on whether Section 2 authorizes a coalition of minority voters to comprise a "minority group."  The Second Circuit declined to decide this issue on appeal.  Pope v. Cnty. of Albany, 687 F.3d 565, 573 n.5 (2d Cir. 2012).  However, it previously upheld a Section 2 violation where the plaintiffs were a mixed group of black and Hispanic voters.  See Bridgeport Coal. of Fair Representation v. City of Bridgeport, 26 F.3d 271, 275-76 (2d. Cir. 1994), vacated on other grounds, 512 U.S. 1283 (1994).  The Supreme Court has likewise reserved judgment, stating only that *if* such claims were allowed, the entire minority group would have to be politically cohesive.  Growe v. Emison, 507 U.S. 25, 41 (1993).  The treatment of aggregate coalition claims has varied among other circuits.  Compare Campos v. City of Baytown, 840 F.2d 1240 (5th Cir. 1988) (approving aggregated claims), and Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs, 906 F.2d 524, 526 (11th Cir. 1990) (same), with Nixon v. Kent Cnty., 76 F.3d 1381 (6th Cir. 1996) (denying coalition claims based upon the text of the VRA).

The Court finds that the plain text of the statute, its purpose, and the legislative history do not abridge the right of politically cohesive minority groups to aggregate.  Defendants advance the line of reasoning in Nixon.  Defs.' SJ Mem. at 15-16.  The Sixth Circuit held that, because Section 2 refers to potential claimants as "members" of a singular "class of citizens protected by subsection

_____

556 U.S. 1 (2009).  Defs.' Mem. at 20-22.  However, the analogy fails for several reasons.  First, Bartlett explicitly distinguishes the two types of claims.  Bartlett, 556 U.S. at 13-14.  Second, the combination of minority groups goes beyond "political alliance," Defs.' Mem. at 24; the Section 2 action addresses discriminatory treatment on the basis of historically disadvantaged race.  Bartlett, 556 U.S. at 10.  Finally, rather than *lacking* power because of a political structure, the minority group in Bartlett *held* political power only because of a political structure.  Id. at 15.  Thus, by seeking to re-create the crossover district by relying on white crossover voting, the minority group in Bartlett may actually be demonstrating that the third Gingles factor, racial bloc voting usually sufficient to defeat the minority candidate, is not present.  Id. at 16 (plurality opinion); id. at 34 (Souter, J., dissenting).

(a)," Congress intended to allow only a single racial group to claim under the VRA. However, the language of subsection (a) does not cabin potential claimants into one racial group; it affords protection from "denial or abridgement of the right of *any citizen* of the United States to vote on account of race or color." 42 U.S.C. 1973 (emphasis added). This broad wording does not suggest that only a single group may allege a violation of its voting rights. See Chisom v. Roemer, 501 U.S. 380, 403 (1991).[16]

### 3. Political Cohesion

Defendants next assert that, even if a joint claim is permitted, Plaintiffs cannot prove political cohesion between black and Hispanic voters. Defs.' SJ Reply at 16. Defendants point out that there is no development in the record of any empirical data suggesting cohesion, and posit that the whole of Plaintiffs' anecdotal evidence cannot support a finding of political cohesion. Id. at 17-18. Plaintiffs present empirical evidence—which Defendants do not challenge in their Memorandum or Reply—showing cohesion among non-Hispanic black voters, but not between black and Hispanic voters. See Liu Report at 4-7. Thus, the Court must determine whether anecdotal evidence alone can support the conclusion that Hispanic voters are politically cohesive with black voters, and if so, whether the anecdotal evidence present here is sufficient to raise a genuine issue of material fact.

Anecdotal evidence can support a finding of political cohesion. The Second Circuit quoted the Supreme Court's language in Gingles, which discussed racially polarized voting, as applicable to

---

[16]  Courts within the Second Circuit have likewise recognized minority coalition claims. See Rodriguez v. Pataki, 308 F. Supp. 2d 346, 405 (S.D.N.Y. 2004); Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 281 F. Supp. 2d 436, 445 (N.D.N.Y. 2003); France v. Pataki, 71 F. Supp. 2d 317, 321-22 (S.D.N.Y. 1999).

the evaluation of cohesion. See Pope v. County of Albany, 687 F.3d 565, 573, n.5 ("Courts must

rely on other factors to determine whether the Section 2 claim has been proved."). The Fifth Circuit

adopted a similar approach, stating that "[s]tatistical evidence is not a *sine qua non* to establish

cohesion." Brewer v. Ham, 876 F.2d 448, 454 (5th Cir. 1989). Thus, the Court rejects Defendants'

contention that a failure to show cohesion between black and Hispanic voters through statistical

evidence is fatal to a Section 2 claim.

Both parties cite Bridgeport to support their arguments, the facts of which are similar to the

ones present here. The Bridgeport plaintiffs, a group of blacks and Hispanics, produced ample

evidence that black voters in the city exhibited polarized voting, but showed less cohesion among

Hispanic voters except in cases where the candidate was Hispanic. Bridgeport, 26 F.3d at 276.

Plaintiffs introduced additional "anecdotal evidence directly bearing on the political cohesiveness

issue." Id. The defendants "introduced little or no evidence on the issue of cohesiveness," id., and

the Second Circuit found sufficient cohesion to uphold a grant of preliminary injunction.[17]

The facts before the Court largely mirror those in Bridgeport. Plaintiffs adduce significant

empirical evidence showing political cohesion among the black community. Their expert, Dr. Liu,

found that there is not sufficient data available to form a conclusion about Hispanic cohesion. Pls.'

Counter-SMF ¶ 7. However, Plaintiffs have bolstered the available statistical evidence with

socioeconomic analysis, see Cooper Report, evidence of joint political ventures, Pls.' Counter-SMF

---

[17] The context of the appeal does not diminish Bridgeport's value here. Although the Second Circuit reviewed a preliminary injunction for abuse of discretion, the Bridgeport panel recognized the significance of a grant of preliminary injunction and reviewed the trial court's decision within that lens. 26 F.3d at 274. The panel remarked that it "recognize[d] the urgency of the City's contention that the prerequisites for the issuance of a preliminary injunction in voting rights cases be scrutinized carefully." Id. The court then found that the plaintiffs had sufficient evidence to support that they were likely to succeed on the merits.

¶¶ 40-68, and witness testimony,[18] much as the <u>Bridgeport</u> plaintiffs did.  Meanwhile, Defendants have neither effectively attacked the veracity of Plaintiffs' evidence or conclusions, nor opted to introduce their own evidence.

The parties agree that it is not possible to accurately analyze Hispanic voting patterns. Scholarship in the field has noted that ecological regression, ecological inference, and homogeneous precincts analysis are often "blunt" tools, and that, "[a]t some point, a racial or ethnic group's numbers in a jurisdiction are so low as to make separate estimation of the group's voting patterns both difficult and unlikely to be useful."  D. James Greiner, <u>Ecological Inference in Voting Rights Act Disputes: Where Are We Now, and Where Do We Want to Be?</u>, 47 JURIMETRICS J. 115, 118, 125 (2007); <u>see also</u> David A. Freedman et al., <u>Ecological Regression and Voting Rights</u>, 15 EVALUATION REV. 673 (1991); Stephen P. Klein et al., <u>Ecological Regressions Versus the Secret Ballot</u>, 31 JURIMETRICS J. 393 (1991); W. S. Robinson, <u>Ecological Correlations and the Behavior of Individuals</u>, 15 AM. SOC. REV. 351 (1950).  The Hispanic VAP in the County, while growing quickly, still comprises only a small percentage of voters.  It is therefore unsurprising that the proof Defendants seek is unavailable.

Plaintiffs have compiled a record of anecdotal political cohesion to show that the black and Hispanic communities satisfy Section 2's cohesion requirements.  The City "recently found the Black and Hispanic populations in the City to be politically cohesive for purposes of redistricting the City's Common Council wards."  Pls.' SMF Resp. ¶ 47.  "Get-out-the-vote" organizations such as One Hundred Black Men and People of Color Who Vote, as well as the local NAACP chapter,

---

[18] <u>See, e.g.</u>, Dkt. Nos. 232-6 ("Declaration of Joseph Gomez"); 232-7 ("Declaration of Nathan LeBron"); 232-10 ("Declaration of Elaine Frazier"); 232-11 ("Declaration of Ladan Alomar"); 232-12 ("Declaration of Corey Ellis"); 232-14 ("Declaration of Vicente Alfonso").

reach out to members of both races and have memberships that include blacks and Hispanics.  Id. ¶¶ 55-57.  Several successful minority-candidate campaigns have relied on outreach to and support from the black and Hispanic communities.  Id. ¶¶ 48-54.  Plaintiffs have sufficiently raised issues of material fact that, when coupled with the empirical evidence of black voter cohesion, could support a finding of political cohesion.  Thus, summary judgment is not appropriate.

### 4. White Majority Bloc Voting

The third Gingles prerequisite requires that voting be polarized along racial lines, and that majority bloc voting "usually" suffice to defeat the minority-preferred candidate.  478 U.S. at 51, 55-57.  "[T]here is no simple doctrinal test for the existence of legally significant racial bloc voting"; "the degree of racial bloc voting that is cognizable . . . will vary according to a variety of factual circumstances."  Id. at 57.  In cases where minority-preferred candidates achieve some success, "special circumstances, such as the absence of an opponent [or] incumbency . . . may explain minority electoral success in a polarized contest."  Id. (noting that the example circumstances are "illustrative, not exclusive").  In cases where some majority-minority districts already exist, the third Gingles factor can be proved where the majority tends to vote as a bloc "to bar minority groups from electing their chosen candidates except in a district where a given minority makes up a voting majority."  DeGrandy, 512 U.S. at 1003-04.  In a largely fact-driven inquiry, it is unsurprising that different circuits have developed divergent acceptable thresholds of minority success.  Compare Old Person v. Cooney, 230 F.3d 1113, 1122 (9th Cir. 2000) (recognizing that "usually" could mean "more than half of the time") with Lewis v. Alamance Cnty., 99 F.3d 600, 606 (4th Cir. 1996) ("Suffice it to say that ['usually,' 'normally,' and 'generally'] mean something more than just 51%").  The Second Circuit has provided little additional guidance beyond stating that the

third <u>Gingles</u> factor "recognizes the need for some flexibility." <u>Pope</u>, 687 F.3d at 578.

Defendants' first argument, that Plaintiffs have not properly identified minority-preferred candidates, is largely duplicative of their political-cohesion arguments addressed above. Defs.' Reply at 21-22. However, Defendants also suggest in passing that Plaintiffs should have analyzed the group of black and Hispanic voters *together* for the racially polarized voting determination, rather than assuming that including the Hispanic population would not change the comparison of the black and white populations. <u>See</u> Defs.' Mem. at 28 ("[P]laintiff made no attempt to demonstrate the 'preferred' candidate of the coalition group."). Although the Court agrees that such a comparison would be preferable, Defendants have failed to argue either that using a combined test group of black and Hispanic voters is possible with the existing data, or that such combination would not demonstrate polarization. Because the Court must make all factual inferences in favor of the nonmoving party, <u>Celotex</u>, 477 U.S. at 330 n.2 (Brennan, J., dissenting), Defendants have not shown that they are entitled to summary judgment on this basis.[19]

Defendants do not advance affirmative evidence to show that voting preferences are not polarized (although they do allege, as discussed, that Plaintiffs have not properly proved such polarization), or dispute that the minority-preferred candidate is successful less than 50% of the time. <u>See</u> Defs.' SJ Mem. at 29 ("Dr. Liu's report concedes that the 'preferred' candidate of the

---

[19] Denial of summary judgment due to a failure to identify empirically a minority-preferred candidate for the entire racial group, without additional support, also defies the <u>Gingles</u> directive to "rely on other factors that tend to prove unequal access to the electoral process" where "a minority group has begun to sponsor candidates just recently," as Hispanic voters have here. 478 U.S. at 57. Thus, although such an argument could be relevant in defeating Plaintiffs' coalition claim at trial, the Court cannot award summary judgment on that ground. <u>See</u> <u>Ruiz v. City of Santa Maria</u>, 160 F.3d 543, 559 (9th Cir. 1998) ("Plaintiffs . . . are not required to *prove* any of the three preconditions in opposing a motion for summary judgment; they need only show a genuine dispute of material fact").

black community prevailed in 16 contests or 47% of the time."). Rather, they argue that the minority-preferred candidate is not successful enough to be "usually" defeated. Because there is widespread recognition that the third prong is a fact-based inquiry, see, e.g., Gingles, 478 U.S. at 57 (stressing the need to examine "factual circumstances"); Ruiz, 160 F.3d at 550 ("[A] '[W]hite majority' voting bloc must be read in the context of the facts presented to the court. . . ."); Uno v. City of Holyoke, 72 F.3d 973, 989 (1st Cir. 1995) ("[D]etermining whether racial bloc voting exists is not merely an arithmetic exercise . . . . To the contrary, the district court should . . . make a practical, commonsense assay of all the evidence."), Defendants face a high bar in proving that they are entitled to judgment as a matter of law.

Defendants attempt to prove that minority success is sufficient to warrant judgment as a matter of law by citing standards used by courts in other jurisdictions. Defs.' Mem. at 29. In one of these cases, Uno, the First Circuit found error in the district court's findings because there was insufficient evidence of both minority and white bloc voting. 72 F.3d at 988. Specifically, Hispanic voters backed a candidate as a bloc in only four out of 11 elections. Id. Even under these circumstances, the thin record of racially polarized voting did not *per se* defeat the plaintiffs' claim; rather, the failure to assign proper weight to this evidence was the fatal flaw. Id. at 988-89. Defendants also cite a case in which the Third Circuit found clear error in the district court's holding that plurality-win schemes undermined that white-bloc voting consistently defeating minority candidates, Jenkins, 4 F.3d at 1122, and another in which the Sixth Circuit found that a 47% success rate of black candidates supported by black voters was not itself sufficient to find sufficient white bloc voting in an at-large scheme, Clarke v. City of Cincinnati, 40 F.3d 807, 812-13 (6th Cir. 1994).

Even if the Court were to adopt these persuasive authorities, none provides a coherent standard to judge that the combination of minority success rate, additional anecdotal evidence, and the existence of special circumstances in the instant case could not reasonably support a finding that there is sufficient white bloc voting to "usually" defeat the minority-preferred candidate. Plaintiffs have showed that minority-preferred candidates are successfully less than half of the time. See Liu Supp. Report at 4. Even among successful minority candidates, several were incumbents, others won races within MMDs, and still others won immediately after prior successful litigation "might have worked a one time advantage for black candidates, Gingles, 478 U.S. at 76. See Pls.' Resp. at 28-32.

Defendants urge that, because the non-Hispanic DOJ Black VAP in the County is only 11%, minority success rates in excess of that amount are enough to show that no additional majority-minority districts are needed. See Defs.' Mem. at 30. Defendants mistakenly rely on Barnett v. City of Chicago, 141 F.3d 699, 705 (7th Cir. 1998), for support. However, the "electoral power . . . equal to its fraction of the electorate" to which Barnett refers is the number of MMDs, not the relative success of minority candidates. See id. at 705-06. Therefore, the Court finds that there are genuine issues of material fact as to whether or not minority-preferred candidates have usually been defeated due to white bloc voting, and summary judgment is not appropriate.

For all of the reasons detailed above, Defendants' Motion for summary judgment is denied.

**B. Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs seek summary judgment on the first two <u>Gingles</u> preconditions under a black-only theory. Plaintiffs contend that there is no genuine issue of material fact as to whether the black population is sufficiently numerous and geographically compact to form a majority of five MMDs,

Pls.' Mem. at 8-15, and as to whether the black population is politically cohesive, id. at 15-16. Defendants dispute whether Plaintiffs have brought a black-only claim, Defs.' Resp. 4-5. Defendants contend that Plaintiffs' theory fails on the merits because: (1) Plaintiffs are required to show, and have not showed, that the minority group contains 50% of the Citizen Voting Age Population ("CVAP"), Defs.' SJ Resp. at 4-7, (2) the minority group is not geographically compact, id. at 7-9; and (3) there are disputed issues of material fact as to black voters' political cohesiveness. The Court finds that there is no genuine issue of material fact as to the first Gingles element of a black only claim, but that Plaintiffs have not proved political cohesiveness.

### 1. Status of the Putative Black-Only Claim

In general, a party may not raise a claim or defense for the first time in summary judgment briefing; rather the party's pleadings must put the opposing party on notice of the claims. See George v. Reisdorf Bros., Inc., 410 Fed. Appx. 382, 384 n.2 (2d Cir. 2011); Johnson v. Cleveland City Sch. Dist., 443 Fed. Appx. 974, 980 (6th Cir. 2011) (discussing whether Plaintiff's claim was "fairly raised" in the Complaint); Nunley v. Dept. of Justice, 425 F.3d 1132, 1140 (8th Cir. 2005) ("[T]he appropriate disposition of these claims . . . will depend on whether they can be said to have been fairly raised in the original complaint."). In some circumstances, the parties' conduct in litigation allows a court to consider a claim that is not raised in the pleadings. See FED. R. CIV. P 15(b)(2) (allowing issues "not raised by the pleadings" to be "treated in all respects as if raised in the pleadings" when "tried by express or implied consent"); Jund v. Town of Hempstead, 941 F.2d 1271, 1287 (2d Cir. 1991) (considering claims not raised in the complaint but briefed and argued without objection at summary judgment). However, defendants should be protected from reasonably conducting discovery on one theory of liability, and then having to defend against a

different theory.  See Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("[A]t the very least, [a] plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense").

Defendants argue that Plaintiffs failed to raise a claim that the County's redistricting scheme dilutes the voting power of black voters alone.  Defs.' SJ Resp. at 4-5.[20]  Defendants point to Plaintiffs' "Cause of Action" section, where Plaintiffs allege:

> 83.    The black and Hispanic populations in the County of Albany are sufficiently large and geographically compact to constitute a majority in five legislative districts.
> 84.    The black and Hispanic populations in the City are politically cohesive.

Am. Compl. ¶¶ 83-84.  Throughout the remainder of the "Cause of Action" section, Plaintiffs refer to the class of claimants as "minorities" and "the minority population."  Id. ¶¶ 80-88.

The language in the complaint does not foreclose a black-only theory.  The Amended Complaint states increases in "the non-Hispanic black population," of the County and City.  Id. at ¶¶ 25, 30.  While this data is useful in proving the first Gingles prong of Section 2 analysis under a black-only theory, it is hardly useful under a coalition claim except, perhaps, as one factor among many under a "totality of the circumstances" analysis.  The Amended Complaint also states that both the black community and the Hispanic community are politically cohesive, which goes to the second element of the Gingles analysis for both a coalition and a black-only claim.

The parties' post-Complaint conduct indicates that there was a sufficient basis for Defendants to anticipate and conduct discovery on a black-only theory.  Plaintiffs filed their original complaint on June 29, 2011.  Id.  Plaintiffs filed their Motion for preliminary injunction and a

---

[20] Defendants do not dispute that Plaintiffs properly raised a coalition claim.

22

supporting brief on July 15, 2011.  See PI Mot.; PI Mem.  Discovery had not yet begun at the time of the initial briefing on preliminary injunction, and thus that briefing was relevant to parties' understanding of the nature of the case when crafting discovery.

Plaintiffs' Motion for preliminary injunction implicitly advances a black-only claim by arguing that black voters alone meet the three Gingles factors.  Plaintiffs noted that "the increased population of blacks *alone* supports 5 MMDs with *non-Hispanic black VAPs* of between 50.44% and 52.67%" in satisfaction of the numerosity requirement of the first prerequisite.  PI Mem. 12 (emphasis added).  In support of the black community's political cohesion, Plaintiffs stated that "the black community has routinely voted as a bloc," with black candidates receiving "73.92% and 77.7% of the black votes" in City-wide elections and "94.95% and 82.44% of their votes" in County Legislature primaries.  Id. at 14.  Furthermore, all of the analysis on racial bloc voting and racial polarization compares black votes with white votes, and black-preferred candidates with white-preferred candidates.  Id. at 15-16.

In response, Defendants did not argue that these statistics were irrelevant.  Rather Defendants argued only that the statistics were insufficient to show that Plaintiffs were likely to succeed on the merits.  See generally PI Resp.  Defendants justified their plan with respect to a black-only claim, stating that "[t]he County has created four reasonably compact MMDs with a sufficiently large black voting age population which allows black voters have [sic] to be able to elect candidates of their choice."  Id. at 10.  Defendants further argued that "Plaintiffs' plan (when counting Blacks alone) does not create an effective majority-minority district."  Id. at 11-12.  Defendants thereby acknowledge that Plaintiffs were proceeding on a black-only claim.

The Court finds that, given the previous conduct of the parties and the broad language used

in the Amended Complaint, Plaintiffs have fairly raised a black-only theory of vote dilution and thus may seek summary judgment on relevant issues.

### 2. Merits of the Claim

#### a. Sufficient Numerosity and Geographic Compactness

Plaintiffs move for summary judgment on the first Gingles element, that black voters in the County are sufficiently numerous and geographically compact to form five MMDs. In support of their motion, Plaintiffs refer to the AHEJ Plan, in which non-Hispanic DOJ black voters comprise a majority of the voting age population in five districts. Pls.' SJ Mem. at 5, 9-11. Defendants assert that (1) the AHEJ plan does not show that black voters comprise a voting majority of the *citizen* voting age population ("CVAP"); and (2) Plaintiffs' proposed districts are irregular and, thus, do not conform with constitutional standards for redistricting. See Defs.' SJ Resp. at 4-9. The Court finds that Plaintiffs have satisfied their burden of persuasion. Thus, summary judgment for Plaintiffs is appropriate on this issue.

In order to satisfy the first element of the Gingles analysis, Plaintiffs must prove that the class of minority voters forms, at least, a simple majority of a compact geographic area, allowing the minority group to form a simple majority of a proposed number of MMDs. Pope, 687 F.3d at 573; Bartlett v. Strickland, 556 U.S. 1, 18-19 (2009); League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 433 (2006).[21]

Plaintiffs have set forth sufficient evidence. Plaintiffs have showed a majority in a compact area by providing several illustrative plans, each creating five districts in which non-Hispanic black

---

[21] This is the only relevant analysis. Defendants' second argument – that a district in one of Plaintiffs' illustrative plans, the AHEJ plan, is irregularly shaped – goes beyond the "objective, numerical test" that the Supreme Court intended at this stage of analysis. Bartlett, 556 U.S. 18.

residents comprise majorities. Cooper Am. Decl. ¶¶ 19-38. Furthermore, they have adduced

evidence that the black population as a whole is geographically compact. Plaintiffs note that "more

than 70 percent of the County's non-Hispanic black citizens live in a geographically compact area

within the City of Albany." Pls.' SJ Mem. at 13. They narrow the concentrations of the black

population further, describing certain neighborhoods with high concentrations of black residents. Id.

at 13-14. Defendants have not disputed these basic facts in their summary judgment papers or

elsewhere in the record. Instead, Defendants argue that Plaintiffs have not met their burden as to

numerosity because they have not showed that black residents comprise a majority of the CVAP.

Defs.' SJ Resp. at 5-7.

Defendants cite several cases that favor the use of CVAP over VAP for the first Gingles

element. However, CVAP has been applied only where there is a significant noncitizen population.

See Barnett v. City of Chicago, 141 F.3d 699, 705 (7th Cir. 1998) (stating that VAP should apply

where "noncitizens [are] not a significant part of the relevant population"); Negron v. City of Miami

Beach, 113 F.3d 1563, 1568 (11th Cir. 1997) ("Of course, [a previous Section 2 decision] did not

address [CVAP], because there was no indication in that case that there was any disparity between

black and white citizenship rates. Nor is there likely to be any disparity in citizenship rates, except

in a case, such as this one, where the minority population includes a substantial number of

immigrants."); Rodriguez v. Pataki, 308 F. Supp. 2d 346, 369 (S.D.N.Y. 2004) (noting that the use

of CVAP instead of *total population* changed disputed districts from overpopulated to significantly

underpopulated); France v. Pataki, 71 F. Supp. 2d 317, 326 (S.D.N.Y. 1999) (finding that the

challenged areas "contain[] a high-proportion of immigrants who are non-citizens who are ineligible

to vote under the Voting Rights Act"); United States v. Village of Port Chester, 704 F. Supp. 2d

411, 419-20 (S.D.N.Y. 2010) (requiring CVAP statistics for a community that was more than one-third noncitizen).

There is no reason to require use of CVAP where there is no evidence of a significant non-citizen population. Given that CVAP data is less reliable VAP,[22] Defendants must first raise some evidence of a higher-than-normal non-citizen population among the minority group. Defendants make no such allegation here. Defendants argue only that "Plaintiffs have not shown that [the black citizenship rate] is 100 percent." Defs.' SJ Resp. at 7.[23] Because Defendants have not raised a genuine issue of material fact that would require the use of CVAP, Plaintiffs are entitled to summary judgment on the first Gingles factor.[24]

### b. Political Cohesion

Plaintiffs also seek summary judgment on the second Gingles factor: political cohesion. In order to carry their burden, Plaintiffs must show that "'a significant number' of minority voters

---

[22] The Census Bureau acknowledged that its American Community Survey, a collection of survey estimates on statistics such as CVAP, is less reliable than Census data and not intended to be used in redistricting. U.S. Census Bureau, Three Tips for Using American Community Survey (ACS) Data, http://www.census.gov/acs/www/guidance_for_data_users/guidance_main/.

[23] While that is true—both in that Plaintiffs have not showed that not all of the City's black residents are citizens and that the citizenship rate may reasonably not be 100%—it also does not guarantee that the VAP and CVAP are different. Rather, for the VAP and CVAP statistics to diverge, the citizenship rate of black County residents over 18 years of age must be less than the citizenship rate of the population as a whole. Defendants have not provided evidence that could reasonably allow that conclusion.

[24] Defendants further assert that "Plaintiffs have not addressed the impact of disenfranchised felons on CVAP." Even if the Court were to accept as true the bare allegation that the County's black population contains a disproportionate number of felons, to deny relief on such basis would be irresponsible. To potentially penalize a minority group seeking to reform one structural issue, an abridgment of voting power, because of the existence of another societal issue, racially correlated felony rates, would directly counteract the VRA's "broad remedial purpose." Chisom, 501 U.S. at 403.

'usually' vote for the same candidate." <u>Mallory v. Ohio</u>, 173 F.3d 377, 383 (6th Cir. 1999) (citing

<u>Gingles</u>, 478 U.S. at 56). Plaintiffs argue that, based upon previous proceedings in this litigation

and the consent degrees in the 1990 and 2000 litigation, Defendants are estopped from arguing that

the black community is not politically cohesive. Pls.' SJ Reply at 10 n.6. In the alternative,

Plaintiffs argue that the findings of their experts and the development of substantial anecdotal

evidence in the record leave no genuine issue of material fact as to cohesion. Pls.' SJ Mem. at 15-

16; Pls.' SJ Reply at 10-13.

Defendants counter with largely irrelevant arguments. Defendants argue that, because black

voters support candidates of several different parties, they are not truly cohesive. Defs.' SJ Resp. at

12. But that black cohesion is not simply due to party affiliation supports Plaintiffs' ultimate claim

more than it detracts. Although there is disagreement as to whether political cohesion must be

caused by race, as opposed to merely correlated with factors such as party affiliation, <u>see</u> <u>Gingles</u>,

478 U.S. at 82-83 (White, J., concurring); <u>id.</u> at 100-102 (O'Connor, J., concurring) (stating that

electoral outcomes may sometimes be an insufficient measure of cohesion, as other factors could be

at play), *independence* from interest-group politics does not undermine racial cohesion. Indeed,

ruling out party affiliation as a reason for polarized voting habits would bolster an inference that

another factor, such as race, caused those disparities. Defendants have raised no other disputed

issues of material fact.

Nevertheless, Plaintiffs are not entitled to summary judgment. Plaintiffs argue that judicial

estoppel bars Defendants from contesting black cohesion because Defendants' positions in their

preliminary injunction papers and the 1991 consent decree are inconsistent with that argument. Pls.'

SJ Reply at 10 n.6. However, Defendants did not concede cohesion in their opposition to

preliminary injunction for the purposes of the entire litigation; rather, the Defendants did not dispute

the likelihood of success on the merits on those grounds. PI Resp. at 19 ("The Second factor

requires that Plaintiffs show that Blacks are politically cohesive. Defendants concede this point *for

the purposes of this hearing*."). Additionally, while the County's admission in joining the 1991

consent decree might prevent Defendants from arguing that the black community was not cohesive

*in 1991*, it does not prevent them from arguing that the community is not cohesive now. Thus, the

Court rejects Plaintiffs' argument that Defendants cannot contest whether the black community is

presently cohesive.

Plaintiffs are seeking summary judgment on cohesion using non-Hispanic DOJ Black data

while they maintain that the proper definition of black is "any part black."[25] To grant Plaintiffs

summary judgment on the issue of political cohesion among the black community using a non-

Hispanic DOJ Black definition, only to have them press an "any part black" definition at trial,

would allow Plaintiffs to improperly "argue one Gingles factor by reference to a particular minority

group, only to recast the minority group in arguing another factor." Pope, 687 F.3d at 577 n.11.

Although this inconsistency was not problematic for the first Gingles factor,[26] a more heterogeneous

definition of the minority group is less likely to be cohesive. While Plaintiffs have also offered

anecdotal evidence to support their claim, this fact-intensive consideration not appropriate for

---

[25] "Any part black" and "non-Hispanic DOJ Black" differ in that the former includes black
Hispanics and multiracial individuals that are part black. If these demographic groups vote
differently than non-Hispanic DOJ Black individuals, the statistical cohesion observed by Dr. Liu
could be upset.

[26] A finding that a *subset* of a minority group is sufficiently numerous and geographically
compact to form a majority of the proposed number of MMDs necessarily implies that *all* members
of the minority group can form a majority within the same geographic area.

decision on summary judgment.  See, e.g., Calamia v. City of New York, 879 F.2d 1025, 1035 (2d Cir. 1989); E.C. ex rel R.C. v. Cnty. of Suffolk, 514 Fed. Appx. 28, 30 (2d Cir. 2013).  The Court holds that, based upon the facts in the record, a reasonable factfinder making all inferences in Defendants' favor could find that the class of any part black voters is not politically cohesive.  Thus, summary judgment on this issue is inappropriate.

## V.        MOTION TO AMEND THE COMPLAINT

Although the Court has discretion to grant or deny a motion to amend pleadings, Foman v. Davis, 371 U.S. 178, 182 (1962), courts "should freely give leave [to amend] when justice so requires."  FED R. CIV. P. 15(a)(2).  Federal Rule of Civil Procedure 21 further allows the  Court to "at any time, on just terms, add or drop a party."  Amendment should be denied in cases of "undue delay, bad faith, and prejudice to the opposing party."  Barrows v. Forest Laboratories, 742 F.2d 54, 58 (2d Cir. 1984).

Plaintiffs argue that justice requires the addition of a Hispanic Plaintiff to replace Gonzalez, who prior to her withdrawal was the only Hispanic party to this case.  Mot. Am. Mem. at 1-2.  They assert that they moved "as quickly as possible" to notify Defendants that Gonzalez "needed to withdraw" and to amend the complaint—indeed, the Motion to Amend was filed two weeks after Gonzalez withdrew from the action.  Mot. Am. Mem. at 1; see generally Dkt.

Defendants claim that allowing leave to amend would cause undue delay and prejudice.[27]

---

[27] Defendants also argue that the Motion to Amend is in bad faith and futile, because neither the current nor the to-be-added Plaintiffs have standing to sue.  But as discussed *supra*, the Court has found that all current Plaintiffs in this action possess standing to bring a Section 2 claim. Defendants' Opposition also brings other arguments based on standing defects in Plaintiffs' previous pleadings.  See, e.g., Mot. Am. Opp. at 3-4.  The Court does not reconsider these arguments in the context of the Motion to Amend.

Opp. Mot. Am. at 3-8. Defendants state that the Motion comes more than a year after the Court's deadline to amend pleadings, would necessitate the re-opening of discovery, and changes the nature of the litigation by expanding the geographic area at issue. Mot. Am. Opp. at 4-6. Although a court may deny amendments after pleading-amendment deadlines have passed, noncompliance with these deadlines does not, *per se*, prevent the amendments. See, e.g., Soler v. G & U, Inc., 103 F.R.D. 69, 74 (S.D.N.Y. 1984). In this instance, the potential viability of a black-Hispanic coalition claim weighs in favor of allowing the addition of a Hispanic Plaintiff.[28] Defendants have not argued that Gonzalez's departure from the action was anticipated by Plaintiffs before they moved to amend.

The Court is loathe, however, to dramatically change the nature of the litigation after discovery has been conducted and summary judgment motions have been filed. See Luellen v. Hodge, No. 11-cv-6144P, 2013 WL 5490166, at *7-9 (W.D.N.Y. Sept. 30, 2013). Plaintiffs' proposed Second Amended Complaint (Dkt. No. 226-4) includes five new Plaintiffs. One of the proposed Plaintiffs, Nathan Lebron, lives within the Town of Colonie, located northwest of the City, and another, Joseph Gomez, lives in the town of Cohoes, which sits on the County's northern border. Given that Plaintiffs' prior claims have concentrated specifically on "the eastern portion of the City," Pls.' SJ Mem. at 8, the addition of these new parties would necessitate reevaluation of even the most basic elements of a Section 2 claim, including geographic compactness. Dramatically changing the scope and nature of the litigation after the close of discovery would cause undue delay and prejudice Defendants. Therefore, the Court denies the addition of Joseph Gomez and Nathan

---

[28] The Court makes no determination of whether the coalition claim could proceed without a new Hispanic plaintiff to replace Ms. Gonzalez, as there is no precedent on that issue. However, to expose Plaintiffs to that unforeseen risk at this stage of the litigation would not further justice when the original group of Plaintiffs could have brought the claim.

Lebron to the action.

Plaintiffs also propose the addition of three potential plaintiffs within the City of Albany. One of these three proposed plaintiffs, Vicente Alfonso, is Hispanic. Mot. Am. Mem. at 2 n.1. He has already been deposed by Defendants. Id. at 3. The other two proposed plaintiffs, Stephanie Davis and Elaine Frazier, are black residents of the City. See Prop. Am. Compl.

The parties have familiarized themselves with the key issues of this litigation. The addition of these new plaintiffs would require little additional discovery, as one proposed plaintiff has already been deposed, and few new relevant issues are raised by the addition of individual similarly situated plaintiffs. Where the burden of additional discovery on the nonmoving party is small and not disadvantageous, courts generally grant motions to amend. See, e.g., United States v. Cont'l Ill. Nat. Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989); Lawrence v. Starbucks Corp., No. 08 Civ. 3734, 2009 WL 4794247, at *4 (S.D.N.Y. Dec. 10, 2009). The addition of new plaintiffs in this case is non-prejudicial and would cause minimal delay, and therefore the Court permits joinder. See Oneida Indian Nation of New York v. City of Sherill, 337 F.3d 139, 168 (2d Cir. 2003).

## VI.   CONCLUSION

Based on the foregoing discussion, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 214) for Summary Judgment is **DENIED**; and it is further

**ORDERED**, that Plaintiffs' Motion (Dkt. No. 209) for Partial Summary Judgment is **GRANTED in part** and **DENIED in part**. The Court finds that there is no genuine issue of fact as to the assertion that "the black community in the County of Albany is sufficiently large and geographically compact to form five majority-minority districts." There are unresolved issues of

31

material fact as to all other elements of Plaintiffs' claims; and it is further

ORDERED, that Plaintiffs' Motion (Dkt. No. 226) for leave to amend is **GRANTED in part** and **DENIED in part**. Plaintiffs may file a second amended complaint within seven (7) days of this order to add proposed plaintiffs Vicente Alfonso, Stephanie Davis, and Elaine Frazier; and it is further

ORDERED, that Defendants may schedule deposition of Vicente Alfonso, Stephanie Davis, and Elaine Frazier within thirty (30) days of the filing of Plaintiffs' Second Amended Complaint; and it is further

ORDERED, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED:          January 28, 2014
                Albany, New York


_____
          Lawrence E. Kahn
          U.S. District Judge