UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANNE POPE; WANDA WILLINGHAM;
GERALDINE BELL; SAMUEL
COLEMAN; LEE PINCKNEY; VICENTE
ALFONSO; and ELAINE FRAZIER,

                    Plaintiffs,

        -against-                                    1:11-cv-0736 (LEK/CFH)

COUNTY OF ALBANY; and ALBANY
COUNTY BOARD OF ELECTIONS,

                    Defendants.
_____

**MEMORANDUM-DECISION and ORDER**

**TABLE OF CONTENTS**

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       A. Voting Rights Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       B. Gingles Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       A. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            1. Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            2. County Redistricting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            3. Prior Section 2 Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                 a. 1991 Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                 b. 2003 Litigation ("Arbor Hill" Litigation). . . . . . . . . . . . . . . . . . . . . . . . 9
            4. 2010 Census. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            5. 2011 County Redistricting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
                 a. The Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
                 b. Definition of Minority Used in Redistricting. . . . . . . . . . . . . . . . . . . . . 14
                 c. Draft Maps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                 d. Public Involvement in Redistricting Process. . . . . . . . . . . . . . . . . . . . 16
                 e. Local Law C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      6. Alternative Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
         a. Arbor Hill Environmental Justice ("AHEJ") Plan. . . . . . . . . . . . . . . . 19
         b. Plaintiffs' Illustrative Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      7. City Redistricting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  B. First Gingles Precondition: Compactness and Numerosity of Minority Community
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  C. Statistical Methods Used to Determine Voter Behavior. . . . . . . . . . . . . . . . . . . . . 21
  D. Second Gingles Precondition: Political Cohesion. . . . . . . . . . . . . . . . . . . . . . . . . . 24
      1. Expert Reports and Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      2. Anecdotal Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
  E. Third Gingles Precondition: Racial Bloc Voting that Usually Defeats Minority's
    Preferred Candidate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
      1. Expert Reports and Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      2. Additional Relevant Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
  F. Totality of the Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      1. History of Voting-Related Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . 32
      2. Racially Polarized Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      3. Dilution-Enhancing Voting Practices and Procedures. . . . . . . . . . . . . . . . . 32
      4. Access to Slating Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      5. Effects of Past Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      6. Racial Appeals in Campaigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
      7. Past Election of Minority Group Members . . . . . . . . . . . . . . . . . . . . . . . . . . 35
      8. Responsiveness to Minority Needs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
  G. Spoliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.   CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
  A. Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
  B. Spoliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
  C. Vote Dilution Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      1. Probative Elections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      2. Political Cohesion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
         a. Statistical Evidence of Cohesion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
         b. Anecdotal Evidence of Cohesion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      3. Racial Bloc Voting that Usually Defeats the Minority-Preferred Candidate
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
         a. Racial Bloc Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
         b. Minority-Preferred Candidate "Usually" Defeated. . . . . . . . . . . . . . . . 52
      4. Totality of the Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
         a. History of Voting-Related Discrimination. . . . . . . . . . . . . . . . . . . . . . . 61
         b. Racially Polarized Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
         c. Dilution-Enhancing Voting Practices and Procedures. . . . . . . . . . . . . . 65
         d. Access to Slating Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
         e. Effects of Past Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    f. Racial Appeals in Campaigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
    g. Past Election of Minority Group Members. . . . . . . . . . . . . . . . . . . . . . 68
    h. Responsiveness to Minority Needs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
    i. Tenuousness Underlying Redistricting Policy. . . . . . . . . . . . . . . . . . . 73
    j. Effective MMDs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
    k. Proportionality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
   5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

V.  REMEDY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
  A. Remedial Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
  B. Attorney's Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

VI.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## I.  INTRODUCTION

Plaintiffs Anne Pope, Wanda Willingham, Geraldine Bell, Samuel Coleman, Lee Pinckney,

Vicente Alfonso, and Elaine Frazier (collectively, "Plaintiffs") commenced this action against

Defendants County of Albany (the "County") and Albany County Board of Elections (collectively,

"Defendants"), challenging the 2011 redistricting of the Albany County Legislature ("Legislature")

under Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301 ("Section 2").  See

Dkt. No. 254 ("Second Amended Complaint").[1]  Plaintiffs allege that the VRA requires the creation

of an additional majority-minority district ("MMD") in the County Legislature following population

shifts reflected in the 2010 Census.

This matter was tried at an eleven-day bench trial before the Court between November 6,

---

[1] Plaintiffs Anne Pope, Janis Gonzalez, and Wanda Willingham filed the original Complaint in June 2011.  Dkt. No. 1.  In January 2012, the First Amended Complaint added Plaintiffs Geraldine Bell, Samuel Coleman, and Lee Pinckney.  Dkt. No. 100.  In April 2013, Janis Gonzalez was dismissed as a plaintiff.  Dkt. No. 222.  Plaintiffs then filed a Motion for leave to amend, Dkt. No. 226, which the Court granted, Dkt. No. 253.  In January 2014, Plaintiffs filed the Second Amended Complaint, adding as plaintiffs Vicente Alfonso, Elaine Frazier, and Stephanie Davis. Second Am. Compl.  In March 2014, Stephanie Davis was dismissed as a plaintiff in this action. Dkt. No. 262.

2014 and January 13, 2015.[2]  See generally Dkt. Nos. 406-16 (collectively, "Trial Transcript"); see also Dkt. No. 336.  At issue in the trial was whether: (1) the County's redistricting plan dilutes the voting strength of black voters under Section 2; (2) the County's plan dilutes the voting strength of a combined minority population of black and Hispanic voters under Section 2 ("coalition claim"); and (3) Plaintiffs are entitled to an adverse inference based on Defendants' spoliation of evidence.  Prior to trial, the parties submitted a joint pre-trial stipulation.  Dkt. No. 321 ("JPS").  In lieu of closing arguments, the parties submitted post-trial briefs, and proposed findings of fact and conclusions of law.  Dkt. Nos. 421 ("Plaintiffs' Trial Brief"); 422; 424-1 ("Defendants' Trial Brief").[3]  Both parties also filed Replies.  Dkt. Nos. 425 ("Defendants' Reply Brief"); 426 ("Plaintiffs' Reply Brief").

Based on the testimony at trial and evidence submitted, the Court finds that while laudable progress to address racial disparities in the County has been made, the County's redistricting plan diluted the voting strength of black voters in Albany County in violation of the VRA.  This conclusion renders it unnecessary for the Court to reach the issue of Plaintiffs' coalition claim.  The Court's specific findings of fact and conclusions of law follow.[4]

---

[2] The procedural history of this case is presumed to be known to the parties and will not be repeated in its entirety herein.  Relevant portions of the procedural history will be discussed in the findings of fact, *infra*.

[3] Defendants initially filed their post-trial brief at Dkt. No. 423.  They subsequently submitted a request to file an edited version of the brief with no substantive changes.  Dkt. No. 424.  That request is granted and the Court accepts Defendants' filing at Dkt. No. 424-1 as Defendants' operative post-trial brief.

[4] Plaintiffs have also filed a second Motion for a preliminary injunction, Dkt. No. 372 ("Second PI Motion"), a Letter Motion requesting that the Court deny any request for extension of time by Defendants to reply to the Second PI Motion, Dkt. No. 418, and a Motion for judgment as a matter of law, Dkt. No. 404.  Because the Court finds for Plaintiffs on the merits, all three Motions are denied as moot.

## II.    LEGAL STANDARD

### A. Voting Rights Act

The VRA was enacted "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude.'" Voinovich v. Quilter, 507 U.S. 146, 152 (1993) (citing U.S. Constitution, Amdt. 15 and NAACP v. New York, 413 U.S. 345, 350 (1973)). "Congress enacted Section 2 of the [VRA] to eliminate discrimination in voting present since the end of the Reconstruction period in the 1870's." Reed v. Town of Babylon, 914 F. Supp. 843, 861 (E.D.N.Y. 1996). Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Section 2 is violated if:

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Id. § 10301(b).

### B. Gingles Framework

Courts assess the merits of Section 2 vote dilution claims under the three-step framework established in Thornburg v. Gingles, 478 U.S. 30 (1986). To prevail on a claim under Section 2, a

plaintiff must prove that: (1) the alleged minority group is sufficiently numerous and geographically compact to compose a majority of a single-member district; (2) members of the minority group are politically cohesive; and (3) white bloc voting is usually sufficient to defeat the minority's preferred candidate. See generally id. at 30; see also Growe v. Emison, 507 U.S. 25, 40-41 (1993) (holding that Gingles applies to single-member districting schemes). To prevail, a plaintiff must "prove each of these preconditions by a preponderance of the evidence." Reed, 914 F. Supp. at 863 (citing Gingles, 478 U.S. at 50).

Though Plaintiffs must satisfy the three Gingles preconditions in order to prevail on their claim, the preconditions alone "are not sufficient to prove a § 2 violation." NAACP, Inc. v. City of Niagara Falls, N.Y., 65 F.3d 1002, 1019 (2d Cir. 1995) (citing Johnson v. De Grandy, 512 U.S. 997, 1011 (1994)). Although it would be "a very unusual case" where a plaintiff establishes the Gingles factors and fails to establish a Section 2 violation, courts still must consider the totality of the circumstances—additional indicia that tend to show a pattern and history of discrimination and a need for redress. Id. at 1019 n.21 (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1135 (3d Cir. 1993)). This inquiry focuses on the following factors as "typically relevant to a vote dilution inquiry:"

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have

been elected to public office in the jurisdiction.

Goosby v. Town Bd. of Town of Hempstead, N.Y., 180 F.3d 476, 491 (2d Cir. 1999) ("Goosby II") (quoting Gingles, 478 U.S. at 44-45). Additional relevant factors include:

> evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous.

Goosby II, 180 F.3d at 491-92 (quoting Gingles, 478 U.S. at 45). These factors are "neither exclusive nor comprehensive." Goosby II, 180 F.3d at 492. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Gingles, 478 U.S. at 45 (quoting S. Rep. No. 97-417, 97th Cong., 2d Sess., 29 (1982)). Taking a "functional view of the process," the most important factors are the extent to which (1) minority group members have been elected in the jurisdiction, and (2) voting is racially polarized. Gingles, 478 U.S. at 48 n.15 (citing S. Rep. No. 97-417, at 28-29). If these two factors are present, other factors "are supportive of, *but not essential to*, a minority voter's claim." Id. (emphasis in original).

## III.    FINDINGS OF FACT

### A. Background

#### 1. Parties

Plaintiffs are black and Hispanic voters and residents of Albany County, New York. See Trial Tr. at 98, 226-27, 742-43, 1164; Dkt. No. 26 ("Willingham Declaration") at 1; see also Second Am. Compl. Defendant County of Albany is a municipality organized pursuant to the laws of the State of New York, and its business office is located at 112 State Street, Albany, New York, which is located within the County of Albany. Second Am. Compl. ¶ 15; Dkt. No. 258 ("Answer") ¶ 6.

Defendant Albany County Board of Elections is vested with the authority and power to conduct county elections for the offices of members of the Albany County Legislature.  Second Am. Compl. ¶ 16; Answer ¶ 6.

### 2.  County Redistricting Process

Albany County is governed by a Legislature (the "Legislature"), which is divided into thirty-nine single-member districts.  ALBANY, N.Y., LOCAL LAW NO. 2 §§ 201, 206 (2004) (original version at Local Law No. 8 (1993)) ("County Charter");[5] see also JPS ¶ 3.  The Legislature holds an election every four years, County Charter § 202, with the next general election to occur in November 2015, see id.  Following each federal census, the Legislature must appoint a reapportionment commission ("Redistricting Commission" or "Commission") to evaluate the County's legislative districts and propose new districts if necessary based on population changes. Id. § 207; see also Trial Tr. at 578.  The Commission makes recommendations to the Legislature in the form of a proposed local law.  See County Charter § 207.  The Legislature then votes whether to adopt the proposed law and send it to the County Executive for signature into law.  See JPS ¶ 3.

### 3.  Prior Section 2 Litigation

#### a.  1991 Litigation

Following the 1990 census, the County drew district maps containing only one MMD. Minority voters alleged a violation of Section 2, arguing that the data reflected in the census warranted creating three MMDs.  Ex. P20 ("1991 Consent Decree") ¶¶ 10-15, 20.  Pursuant to the 1991 Consent Decree, the County created a new redistricting plan containing three MMDs.  JPS ¶ 1.

---

[5] The Court may take judicial notice of published state and local laws, and court decisions. See Reardon v. Keating, 980 F. Supp. 2d 302, 306 (D. Conn. 2013); see also FED. R. EVID. 201.

As part of the Consent Decree, the County admitted that "[t]he black population of Albany County is characterized by sufficient numerosity, political cohesion, and geographic concentration within particular areas of the county such that" three MMDs were warranted.  Id. ¶ 17.  The plan included "three majority Black and Hispanic legislative districts."  Id. ¶ 24.

### b.  2003 Litigation ("Arbor Hill" Litigation)

Following the 2000 Census, the County adopted a redistricting plan that maintained three MMDs and included only black voters in its definition of "minority."  Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, No. 03-cv-502, 2003 WL 21524820, at *1-2 (N.D.N.Y. July 7, 2003) ("Arbor Hill I"), report and recommendation adopted sub nom. Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 281 F. Supp. 2d 436 (N.D.N.Y. 2003) ("Arbor Hill II").  In 2003, minority voters again brought suit, alleging that the increase in the minority population warranted four MMDs consisting of black and Hispanic voters.  Id.  U.S. Magistrate Judge David R. Homer found that the plaintiffs were likely to prevail on the merits of their case and therefore granted a preliminary injunction; the District Court adopted Judge Homer's Report-Recommendation in its entirety.  See generally id.

Following the 2003 Litigation, the County created a redistricting plan with four MMDs pursuant to a consent decree.  JPS ¶¶ 2, 20.  This redistricting plan, Local Law E, included in its definition of minority both black and Hispanic voters.[6]  See Ex. D103 ("Plaintiffs' 2003

---

[6] Local Law E used "non-Hispanic DOJ black" ("DOJ black") to define black voters for the purpose of drawing MMDs.  See Pls.' 2003 Objs. at 6.  This refers to "all non-Hispanic individuals who, in the Census, identified themselves as Black only, or as Black and white, but not non-Hispanic persons who identified themselves as Black and another minority race."  JPS ¶ 24 (citing Guidance Concerning Redistricting and Retrogression Under Section 5, 76 Fed. Reg. 7470).  This definition is commonly used by municipalities in redistricting.  Trial Tr. at 857-58.

Objections") at 6.  Local Law E included the following population numbers in its MMDs:

**Table 1:** Minority Voting Age Population ("VAP") Figures in Local Law E

| District | DOJ Black VAP | Hispanic VAP | Combined VAP |
|----------|---------------|--------------|--------------|
| 2 | 49.16% | 8.47% | 57.63% |
| 3 | 51.16% | 5.16% | 56.37% |
| 4 | 54.16% | 5.27% | 59.43% |
| 5 | 52.3% | 6.10% | 58.4% |

Id.

Magistrate Judge Homer issued a Report-Recommendation approving of Local Law E. Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, No. 03-CV-502, 2003 WL 22139798, at *3, 9 (N.D.N.Y. Sept. 17, 2003) ("Arbor Hill III") report and recommendation adopted, 289 F. Supp. 2d 269 (N.D.N.Y. 2003) ("Arbor Hill IV") rev'd on other grounds Arbor Hill Concerned Citizens v. Cnty. of Albany, 357 F.3d 260 (2d Cir. 2004) ("Arbor Hill V").

The 2003 plaintiffs objected to Magistrate Judge Homer's decision, arguing that the County's remedial plan divided communities of interest, that the minority population figures in Local Law E were not high enough to create effective MMDs, and that MMDs require more than a "bare majority" minority population in order to combat low voter turnout and allow minority voters to elect their candidates of choice.  Pls.' 2003 Objs. at 2, 3.  The 2003 plaintiffs also objected to the inclusion of Hispanic voters in calculating population figures for effective MMDs.  Id. at 18 n.13. They proposed the following alternative remedial plan:

**Table 2:** Minority Voting Age Population ("VAP") Figures in Plaintiffs' Alternative Remedial Plan

| District | DOJ Black VAP | Hispanic VAP | Combined VAP |
|----------|---------------|--------------|--------------|
| 2 | 54.03% | 7.88% | 61.91% |
| 3 | 53.91% | 6.12% | 60.03% |
| 4 | 51.22% | 4.34% | 55.56% |
| 5 | 57.72% | 6.10% | 63.82% |

10

Id. at 6-7. The district court rejected the plaintiffs' objections and adopted the Report-Recommendation in its entirety. See generally Arbor Hill IV, 289 F. Supp. 2d at 277.

At trial in the instant case, several witnesses who had been involved in the 2003 Litigation discussed the plaintiffs' objections. One of Plaintiffs' expert witnesses, Aaron Mair ("Mair") testified that in 2003, plaintiffs primarily objected to the County's methods. See Trial Tr. at 1399-1400. Plaintiffs' other expert, Dr. Baodong Liu, clarified that in 2003, he had stated that plaintiffs' plan was preferable, but he did not think that Local Law E would preclude minorities from electing their candidates of choice. See id. at 297-98. Anne Pope ("Pope"), however, testified that it would not be unreasonable for the County to "try to achieve ideal districts." See id. at 499-500.

### 4. 2010 Census

The 2010 census figures for New York State were released on March 24, 2011. JPS ¶ 8. Relevant populations for purposes of this case include non-Hispanic single-race black ("single-race black"), non-Hispanic DOJ black ("DOJ black"), Hispanic, and non-Hispanic white ("white"). Single-race black refers to individuals who select only "Black or African American" in the racial group category on the census, and do not also select Hispanic or any other race.[7] Trial Tr. at 855. DOJ black refers to "all non-Hispanic individuals who, in the Census, identified themselves as Black only, or as Black and white, but not non-Hispanic persons who identified themselves as Black and another minority race." JPS ¶ 24 (citation omitted).[8]

---

[7] "Single-race black" is generally not used in redistricting because it is not "sufficiently comprehensive" of a minority population. Trial Tr. at 858.

[8] The Court recognizes that this definition does not include Hispanic individuals that may identify as black, nor multiracial individuals identifying as a combination of races other than "White" and "Black or African American," and thus may not be fully inclusive of the population that identifies as black. However, this definition ensures that the operative black and Hispanic

The 2010 census showed that Albany County had a population of 304,204, with a voting age population ("VAP") of 243,573. <u>Id.</u> ¶¶ 4, 20. The County's single-race black population was 36,396, or 12% of the County's total population, and the single-race black VAP was 26,196. <u>Id.</u> ¶ 21. The County's DOJ black population was 39,087, or 12.9% of the County's total population, and the DOJ black VAP was 27,248, or 11.2% of the County's VAP. <u>Id.</u> ¶ 22. The County's non-Hispanic white population was 231,152—76% of the total population; the non-Hispanic white VAP was 192,347—79% of the total VAP. <u>See</u> Ex. P63 ("Albany Census Data").

Since 2000, the single-race black population in the County has increased by 15.5%. Ex. P62 ("Cooper Declaration") at 3; <u>see also</u> Trial Tr. at 863.[9] "During the same period, the non-Hispanic white population of the [County] decreased by 4.1%," declining from 81.79% of the County's total population in 2000 to 76% in 2010. Cooper Decl. at 3-4; <u>see also</u> Trial Tr. at 862-63. Much of the growth in the minority population of Albany County has occurred in the City of Albany (the "City"), specifically in the eastern part of the City. <u>See</u> Trial Tr. at 868-69, 1085, 1404-06, 1410-11; <u>see also</u> Cooper Decl. ¶ 6 (noting that "71.9% of the County's non-Hispanic blacks . . . reside . . . within the City of Albany."). The non-Hispanic black population makes up 32% of the City's total population and 27% of the City's VAP. <u>See</u> Albany Census Data. Within the City, the South End, Arbor Hill, West Hill, and North Albany are predominantly minority neighborhoods. <u>See</u> Trial Tr. at 7-8, 455.

---

populations do not overlap for the purposes of VRA litigation.

[9] Plaintiffs' expert William Cooper, who conducted this analysis, testified that he used single-race black demographic data because he evaluated census data from 1980-2010. The census did not allow a person to choose multi-race categories prior to 2000; therefore, Cooper used single-race black to analyze consistent numbers over the relevant time period. See Trial Tr. at 862-64.

*5. 2011 County Redistricting*

a.  The Commission

On January 10, 2011, the Legislature appointed a Redistricting Commission pursuant to the

County Charter.  JPS ¶ 5.  Members of the Commission were chosen by then-Chairman of the

Legislature Daniel McCoy ("McCoy"), Trial Tr. at 625-26, and included Democratic County

Legislator and Majority Whip Shawn Morse ("Morse"), the Commission's chair; Joseph Rabito

("Rabito"); Thomas Nardacci ("Nardacci"); Democratic Legislator Norma Chapman ("Chapman");

Democratic Legislator Thomas Cotrofeld ("Cotrofeld"); Republican Legislator Christine Benedict

("Benedict"); and Peter Kermani ("Kermani").  See Ex. P31; see also Trial Tr. at 579.  Democratic

County Legislator Lucille McKnight ("McKnight") later replaced Rabito on the Commission, after

Rabito resigned.  Trial Tr. at 579-80; see also Exs. P108, P146.

Under New York State Election Law, the primary election following the 2010 census was

scheduled for September 13, 2011.  See N.Y. ELEC LAW § 8-100(1)(a).  The first day on which

candidates could designate petitions was June 7, 2011.  Dkt. Nos. 82, 84, 85 (collectively, "PI

Hearing Transcript") at 277.  The Commission intended to have a redistricting plan approved by

June 6, 2011, to allow time for the petitioning process.  See Ex. P51 ¶ 5.

John Merrill ("Merrill") was hired to assist the Commission in drawing district maps.  See

Trial Tr. at 1189-90; Ex. P32.  Merrill is a former County employee who had worked for the County

for over thirty years, including in the planning department.  See Trial Tr. at 1184-85.  Merrill had

previously created district maps for the County following the 2003 Litigation.  Id. at 1185-86.

Thomas Scarff ("Scarff"), a policy analyst for McCoy at the time, served as the Commission's

secretary and took notes at each of the Commission's meetings.  Id. at 1355.  Around March 2011,

Thomas Marcelle ("Marcelle"), current County Attorney and then-counsel to the Republican Minority in the Legislature, was asked to serve as counsel to the Commission.[10]  See id. at 1230, 1262.  Marcelle had previously been involved in the 2003 Litigation.  See Dkt. No. 157 at 13.

The Commission held its first meeting on February 24, 2011.  JPS ¶ 6.  At that meeting, Morse stated that the Commission should conduct itself in an "open and transparent manner," Ex. P3 at 1, and that the County was required to design a plan that complied with the VRA, Trial Tr. at 1302.  Following the release of the census data on March 24, 2011, Merrill began working on draft maps, Ex. P51 ¶¶ 8-9, and shared preliminary draft maps with Morse, see Exs. P128, P155, P156.  The Commission held six public hearings throughout the County between March 24 and April 23, 2011, including one in an MMD.  See JPS ¶¶ 7-13; Exs. P4 through P9; see also Trial Tr. at 1326.  Not every Commissioner attended every hearing.  See Exs. P1 through P9.

### b.  Definition of Minority Used in Redistricting

During the redistricting process, Merrill reviewed Magistrate Judge Homer's July 7, 2003, Report-Recommendation.  See Exs. P51 ¶ 12; P105; see also Ex. P107.  At the time, Merrill understood the court's definition of minority to include those who identified as: (1) non-Hispanic black; (2) non-Hispanic, two or more races; and (3) Hispanic or Latino.  Ex. P51 ¶ 12; see also Trial Tr. at 1193-94.  However, Merrill did not include the Hispanic population in his definition of minority when drawing maps for the Commission.  See Trial Tr. at 1203; see also Ex. P315

---

[10] Plaintiffs argued at trial that Marcelle had no formal "attorney-client" relationship with the Commission, and therefore did not actually serve as counsel.  See generally Trial Tr. at 1230-41; see also Dkt. No. 422 ¶ 79 & n.3.  Magistrate Judge Homer already issued a decision on this matter finding that Defendants had established an attorney-client relationship between Marcelle and the Commission.  Dkt. No. 157 at 16-18.  Plaintiffs did not object to this portion of Magistrate Judge Homer's decision in their appeal.  See generally Dkt. No. 159; see also Dkt. No. 178 at 9 n.7.  The Court sees no reason to disrupt the prior decision.

("Merrill Deposition") at 185-86.

Merrill initially stated that when he drew the district maps, he used single-race black as the relevant minority population for drawing MMDs. See Merrill Dep. at 176-77; 200-201. Single-race black is generally considered a very narrow definition of black voters, and therefore is not often used in redistricting. Trial Tr. at 858. Plaintiffs' expert William Cooper ("Cooper") testified that after seeing Merrill's report, "it appears that he is using a much more restrictive definition[:] . . . single-race non-Hispanic black." Id. at 896. Consequently, the Court finds the Commission's draft maps and final plan used the restrictive, single-race black definition of minority.[11]

The Commission never discussed as a group which definition of minority would be used to create MMDs. See Ex. P310 at 202-04; see also Trial Tr. at 723-24. When one commissioner inquired into the definition being used, she was told that MMDs would be drawn using a definition of minority that included mixed-race black and Hispanic individuals. See P111; Trial Tr. 726-27.

When members of the public inquired into the definition of minority being used to draw MMDs, they were told that the Commission had used combined mixed-race black and Hispanic population figures. See Ex. P10; see also Trial Tr. at 600-01, 1248, 1403. The Commission eventually informed the public at the May 23 hearing that it had not included Hispanic or mixed-race black individuals in calculating the minority population for MMDs. See Trial Tr. at 729.

c. Draft Maps

In drawing draft maps for the County, Merrill took a number of factors into consideration,

---

[11] Defendants cite JPS ¶ 25 to support their contention that Merrill used the DOJ black definition of minority in creating maps for Local Law C. See Defs.' Tr. Br. at 17. However, JPS ¶ 25 merely states the DOJ black population figures under Local Law C; it does not stipulate that these figures were used in redistricting.

including compactness, contiguity, municipal boundaries, keeping together communities of interest, population increases in suburban areas of the County, protection of incumbents, and the 2003 plaintiffs' objections to the prior remedial plan. See generally Ex. P51. The record indicates that incumbency protection was an important priority for the Commission. See id. ¶¶ 10, 13; see also Exs. P148, P152. However, most commissioners were generally uninvolved in the mapmaking process. See, e.g., Trial Tr. at 582-84, 594-95. The Commission never met to discuss the number of MMDs or the definition of minority to be used in creating them. Id. at 582-84.

Merrill attempted to create a fifth MMD using the single-race black definition of minority, but was ultimately unsuccessful. See Ex. P51 ¶ 15. Merrill indicated the he could not "guarantee that someone won't come up with a different solution, but [he had not] seen it yet and [was] open to suggestions." Id. Morse recalled Merrill stating that he was able to create a fifth MMD, but was not satisfied with it because of its shape, and the fact that the minority population was "less than 60 percent." Ex. P314 ("Morse Deposition") at 125. At a caucus meeting on May 23, 2011, Merrill told the caucus that the data showed that a fifth MMD was possible, but that he was told to create only four MMDs. Trial Tr. at 728-29.

### d. Public Involvement in Redistricting Process

Though there were public hearings about redistricting, the Commission did not plan to give the public a draft plan due to time constraints. See Ex. P9. At the April 23 meeting, Pope stated that she believed the process was moving too fast and that the community was not being given enough information about the redistricting process. Ex. P9; Trial Tr. at 234-35. She also raised concerns about the lack of a fifth MMD at both the April 23 and May 17, 2011, hearings. Trial Tr. at 234, 241; see also Ex. P9. At the April 23 hearing, the Commission told Pope it would consider a

fifth MMD. Ex. P9; see also Trial Tr. at 240. However, McKnight testified that the Commission

never did so. See Trial Tr. at 591. Pope attempted to get additional information about the

redistricting process outside of these hearings, but was unable to obtain any further information. Id.

at 238-40. At a later public hearing, Pope again requested more information about the redistricting

process, but never received any. Id. at 240. At the hearing on May 17, 2011, the Commission

informed Pope and the public that a fifth MMD would not be possible given the census figures. See

id. at 241. No further explanation was provided to the public or to certain commissioners about any

work or consideration that went into creating a fifth MMD. See Ex. P109; Trial Tr. at 595.

### e. Local Law C

On May 6, 2011, the Commission held a public hearing at which the commissioners voted to

send a recommended redistricting plan to the Legislature. Id. ¶ 14. This was the first time that a

proposed map had been presented to the public. See Exs. P304 ("May 6 Hearing Transcript") at 18-

19; P10. At this hearing, the Commission informed the public that it was only able to create four

MMDs using the definition of minority from Magistrate Judge Homer's opinion, and explicitly

stated that the Commission included in its definition of minority both Hispanic and mixed-race

black individuals. See May 6 Hrg. Tr. at 4-5. At the end of the hearing, the Commission voted

unanimously to send the plan to the Legislature. See id. at 36-37.[12]

The plan sent to the Legislature became known as Local Law C. JPS ¶ 14. The Legislature

held a public comment period regarding Local Law C on May 9, 2011, id. ¶ 15, and additional

public hearings on May 17, May 19, and May 23, 2011, id. ¶¶ 16-18. Though proposed Local Law

---

[12] McKnight stated that she voted for the plan because the Commission had not done enough to create a fifth MMD and she hoped the Legislature would fix the problems with the plan. See Trial Tr. at 729-30.

C was released to the public, it was released only in PDF form. See Ex. P12. Block equivalency files—which are required to analyze a redistricting plan in detail—were not released before Local Law C was approved by the Legislature. See id.; Ex. P164.

At the May 9 hearing, several community members, including Clifton Dixon, Mair, and Pope expressed dissatisfaction with the lack of community involvement during the redistricting process. See generally Exs. P12 through P15; Trial Tr. at 607. Following this hearing, Mair circulated a report with the population demographics from proposed Local Law C, and stated that he believed the plan showed evidence of "packing" minority voters into four MMDs.[13] See Ex. P150; Trial Tr. at 1449.

At the May 17 pubic hearing, Pope reiterated her request that the Commission provide the data for proposed Local Law C and explain its methodology. See Ex. P16; Trial Tr. at 449-50. She stated that the minority community "would be looking for at least one additional [MMD]." Ex. P16 at 6. Carlos Gonzalez similarly stated at the same meeting that he believed the MMDs provided by the Commission were "not representative of [his] rights." Id. at 8. Mair stated at this hearing that he believed that proposed Local Law C packed minorities into four MMDs, see id. at 17-18, and that he would draw and submit a new district map, id. at 33-34.

On May 22, 2011, Mair distributed a draft plan to several individuals, including many County legislators. Ex. P138. At the hearing on May 23, 2011, Pope and County Legislator

---

[13] "Packing" and "cracking" refer to two ways in which minority votes can be diluted in the context of single-member districts. "'[D]ilution of racial minority group voting strength may be caused' either 'by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority.'" Voinovich, 507 U.S. at 154 (citing Gingles, 478 U.S. at 46, n.11). The former constitutes "cracking" and the latter, "packing." See Trial Tr. at 873-74.

Gordon urged legislators to vote against Local Law C, see Ex. P305 at 57-58, 80, and McKnight

suggested that the Legislature use Mair's plan as a starting point to draw new districts, id. at 83-84.

The Legislature voted in favor of Local Law C. JPS ¶ 18. Following the Legislature's vote,

many community members, including McKnight; Debra Brown Johnson, President of the Albany

NAACP; and numerous constituents, urged then-County Executive Michael Breslin ("Breslin") to

veto Local Law C. See generally Exs. P19, P61, P120; Trial Tr. at 607-09.

On June 6, 2011, Breslin signed Local Law C into law. JPS ¶ 19. Local Law C included

four MMDs, in Districts 1-4, see id. ¶ 24-25, with DOJ black voting-age populations of 59.16% in

District 1; 55.39% in District 2; 61.75% in District 3; and 55.09% in District 4, id. ¶ 25.[14] The

population of districts under Local Law C have a maximum population deviation of 9.81%, a

"minor deviation." See Ex. D226 at Ex. D.[15]

### 6. Alternative Plans

#### a. Arbor Hill Environmental Justice ("AHEJ") Plan

The plan distributed by Mair on May 22 became known as the AHEJ Plan. The AHEJ Plan

created five MMDs with DOJ black voting-age populations of 52.17% in District 1; 52.66% in

District 2; 52.67% in District 3; 50.44% in District 4; and 51.56% in District 6. JPS ¶ 27. The

---

[14] As discussed *supra*, the Court finds that non-Hispanic DOJ black was *not* the definition used by Merrill in drawing the districts for Local Law C. The Court merely notes here the relevant population figures as they exist under the enacted plan.

[15] Legislative districts must contain populations that are approximately equal, subject to slight deviations. See JPS ¶ 4; see also Reynolds v. Sims, 377 U.S. 533, 579 (1964). The 2010 Census showed an Albany County population of 304,204. With 39 districts in the Legislature, each proposed district should have an optimum population of 7,800 persons. Population deviations reference the deviation in each district from the population figure that would form these equal districts. "[A]n apportionment plan with a maximum population deviation under 10% falls within [the] category of minor deviations." Brown v. Thomson, 462 U.S. 835, 842 (1983).

AHEJ Plan was created in accordance with accepted principles of redistricting, including low variance in the population numbers for each district, avoiding conflicts between incumbents, and keeping neighborhoods and towns together. See Trial Tr. at 1463-65. The districts in the AHEJ Plan have a total population deviation of 3.49%. See Ex. P67. The Commission did not consider the AHEJ Plan. See Ex. P313 at 145-46; see also Trial Tr. at 1352.

### b. Plaintiffs' Illustrative Plans

Plaintiffs created several illustrative plans to show that it is possible to create five MMDs based on the 2010 census figures. Plaintiffs' Illustrative Plans 1 and 3 both create five MMDs using either DOJ black or DOJ black plus Hispanic as the relevant minority population.[16] See Ex. P69; JPS ¶¶ 29-30. Plaintiffs demonstrate that there are other ways to create five MMDs in Albany County. See Trial Tr. at 906, 1465-66.[17] Cooper testified that using the 2010 census data, it was possible to create five MMDs with DOJ black populations of at least fifty-four percent each. Id. at 963-64. Cooper also believes that it is possible to draw five MMDs using the more restrictive, single-race black definition of minority. See id. at 897. In creating Plaintiffs' illustrative plans, Cooper took into consideration traditional redistricting principles including compactness, contiguity, population deviations, incumbency protection, and keeping neighborhoods and former election districts together. Id. at 897-98.

### 7. City Redistricting Process

The City's 2012 redistricting process was far more transparent than its County counterpart.

---

[16] Illustrative Plan 1 merges the AHEJ Plan with Local Law C, in order to "show that it is possible to create a plan with one additional minority-majority district, without dramatic across-the-board changes to the Local Law C Plan." Ex. P62 ¶ 31.

[17] Plaintiffs' Illustrative Plan 2, for example, also creates five MMDs. See Ex. P71.

The City's redistricting commission held numerous meetings in minority neighborhoods. See Trial Tr. at 751-52. The City commission provided multiple draft maps to the public via its website, see id. at 125, and received feedback from the public on these maps, see id. at 754-55. The definition of minority that the commission used to create MMDs was disclosed on the draft maps and on the commission's website. Id. at 129. In addition to the draft maps released to the public, the City commissioners discussed numerous other possible maps, see id. at 753-54, and reviewed and discussed the census data, see id. at 126-27.

**B. First Gingles Precondition: Compactness and Numerosity of Minority Community**

In a Memorandum-Decision and Order dated January 28, 2014, the Court granted summary judgment for Plaintiffs on the first Gingles precondition as to the black population in Albany County. See generally Dkt. No. 253 ("Summary Judgment Order"). The Court found that "the black community in the County of Albany is sufficiently large and geographically compact to form five majority-minority districts." Id. at 31.

**C. Statistical Methods Used to Determine Voter Behavior**

Plaintiffs presented statistical evidence to support their claim of vote dilution. As this analysis is relevant to both the second and third Gingles preconditions, the Court will discuss the statistical methods used before proceeding to more detailed findings of the results as they relate to each precondition.

Plaintiffs' expert Dr. Baodong Liu ("Dr. Liu") analyzed forty-six bi-racial elections in Albany County between 1991 and 2011. See generally Ex. P99. Bi-racial elections are those "involving both white [and] black candidates." Ex. P82 at 3. In order to determine whether an

election exhibited racially polarized voting, or bloc voting,[18] Dr. Liu engaged in a multi-step analysis. First, he "look[ed] at [whether] a minority group . . . prefer[red] a particular candidate"; he then "analyze[d] whether the same candidate receive[d] the same level [of] support from the white majority"; if the levels of support differed, he analyzed whether the level of disparity in voter preferences revealed racial bloc voting. Trial Tr. at 265-66. Dr. Liu also testified that the minority-preferred candidate is not necessarily the minority candidate, id. at 266, and that racial bloc voting can exist even in an election where a minority candidate wins, id. at 266-67. Dr. Liu based his analysis on DOJ black voting trends. See id. at 264.

Thirty-four of the elections Dr. Liu analyzed were single-member district elections, that is, elections in which voters can only vote for one candidate. See generally Ex. P99; see also Trial Tr. at 263. Of these, nine were endogenous elections. Elections are referred to as endogenous when they "occur[] in the jurisdiction at issue and for the office at issue." Rodriguez v. Pataki, 308 F. Supp. 2d 346, 389 (S.D.N.Y.) aff'd, 543 U.S. 997 (2004). The endogenous elections for the purpose of this trial are County Legislature elections. All other elections are referred to as exogenous elections. To analyze single-member district elections, Dr. Liu used the Ecological Inference ("EI") method. Trial Tr. at 259; see also Ex. P99.

Dr. Liu also analyzed twelve multi-member district elections. See generally Ex. P99. Multi-member elections are those in which voters can vote for multiple candidates. See Trial Tr. at 263, 281-82. To analyze multi-member elections, Dr. Liu used homogenous precinct analysis, which is the only way to analyze racial bloc voting in this type of election. Id. at 262-63. For multi-

_____

[18] In his analysis, Dr. Liu used the term "racially polarized voting" to describe bloc voting. The Court uses the terms "racially polarized voting" and "bloc voting" interchangeably.

member elections, Dr. Liu only analyzed the first-place winner of elections because "the first-place winner would receive significant support . . . and then [one can compare] whether this first-place winner is indeed a preferred candidate of one racial group or another." Id. at 283-84. Dr. Liu explained that this method is well-accepted in political science, and is the "only method [by which] one can draw reasonable and [valuable] conclusion[s] about a multi-member" district election. Id. at 284.

Both ecological inference and homogenous precinct analysis have been accepted by courts in Section 2 cases. See, e.g., Rodriguez, 308 F. Supp. at 388 (accepting ecological inference analysis); United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 441 (S.D.N.Y. 2010) (same); see also Large v. Fremont Cnty., Wyo., 709 F. Supp. 2d 1176, 1193 (D. Wyo. 2010) (noting that homogenous precinct analysis was accepted by the Supreme Court in Gingles). The Court also finds that these methods are well-accepted in political science and therefore accepts Dr. Liu's statistical methods.[19]

However, Dr. Liu analyzed several elections that the Court finds not probative of voting patterns, and therefore excludes them from the present analysis. The first is the 2011 County Legislature District 6 primary. In this election, the minority candidate dropped out of the race before Election Day. See Trial Tr. at 271-72; Exs. P91 at 10; D6. Dr. Liu noted that this election skews his findings, Ex. P91 at 10, and Defendants similarly argue that it is uninformative, see Defs.' Tr. Br. at 62-63. Consequently, the Court finds that this election is not probative of voting patterns. In addition, the 2005 City Common Council Ward 7 and 8 primary elections were Republican

---

[19] Defendants raise several challenges to Dr. Liu's methods and analysis, which are addressed in the Court's Conclusions of Law, *infra*.

primary elections in which only forty-three and seventy-five votes were cast, respectively. See Trial Tr. at 323; see also Ex. D19 at 1. With so few votes, the Court will not rely on these elections to extrapolate larger patterns of voting. Therefore, the Court will discuss Dr. Liu's single-member district election findings with respect to thirty-one elections, rather than thirty-four, and his findings about County Legislature elections with respect to the eight remaining relevant elections.

### D. Second Gingles Precondition: Political Cohesion

#### 1. Expert Reports and Testimony

Dr. Liu's analysis shows that in twenty-seven of thirty-one (87%) single-member district elections, a majority of black voters supported the minority candidate. See Ex. P99, Table 3.[20] In eighteen of these elections (58%), black voter support for the minority candidate exceeded seventy percent. See id. The four elections where black voters did not support the minority candidate were general elections in which the black-preferred candidate had already been defeated in the primary. See id. In the sixteen single-member district primary elections Dr. Liu analyzed, black voters preferred the minority candidate in every election. See id. Similarly, black voters supported a minority candidate in seven of eight (87%) relevant County Legislature elections. See id., Table 6. In the one County Legislature election where black voters did not support the minority candidate, the black-preferred candidate had already been defeated in the primary. See id. Dr. Liu also analyzed twelve bi-racial elections in multi-member districts and found that in every election, a black candidate was the first preference in black districts. See Ex. P91 at 13. Based on his findings,

---

[20] Dr. Liu's analysis indicates both electoral outcomes for minority candidates and the percentage of black voters who supported those candidates. Therefore, the Court differentiates between minority candidates, and those who were shown to be "black-preferred candidates," in Dr. Liu's analysis.

Dr. Liu concluded "that African American voters [in Albany County] are 'politically cohesive' in that they have overwhelmingly preferred African American candidates as their choices in biracial or multiracial elections involving black and white candidates." Ex. P91 at 6-7; see also Trial Tr. at 269.

### 2. Anecdotal Evidence

In the past two VRA lawsuits involving Albany County, the courts found that the black community in the County was politically cohesive. See 1991 Consent Decree ¶ 17; see also Arbor Hill II, 281 F. Supp. 2d at 448. In addition, Pope and McKnight both testified that based on their experiences as members of, and working with, the black community in Albany County, they believed the black community to be politically cohesive. Trial Tr. at 491; 617-18. Evidence shows that leaders in the black community have generally supported black candidates. See, e.g., id. at 129-30, 136, 200, 615. Several witnesses similarly testified that individual members of the black community in Albany County tend to support the same candidates in elections, see id. at 28, 132, 462, 1573-75, and that the black community in the County unites behind issues such as housing discrimination, education, policing, jobs, voting rights, and health issues, id. at 137-38.

### E. Third Gingles Precondition: Racial Bloc Voting that Usually Defeats Minority's Preferred Candidate

The third Gingles precondition is a highly fact-specific inquiry, and involves an examination of elections in the political subdivision at issue and their relative probative values. Though discussed in greater detail in the Court's Conclusions of Law, *infra*, the Court notes here the elections that are most probative in this case. Because the majority of voters in Albany County, and especially in the City, are Democrats, see Trial Tr. at 1696-97, primary elections are far more probative than general elections of racial voting patterns in this case. Similarly, the Court will

accord less weight to general elections where the minority-preferred candidate was defeated in the primary. The Court will afford more weight to County Legislature and County-wide elections than to other elections taking place in subsets of the County. The Court will also weigh more heavily the results of more recent elections, and elections showing minority-preferred candidate success outside of MMDs.

### 1. Expert Reports and Testimony

Of the forty-three relevant elections Dr. Liu analyzed, twenty-seven (63%) showed racial bloc voting. See Exs. P91, Table 2; P99, Table 3. The results show racial bloc voting in eleven of twelve—or 91.67%—exogenous, multi-member, bi-racial elections, Ex. P91 at 13; Trial Tr. at 282, and in sixteen (52%) of the thirty-one relevant single-member elections analyzed, see Ex. P99, Table 3. In the sixteen relevant single-member primary elections, twelve (75%) exhibited racial bloc voting. See id. This percentage was consistent even when considering only primary elections since 2004. See id. (showing bloc voting in nine of twelve primary elections since 2004). In County Legislature elections, Dr. Liu found racial bloc voting in six of eight (75%) relevant elections, and five of seven (71%) elections since 2004. See id., Table 6.

Defendants argue that the 2007 County Legislative District 4 primary does not show racial bloc voting because there were three candidates in the election, and Dr. Liu's analysis combined black support for the two black candidates in his results. See Defs.' Reply Br. at 32. Dr. Liu's analysis shows that in this election, 76.51% of black voters supported one of the minority candidates and only 23.56% of white voters supported one of the minority candidates. Ex. P99, Table 3. Even though the analysis combines support for the two black candidates, this election still demonstrates racial bloc voting. Because there were only three candidates in this election, Ex. D15

26

at 4, Dr. Liu's results show strong support (76%) of white voters for the one white candidate, and much lower support for that candidate from black voters (23.5%). Even if black voters voted for one of the two black candidates, this election still indicates that black and white voters preferred different candidates in this election, by wide margins, and therefore racial bloc voting was present.

Dr. Liu's report showed no racial bloc voting in fifteen single-member district elections and one multi-member district election. See Trial Tr. at 275-76; Exs. P91, Table 2; P99, Table 3. For these elections, Dr. Liu analyzed whether "special circumstances" were present. See Ex. P91 at 7. Two special circumstances Dr. Liu investigated were incumbency and appointment. Dr. Liu explained at trial that incumbents enjoy advantages over non-incumbents, including name recognition, resources, and access to constituents, and that incumbency following an appointment can be particularly helpful to candidates in their subsequent elections. Trial Tr. at 280-81. This is "widely accepted" in political science. See id. at 280. Dr. Liu found that among the fifteen relevant single-member elections where racial bloc voting was not found, ten involved candidates who were incumbents, some of whom had been appointed. See Exs. P99, Table 4; P91, Table 5.

Dr. Liu's analysis of thirty-one single-member elections in the County shows that there was a black-preferred candidate in twenty-seven elections. In the other four elections, the black-preferred candidate had been defeated in the primary. Black-preferred candidates were defeated in fourteen of these elections. Ex. P99, Table 3.

In single-member primary elections, Dr. Liu's analysis shows that white bloc voting defeated black-preferred candidates (who were also the minority candidate in every election) in twelve of sixteen (75%) elections. See Ex. P99, Table 3. In the twelve primary elections where racial bloc voting was found, black-preferred candidates were defeated in every one. See id. This

trend is consistent even when considering only primary elections since 2004. See id. (showing that black-preferred candidate was defeated by white bloc voting in nine of the twelve primary elections analyzed since 2004). Dr. Liu's analysis also indicates that of the eight relevant County Legislature elections, white bloc voting defeated the black-preferred candidate in five (63%). See id., Table 6. In two elections, the black-preferred candidate was not defeated, and in one—a general election following a primary in which the black-preferred candidate was defeated—Dr. Liu's analysis showed no black-preferred candidate. See id.

Dr. Liu analyzed seven county-wide elections: the 2010 County Surrogate Court Judge primary and general elections, the 2008 District Attorney general election, the 2004 District Attorney primary and general elections, and the 2003 and 2011 Coroner elections.[21] In the 2010 Surrogate Court election, the black-preferred candidate was defeated in the primary election by white bloc voting. See Ex, P99, Table 3. The general election did not show bloc voting or the defeat of the minority-preferred candidate. Id. In all three District Attorney elections analyzed, Dr. Liu's analysis showed no racial bloc voting; the minority candidate won all three elections. Id. The winning candidate in these elections was the same individual, David Soares ("Soares"), who is African American. See Trial Tr. at 129-30, 134. Both Coroner elections analyzed show racial bloc voting, but the report indicates that the minority-preferred candidate was not defeated. Ex. P91, Table 2. However, in the 2003 Coroner election, the successful minority candidate was an appointed incumbent, see id., Table 5, and in the 2011 election, the successful minority candidate ran unopposed, see Ex. D6 at 2.

The single-member exogenous elections in Plaintiffs' expert report show slightly higher

---

[21] The Coroner elections were multi-member district elections. See Ex. P91, Table 2.

levels of success for minority-preferred candidates than did County Legislature elections.  See generally Ex. P99.  However, across all single-member exogenous *primary* elections, minority-preferred candidates were defeated at high rates.  Of all exogenous primary elections Dr. Liu analyzed, minority-preferred candidates were defeated in seven of eleven (64%) elections.  See id., Table 3.  This percentage was consistent when looking only at exogenous primary elections since 2004, which show minority-preferred candidates defeated in five of eight elections.  See id.

Dr. Liu concluded based on his analysis that "Blacks voted significant[ly] for Blacks as a group. . . . [However,] whites formed a voting block that voted differently.  In this case [white voters] preferred white candidates in bi-racial elections and the existence of [racial bloc] voting indeed [typically] led to . . . defeat of blacks [sic] preferred candidate."  Trial Tr. at 268-69; see also Ex. P91 at 4.

### 2.  Additional Relevant Elections

In their Trial Brief, Defendants ask the Court to consider more than fifty elections that have occurred over the past decade that Dr. Liu did not analyze.  See generally Defs.' Tr. Br.; see also Pls.' Rely Br. at Table A.  However, many of these elections have little to no probative value for assessing whether minority-preferred candidates are usually defeated by white bloc voting.  At least half of these elections took place in MMDs or majority-minority wards within the City.[22]  Other elections include those where a minority candidate ran unopposed.[23]  In four specific general

---

[22] These include all elections in County Legislative Districts 2-5 prior to 2011, see Pls.' 2003 Objs. at 6, and all elections in City Wards 2-5, see Defs.' Tr. Br. at 58 (conceding that Wards 2-5 were majority minority wards prior to 2012 redistricting), 60 (conceding that Wards 2-5 were majority minority wards in 2013).

[23] These include: (1) 2007 County Legislative District 13 general election, in which William Clay ran unopposed, see Defs.' Br. at 120; Ex. D14 at 6; (2) 2012 City Court Judge general election,

elections that Defendants highlight—the 2005 Ward 7 and Ward 8 general elections, the 2007

County Legislative District 4 general election, and the 2009 City Treasurer general election—Dr.

Liu's analysis shows that in each case, the minority-preferred candidate was defeated in the primary

election.  See Ex. P99, Table 3.  Defendants also ask the Court to consider the 2008 and 2012

general Presidential elections.  However, in a heavily-Democratic area such as Albany County,

general Presidential elections have minimal probative value.  After careful consideration, the Court

finds that these elections will not weigh substantially on the present analysis.[24]

In addition, several elections Defendants mention were races between two minority

candidates,[25] or were multi-member district elections.[26]  In other elections Defendants proffer, the

race of at least one candidate was not established in the record.[27]  These election results alone,

without evidence of minority-preferred candidates, or ranking for multi-member district elections,

---

where two candidates ran for two spots; and (3) 2014 County Family Court Judge election, in which
Richard Rivera won in an election where there were two candidates for two seats, Defs. Tr. Br. at
111; Ex. D1 at 3.

[24] Defendants also argue that Dr. Liu's claim that the 2008 Presidential election showed
racial bloc voting is "fraudulent" and reveals a lack of trustworthiness.  Defs.' Tr. Br. at 57-58.
However, Dr. Liu explained at trial how minority candidates can still win in racially polarized
elections, see, e.g., Trial Tr. at 266-67, and the results of his analysis in Albany County support this.
Defendants provide no evidence to suggest that Dr. Liu's assertion is untrue, let alone fraudulent.

[25] These elections include: (1) 2005 city treasurer primary and general election between
Barnette and DeWitt, see Exs. D18-19 at 2; see also Trial Tr. at 1707, 1724; and (2) 2011 City Court
Judge election between Brooks and Health-Roland, whom Defendants admit are both black, see
Defs.' Tr. Br. at 58.

[26] These include City Board of Education elections between 2004-2014, a 2013 County
Coroner election, and "four black judicial delegates elected in various Assembly Districts."  Id.

[27] These include: (1) 2013 Common Council Ward 1general election (Mannarino's race not
established on the record); (2) 2013 Legislative District 13 general election (neither candidate's race
established in the record); (3) 2014 State Assembly race (Joyce Love's race not established in the
record).

provide little probative value for considering the third Gingles precondition.

However, the Court will consider the following elections that Dr. Liu did not analyze as relevant to the analysis of the third Gingles precondition:

- 2004 County Legislature District 10 election where Daniel McCoy, a white candidate, defeated Herbert McLaughlin, a black candidate. See Trial Tr. at 1709-10;

- 2004 County Legislature District 13 election where Bill Clay, a black candidate, defeated a white candidate. See id. at 1710-11. Clay was initially appointed to the position in 2003 and won a special election in 2004, following the 2003 Litigation. Id. at 1761;

- 2012 State Committee member election where Corey Ellis, a black candidate, defeated a white incumbent. See D5 at 2; Trial Tr. at 1737;

- 2012 State Assembly 108th District election where Carolyn McLaughlin ("McLaughlin"), a black candidate, lost both the primary and general elections to a white candidate, John McDonald. See Exs. D4, D5; Trial Tr. at 1677. Testimony at trial indicates that McLaughlin was the minority-preferred candidate in the primary, as she won every minority ward. See Trial Tr. at 1142-43; see also Defs.' Tr. Br. at 59. After losing the primary, McLaughlin remained in the race as the Working Families' Party candidate. See Trial Tr. at 1066. She lost the general election by a wide margin. See id.;

- 2012 District Attorney primary where incumbent David Soares defeated a white candidate. See id. at 1736; and

- 2013 City Common Council election where Dorcey Applyrs, a black candidate, defeated Andres Rivera, a Hispanic candidate. See D3; Trial Tr. at 89, 1739. The record indicates that members of the black community supported both candidates in this election. See Trial

Tr. at 206, 545, 676.

**F. Totality of the Circumstances**

### 1. History of Voting-Related Discrimination

In previous Section 2 cases against Albany County, courts found a history of discrimination. See Arbor Hill II, 281 F. Supp. 2d at 451-52. This is the third time the County has been sued for violating Section 2. Following a special election in 2004, voters brought a lawsuit against the County and County Board of Elections for absentee ballot abuses that heavily affected two MMDs. See Trial Tr. at 571-73; Ex. P26. The County settled and agreed to systemic reforms to remedy the challenged practices. See Ex. P26.

### 2. Racially Polarized Voting

The Court's findings on racial bloc voting are discussed in detail *supra*, and will not be repeated here. However, Defendants also offer evidence to discount the presence of racial bloc voting in Albany County. In the 2011 Legislative District 3 election, for example, the white candidate was a long-time incumbent and the black candidate had been convicted of a felony in 2003.[28] Trial Tr. at 1175.

### 3. Dilution-Enhancing Voting Practices and Procedures

In recent years, the County has moved polling sites in several MMDs, causing transportation issues and discouragement for many minority voters. See Trial Tr. at 1095-98, 1169-70. The County informed voters of these changes by mail. Id. at 1097. Plaintiffs also note that the County

---

[28] Defendants offer additional explanations for bloc voting in certain elections. See Defs.' Tr. Br. at 65-66. However, these explanations appear to be based on speculative testimony by a non-expert witness that was previously stricken from the record. See Dkt. No. 403 (striking from the record portions of Matthew Clyne's testimony speculating on the reasons for electoral outcomes). The Court therefore will not consider them.

does not offer Spanish language ballots.  See id. at 1686.  Matthew Clyne, who has been a member of the County Board of Elections since 2007, id. at 1664, testified that one of the polling locations to which Plaintiffs referred was moved only a block and a half from its previous location.  See id. at 1690.  He also stated that it was moved because of concerns that the prior location was inaccessible to non-residents of the building, and because turnout had been extremely low—only thirty to forty voters routinely voted there.  See id. at 1690-91.  These changes were also part of a larger effort to reduce the number of polling places in the City generally, to offset costs from the transition to mechanical voting systems.  Id. at 1691.

### 4. Access to Slating Process

Elections in Albany County are dominated by the County Democratic Party ("Democratic Party" or the "Party").  See Ex. P323 ("Gonzalez Deposition") at 95.  The Party's endorsement confers a number of advantages on candidates, including infrastructure, manpower, and most often electoral success.  See Trial Tr. 615, 1036-37.  The Party has a Candidate Selection Committee, which hears presentations from potential candidates and makes a recommendation to the executive committee about whom to support.  See id. at 1671.  The process is open to anyone who wishes to present before the committee.  See id. at 1671-72.  The County Democratic party has endorsed at least nine minority candidates in County and City elections in the past decade, including Soares in his 2012 primary, Samuel Coleman in his 2011 County Legislature primary, and McLaughlin in her 2012 State Assembly primary.  Id. at 1674-78.

However, several witnesses discussed the difficulties minority candidates still face when seeking party endorsements.  For example, black candidates have been denied Party endorsements for reasons that seem to be mere pretense, see id. at 1045-49, 1062, 1064, and even when minority

33

candidates are endorsed, there has not always been a concerted effort to support their candidacies, see id. at 1170. Despite these difficulties, however, some minority candidates have won hard-fought victories without the Party's endorsement—Soares defeated a white incumbent in the 2004 District Attorney primary and McLaughlin won her 2009 race for Common Council President. See id. at 13, 1045-49. Significantly, in September 2014 McLaughlin was elected as Chair of the County Democratic Party, id. at 1052, traditionally the most powerful position in the endorsement process.

### 5. *Effects of Past Discrimination*

In the Arbor Hill Litigation, the court noted that the 2000 census data showed that "minorities continue to lag behind the white majority in the County in virtually all socio-economic categories, including education, employment, housing, income and mobility." Arbor Hill I, 2003 WL 21524820, at *12. The most recent census data indicates that this trend continues. There remains a wide disparity between black and white individuals in Albany County on a wide swath of socioeconomic measures. Cooper testified that the American Community Survey ("ACS") socioeconomic data from 2011-13 shows that, "across the board African-Americans . . . lag behind non-Hispanic whites in virtually every single category in the American Community Survey . . . that reflects socioeconomic well-being," and that this reflects the findings of earlier surveys. Trial Tr. at 911. The ACS data showed high levels of disparity between black and white individuals in the County in areas such as median household income, median family income, per capita income, and unemployment of the working age population. Id. at 917-19, 926; see also generally Ex. P261. The data also indicates that the poverty rate for African Americans in Albany County is approximately five times that of non-Hispanic whites. Trial Tr. at 917. Data from the City shows similar trends.

See id. at 928-29; see also Ex. P260.

Plaintiffs also presented lay testimony about the socioeconomic and health concerns of African Americans in the County, including disparate rates of health issues such as HIV, diabetes, and asthma, see Trial Tr. at 5-6, 18, 568-69; barriers to accessing health services, id. at 19-21; and greater high-school dropout rates than white students, id. at 16, 36-38, 66-67, 476. Former Deputy Commissioner of Social Services David Kircher testified that the highest level of need for the department's services and for temporary assistance programs comes from the minority communities in the City. See id. at 1602.

In addition, witnesses testified that minority voters in Albany County tend to have lower voter turnout rates than white voters. See id. at 109-12, 1693.

### 6. Racial Appeals in Campaigns

Several candidates discussed incidents of racial discrimination that they had experienced during their campaigns. See, e.g., Trial Tr. at 1064-65; Gonzalez Dep. at 37-39; Willingham Decl. at ¶ 23. However, such overt incidents were rare, and Plaintiffs do not allege that the candidates in these races made any racial appeals to voters.

### 7. Past Election of Minority Group Members

Four minority candidates have been elected to County-wide positions: District Attorney Soares; two County Coroners, Herman Thomas and Charles Smoot; and Richard Rivera, a Family Court Judge. Soares won a hotly-contested primary in 2004 against a white incumbent, see Trial Tr. at 129-30, 1703-04, and faced a primary challenger in his 2012 re-election, Ex. D5. Coroner Thomas was an appointed incumbent in his first election, see Ex. P91, Table 5, and Judge Rivera ran unopposed, see Trial Tr. at 134-35. Coroner Smoot ran unopposed in his first election in 2011,

but won a contested election in 2013.  See Exs. D2, D6.

In County Legislature elections, minority candidates have seen little success outside of MMDs.  The only minority County Legislator to be elected outside of an MMD, Bill Clay, was first appointed to the position in 2003 following the Arbor Hill Litigation and won his first race in a special election in 2004.  See Trial Tr. at 1761.  He has won two uncontested elections since then.  See Exs. D6 at 4; D14 at 6.

*8. Responsiveness to Minority Needs*

The County has made significant efforts to address health issues faced by the minority community.  For many years, the County has maintained a lead paint abatement initiative, focused on detecting lead-based paint hazards and addressing them before they harm children's health.  See Trial Tr. at 1745-46; see also id. at 661-62.  In addition, the County provides subsidized dental care at a clinic in the South End, see id. at 660-61, 1749, and maternal and prenatal care programs in Arbor Hill and the South End, id. at 1748.  The County has also done work on HIV and AIDS education in minority communities.  See id. at 660.

County Executive McCoy recently imposed a moratorium on construction of further oil facilities in the South End of the City.  Id. at 212-13.  This was an important issue to the minority community, because trains carrying oil present dangerous conditions and health hazards for the communities nearby.  Id. at 116-19, 212.  McCoy also created a Clean Air Committee, on which he asked Pope to serve.  Id. at 542.  McKnight, in her capacity as a County Legislator, held over twenty meetings in low-income communities to discuss issues related to air quality and oil trains in the City.  Id. at 566-67.

The County also recently opened a Schenectady County Community College campus in the

City of Albany. See id. at 698-700, 1333. McKnight was involved in this effort, and supported the Resolution establishing the City campus. Id. at 698-99. She also testified that she believes it is important for minorities to have close access to a community college. Id. at 699-700.

Recent years have also seen increased opportunities for minority employment in the County's education system. In the past decade, there have been two black superintendents for the Albany school districts, and there are currently four African-American principals in the Albany City School District, out of approximately thirteen. See id. at 530-31. Since Bill Barnett, who is African American, was elected as President of the City School Board, there has been an increase in the number of professionals of color employed by the school district. See id. at 191-94.

The County has also established the Albany County Land Bank, which provides funds for developing distressed and blighted properties in Albany, primarily in minority areas such as Arbor Hill, West Hill, and the South End. Id. at 683, 1333. The County Legislature has also passed resolutions which have authorized the transfer of County property to predominately black churches, non-profit, and other organizations in the minority community, see id. at 721, and to Habitat for Humanity to restore blighted properties, id. at 700-01.

In addition, the Department of Social Services and Department for Children, Youth and Family Services offer a number of programs aimed at assisting the minority community in Albany County. See id. at 1606, 1616-17, 1793-94, 1798-1800, 1803-05. In fact, as one former County official noted, the Department of Social Services' relationship with the minority community since the 1970s has evolved from combative to collaborative, as the Department and community seek to achieve common goals. Id. at 1610-13. Moreover, the County has made significant efforts to hire minority individuals, and has had an Affirmative Action policy since the mid-1990s. See id. at 561-

62.

**G. Spoliation**

In May 2012, Plaintiffs filed a Motion seeking sanctions against the County for spoliation of evidence, see generally Dkt. No. 134, which Magistrate Judge Homer denied, Dkt. No. 157. On Appeal from that Decision, the Court affirmed the denial of sanctions, but found that: (1) the County had a duty to preserve relevant evidence about the redistricting process as of January 2011; (2) the County was negligent with respect to the destruction of certain documents; and (3) Plaintiffs had not met their burden of showing relevance of the destroyed documents and prejudice. Dkt. No. 178 ("January 2013 Order") at 13, 19, 22.

At trial, two categories of "relevant" documents were discussed: Scarff's handwritten notes of the Commission's meetings and hearings, and a "Redistricting file" kept by the County Executive's office. After each meeting of the Commission, Scarff typed up his handwritten notes from the meeting. Trial Tr. at 1358. The typed notes were the same as Scarff's handwritten notes—he did not make any "material deletions [or] alteration[s]." Id. After the notes were typed, Scarff threw them away. Id. at 357. In addition, the County kept a correspondence file regarding Local Law C, including a phone log noting calls from constituents. See id. at 1432-33. The County Executive's office also received documents from the Legislature regarding Local Law C. See id. at 1433. Michael Perrin ("Perrin"), who served as Deputy County Executive during the 2011 redistricting process, see id. at 1427, testified that after a "diligent search," these documents could not be found, id. at 1433-35. In December 2011, the County Executive's office authorized the destruction of certain files, including items related to constituent issues, litigation, and correspondence. Id. at 1436. Two boxes of documents were destroyed that were not on the

38

authorization list.  Id. at 1438.  Perrin did not recall what those boxes contained.  Id. at 1443.  Perrin also testified that he did not destroy any documents related to Local Law C or redistricting and that he was unaware of anyone else who did.  Id. at 1442.

## IV.    CONCLUSIONS OF LAW[29]

### A.  Expert Testimony

As a preliminary matter, the Court will address Defendants' objections to Dr. Liu's testimony and analysis.  Defendants challenge Dr. Liu's testimony on the grounds that: (1) Dr. Liu focused on the race of candidates, rather than the minority-preferred candidate, Defs.' Tr. Br. at 51; (2) Dr. Liu's focus on bi-racial elections was too narrow because it omits relevant MMD elections where black candidates won, id. at 52; (3) Dr. Liu considered irrelevant elections from the 1990s and the Court should only consider elections that occurred since the 2003 Litigation in order to assess the current realities of the electoral system, id. at 50; (4) Dr. Liu failed to consider numerous elections, making his testimony and analysis inherently untrustworthy, see id. at 52-60; (5) Dr. Liu's analysis of multi-member elections was flawed, id. at 70; and (6) Dr. Liu's demeanor on the witness stand was "[a]t a minimum . . . recalcitrant," and his testimony is therefore unreliable, see id. at 75.

The Court has already discussed Dr. Liu's analysis of multi-member district elections, and accepted his corresponding method, homogenous precinct analysis.  Moreover, though Defendants argue that it was improper for Dr. Liu to treat "only the most popular candidate among black voters [as] the preferred candidate," Defs.' Tr. Br. at 71, this method is consistent not only with political science literature, but with Second Circuit precedent.  See City of Niagara Falls, 65 F.3d at 1017,

---

[29] To the extent parts of this section constitute additional findings of fact, they are incorporated into the Court's findings of fact.

1019 (finding error where "the district court treated successful candidates with some black support as preferred candidates, despite the fact that other unsuccessful candidates had received significantly more support" and holding that in multi-member district elections, "even if a candidate receives 50% or more of the minority vote, a court need not treat the candidate as minority-preferred if another candidate receives significantly higher support"). Therefore, Dr. Liu's focus on the first preference candidate as the minority-preferred candidate in multi-member elections was proper.

As to his analysis of minority-preferred candidates in single-member elections, Dr. Liu explicitly stated that the minority candidate was not necessarily the minority-preferred candidate, and that he did not assume as much in his analysis. Trial Tr. at 266. Furthermore, Dr. Liu's analysis indicates whether a candidate was a minority candidate *and* the percentage of minority voters who supported that candidate, allowing the Court to deduce the minority-preferred candidate by looking to whether a candidate received more than fifty percent of the minority vote.[30]

The Court finds that Dr. Liu's analysis of bi-racial elections was not too narrow. Though other elections may also be relevant, Dr. Liu explained that he used bi-racial elections for his

---

[30] In almost all elections Dr. Liu analyzed, the minority candidate was the minority-preferred candidate. See Ex. P99, Table 3. The four elections in which the minority candidate was not the minority-preferred candidate were the 2010 County Surrogate Court general election, the 2005 and 2009 Mayoral general elections, and the 2005 Ward 7 primary. See id. At trial and in their Trial Brief, Defendants contend that if a minority candidate received less than fifty percent of the minority vote, *a fortiori*, the white candidate was the minority-preferred candidate. See, e.g., Defs.' Tr. Br. at 64-67. However, this argument presumes that each election featured only two candidates. Evidence shows multiple candidates in the 2010 Surrogate Court election, see Ex. D8, the 2009 mayoral election, see Ex. D10, and the 2005 mayoral election, see Ex. D18, and Defendants have proffered no evidence indicating which of these candidates was minority-preferred. Similarly, Dr. Liu's data indicates that in these three elections, the minority-preferred candidate was defeated in the primary, see Ex. P99, Table 3, so the Court will not assume a preference in the general election. As for the 2005 Ward 7 primary, the Court has already noted that this election is not probative due to the low number of votes cast.

analysis because that is the way to analyze "whether or not racial preference is a driving force in the [decision-making] process for individual voters."  Id. at 255, 268.  Other courts have approved of this method, and noted that bi-racial elections are often the most probative in Section 2 cases.  See, e.g., Bone Shirt v. Hazeltine, 461 F.3d 1011, 1020-21 (8th Cir. 2006) ("Bone Shirt II") ("Endogenous and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate.") (citing Old Person v. Cooney, 230 F.3d 1113, 1127 (9th Cir. 2000)) (citation omitted); Rural West Tenn. African American-Affairs Council v. Sundquist, 209 F.3d 835, 840-41 (6th Cir. 2000) (approving a decision to accord greater weight to results of black-versus-white elections); see also Campos v. City of Baytown, Tex., 840 F.2d 1240, 1248-49 (5th Cir. 1988) (upholding district court decision where "the inquiry of racially polarized voting properly focused only on those contests . . . that had a minority member as a candidate."); Black Political Task Force v. Galvin, 300 F. Supp. 2d 291, 304-05 (D. Mass. 2004) (holding that minority group's ability to elect preferred candidates "is best and most easily measured in elections that offer black voters the chance to support a viable black candidate against a viable white candidate"). Though the Second Circuit has "decline[d] to adopt an approach precluding the possibility that a white candidate" can be the minority-preferred candidate, City of Niagara Falls, 65 F. 3d at 1016, and has held that uni-racial elections can be probative of voting patterns, see id. at 1016-17, there is no requirement that uni-racial elections must be considered.  The Court therefore does not find that Dr. Liu erred by only considering bi-racial elections.

Further, to the extent Defendants argue that Dr. Liu's focus on bi-racial elections was too narrow because it excluded relevant MMD elections, see Defs.' Tr. Br. at 52, black candidate success in MMDs has little probative value for assessing whether white bloc voting "usually

defeats" the minority-preferred candidate under the third Gingles precondition, since MMDs were created for the express purpose of electing minority candidates. See De Grandy, 512 U.S. at 1003-04; Black Political Task Force, 300 F. Supp. 2d at 305 (finding that the fact that a district was an MMD "rob[bed] the election of any probative force with respect to the third Gingles precondition"). Including minority-preferred candidate success in MMDs in an analysis of the third Gingles precondition "would permit white bloc voting in a majority-white district to be washed clean by electoral success in neighboring majority-[minority] districts." Old Person, 230 F.3d at 1122.[31]

The Court also finds that the time frame of Dr. Liu's analysis was proper. Dr. Liu explained at trial that he did not analyze elections after 2011 because of the deadline for his report. Trial Tr. at 257-58. Additionally, because "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election," Gingles, 478 U.S. at 57, the Court will consider the entirety of Dr. Liu's analysis.

Finally, the Court does not fault Dr. Liu for his failure to analyze certain elections. Dr. Liu testified at trial that he analyzed all elections that Plaintiffs provided to him and did not intentionally omit any bi-racial elections. See Trial Tr. at 404. Defendants argue that Dr. Liu should have at least considered additional bi-racial elections that occurred prior to 2011. See generally Defs.' Tr. Br. at 52-62. However, only three of these elections were endogenous County

---

[31] The Court notes that all of the County Legislature elections that Dr. Liu analyzed are MMDs. However, the Court nonetheless finds them probative. It is not surprising that almost all minority candidates in County Legislature elections have run in MMDs, leaving few other bi-racial endogenous elections to analyze. Though examples of minority candidate success in MMDs are less probative because the very purpose of MMDs is for minority candidates to have an opportunity to elect candidates of their choice, the inability of minority voters to elect candidates of choice *even in MMDs*, suggests that white bloc voting is especially strong.

Legislature elections; of these, all were general elections and one occurred in an MMD where the minority-preferred candidate lost in the primary. Though the Court will consider these elections, the Court does not fault Dr. Liu for not analyzing them. "[I]n the context of election challenges, the law does not require that expert opinions be supported by an exhaustive analysis of elections within the relevant period. . . . Further, even when omitted data are available, a court may properly consider whether they pertain to exogenous elections or the ones specifically at issue." Pope v. Cnty. of Albany, 687 F.3d 565, 581 (2d Cir. 2012). Therefore, the Court finds that Dr. Liu analyzed a sufficient number of elections to meet Plaintiffs' burden.

Defendants also request that the Court grant them an adverse inference regarding all elections that Dr. Liu did not analyze. See, e.g., Defs.' Tr. Br. at 53. However, because the Court does not fault Dr. Liu for failing to analyze these elections, and because Defendants had adequate time before and during trial to present evidence as to the minority-preferred candidates in these elections, the Court declines to grant Defendants' request for an adverse inference.[32]

As for Dr. Liu's demeanor at trial, the Court finds Defendants' charges that Dr. Liu was "untrustworthy" or "recalcitrant" unfounded. Dr. Liu testified credibly based on the analysis he conducted of the elections provided and the Court considers his analysis reliable.

**B. Spoliation**

"Spoliation refers to the destruction or material alteration of evidence or to the failure to

---

[32] Defendants also argue that "Dr. Liu has been criticized for his creative interpretation of Gingles' third precondition and failure to recognize victories by minority-preferred candidates." Defs. Tr. Br. at 73. However, in the case Defendants cite, Radogno v. Ill. State Bd. of Elections, 836 F. Supp. 2d 759, 773 (N.D. Ill. 2011) aff'd sub nom. Radogno v. Ill. State Bd. of Elections, 133 S. Ct. 103 (2012), the court rejected *plaintiffs'* theory of Gingles' third prong, noting specifically that it *contradicted* Dr. Liu's results. See id. at 772. Contrary to Defendants assertions, the court did not criticize Dr. Liu for his "creative interpretation" of Gingles.

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456,

465 (S.D.N.Y. 2010); see also West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.

1999). "The right to impose sanctions for spoliation arises from a court's inherent power to control

the judicial process and litigation, but the power is limited to that necessary to redress conduct

'which abuses the judicial process.'" Pension, 685 F. Supp. 2d at 465 (quoting Chambers v.

NASCO, Inc., 501 U.S. 32, 45 (1991)).

"Where . . . the nature of the alleged breach of a discovery obligation is the non-production

of evidence, a district court has broad discretion in fashioning an appropriate sanction, including . . .

to proceed with a trial and give an adverse inference instruction." Residential Funding Corp. v.

DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002). To be entitled to an adverse inference

(or some other form of sanction), a party must demonstrate:

> (1) that the party having control over the evidence had an obligation to preserve it
> at the time it was destroyed; (2) that the records were destroyed with a culpable
> state of mind; and (3) that the destroyed evidence was relevant to the party's claim
> or defense such that a reasonable trier of fact could find that it would support that
> claim or defense.

Chin, 685 F.3d at 162 (quoting Residential Funding Corp., 306 F.3d at 107).

In the January 2013 Order, the Court found that: (1) the County had a duty to preserve

relevant evidence about the redistricting process as of January 2011; (2) the County was negligent

with respect to the destruction of certain documents; and (3) Plaintiffs had not met their burden of

showing relevance of the destroyed documents and prejudice. Jan. 2013 Order at 13, 19, 22-23.

Plaintiffs have not adduced sufficient additional evidence at trial to show that these documents were

relevant. Scarff's handwritten notes were the same as his typed notes, of which Plaintiffs have

copies. Additionally, there is insufficient evidence in the record to suggest that the destroyed documents related to the 2011 redistricting process, or Local Law C. Therefore, the Court will not grant Plaintiffs an adverse inference regarding these documents.

### C. Vote Dilution Claim

In order to prevail on their claim that Local Law C diluted the voting strength of black voters in Albany County, Plaintiffs must show that: (1) the black community is sufficiently numerous and geographically compact to compose five MMDs; (2) members of the black community are politically cohesive; and (3) white bloc voting is usually sufficient to defeat the preferred candidate of the black community. See generally Gingles, 478 U.S. 30. Once Plaintiffs have met that burden, the Court must consider whether the totality of the circumstances supports a finding of vote dilution. See id. In the Summary Judgment Order, the Court found that the non-Hispanic black population in Albany County was sufficiently numerous and geographically compact to comprise five MMDs, and therefore the first Gingles precondition is satisfied. Summ. J. Order at 24-26.

### 1. Probative Elections

"The proper focus for the second and third Gingles factors is 'the probative value of the proffered evidence as an indicator of the voting behavior of the relevant [political subdivision].'" City of Niagara Falls, 65 F. 3d at 1012 (citing Westwego Citizens for Better Gov't v. City of Westwego, 872 F.2d 1201, 1209 (5th Cir. 1989)). Certain elections are more probative than others of minority electoral success in the County. Because the majority of voters in Albany County, and an even higher percentage in the City, are Democrats, see Trial Tr. at 1696-97, the Court finds that primary elections are more probative than general elections of racial voting patterns in this case and will therefore afford them greater weight. Similarly, the Court will give less weight to general

elections where the minority-preferred candidate was defeated in the primary.  See City of Niagara Falls, 65 F.3d at 1017 (finding error where "the district court apparently gave equal weight to the results of general and primary elections, even when a candidate strongly preferred by minority voters lost the primary election").

The Court will also accord more weight to endogenous County Legislature elections and other County-wide elections than to City and state elections, as they are more probative of voting patterns in the relevant political subdivision in this case—the County.  See Pope, 687 F.3d at 581 (citing Goosby II, 180 F.3d at 497); see also City of Niagra Falls, 65 F.3d 1015 n.16 ("The parties, as well as the district court, focus on the City Council elections in their analysis.  This approach makes sense, since it is the City Council election scheme that is being challenged.").

The Court also finds especially probative bi-racial elections, see, e.g., Bone Shirt II, 461 F.3d at 1020-21, and elections where minority candidates were successful outside of MMDs, see De Grandy, 512 U.S. at 1003-04; Old Person, 230 F.3d at 1122.  In addition, the Court finds that more recent elections are more probative.  See Uno v. City of Holyoke, 72 F.3d 973, 990 (1st Cir. 1995).  Finally, the Court will give less weight to elections where minority candidates ran unopposed.  See Gingles, 478 U.S. at 51.

### 2. Political Cohesion

To prevail on their claim, Plaintiffs must show that the black community in Albany County is politically cohesive.  Gingles, 478 U.S. at 51.  One way of proving political cohesion is to demonstrate "that a significant number of minority group members usually vote for the same candidates."  Id. at 56 (citation omitted).  "Unlike the first [Gingles] prong, which has an established bright-line test of 50%+, there is no cutoff for political cohesion."  Fabela v. City of

Farmers Branch, Tex., No. 10-CV-1425-D, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012). "[T]he degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." Gingles, 478 U.S. at 55-56.

Political cohesion can be demonstrated through both statistical and non-statistical evidence. See, e.g., Gingles,478 U.S. at 52-58; Goosby II, 180 F.3d at 482, 498 (describing district court's use of statistics to find cohesion and affirming the decision); see also Brewer v. Ham, 876 F.2d 448, 454 (5th Cir. 1989) ("Statistical evidence is not a *sine qua non* to establish cohesion."); Sanchez v. Bond, 875 F. 2d 1488, 1493-94 (10th Cir. 1989); Summ. J. Order at 7 ("Anecdotal evidence can support a finding of political cohesion.").

### a. Statistical Evidence of Cohesion

In twenty-seven of thirty-one (87%) single-member district elections, a majority of black voters supported a minority candidate. See Ex. P99, Table 3. In eighteen of these elections (58%), black support for minority candidates exceeded seventy percent. See id. The four single-member elections where black voters did not support the same candidate were general elections where the black-preferred candidate had been defeated in the primary. See id. In primary elections, black voters preferred the minority candidate in *every* election analyzed. See id. Similarly, in all but one of the relevant County Legislature elections analyzed, a majority of black voters supported a minority candidate. See id. The twelve multi-member elections analyzed showed that in every race, a black candidate was the first place winner in majority black districts. See Ex. P91 at 13. Based on these findings, Dr. Liu concluded that "blacks voted significantly for blacks as a group." Trial Tr. at 268-69.

Black voters need not vote cohesively in every election in order for the Court to find that

they are cohesive.  See, e.g., Gingles, 478 U.S. at 59 ("[B]lack voters' support for black candidates

was overwhelming in almost every election."); see also Fabela, 2012 WL 3135545, at *11 (finding

cohesion where statistics showed "overwhelming"—that is, over 67%—support by minority voters

for minority candidates in three of five elections analyzed, and noting that 54.1% support, though

possibly only showing moderate cohesion, still showed cohesion); Large, 709 F. Supp. at 1194,

1202 (finding cohesion where "in . . . elections from 1982 to 2006, [there were] four instances of

strong cohesion and fourteen instances of moderate cohesion, for a total of eighteen cohesive

elections" out of a total of thirty-two elections) (internal citation omitted).  Expert statistical

analysis in this case shows that in a vast majority of elections, black voters preferred the same

candidates, and that this cohesion was especially strong in primary elections, which eliminate party

affiliation as a factor.  The Court therefore finds that Plaintiffs' statistical analysis supports a

finding of political cohesion among black voters in Albany County.

### b.  Anecdotal Evidence of Cohesion

Plaintiffs have also provided anecdotal evidence of cohesion among the black community in

Albany County.  First, the County did not contest the cohesiveness of the black community in either

of the two prior cases against it.  See Arbor Hill II, 281 F. Supp. 2d at 448; 1991 Consent Decree

¶ 17.  Though this alone is not conclusive of the current cohesiveness of the black community, at a

minimum it constitutes an admission that, as of those dates, the black community was politically

cohesive.  See Arbor Hill I, 2003 WL 21524820, at *9.

Plaintiffs presented testimony at trial showing that the black community in Albany County

has remained cohesive over the past decade.  Two leaders in the black community, Pope and

McKnight, testified that the black community in Albany County is cohesive in that black voters

usually vote for the same candidates.  See Trial Tr. at 491, 617-18.  Plaintiffs also presented

testimony showing that leaders in the black community supported minority candidates, see, e.g., id.

at 129-30, 136, 138-39, 200, 615, and that members of the black community typically support the

same candidates, see id. at 28, 132, 462, 1573-75.

Defendants argue that evidence that black individuals ran as candidates for the Conservative,

Republican, Green, Working Families, and Democratic parties undermines Plaintiffs' claims of

cohesion.  Defs.' Tr. Br. at 38.  However, the Court already rejected this argument in the Summary

Judgment Order, noting, "that black cohesion is not simply due to party affiliation supports

Plaintiffs' ultimate claim more than it detracts."  Summ. J. Order at 27.

Next, Defendants argue that the County's black population is not politically cohesive

because McKnight "questioned whether blacks born and raised outside the South were politically

aligned with blacks from the 'original melting pot.'"  Defs.' Tr. Br. at 38.  Though Defendants are

correct that McKnight testified to the differences between black immigrants to the United States and

black individuals whose families have a history in this country, see Trial Tr. at 670-71, 678, 687,

Defendants take these comments out of context.  The Court will not read into this testimony that the

black community in Albany County is not cohesive, nor would this alone be enough to rebut

Plaintiffs' evidence.  The court therefore finds that Plaintiffs have met their burden of showing that

the black community in Albany County is politically cohesive.

### 3.  Racial Bloc Voting that Usually Defeats the Minority-Preferred Candidate

To prevail on their vote dilution claim, Plaintiffs must also "demonstrate that the white

majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . .

—usually to defeat the minority's preferred candidate."  Gingles, 478 U.S. at 51; see also Goosby II,

180 F.3d at 491.  "This last threshold factor has been termed the 'essence of a vote dilution claim because, to be actionable, the electoral defeat at issue must come at the hands of a cohesive white majority.'"  Reed, 914 F. Supp. at 874 (internal citation omitted).  The key components of the final Gingles factor are the presence of racial bloc voting, identifying the minority-preferred candidate, and the extent to which racial bloc voting results in defeat of the minority's preferred candidate.

There is "no simple doctrinal test" for the third Gingles precondition.  Pope, 687 F.3d at 578 (quoting Gingles, 478 U.S. at 58).  "[T]he critical point is whether White voters are voting for other candidates to such a degree that [minority]-preferred candidates are consistently defeated."  Port Chester, 704 F. Supp. 2d at 442 (citing Jenkins, 4 F.3d at 1123).  To satisfy this precondition, "plaintiffs are not required to show that minority candidates *always* lose to white candidates, only that they *usually* do."  Arbor Hill I, 281 F. Supp 2d at 436 (citing Gingles, 478 U.S. at 75).  In this largely fact-driven inquiry, different circuits have developed divergent acceptable thresholds of minority success.  Compare Old Person, 230 F.3d at 1122 (recognizing that "usually" could mean "more than half of the time") with Lewis v. Alamance Cnty., 99 F.3d 600, 606 (4th Cir. 1996) ("Suffice it to say that ['usually,' 'normally,' and 'generally'] mean something more than just 51%.").  The Second Circuit has stated that the third Gingles factor "recognizes the need for some flexibility."  Pope, 687 F.3d at 578.

Indeed, there is widespread recognition that the third precondition is a fact-based inquiry.  See, e.g., Gingles, 478 U.S. at 57 (stressing the need to examine "factual circumstances"); Ruiz v. City of Santa Maria, 160 F.3d 543, 550 (9th Cir. 1998) ("[A] 'white majority' voting bloc must be read in the context of the facts presented to the court."); Uno, 72 F.3d at 989 ("[D]etermining whether racial bloc voting exists is not merely an arithmetic exercise . . . .  To the contrary, the

district court should . . . make a practical, commonsense assay of all the evidence."). "[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." Gingles, 478 U.S. at 57.

In cases where some majority-minority districts already exist, the third Gingles factor can be proved where the majority tends to vote as a bloc "to bar minority groups from electing their chosen candidates except in a district where a given minority makes up a voting majority." De Grandy, 512 U.S. at 1003-04; see also Barnett v. City of Chicago, 141 F.3d 699, 702 (7th Cir. 1998) (finding that racial bloc voting is shown where minorities almost never win unless the district is majority-minority). Moreover, primary elections can be especially probative of whether minority-preferred candidates are usually defeated by white bloc voting. See City of Niagara Falls, 65 F.3d at 1017 ("[A] focus on general elections, without regard to primary results, can fail to 'present a full picture of the extent to which white bloc voting is preventing minority-preferred candidates from electoral success.'") (quoting White v. Alabama, 867 F. Supp. 1519, 1554 (M.D. Ala. 1994)). Success of minority-preferred candidates "does 'not necessarily negate' a finding of bloc voting, particularly if 'elections are shown usually to be [racially] polarized' or the success of minority candidates in particular elections can be explained by 'special circumstances, such as the absence of an opponent [or] incumbency.'" Pope, 687 F.3d at 582 (quoting Gingles, 478 U.S. at 57).

a. Racial Bloc Voting

In Gingles, the Supreme Court defined racial bloc voting as "a consistent relationship between the race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently." 478 U.S. at 51 n.21. Having found that the black

51

community in Albany County votes as a bloc, see Gingles, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2.") (internal citation omitted), the Court now turns to whether white voters in Albany County vote sufficiently as a bloc to satisfy the third Gingles precondition. Statistical analysis showed racial bloc voting in a majority of elections analyzed; County Legislature elections and primary elections showed even higher rates of bloc voting.

Defendants argue that racial bloc voting cannot be present in Albany County because black candidates have won elections in the super-majority white County and City. See, e.g., Defs.' Tr. Br. at 5, 57-58. If all white voters voted against black-preferred candidates, Defendants argue, black-preferred candidates would never be able to win elections. See id. However, "Gingles does not require a showing that white voters vote as an unbending monolithic block against whoever happens to be the minority's preferred candidate." Jenkins, 4 F.3d at 1123 (citing Gingles, 478 U.S. at 56 (defining legally significant white bloc voting as "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes")). Rather, this inquiry requires examination of the relative levels of support from black and white voters for certain candidates and the extent of the disparity between the two. Given that racial bloc voting was present in a great majority of elections that the Court finds most probative, especially in County Legislature and primary elections, the Court finds the results of Plaintiffs' statistical evidence sufficient to demonstrate that racial bloc voting is prevalent in the County.

### b. Minority-Preferred Candidate "Usually" Defeated

Plaintiffs must demonstrate not only that racial bloc voting exists, but also that it usually

leads to the defeat of the minority's preferred candidates. <u>Gingles</u>, 478 U.S. at 51; <u>see also</u> <u>Goosby</u> <u>II</u>, 180 F.3d at 491. In general, a court may consider a candidate minority-preferred "when he or she receives support from more than 50% of the minority voters." Arbor Hill I, 2003 WL 21524820, at *10 (citing Goosby II, 180 F.3d at 493). However, even if a candidate receives support from more than 50% of minority voters, the Court need not consider that candidate minority-preferred if "another candidate receiv[ed] greater support in the primary [but] failed to reach the general election." Goosby II, 180 F.3d at 493 (citing City of Niagara Falls, 65 F.3d at 1019).

### i. Single-Member District Elections

The results of Dr. Liu's analysis show that in single-member primary elections, racial bloc voting led to the defeat of black-preferred candidates in twelve of sixteen (75%) elections. This finding is buttressed by the results of County Legislature elections.[33] In the eight relevant County Legislature elections analyzed, black-preferred candidates were defeated by white bloc voting in five (63%). In the other three elections (37%), there either was not a minority-preferred candidate, or the minority-preferred candidate was not defeated. Moreover, these five defeats occurred in an MMD, suggesting that white bloc voting was especially strong. The two County Legislature elections that Defendants offer do not alter this analysis. In the 2004 Legislative District 10 general election, a black candidate was defeated by a white candidate, and in the District 13 election, a black candidate prevailed over a white candidate. Even assuming that the black candidates in these elections were the minority-preferred candidates, which was not established at trial, these elections do not alter the fact that in the majority of bi-racial County Legislature elections, absent special

---

[33] There is some overlap between County Legislature elections and primary elections, as some of the County Legislature elections were primaries.

circumstances, minority-preferred candidates were defeated by white bloc voting.

To the extent that Defendants' added elections are more probative because they occurred in majority white districts, they still do not alter the Court's conclusion. In the District 13 election, the black candidate was appointed to the position prior to the election. In the only other majority white legislative district where a minority candidate ran, he was defeated. In conjunction with the statistical evidence presented, which shows that *even in an MMD*, black-preferred candidates were defeated by white bloc voting, the results of County Legislature elections indicate that racial bloc voting is strong enough to usually defeat minority-preferred candidates.

Defendants argue that the Court should ignore the 2004 District 1 primary, because the expert report shows that black support for the minority candidate was 51.32%, and since Dr. Liu did not report the margin of error, the Court cannot determine the minority-preferred candidate in that election. Defs.' Tr. Br. at 63-64. Though Dr. Liu's report does not indicate margins of error or confidence intervals, he testified at trial that he checked them in his analysis. See Trial Tr. at 394-95. The Court has already accepted Dr. Liu's data analysis and similarly accepts that the numbers presented in it are reliable.

Single-member exogenous elections overall show measurably more success for minority candidates than do County Legislature elections. However, in exogenous primary elections, statistical analysis still shows that in a majority of elections (seven of eleven, or 64%), black-preferred candidates were defeated by white bloc voting. In the other four primary elections, there either was not a black-preferred candidate, or the black-preferred candidate was not defeated. These primary elections are more probative of minority-preferred candidate success because they indicate that "potential black candidates often do not reach the general election because they lose in the

54

primaries." City of Niagara Falls, 65 F.3d at 1017 (citation omitted). Moreover, in the exogenous single-member elections where black-preferred candidates were successful, six involved incumbents, four of whom were appointed prior to their first elections. The Court does not highlight these details to belittle the success of these individual candidates, or to ignore that progress has been made. Rather, these circumstances indicate that levels of success observed in these elections "do[] 'not necessarily negate' a finding of bloc voting, particularly [because] 'elections are shown usually to be polarized' [and] the success of minority candidates in particular elections can be explained by 'special circumstances.'" Pope, 687 F. 3d at 582.

Similarly, the single-member exogenous elections Defendants proffer do not detract from Dr. Liu's findings. These elections include one in which a black-preferred candidate, McLaughlin, was defeated by a white candidate in the primary and general elections; one City election between two minority candidates in which testimony indicates that there was not a minority-preferred candidate; one State Party Committee election where a black candidate defeated a white incumbent; and one election in which a two-time incumbent District Attorney defeated a white primary opponent. Even assuming, *arguendo*, that minority candidates in these elections were minority-preferred candidates, minority candidates generally won only in elections where there were either only minority candidates, or the minority candidate was an incumbent. These circumstances do not alter the Court's conclusion.

Defendants argue that Plaintiffs' evidence showing that minority-preferred candidates prevailed in forty-four percent of bi-racial elections defeats Plaintiffs' claim that minority-preferred candidates were "usually defeated." See Defs.' Reply Br. at 35-36. This number appears to be based on Dr. Liu's analysis of single-member elections, which show that minority candidates were

defeated in fifty-six percent of all thirty-four elections analyzed. Ex. P99, Table 3. Defendants cite

Clarke v. City of Cincinnati, 40 F.3d 807, 812-13 (6th Cir. 1994), in which the court found that a

forty-seven percent success rate of black candidates supported by black voters was not itself

sufficient to find that black-preferred candidates were "usually" defeated. Defendants' argument,

however, fails to take into account the types of elections analyzed and the relative weight accorded

to each. In Dr. Liu's overall analysis of single-member elections, many were general elections,

exogenous elections, or elections where a minority-preferred candidate was defeated in the primary.

The third Gingles precondition "is not merely an arithmetic exercise that consists of toting up

columns of numbers, and nothing more." Uno, 72 F.3d at 989. It requires the Court to consider the

types of elections before it, and to weigh their probative values based on precedent and the specific

circumstances of the case at hand. In the elections the Court has found most relevant in this

case—primary elections and County Legislature elections—statistical analysis shows that minority-

preferred candidates were defeated by white bloc voting at a much higher rate. Similarly, in Clarke,

the forty-seven percent success rate to which the court referred was the minority-preferred success

rate in the endogenous elections in that case, city council elections. See id. at 812. The Court is

therefore unpersuaded by Clarke that minority-preferred candidates were not usually defeated in

Albany County.

Defendants further argue that "plaintiffs should show that the success rate of [the] relevant

minority's preferred candidate is less than its proportional representation" in order to show that the

minority-preferred candidate is "usually" defeated. See Defs.' Reply Br. at 35. Defendants contend

that because the County's DOJ black voting age population is 11.9%, any success of black-preferred

candidates in excess of that percentage defeats a claim that black-preferred candidates are "usually"

defeated.  For support, Defendants rely on Gingles and Barnett, 141 F.3d at 705.  However, Defendants' argument misunderstands the relevance of proportionality in a vote dilution analysis. As the Court already noted in the Summary Judgment Order, "the 'electoral power . . . equal to its fraction of the electorate' to which Barnett refers is the number of MMDs, not the relative success of minority candidates."  Summ. J. Order at 20 (citing Barnett, 141 F. 3d at 705-06).  This is consistent with the general principle of "proportionality" as it relates to a Section 2 analysis.  See, e.g., De Grandy, 512 U.S. at 1014 n.11 ("'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population.'"); see also Rodriguez, 308 F. Supp 2d at 346 (noting that minority candidates had achieved "substantial proportionality" because the percentage of districts "controlled" by their preferred candidates exceeded their VAP in the political subdivision).

Defendants also offer explanations for why white bloc voting in these elections was not racially biased.  See, e.g., Defs.' Tr. Br. at 63-64.  However, the reasons for racial bloc voting are irrelevant at this stage of the inquiry.  See Gingles, 478 U.S. at 74 ("Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent."); Goosby II, 180 F.3d at 493 ("We think the best reading of the several opinions in Gingles, however, is one that treats causation as irrelevant in the inquiry into the three Gingles preconditions.") (citations omitted).  Therefore, though the Court will consider this evidence in the totality inquiry, it will not serve to rebut Plaintiffs' evidence on the third Gingles precondition.

### ii.  Multi-Member District Elections

The Court finds that there is insufficient evidence to determine whether minority-preferred

candidates were usually defeated in multi-member elections. The expert report provided by Plaintiffs indicates the minority-preferred candidate by looking to the first choice candidate of the minority community, as is proper in homogenous precinct analysis. However, as Dr. Liu noted at trial, the chart Plaintiffs provided indicates only that *a* black candidate was defeated, not necessarily that the minority group's first choice, or preferred candidate was defeated. See Trial Tr. on 347; see also Ex. P91, Table 2. Many of these elections included more than one black candidate, yet Plaintiffs did not provide an analysis showing the levels of support each candidate received from black and white voters. See generally Exs. P82, P91, P94, P99.[34] Similarly, Defendants have provided evidence showing that black candidates have succeeded in numerous City School Board elections, but have not provided evidence showing which candidates in those elections were minority-preferred. See City of Niagara, 65 F. 3d at 1019 (stating a bright-line rule that in multi-member district elections, "a candidate cannot be 'minority-preferred' if that candidate receives support from fewer than 50% of minority voters"). Consequently, though the Court will consider these elections in the totality of the circumstances, they provide no probative value regarding the third Gingles precondition.

The Court does not find, however, that a failure to show that minority-preferred candidates were usually defeated in multi-member elections is fatal to Plaintiffs' case. With the exception of County Coroner elections, all multi-member elections discussed were City elections. City elections are exogenous elections that involve only a small subset of the County electorate. The City's black

---

[34] Though some of this analysis was included in an earlier version of Dr. Liu's report, submitted at the Preliminary Injunction Hearing, it did not indicate the percentage of support minority candidates received from different racial groups in each election. Furthermore, Plaintiffs appear to have purposely not submitted this data as evidence at trial. The Court therefore will not consider it.

and minority voting-age population is more than double the County's, and the City does not have the same tension with the minority community with respect to redistricting. Therefore, City elections are not necessarily probative of the extent to which minority-preferred candidates can succeed in County elections.

Further, in both of the County Coroner elections analyzed, special circumstances were present. In the 2003 election, the successful minority candidate was an appointed incumbent, see Ex. P91, Table 5, and in the 2011 election, the successful minority candidate ran unopposed, see Ex. D6 at 2. The Court reiterates that these special circumstances do not minimize the achievement of these individual candidates, but rather demonstrate why these specific elections are not necessarily probative of a larger pattern of minority-preferred candidate success.

Furthermore, to the extent minority-preferred candidates were elected in multi-member district elections, these elections remain less probative in this case. Plaintiffs' expert report shows that in all but one multi-member election, a black candidate was the first preference of black voters, but not of white voters. See Ex. P91, Table 2. This means that in all but one election, black and white voters did not prefer the same candidate. Therefore, to the extent black-preferred candidates were elected, it would seem that they succeeded because white voters could vote for more than one candidate. Though this success is still relevant, it is not necessarily indicative of the electoral opportunities for black-preferred candidates in the single-member district elections at issue—County Legislature elections—where voters can choose only one candidate. Therefore, though the Court finds that there is insufficient evidence from which to conclude that minority-preferred candidates were usually defeated by bloc voting in multi-member elections, this finding does not defeat Plaintiffs' claim.

### iii. Summary

The results of the elections the Court finds to be most probative—County Legislature elections and primary elections—indicate that white bloc voting in the County usually defeats minority-preferred candidates in a great majority of elections. Cf. Vill. of Port Chester, 704 F. Supp. 2d at 442 ("The evidence here is clear that in 12 of the 16 elections this Court views as most probative in this case, the candidates of choice of [minority] voters . . . were defeated by the candidates of choice of non-[minority] voters."); Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1017 (D.S.D. 2004) ("Bone Shirt I") (finding that white bloc voting usually defeated minority-preferred candidates where the minority-preferred candidate was defeated by bloc voting in fourteen of twenty-four exogenous elections). The results of additional County-wide and other exogenous elections, absent special circumstances, bolster this conclusion. Together, these elections show that to a great degree, black voters in the County are still denied an opportunity to elect candidates of their choice outside of MMDs. The Court therefore finds that Plaintiffs have met their burden in demonstrating the final Gingles precondition.

### 4. Totality of the Circumstances

Once Plaintiffs have met their burden the Gingles preconditions, they must then show "from the 'totality of the circumstances,' that members of the identified racial group 'have less opportunity than do other members of the electorate' to elect a candidate of their choice." Pope, 687 F.3d at 571 (quoting League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 425-26 (2006) ("LULAC")). Seven of the totality factors considered by courts are factors listed in the Senate Judiciary Committee's Report on the bill that amended Section 2 ("Senate Factors"). See Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45).

The totality factors are "neither exclusive nor comprehensive." Id. at 492. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Gingles, 478 U.S. at 45 (citation omitted). "[T]he question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." Gingles, 478 U.S. at 45 (citing S. Rep. No. 97-417, at 30 & n.120) (internal quotation marks omitted).

### a. History of Voting-Related Discrimination

The first Senate Factor asks the Court to consider "'the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.'" Arbor Hill II, 281 F. Supp. at 451 (quoting Gingles, 478 U.S.36-37). "[A] plaintiff may not satisfy her burden with general allegations of racial discrimination." Montano v. Suffolk Cnty. Legislature, 268 F. Supp. 2d 243, 265 (E.D.N.Y. 2003) (citation omitted).

Plaintiffs have adduced specific evidence showing that Albany County has a fairly recent history of attempting to interfere with minority voters' opportunity to participate in the political process. In both 1991 and 2003, despite significant increases in the minority population, the County created additional MMDs only after members of the minority community initiated lawsuits. Even after the last lawsuit, the County and County Board of Elections entered into a consent decree over absentee ballot violations that affected MMDs.

In 2003, the Court found relevant to this factor that: no minority candidate had ever been elected to County-wide office or nominated by a political party to run for County-wide office; a major party had only on one occasion endorsed a minority candidate to run in a majority-white

legislative district; and only one minority individual had ever been appointed to head one of the County's nineteen departments; and concluded that "[t]he history of the County thus demonstrates that except for elections in majority/minority districts, minorities have been effectively excluded from meaningful participation in County elections and governance." Arbor Hill I, 2003 WL 21524820, at *11.

Defendants argue that at present, black candidates and officials have a meaningful opportunity to participate in County governance, and therefore this factor no longer weighs in Plaintiffs' favor. See Defs.' Tr. Br. at 107. Defendants list eleven black officials who have been either elected or appointed to County positions over the past decade. See id. at 107-08. Though this progress does not wholly discount the County's recent history with respect to elections, the Court finds that this factor weighs in favor of Defendants.

### b. Racially Polarized Voting

The next Senate Factor requires the Court to consider "the extent to which voting in the elections of the State or political subdivision is racially polarized." Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45). Defendants argue that under this factor, "[t]he proper inquiry is whether race, as opposed to partisanship or some other factor, explains why white voters did not support the minority-preferred candidate." Defs.' Tr. Br. at 112.

When Congress amended Section 2 in 1982, "it clearly expressed its desire that § 2 *not* have an intent component." Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 482 (1997) (emphasis in original) (citation omitted); see also Chisom v. Roemer, 501 U.S. 380, 394 (1991) ("Under the amended statute, proof of intent is no longer required to prove a § 2 violation."). The Gingles Court was divided on the role intent should play in a Section 2 analysis, with no majority for either

position. See Gingles, 478 U.S. at 63; see also id. at 100-01 (O'Connor, J. concurring). The Second Circuit has adopted an approach wherein the reasons for racial bloc voting are relevant to the totality of the circumstances inquiry in a Section 2 redistricting case. See Goosby II, 180 F.3d at 493. However, though evidence of discriminatory intent is relevant, it is not dispositive. See, e.g., Goosby I, 956 F. Supp at 355 ("[T]he fact that divergent voting patterns may logically be explained by a factor other than race does not end the inquiry, nor does it require plaintiffs to prove racial bias in the community or that political parties in the Town serve as 'proxies' for racism."); see also Vill. of Port Chester, 704 F. Supp. at 418 ("No specific showing of discriminatory intent is required to prove a Section 2 violation."); Coleman v. Bd. of Educ. of City of Mount Vernon, 990 F. Supp. 221, 227 (S.D.N.Y. 1997) (same). Rather, it is one part of the relevant inquiry into the totality of the circumstances.

Defendants cite a number of cases to support their argument that "racial disparity in voting provisions is not enough to prove a Section 2 claim." See Defs.' Reply Br. at 49-50. However, most of the cases on which Defendants rely consider statistical racial disparities in conjunction with other factors. See, e.g., Salas v. Southwest Tex. Junior Coll. Dist., 964 F.2d 1542, 1553-56 (5th Cir. 1992) (weighing the effects of bloc voting against other factors where plaintiffs constituted a registered voter majority in the jurisdiction); Irby v. Va. State Bd. of Elections, 889 F.2d 1352, 1357-58 (5th Cir. 1989) (finding no Section 2 violation in appointment system where minority candidates never sought seats). In the cases where courts found that statistical racial disparities alone were insufficient to support a Section 2 claim, there were often no other indicia of racial bias present. See Smith v. Salt River Project Agr. Imp. & Power Dist., 109 F.3d 586, 595-96 (9th Cir. 1997) (finding that statistical racial disparity alone was insufficient to show Section 2 violation

where there was no racial bloc voting, no history of racial politics, and no other indicia of racial bias); Wesley v. Collins, 791 F.2d 1255, 1260-61 (6th Cir. 1986) (finding that "a showing of disproportionate racial impact alone does not establish a *per se* violation of the Voting Rights Act" with respect to a felon disenfranchisement statute, especially where the state had a "legitimate and compelling rationale" for the statute); Ortiz v. City of Phila. Office of the City Commrs. Voter Registration Div., 28 F.3d 306, 310-13 (3d Cir. 1994) (affirming district court's decision that disproportionate impact of voter purge statute on minority voters was insufficient to show Section 2 violation). Therefore, though these cases support the Court's approach to take into account intent as part of the totality analysis, they provide no compelling argument as to why this inquiry should be dispositive in the present case.

As discussed *supra*, the Court finds that recent elections in Albany County still exhibit racial bloc voting. By proving the Gingles preconditions, Plaintiffs have offered evidence that "give[s] rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." Uno, 72 F.3d at 983 (citing De Grandy, 512 U.S. at 1012) (citations omitted). Though this inference may be refuted, "it will endure unless and until the defendant adduces credible evidence tending to prove that detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system." Id. (citations omitted).

Defendants argue that they have provided sufficient alternative explanations for divergent voting patterns. See Defs.' Tr. Br. at 63-64. With respect to the 2011 primary in Legislative District 3, Defendants argue that any racial bloc voting was due to the white candidate's status as a three-term incumbent, and the black candidate's 2003 conviction. See id. at 64. However, the

circumstances of one election do not negate the significant bloc voting that was shown, particularly in County Legislature and primary elections. Defendants' evidence does not suffice to rebut Plaintiffs' case. The Court therefore adheres to its prior conclusion regarding the presence and prevalence of racial bloc voting in the County and finds that this factor weighs in favor of Plaintiffs.

c. Dilution-Enhancing Voting Practices and Procedures

This factor considers "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting." Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45). Though several polling places in the minority community have been moved in recent years, evidence shows that these polling locations were not moved far from their prior locations, that the prior locations experienced extremely low turnout, and that polling locations in the City were generally consolidated to offset costs of new voting systems. Trial Tr. at 1690-91. The Court does not find that these polling locations were moved in order to inhibit minority voters.

Plaintiffs also allege that the County's failure to offer Spanish language voting materials enhances vote dilution. Pls.' Tr. Br. at 21. However, the Court finds that this alone does not establish by a preponderance of the evidence that the County engaged in dilution-enhancing practices. The Court therefore finds that Plaintiffs have not met their burden on this factor.

d. Access to Slating Process

This factor considers "the exclusion of members of the minority group from candidate slating processes." Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45). "The term 'slating' is generally used to refer to a process in which some influential non-governmental

organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." Reed, 914 F. Supp. at 887 (quoting Westwego Citizens for Better Gov't, 946 F.2d at 1116 n.5).

In Albany County, the only effective slating process is controlled by the County Democratic Party. The Party's endorsement conveys numerous benefits on candidates, including money, support, and most often victory. Testimony and evidence indicates that black candidates have been denied Party endorsements for reasons that seem to be mere pretense, and even when black candidates are endorsed, there has not always been a concerted effort to support their candidacies.

However, over the past decade, the County Democratic Party has endorsed at least nine minority candidates for City and County-wide offices. See Trial Tr. at 1674-79. Significantly, in September 2014, McLaughlin was elected Chairperson of the County Democratic Party, traditionally the most powerful position in the endorsement process. McLaughlin has been a leader in the black community in the County, and her leadership of the Party suggests that minority candidates may have increased opportunities in the Party's slating process in the future. The Court therefore finds that taking into account all relevant circumstances, minority candidates are not excluded from the Party's endorsement process.

### e. Effects of Past Discrimination

The next Senate Factor looks at "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45).

Cooper testified that African Americans in Albany County continue to lag significantly

behind non-Hispanic whites on all socioeconomic measures, and numerous witnesses testified to the continued effects of discrimination in areas such as housing and healthcare. McLaughlin testified that she does not believe there are sufficient opportunities for minority individuals to participate in the political process, see Trial Tr. at 1101-10, and that this has led to depressed minority voter turnout, see id. at 1093. Pope similarly testified that minority voters typically experience low turnout in elections. Id. at 498-99. Indeed, Defendants do not contradict that black voters in the County experience low voter turnout.

Defendants argue that because Cooper's data was based on the American Community Survey ("ACS"), the Court should not consider it because the ACS is not appropriate for use in redistricting. See Defs.' Tr. Br. at 114. However, when the Court noted in the Summary Judgment Order that the ACS was less reliable than census data for redistricting, the Court was referring to population numbers for the purpose of drawing redistricting maps. The Court finds that ACS data is reliable for the purpose of considering the relative socioeconomic positions of different populations in the County.

Defendants also argue that Plaintiffs must prove that lower socioeconomic status directly causes depressed political participation. Id. at 115-16. However, "[a]ccording to the Senate Report, voting rights plaintiffs need not establish such a nexus where both disparate socioeconomic conditions and depressed political participation are shown to exist." City of Niagara Falls, 65 F.3d at 1021 (citation omitted); see also S. Rep. 97-417 at 206 n.14 ("The courts have recognized that disproportionate educational employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any

further causal nexus [between the two]").  Indeed, the Court acknowledges that much of this voter apathy emanates from a perception that minority voters are not a meaningful part of the political process.  Therefore, the Court finds that this factor weighs in favor of Plaintiffs.

### f.  Racial Appeals in Campaigns

The next factor requires the Court to consider "the use of overt or subtle racial appeals in political campaigns."  Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45).  Though Plaintiffs presented some evidence of individual racial epithets being used by certain individuals during recent campaigns, they presented no specific evidence showing that campaigns themselves had made overt or subtle racial appeals.  These individual incidents, though abhorrent, do not reflect or represent the political campaigns, and alone are insufficient to meet Plaintiffs' burden on this factor.

### g. Past Election of Minority Group Members

The final Senate Factor requires the Court to consider "the extent to which members of the minority group have been elected to public office in the jurisdiction."  Goosby II, 180 F.3d at 491 (quoting Gingles, 478 U.S. at 44-45).  Along with the extent of racial bloc voting, this is the most important factor in the totality analysis.  See Gingles, 478 U.S. at 48 n.15 (citing S. Rep. No. 97-417, at 28-29); see also City of Niagara Falls, 65 F.3d at 1022.  "[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [minority] vote," in violation of Section 2.  Sanchez v. State of Colo., 97 F.3d 1303, 1324 (10th Cir. 1996) (quoting S. Rep. No. 97-417, at 206 n.15); see also Pope, 687 F.3d at 582 (quoting Gingles, 478 U.S. at 57).

The electoral prospects for minority candidates in Albany County have certainly improved since the 2003 Litigation, when "no minority ha[d] ever been elected to County-wide office and no

minority ha[d] ever been elected to office from a County district except in the majority/minority districts."  Arbor Hill I, 2003 WL 21524820, at *13.  There are now more minority individuals in County government, and numerous black officials have been elected in the City.  In fact, black leadership in the City and County has been vibrant and more impactful in recent years, which augurs well for the County's future.

However, though there has been meaningful progress, the journey to real electoral opportunity for minority voters in Albany County is not yet over.  There has still been only one black legislator elected to the County Legislature outside of an MMD, and he was first appointed following the 2003 Litigation.  Cf. Goosby I, 956 F. Supp. at 355 ("The significance of the Fisher election is blunted, if not erased, by the special circumstance of incumbency (he had been appointed to the position prior to the 1993 election), as that status has proved to be a guarantee of success in Town Board elections.").  Similarly, even though four minority officials have been elected County-wide, two of these officials were first elected in unopposed elections, and one was an incumbent who was appointed prior to his first election.  The only candidate to have uniquely sustained success County-wide is District Attorney David Soares, who was first elected in a contested primary election in 2004.  Though the Court will not discount Soares' historic success, especially since he has been elected twice since then, the Court also will not interpret one candidate's sustained success as evidence that minority candidates are now generally able to win County-wide elections.

Defendants argue that elections where minority candidates ran as incumbents or unopposed should weigh in their favor, because incumbents had to succeed in gaining white support to get elected, and candidates running unopposed indicates that white voters did not believe there was a

better candidate. See Defs.' Tr. Br. at 123-24. However, the evidence shows that several minority candidates who were elected County-wide were appointed before they were elected, and therefore gained the benefits of incumbency without first having to win white voter support. Further, candidates running unopposed does not necessarily signal that there was no better candidate. Indeed, Gingles specifies candidates running unopposed in its definition of "special circumstances." See Gingles, 478 U.S. at 51. The Court therefore finds these arguments unpersuasive.

Defendants also note that over the past decade, several minority officials have been appointed to head County departments. Though the Court recognizes the County's increased appointments of minority officials to departmental positions in the County since the 2003 Litigation, the pole star of the Voting Rights Act is ensuring that minority voters have an opportunity to participate equally in the electoral process. County-wide, the electoral opportunity for minority candidates, absent special circumstances, seems to have changed only marginally.

Furthermore, though minority candidates have been successful City-wide, these elections took place in a small subset of the County where black voters make up a relatively higher proportion of voters than they do in the County as a whole. Cf. Goosby II, 180 F. 3d at 497 (noting that this factor weighed in favor of plaintiffs where "the segments of the Town from which these [successful] black-preferred officeholders were elected have a predominantly black population"). The record also indicates that the City has a different dynamic between white and minority voters, as evidenced by the City's far more open and transparent redistricting process. Therefore, these elections do not alter the Court's conclusion regarding minority electoral success in the relevant political subdivision—the County.

Defendants also ask the Court to consider white candidate incumbency as a "special

70

circumstance" that blunts the probative value of many elections where white candidates prevailed over black-preferred candidates. See Defs.' Tr. Br. at 63. Defendants specifically note that in all of the County Legislature elections that Plaintiffs analyzed, where black-preferred candidates lost, they were defeated by a white incumbent. See id. However, the very nature of increasing minority electoral opportunity often requires that minority-preferred candidates run against entrenched, often white candidates. Therefore, to say that minority-preferred candidates have sufficient electoral opportunity because they only lose to white incumbents is contrary to the purpose of Section 2. Furthermore, in the specific County Legislature elections at issue, minority-preferred candidates were defeated by a white incumbent *in an MMD*. Rather than detracting from the Court's conclusions about minority candidate success, the fact that white bloc voting served to hinder minority-preferred candidates in an MMD actually strengthens those conclusions.

Defendants further argue that disparities in electoral success between white and minority candidates may be due to other "special circumstances" such as campaign expenditures. See Defs.' Reply Br. at 33-34. However, as the Supreme Court noted in Gingles, often the same vestiges of past discrimination that inhibit minority electoral opportunity also result in fewer opportunities in education and employment, leaving the minority community "[un]able to provide the candidates of their choice with the same level of financial support that whites can provide theirs." Gingles, 478 U.S. at 70. The evidence in this case indicates that this is the situation in Albany County, with African Americans lagging behind whites on all socioeconomic measures. Therefore, "[i]t would be both anomalous and inconsistent with congressional intent to hold that, on the one hand, the effects of past discrimination which hinder blacks' ability to participate in the political process tend to prove a § 2 violation, while holding on the other hand that, where these same effects of past

discrimination deter whites from voting for blacks, blacks cannot make out a crucial element of a vote dilution claim." Id.

Contrary to Defendants' assertion that County elections over the past decade show "'a general willingness of white voters to vote for black candidates,'" Defs.' Tr. Br. at 122 (quoting Abrams v. Johnson, 521 U.S. 74, 93 (1997)), a thorough inquiry into the facts and circumstances of County-wide and County Legislature elections over the past decade shows that with rare exceptions, there is not yet an equal, fair opportunity for minority-preferred candidates to be elected on a County level absent special circumstances. The Court therefore finds that this factor weighs in favor of Plaintiffs.

### h. Responsiveness to Minority Needs

This factor looks at "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group." Goosby II, 108 F.3d at 491-92 (quoting Gingles, 478 U.S. at 45). The evidence presented at trial shows that in general, the County has been responsive to minority concerns, including by providing health services, creating the Land Bank, reaching out to the community through the Department for Children, Youth, and Families, establishing a community college in the City, and responding to the community's concerns regarding oil trains. The Court also recognizes that minority Legislators and County officials were and remain heavily involved in many of these initiatives, see, e.g., Trial Tr. at 191-94, 566-67, 682, 698, underscoring the need for minority representation in the County. However, overall, Plaintiffs have not shown that the County has been generally unresponsive to minority needs over the past decade, and the Court therefore finds for Defendants on this factor.

i. Tenuousness Underlying Redistricting Policy

This factor allows the Court to consider whether "the policy underlying the . . . [County's] use of the contested practice or structure is tenuous." Goosby II, 108 F.3d at 491-92 (quoting Gingles, 478 U.S. at 45). Despite the Commission's stated intention to run a transparent process, the County redistricting process in 2011 was at best, opaque.

Testimony presented at trial, as well as other evidence, shows that the County's redistricting process was generally conducted by only a few individuals, and that neither the commissioners nor the public were accurately informed of the procedures that were used. Testimony also indicates that the public and commissioners were led to believe that creating five MMDs simply was not possible, even using a broad definition of minority voters, which evidence shows was untrue.

Defendants argue that the County followed traditional redistricting principles and the Court should therefore defer to its plan, as redistricting is a legislative task. Defs.' Tr. Br. at 32 (citing Wise v. Lipscomb, 437 U.S. 535, 539 (1978)). However, though redistricting is traditionally within the purview of the legislature, the Court need not, and in fact should not, defer to a legislative redistricting plan that violates the Voting Rights Act. The cases on which Defendants rely discuss deferring to a legislature's remedial plan *after* a Constitutional or Voting Rights Act violation has been found, and none suggest deferring to an otherwise unlawful redistricting plan. See Perry v. Perez, 132 S. Ct. 934, 943 (2012) (finding error where court failed to defer to lawful portions of state's plan in drawing an interim redistricting map to be used while VRA litigation was pending); Chapman v. Meier, 420 U.S. 1, 3 (1975) ("[The] State like many others, has struggled to satisfy constitutional requirements for legislative apportionment. . . . This litigation is the culmination of that struggle, totally ineffectual on the legislative side."); see also Wise, 437 U.S. at 540 (stating

that where a court declares a reapportionment scheme unconstitutional, the court should afford the challenged jurisdiction the first opportunity to create a remedial reapportionment scheme); Baines v. Masiello, 288 F. Supp. 2d 376, 392 (W.D.N.Y. 2003) (noting that a court should not defer to a legislature's decision where "the evidence suggests that the legislature has chosen its size solely in order to diffuse [minority] voting strength") (citations omitted).

Defendants also argue that the Commission's decisions regarding the percentage of minority voters required in an MMD, as well as the definition of minority, were made in good faith reliance on the 2003 plaintiffs' objections to the County's remedial plan. See Defs.' Tr. Br. at 32. However, the record contradicts this assertion. First, though the record shows that the Commission was indeed trying to avoid litigation, it is not clear that the maps were drawn with the interests of the minority community in mind. Though Defendants claim that the Commission attempted to take the minority community's concerns into account by heeding the 2003 plaintiffs' objections, the Commission plainly ignored current concerns of members of the minority community, many of whom were plaintiffs in the prior lawsuit. Numerous members of the minority community, including McKnight and Pope, expressed opinions about *this* redistricting process, and did not object to the inclusion of Hispanics in the calculation of the minority population in MMDs. Additionally, Mair presented a plan to the Commission that created five MMDs, and that had the support of members of the minority community, and the Commission did not even consider it. While the Court recognizes that time was an issue in redistricting, the evidence shows that draft maps were created several weeks before the April 23 meeting where the public was told they would not see maps due to time constraints.

Furthermore, while the Court recognizes that the Commission took into account legitimate

factors such as incumbency protection in creating the maps for Local Law C, these considerations

do not obviate the need to also consider possible dilution of minority voting strength, especially

when members of the minority community vocally raised the issue.  In this case, incumbency

protection trumped other considerations in the redistricting process.  Though incumbency protection

is certainly a legitimate and understandable consideration in redistricting, "[s]ince it is frequently

impossible to preserve white incumbencies amid a high black-percentage population without

gerrymandering to limit black representation, it seems to follow that many devices employed to

preserve incumbencies are necessarily racially discriminatory."  Ketchum v. Byrne, 740 F.2d 1398,

1408 (7th Cir. 1984); see also Black Political Task Force, 300 F. Supp at 314 (noting that the

redistricting commission had "sacrificed racial fairness to the voters on the altar of incumbency

protection" and that this "sacrifice lends considerable luster to the plaintiffs' case").

Defendants further argue that Plaintiffs are requesting "maximization" of MMDs, which is

unlawful.  Defs.' Tr. Br. at 78.  They cite in support of this proposition Johnson v. De Grandy, 512

U.S. at 1016-17.  However, in De Grandy, the Supreme Court stated that failure to maximize

MMDs does not constitute vote dilution, and that district courts should not require municipalities to

maximize MMDs.  See id.  It did not say that maximization, if chosen by a municipality, is

unconstitutional, or in any way unlawful.[35]  Furthermore, the Court does not require maximization

of MMDs in Albany County, but rather finds that the facts in this case demonstrate that the VRA

---

[35] To support their arguments about "maximization" of MMDs, Defendants also attack
Mair's credibility, and insinuate that he purposely supplied Dr. Liu with incorrect data.  See Defs.'
Tr. Br. at 80-81.  None of this is supported by the record.  Mair's AHEJ plan complied with
traditional redistricting principles, and when he realized that he had provided Dr. Liu with incorrect
data, he corrected the mistake.  See Ex P99, Ex. B.  The Court therefore finds Defendants'
accusations against Mair unfounded.

requires five MMDs.

The Court finds that the policy underlying Local Law C, including the process by which the maps were created, weighs in favor of a finding of vote dilution.

### j. Effective MMDs

Throughout this case, Defendants have argued that "effective" MMDs in Albany County must have a minimum minority population of fifty-five percent. See, e.g., Defs.' Tr. Br. at 48; Defs.' Reply Br. at 53-55. However, no such bright-line rule exists. Though MMDs should certainly be drawn so as to provide "real electoral opportunity" for minority voters, see Pope, 687 F.3d at 575 n.8 (citing LULAC, 548 U.S. at 428), the exact percentage of minority voters required to achieve that opportunity may vary.

Defendants argue that minority voters in Albany County suffer from low voter turnout, necessitating at least a fifty-five percent minority population for MMDs to be effective. See Defs.' Reply Br. at 53-55. However, what this argument "fails to consider is that there may very well be a correlation between the subject matter of this lawsuit—the various circumstances and conditions that contribute to the inability of the [black] community to elect candidates of its choice—and the lower turnout." Vill. of Port Chester, 704 F. Supp. 2d at 426. As the Court has already acknowledged, low voter turnout is often a result of minority communities having been long-excluded from the political process. Moreover, as witnesses testified and as recent elections in the County confirm, black voters often turn out in larger numbers when their preferred candidates have an opportunity to run. See Trial Tr. at 132, 1093.

Furthermore, the evidence in this case indicates that MMDs need not always contain a super-majority of black voters in order to be effective. The MMDs in the County's 2003 remedial

plan contained DOJ black populations ranging from forty-nine to fifty-four percent. Similarly, Local Law 2, which was used in the 2007 elections, had four MMDs with DOJ black populations ranging from fifty-one to fifty-five percent. See Ex. P145. Black voters generally have been able to elect their candidates of choice in these MMDs. The one MMD where black-preferred candidates have been consistently defeated did not contain the lowest percentage of black voters as compared to the other MMDs, suggesting that the exact percentage of black voters in an MMD, though important, is not the only factor that makes a district "effective."

The Court recognizes that the total minority populations in the prior plans' MMDs were higher than the DOJ black populations, due to the inclusion of Hispanic voters in the calculation of the minority population. This would seem to support Dr. Liu's contention that relative voting power can influence the "effectiveness" of an MMD—that is, that black voters in an MMD have an increased opportunity to elect candidates of their choice when the rest of the district's population is composed of white and Hispanic voters, rather than only white voters. See Trial Tr. at 292-95. Furthermore, both Mair and Cooper testified that five MMDs could be created in the County with DOJ black voting age populations of at least fifty-four percent, using the 2010 census data. Therefore, though MMDs should be drawn to provide "real electoral opportunity" to minority voters, the Court finds that there is no minimum majority percentage required to provide this opportunity. Though the percentage of minority voters in an MMD is certainly important, the effectiveness of an MMD depends on the intersection of a number of factors.

k. Proportionality

Defendants argue that minorities in Albany County have proportional representation in the Legislature, which defeats Plaintiffs' Section 2 claim. See Defs.' Tr. Br. at 77-78.

Defendants attempt to cabin a proportionality analysis to the County Legislature districts in the City of Albany, since that is where the minority population is located. See Defs.' Tr. Br. at 77-78. They argue that four of the City's thirteen districts, or 30.7%, are MMDs, which is higher than the City's minority population. However, as the case at hand deals with the County as the relevant political subdivision, it is the County Legislature's seats that are relevant. The thirteen County Legislative Districts in the City have no power independent of the thirty-nine seat County Legislature. Breaking them out to measure proportionality is misleading at best. The proper subdivision to use for a proportionality analysis in this case is the County. See LULAC, 548 U.S. at 437-38 (rejecting state legislature's attempt to limit proportionality analysis to areas of the state where majority-minority districts could be drawn, and holding that where "[a]ppellants have alleged statewide vote dilution based on a statewide plan, . . . it ma[de] sense to use the entire State in assessing proportionality").

The County Legislature has thirty-nine seats, four of which are MMDs. Therefore, 10.25% of the County's legislative districts are MMDs, while the County has a DOJ black population that is 11.2% of the County's VAP and 13% of the County's total population. Even if this approaches proportional representation, proportionality "does not . . . act as a 'safe harbor' . . . in complying with § 2." LULAC, 548 U.S. at 436 (citation omitted); see also De Grandy, 512 U.S. at 1020 ("[T]he degree of probative value assigned to proportionality may vary with other facts."). Evidence in this case indicates that in one of these MMDs, black voters have been consistently denied an opportunity to elect candidates of their choice by white bloc voting. Therefore, though the degree of disproportionality here is not so high as to show a dilution in minority voting strength, neither is there proportionality that, when considered with the facts as a whole, is sufficient to defeat

Plaintiffs' claim.

    5. *Conclusion*

"The Supreme Court instructs that a Voting Rights Act violation occurs when 'a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" Goosby II, 180 F. 3d at 496 (citing Gingles, 478 U.S. at 47). After an exhaustive inquiry into the facts and circumstances of this case, the Court finds that Plaintiffs have satisfied the three Gingles preconditions, and that the totality of the circumstances—in particular the persistent presence of racial bloc voting, the continued low levels of minority-preferred candidate success, the lingering effects of past discrimination that continue to inhibit minority participation in the electoral process, and the questionable manner in which the County conducted its redistricting process—demonstrate that Local Law C dilutes the voting strength of black voters in the County.

## V.    REMEDY

### A.  Remedial Plan

Plaintiffs have proved that Local Law C violates Section 2 of the VRA as to black voters in Albany County and are therefore entitled to relief. Consequently, a remedial redistricting plan should be created to restore the rights of black voters in the County. "Where a court has struck down a voting system, it must give the appropriate elected body an opportunity to propose a remedial plan." Goosby v. Town Bd. of Town of Hempstead, N.Y., 981 F. Supp. 751, 755 (E.D.N.Y. 1997) aff'd, 180 F.3d 476 (2d Cir. 1999) (citing Wise, 437 U.S. at 540). However, "if the jurisdiction fails to remedy completely the violation or if a proposed remedial plan itself constitutes a § 2 violation, the court must itself take measures to remedy the violation." Harper v.

<u>City of Chicago Heights</u>, 223 F.3d 593, 599-600 (7th Cir. 2000) (citation omitted); <u>see also</u> <u>Wise</u>, 437 U.S. at 540.

Consistent with these principles, the Court will afford the County the first opportunity to create a remedial plan. In fashioning a remedial plan, Defendants must act with all deliberate speed. Mindful that 2015 is an election year, the Court orders Defendants to submit a remedial plan to the Court within three weeks of the date of this Memorandum-Decision and Order. The Court reminds Defendants that the Court's finding of vote dilution was premised on the DOJ black population in Albany County, and it is therefore improper for the County to use the more restrictive single-race black definition in creating MMDs in a new plan. Furthermore, though the MMDs in the remedial plan must be majority black, and must provide black voters with a real opportunity to elect candidates of their choice, the Court urges Defendants not to ignore cross-racial voter coalitions in creating effective MMDs.

### B. Attorney's Fees

"In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310. The Court therefore awards attorney's fees to Plaintiffs. The amount of fees and costs to be awarded to Plaintiffs will be determined on a separate motion to be filed with the Court.

## VI.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Judgment be entered for Plaintiffs on the issue of vote dilution in violation

of Section 2 of the Voting Rights Act; and it is further

**ORDERED**, that Defendants are enjoined from holding any further elections under the plan enacted in Local Law C; and it is further

**ORDERED**, that Defendants submit a remedial plan to the Court within three weeks of the date of this Memorandum-Decision and Order. Plaintiffs may submit a response within two weeks thereafter. Defendants will be given one week after Plaintiffs' response to file a reply; and it is further

**ORDERED**, that Plaintiffs' second Motion (Dkt. No. 372) for a preliminary injunction is **DENIED as moot**; and it is further

**ORDERED**, that Plaintiffs' Motion (Dkt. No. 404) for judgment as a matter of law is **DENIED as moot**; and it is further

**ORDERED**, that Plaintiffs' Letter Motion (Dkt. No. 418) is **DENIED as moot**; and it is further

**ORDERED**, that Defendants shall pay Plaintiffs' attorney's fees and costs in an amount to be determined by the Court at a later date. Plaintiffs are ordered to file a motion concerning the amount of attorney's fees and costs for which they seek reimbursement; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED.**

DATED:  March 24, 2015
        Albany, NY

Lawrence E. Kahn
U.S. District Judge